UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

REGINALD LEAMON ROBINSON, PRO SE

Plaintiff,

-- against ---                                     No. 1:18-cv-00518-TNM

**JURY IS DEMANDED**

HOWARD UNIVERSITY, INC., ET AL.;

Defendants.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

### FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND JURY DEMAND

**COMES NOW** Plaintiff Reginald Leamon Robinson (hereinafter "Plaintiff"), by and through himself, in the above-caption action states to this Honorable Court, files this Amended Complaint pursuant to Fed. R. Civ. Pro. Rules 15(a), 4(d), and 12(a)(1)(A), and ~~in support thereof~~ alleges as follows:

### I. PRELIMINARY STATEMENT

**"There is a widespread crisis surrounding sexual harassment, dating and domestic violence, gender-based discrimination and, most alarming, sexual assault. Unfortunately, Howard University is not immune."**

**Candi N. Smiley, Title IX Coordinator, Howard University, https://www2.howard.edu/title-ix/coordinator-statement (last visited: Dec. 29, 2017)**

1.     This case arises out of Defendant Howard University, Inc.'s, ("Howard" or "University"), a recipient of federal funding, knowingly fraudulent and deliberately deceptive conversion of two female students' false, spurious, and frivolous complaints against Professor Reginald Leamon Robinson ("Plaintiff").  During the investigation of

**RECEIVED**

JUN 2 8 2018

Clerk, U.S. District and
Bankruptcy Courts

these complaints, Howard violated the rules, regulations, and procedures of its Title IX Policy ("Policy"). These violations led to erroneous outcomes, and followed from the deliberate indifference of Howard's leadership after Plaintiff put them on actual and inquiry notice that Plaintiff was suffering sex discrimination, which they had the institutional authority to correct.

2.    Howard issued an unsupported Notice of Findings ("Notice") of sexual harassment against Plaintiff. But the Report of Investigation ("Report"), on which the Notice substantively depended and from which the Notice legally gains its institutional force, was completely devoid of the required findings of material facts and conclusions. Howard had the burdens of production and persuasion under the preponderance of the evidence standard, which it failed to meet. Nevertheless, Howard sanctioned and disciplined Plaintiff, and placed the Notice of Findings and Sanctions/Disciplinary Action in his personnel file permanently.

3.    After Howard issued the Notice, Plaintiff made institutional attempts to correct the erroneous outcome and sex discrimination. He appealed to the Provost. He sent the record to a disinterested nonprofit, nonpartisan third-party organization, hoping to end the sex discrimination, and he told the Provost that he had sought such disinterested help. Plaintiff also sent the appeal memo to the President and Board of Trustees of Howard. In retaliation for seeking help from a disinterested organization, the Provost summarily rejected his appeal, which has frustrated Plaintiff's effort to overturn the erroneous outcome and sex discrimination because under the Policy, Plaintiff cannot appeal the Provost's Findings to any other University's official. Howard's leadership failed to respond to the actual notice it received from Plaintiff, even though it had the

institutional authority to take corrective action. Plaintiff also filed a timely grievance with the Faculty Grievance Commission ("FGC"), and he sent such grievance to the entire Howard leadership. The FGC found that Howard's Notice was arbitrary and capricious and warranted a detailed investigation. That preliminary finding required mandatory mediation, which was not covered by confidentiality and privilege, and at which Howard acknowledged that Plaintiff had not violated its Policy.

4.     Plaintiff's nearly 25-year relationship with Howard was governed by and understood through an employment contract, the *1993 Faculty Handbook*, and its implied duty of good faith and fair dealings. Howard has a duty to Plaintiff to abide its rules and regulations and the implied duty of good faith and fair dealing. Howard thus cannot make personnel decisions, whether positive or negative, without complying with the *1993 Faculty Handbook*, even if the Policy constitutes a stand-alone set of rules and regulations. Howard breached its duty to Plaintiff under the *1993 Faculty Handbook* when it failed to comply with the Policy and OCR guidance, and in issuing the Notice, Howard breached Plaintiff's reasonable contractual expectations to be free of arbitrary and capricious personnel decision, his contractual entitlement of academic freedom, and his right to free expression. After these breaches, Howard labeled Plaintiff a sexual harasser, and without legal sufficiency, Howard notified the two complaining students that he was a sexual harasser and that he had been disciplined and sanctioned.

5.     On September 17, 2015, during a quiz, no sexual harassment took place. On December 4, 2015, Complainants 1 and 2 filed complaints against Plaintiff. In those complaints, Complainants 1 and 2 never alleged sexual harassment. More than 504 days later, Howard made no material findings on the legal factual predicates of the threshold

3

analyses of sexual harassment.  Those predicates are whether Plaintiff made unwelcomed sexual advances, requested sexual favors, and engaged in verbal or physical conduct of a sexual nature.  In this absence of legal sufficiency in the complaints, and with no material findings on these predicates, Howard sustained the fraudulently transmuted allegations and found that Plaintiff had committed sexual misconduct, needed sexual harassment sensitivity training, no longer had the contractual entitlement of academic freedom, and could be fired from Howard if he violated the Policy again.

6.     Howard's unsupported Notice was informed by erroneous outcome. Howard relied on an unknown, unpublished evaluation standard, i.e., the subjective experience of the female to determine conclusively if Plaintiff violated the Policy.  Candi N. Smiley ("Smiley"), the investigator, was not fair, objective, neutral, and impartial, and believed the students' highly subjective allegations as holy writ.    Smiley rejected Plaintiff's exculpatory and/or explanatory statements, which were based on his years of teaching Agency Law.  The Report adopted the claims and reliefs sought by the two students, which were driven by their deep hostility to Plaintiff's right to free speech, his professional personality, and his academic freedom to test them through various hypotheticals.  Moreover, the Report was grounded on speculative beliefs and hearsay statements, none of which was supported by legal sufficiency and documented records/evidence.  Within the Report, Smiley's (and thus Howard's) Rationale relied on inadmissible character evidence or character traits to assert that based on Plaintiff's purported past action, he more than likely drafted a depilatory hypo to test § 261 of a sexual nature.  The Rationale's reliance of inadmissible character evidence or character traits is a prop that hopes to stand in for sufficiently reliable and probative findings of

4

material facts.  Such evidence simply confessed the Rationale lack of legal sufficiency.
In the absence of legal sufficiency, the Report flowed inexorably from Smiley's (and
Love's) believe the victim stance, or her anti-male bias.

7.      Howard engaged in negligent and intentional infliction of emotional
distress.  Based on the ongoing training of personnel in the Title IX Office, Howard knew
or had reason to know that two students had not made allegations of sexual harassment
against Plaintiff.   Howard then converted their allegations, bringing them under the
Policy's jurisdiction.  In spring 2017, Howard suffered student protests, twitter storms,
negative press coverage, and angry community outburst, accusing Howard of not
punishing accused male employees and students.   The unrest was triggered by 5
unresolved or slow to resolve complaints of sexual assault filed by five female students
against Howard's male employees and students.  After such protests, and as set forth in
*Jane Doe 5 v. Howard*, Howard was under pressure for not punishing male employees
and students who were accused of sexual misconduct.  Howard feared that such infamy
would trigger an OCR investigation.  In the immediate days prior to the filing of *Jane
Doe 5 v. Howard* on May 10, 2017, Howard issued its unsupported Notice against
Plaintiff on May 4, 2017 on a timing that served a deep institutional conflict of interest,
even though Howard had no legal sufficiency to find that Plaintiff had engaged in sexual
misconduct.

8.      Such Notice and the Disciplinary Action, which were permanently placed
in Plaintiff's personnel file and other related employment files, altered the terms and
condition of his employment and violated his reasonable expectations of contractual
entitlement of academic freedom because Howard can punish and discipline him,

5

including terminating his employment, if his pedagogical approach, his professional personality, or his published articles from which he might choose to teach might contain what a University administrator considers "sexually offensive and/or indecent language," which arbitrarily and capriciously now falls under the Policy against sexual harassment.

9.     Today, Howard knows or has reason to know that males who are accused of sexual misconduct like sexual harassment become social and institutional pariah. Upon information and belief, Howard may be counting on accused males, even if wrongly found to have violated the Policy due to erroneous outcomes, keeping silent, lest they risk more than institutional sanctions.  In academia, Plaintiff has become a pariah, and he will suffer what will amount to professional solitary confinement. Due to rapidly shifting sexual norms and values, Howard's arbitrary and capricious labeling of Plaintiff as a sexual harasser was extreme and outrageous, especially because Howard had no factual or legal basis to assert Title IX jurisdiction over the specious allegations of Complainants 1 and 2, and because Howard knew or in the exercise of due care should have known that Smiley's Rationale lack the very legal sufficiency on which the Notice's legal and moral standing would rest.  What makes Defendants' arbitrary and capricious conduct so extreme and outrageous is that they knew or had reason to know that Plaintiff had not violated the Policy when on May 4, 2017 Wutoh stated that Plaintiff had not been chasing a student around his office, and when on July 12, 2017, during a mandatory mediation meeting, which was not governed by confidentiality and privilege, Wutoh also acknowledged in the presence of Plaintiff's then-legal counsel that Plaintiff had not violated Howard's Policy.  As a result, Plaintiff, even though he is an elected member of the American Law Institute, will suffer the loss of new academic and administrative

opportunities, including but not limited to lateral positions, visiting positions, distinguished visitorships, and decanal appointments, for which he has interviewed and been considered.

10.      As a direct and proximate cause of Howard's knowingly negligent and intentional conduct, which under the circumstances was extreme and outrageous, Plaintiff suffered emotionally, physically, and psychologically, resulting in for example panic attacks, anxiety, sleeplessness, suicidal ideations, etc., and Howard had every conceivable reason to know or to believe that if Plaintiff were found to have violated the Policy, especially falsely, he would suffer emotionally, physically, and psychologically. Despite the reasonableness of such knowing and belief, Howard, even at the filing of this amended complaint, still hold to the assertion, despite what their own Report reveals, that Plaintiff's non-Title IX conduct on September 17, 2015 fell within the jurisdiction of the Title IX Office.

## II. PARTIES

11~~45~~. Plaintiff Reginald Leamon Robinson ("Plaintiff") is a natural person who resides in Silver Spring, Maryland. Plaintiff has been a full-time faculty at Howard University since 1994 and tenured faculty since 1996. Plaintiff is not an at-will employee. His employment contract with Howard University has been governed by and understood through the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

12~~46~~. Defendant Howard University, Inc.,[1] ("Howard" or "University") is a

---

[1]      Per Rule 15C of the Federal Rules of Civil Procedure, Plaintiff has amended the complaint to substitute "Trustees of Howard University, Inc.," for "Howard University, Inc.", because under the relations back doctrine, Defendant Howard University, Inc., knew or had reason to know, and had constructive notice, that Plaintiff was suing and had intended to sue it for the matters set forth in the

private, enterprise, coeducational research university incorporated by an act of the United States Congress in 1867. Howard, a culpable person, operates its university at 2400 Sixth Street, N.W., Washington, D.C. 20059. ~~During all relevant times, Plaintiff was a full-time tenured Professor of Law at the Howard University.~~ At all times relevant hereto, Howard University was and is a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a).

13~~7~~. Defendant Anthony K. Wutoh ("Wutoh"), appointed on June 15, 2015, was the Provost, Chief Academic Officer, and Title IX Decisional Authority at Howard University at all relevant times. Defendant Anthony K. Wutoh during all relevant times was the second highest-ranking agent and a culpable person at Howard University.

14~~8~~. Defendant Candi Smiley, Esq., ("Smiley") worked in the Office of the Provost and was listed as the then Deputy Title IX Coordinator, and a culpable person, at all relevant times and personally and/or with the ~~aide~~ assistance of other employees in the Office of the Provost's Title IX Office oversaw Howard's Title IX compliance, and investigated and responded to the allegations of sexual harassment against respondents.

15~~9~~. Defendant Vanessa Love ("Love") worked in the Office of the Provost, and on December 17, 2015 was listed as the Title IX Coordinator, and a culpable person, at all relevant times. "The Title IX Coordinator is tasked with overseeing the investigative process. It is the responsibility of the Title IX Coordinator to ensure that the Deputy Title IX Coordinator investigates the factual allegations of the complaint under the procedures of the Policy."[2]

---

original complaint that he filed on February 24, 2018. Accordingly, Howard has suffered no prejudice with this amendatory change.

[2]    See MEMORANDUM TO MR. REGINALD ROBINSON, PROFESSOR, SCHOOL OF LAW, NOTICE OF COMPLAINT MADE PURSUANT TO THE HOWARD UNIVERSITY TITLE IX (STUDENT) POLICY ON PROHIBITED SEXUAL HARASSMENT AND GENDER-BASED DISCRIMINATION IN EDUCATION PROGRAMS AND ACTIVITIES,

16~~50.   Howard University is the premier historically black college and university in the nation.~~

175~~1~~. At all times material hereto, Howard acted by and through its agents, servants, employees, and representatives who were acting in the ordinary ~~course and~~ scope of their respective agency or employment and/or in the promotion of Howard's business, mission, and/or affairs.   Where such agents, servants, employees, and representatives breached their authority or scope of their employment while attempting to promote Howard's business, mission, and/or affairs, Howard's leadership has either ratified or acquiesced in such breaches once they were placed at the very least on inquiry notice, and/or once they could have known fully of the extent of such breaches if it had undertaken ~~the~~ either the slightest or reasonable due diligence, and/or once they believed such conduct was done to serve the best, legal interest of the University.

### III.    JURISDICTION

185~~2~~. Diversity and supplemental jurisdiction of this Court against all defendants is invoked pursuant to 28 U.S.C. §§ 1331, 1332 (diversity), 1367, to 42 U.S.C. § 1988, and to 18 U.S.C. § 1964 because:  (a) ~~[a]~~ Plaintiff ~~Reginald Leamon Robinson~~ and Howard are citizens of different states and/or federal district and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (b) ~~[b] this complaint alleges violations of the Racketeering Influenced Corruption Organizations Act ("RICO"), 18 U.S.C. § 1982; [c]~~ the state law claims arise out of the same nucleus of facts as to be ~~are no~~ closely related to the federal claims and as to form the same case or controversy under Article III of the U.S. Constitution; and (c) ~~[d]~~ Plaintiff suffered

dated Dec. 17, 2015, at 2, attached hereto as Ex. ~~12~~ 10a & 10b [hereinafter after cited as "~~Notice of~~ Complaint" or "Policy"].

additional harm while seeking to remedy the sex-based discrimination against him.

19~~53~~. This Court has personal jurisdiction over Howard ~~on the grounds that~~ as Howard ~~is conducting~~ conducts business within ~~with~~ the District of Columbia.

20~~54~~. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Judicial District. Howard University resides in the District of Columbia.

### IV. COMMON FACTUAL BACKGROUND GIVING RISE TO RELIEF

#### A. Plaintiff's Employment Contract, Entitlement of Academic Freedom, and Freedom From Arbitrary and Capricious Action under § 2.8.2 of the *1993 Faculty Handbook*

##### 1. Plaintiff's Employment Contract

21. In fall 1994, Plaintiff joined the law faculty in Howard. In fall 1996, Plaintiff became tenured faculty. Plaintiff is not an at-will employee. Through Plaintiff's legal scholarship and academic publications, he has distinguished himself and brought notoriety to himself, the Law School, and Howard University.[3] (Reginald Leamon Robinson's Curriculum Vitae, dated June 24th 2018, attached hereto as Amended Complaint, Ex. 1).

22. Since 1994, Plaintiff has had an employment contract with Howard. Per the *1993 Faculty Handbook*, that contract incorporates §§ 2 and 3 of the *1993 Faculty Handbook*. (1993 Faculty Handbook, § 2.1, at 2-19, Original Complaint, Ex. 18). The employment contract's terms and conditions have been understood through and governed by the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings. (*Allworth v. Howard Univ.*, 890 A.2d 194, 201 (DC CA 2006)).

---

[3] As Dean Danielle Holley-Walker stated during her interview, "Professor Robinson is probably, he may be the most prominent person on our faculty, in terms of scholarship. In terms of his writing, how well he is known nationwide in terms of scholarship." (Report of Investigation, Interview Report, Dean Holley-Walker, at 12, ECF No. ___, Appendix ___).

23.     Within the District of Columbia, Plaintiff's employment contract, the *1993 Faculty Handbook*, and its implied duty of good faith and fair dealings together fully determine the duties, rights, privileges, obligations, and procedures between Howard and its faculty. (*McConnell v. Howard Univ.*, 818 F.2d 58, 62-63 (CA DC Cir. 1987)) Howard's actions to enforce its rules and regulations, e.g., Title IX Policy, must comply with and promote the decency, fairness, and/or reasonableness of Plaintiff's contractual expectations. (*Allworth v. Howard Univ.*, 890 A.2d 194, 201 (DC CA 2006)).

24.     Howard's Policy is appended to the *1993 Faculty Handbook* at Appendix B. (1993 Faculty Handbook, Ex. 2, at B103-B-111), and even if Howard posits that the Policy constitutes a stand-alone set of rules and regulations, Howard's Policy cannot unilaterally amend the faculty's reasonable contractual expectations and entitlement of academic freedom arising out of and under Plaintiff's employment contract and the *1993 Faculty Handbook*. (1993 Faculty Handbook, Ex. 2, § 2.9, at 2-68 to 2-70 (setting forth the process by which the *1993 Faculty Handbook* can be amended))

25.     Under the *1993 Faculty Handbook*, the Policy stated, "Disciplinary actions against individuals who do not belong to collective bargaining units will be in accordance with the applicable University handbook." (1993 Faculty Handbook, Ex. 18, § X., at B-111)

26.     Since July 1994, Plaintiff has not been part of a collective bargaining unit, and any disciplinary action under the Policy against Plaintiff must comport with Plaintiff's reasonable contractual expectation arising out of and under the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

27.     Since 1994, per the *1993 Faculty Handbook*, Plaintiff has had a reasonable

11

contractual entitlement of academic freedom and reasonable expectation to be free of arbitrary and capricious actions by Howard. Those entitlement and expectation must be enforced and understood through the *1993 Faculty Handbook* and its implied duty of good faith and fair dealing. (1993 Faculty Handbook, § 2.8.2, at 2-62)

### 2. Plaintiff's Contractual Entitlement of Academic Freedom and Free Speech

28. In setting forth Howard's Academic Freedom Policy, the *1993 Faculty Handbook* provides, in relevant, part:

> Faculty members are *entitled* to freedom in the classroom in discussing their subjects, but they should be careful not to introduce matter into their teaching that has no relation to their subjects. Students are entitled to an atmosphere conducive to learning and to even-handed treatment in all aspects of their teacher-student relationship. Therefore, in exercising their freedom in the classroom, faculty members are responsible for ensuring that their treatment of students is in no way inconsistent with the university's equal opportunity policy or the university's commitment to promoting the education aspirations and achievements of all students.

(1993 Faculty Handbook, Ex. 2, § 2.2.4, at 2-22) (italics added).

29. On February 28, 2017, President Wayne A.I. Frederick committed Howard to the principles of free speech and noted that the University has defended the right of faculty to "express a wide range of often conflicting points of view"[4] He declared that Howard has been a "safe haven for such discourse." He stated that Howard welcomed "opposing views." He stated that Howard would provide "a platform for stimulating dialogue among students, faculty, staff and alumni alike." He stated that Howard's progress rested on "respectful dialogue, not bullying behaviors." He also stated that the Howard community must "learn to communicate with those who have opposing views." He encouraged the Howard community to "avoid the use of

---

[4]      *See generally* Letter from Wayne A.I. Frederick, M.D., M.B.A., President, Howard Univ., to Howard      Univ.      Community      (Feb.      28,      2017,      *available      at* https://www2.howard.edu/about/president/statements/freedom-of-speech-0228017.

12

condemning speech." (President Wayne A.I. Frederick, Statement on Freedom of Speech, Tuesday, Feb. 28, 2017)

30. Together, § 2.2.4's entitlement of academic freedom and President Frederick's commitment to free speech dedicated and acknowledged Howard as a community of different professional personalities, pedagogical approaches and teach styles, ideas and thoughts, scholarly approaches, and respectful dialogues. As a corollary, § 2.2.4's entitlement and the President's commitment rejected rude or abusive ways of opposing differing views.

31. Under § 2.2.4, Plaintiff has a reasonable contractual entitlement of academic freedom to choose his textbook, to develop pedagogical approaches to teaching bedrock legal principles of law, to ground students in the logic of deductive and inductive reasoning, to fashion logical black-box hypotheticals of varying complexities to reinforce such bedrock legal principles, to provide reasonable feedback through the learning module of quizzes at the end of very textbook chapter, and finally to write final examinations that provide an in-depth coverage of the fundamental legal principles within the textbook and of the verbally or otherwise delivered materials to the students.

32. In fall 2015, Plaintiff taught Agency, Partnerships, and Other Unincorporated Business Associations ("Agency Law"). Plaintiff chose an excellent, widely adopted textbook. That textbook required Plaintiff to revisit traditional and fundamental legal concepts of the first-year curriculum, e.g., torts, criminal law, and contracts. (J. DENNIS HYNES & MARK J. LOEWENSTEIN, AGENCY, PARTNERSHIP, AND THE LLC: THE LAW OF UNINCORPORATED BUSINESS ENTERPRISES xi-xxvii (9th ed., 2015) (Table of Content), attached hereto as Ex. 3).

33.    Consistent with § 2.2.4 and President Frederick's commitment, Plaintiff drafted learning, evaluative, and testing modules called Knowledge Demonstration Opportunities ("KDO").

34.    KDOs are multiple-choice quizzes.   KDOs are sex and gender neutral. Once students have taken KDOs, they receive immediate feedback.   Students must volunteer to participate.   Non-participants suffer no final grade penalty.   Meaningful participation requires students to reveal their choices and to defend those choices based on the legal principles and relevant/material facts.  KDOs contain geometric givens and algebraic probabilities, on which students' analyses depend.   KDOs offer Plaintiffs' students opportunities to analyze substantive rules and to train in deductive and inferential reasoning. ((Agency Law, Fall 2015 Syllabus, attached hereto as Ex. 4; Faraz Siddiqui's Affidavit, dated Dec. 21, 2017, attached hereto as Ex. 5; Vernon Ross's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 6).

35.    KDOs constitute logical black boxes (a traditional mainstay of near classic law school pedagogy), beyond which students need not venture factually and substantively to answer quiz questions. (De Cruise's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 7).

36.    Consistent with § 2.2.4, in fall 2015, Plaintiff required his students to read emotionally charged cases related to *Vicarious Tort Liability* (Chapter 3), dealing *inter alia* with assault, sexual assault, sexual misconduct, rape, criminal molestation, pedophilia, etc. (*See* Textbook Table of Content, Ex. 3).

37.    On September 8, 2015, Plaintiff gave his students a KDO on the substantive law of vicarious tort liability (chapter 3).  (KDO3, dated Sept. 8, 2015,

attached hereto as Ex. 8).

38.     In fall 2015, Plaintiff sought to test § 261 of RESTATEMENT (SECOND)
AGENCY (1958) using tortious touching and fraud in the hypothetical context of
depilatory personal services.  Section 261 states that "A principal who puts a servant or
other agent in a position which enables the agent, while apparently acting within his [or
her] authority, to commit a fraud upon third persons is subject to liability to such third
persons for the fraud."

39.     In fall 2015, Plaintiff researched the annotated materials of § 261, and
learned that § 261 applies to tortious touching by an agent, *viz.*, tortious touching and
deceit;[5] sexual harassment and constructive discharge;[6] sexual harassment and negligent
hiring/retention;[7] employee's homosexual advances toward a student;[8] and rape and sexual
assault.[9]

40.     On September 17, 2015, Plaintiff gave his students a KDO (chapter 5—
*Fraudulent Acts of Agents*).  Of the seven questions, Question 5 asked:  if a customer, T,
sought a depilatory service (Brazilian wax) from an owner, P, if T had never had such a
service, if P's employee or agent, A, explained the services (full or partial) to T, if A
described the touching that was required, if T signed the personal services contract
believing what A had said to T, if T upon awaking from a light sleep felt funny and

---

[5]     *See Bowman v. Home Life Ins. Co.*, 243 F.2d 331 (3d Cir. 1957) (an insurance agent masquerades as medical doctor and tortiously gave mother and daughter a physical exam).

[6]     *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) (employer liable for employee's refused sexual harassment and constructive discharge).

[7]     *See Jansen v. Packaging Corp. of America*, 123 F.3d 490 (7th Cir. 1997) (employer liable for negligent hiring and retention for employee's sexual harassment).

[8]     *See Bozarth v. Harper Creek Board of Educ.*, 288 N.W.2d 424, 426 (Mich. App. 1979) (school district not liable due to immunity and per § 228 employee's conduct was not actuated to serve employer's interest).

[9]     *See Primeaux v. United States*, 181 F.3d 876, 880 (8th Cir. 1999) (native female who was raped and sexual assaulted by tribal reservation officer cannot hold United States liable under theory of apparent authority and Federal Tort Claims Act); *Doe v. Forrest*, 853 A.2d 48, 63 (Vt. 2004) (holding that material facts existed as to whether deputy was aided in accomplishing assault due to agency relationship under §§ 219(2)(d) and 261).

15

accused A of tortious touching, and if T sued P citing vicarious liability for A's alleged tortious touching, would T prevail?

41.     Question 5 offered geometric givens and algebraic probabilities to the students. First, at a later deposition, the attorneys for P and T understood that A had not touched T tortiously. Second, by implication, this understanding connotes that A did not make fraudulent misrepresentations to T, and third that A had not induced T to T's legal detriment. Fourth, despite this understanding, T insisted on suing P. Fifth, in responsive pleadings, P demurred. With those geometric givens and algebraic probabilities (implications), will T prevail? The students must choose from among four choices. For students who had carefully read and who knew the elements of § 261, the Answer was (D) No. (KDO5, Question 5, Fall 2015, attached hereto as Ex. 9).

42.     On September 17, 2015, Question 5 was a proper test of Agency Law because a student's correct, complete analysis would have included the following:

(a)     P had held A out as an agent, servant, and/or employee;

(b)     A, while A was within the scope of A's employment, made representations to T about the Brazilian waxing services, which T had never received before;

(c)     T, as a result of A's representations about the services and the required touching to provide this service, agreed to the service, which suggests that A might have been induced by T to sign the service contract;

(d)     T, believing that A had been properly held out by P as P's agent, servant, and/or employee, would have had no notice if A's representations about the waxing service were offered to serve P's economic interest or A's fraudulent

16

intentions;

(e)     T, at the completion of the waxing service, and after awaking from a light sleep, felt funny and accused A of touching T tortiously;

(f)     T later sued P alleging that P, an innocent employer, was liable for A's allegedly tortious conduct toward T;

(g)     T, assuming that A had touched T tortiously, need not show that P didn't benefit from the alleged tortious touching during the services rendered by A;

(h)     in the alternative, T's claim for tortious touching, if true, would not be defeated by P showing that A's tortious touching wasn't actuated at least in part to benefit P (*see* § 228 of RESTATEMENT (SECOND) AGENCY);

(i)     later, during the deposition, attorneys for P and T realized that A did not touch T tortiously, but T nevertheless insisted on suing P; and

(j)     to the call of the question: "If P demurred, in effect saying 'Yeah, so what!' to T's pleadings, will the court find in favor of T?"

43.     Given ¶ 43, in analyzing Question 5, no student, who knew the elements of § 261, would have had to introduce the factual irrelevancy of her/his personal grooming habits, or would have had to discuss the legal irrelevancy of whether T could actually and/or in reality fall asleep even lightly during a depilatory service, when Question 5 provided students with geometric givens (and algebraic probabilities) on which they should rely to deduce logically the correct answer choice—(D) No. (De Cruise's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 7).

44.     Per § 2.2.4's contractual entitlement and President Frederick's

commitment to the principles of free speech, Plaintiff drafted a proper depilatory service hypo that mirrors real world legal issues faced by innocent (and negligent) employers. (https://www.washingtonpost.com/ amphtml/local/public-safety/massage-therapist-arrested-after-alleged-sexual-assaultin-dc/2017/09/18/5ca87780-9ca5-11e7-84fb-b4831436e807_ story.html; http://amp.tmz.com/2017/09/27/massage-envy-sued-woman-claims-therapist-sexually-assaulted.)

45.     Per § 2.2.4's contractual entitlement, Plaintiff treated all students even-handedly, especially when a volunteering female student observed, "T would not sleep!" To which Plaintiff said, "No?" She said, "No!" At that point, Plaintiff immediately halted the feedback. (De Cruise's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 7). He issued the following caveat: do not challenge the hypo based on what you know or what you might believe or know. That caveat prevented any (male or female) student from offering personal grooming habits. No student challenged whether T could fall into a light sleep. No student did offer personal grooming habits. Plaintiff treated all students equally by limiting their volunteered answers and analyses to the elements and factors set forth in ¶ 42.

46.     Per § 2.2.4's contractual entitlement, Plaintiff must craft questions that he believes will best convey the nuances of Agency Law to his students. Such contractual freedom cannot be only properly exercised if Plaintiff used only the "most anodyne or commonly employed illustrations of each principle [he is] teaching." (Susan Kruth, FIRE's Letter to President Wayne A.I. Frederick, Howard University, on Behalf of Professor Reginald Leamon Robinson, dated June 16, 2017, at 6, attached hereto as Original Complaint, Ex. 10; Susan Kruth, FIRE's Letter to President Wayne A.I.

Frederick, Howard University, on Behalf of Professor Reginald Leamon Robinson, dated Dec. 19, 2017, attached as Ex. 11).

47.     Per § 2.2.4's contractual entitlement, Plaintiff illustrated a principle of Agency Law, § 261, that differed factually from the overwhelming majority of his hypotheticals in fall 2015 that did not include allegations of tortious touching.

### 3.     Plaintiff's Reasonable Contractual Expectation to be Free of Arbitrary and Capricious Personnel Action Under § 2.8.2 of the *1993 Faculty Handbook*.

48.     Plaintiff has been employed at Howard for nearly 25 years. Plaintiff has an employment contract with Howard. That contract has been governed by the *1993 Faculty Handbook* and its implied duty of good faith and fair dealing.

49.     In 1994, Plaintiff was hired at Howard based on the *1994 Faculty Handbook*'s section for appointing tenure-track faculty.

50.     Since 1996, Plaintiff was tenured under the *1993 Faculty Handbook*, Law School bylaws, and other rules and regulations that were promulgated by Howard and that were consistent with the *1993 Faculty Handbook*.[10]

51.     Since 1994, Plaintiff has received three sabbatical leaves and one unpaid leave to serve as a Distinguished University Visitor in Law and Social Theory at the Southern Illinois University-Carbondale, all considered within and granted under the sections of the *1993 Faculty Handbook*.

52.     Based on ¶¶ 49-52, Plaintiff has a reasonable expectation that any

---

[10]     Hypothetically, if Howard were to have denied Plaintiff's application for tenured and/or promotion, Howard would have had to comply with the requirements of the *1993 Faculty Handbook*, and if Plaintiff were to have appealed or challenged any such denials, he would have had to do so as prescribed by and understood through the *1993 Faculty Handbook*, and any other set of rules and procedures that was consistent with the reasonable contractual expectations of the *1993 Faculty Handbook*. *See, e.g., Allworth v. Howard Univ.*, 890 A.2d 194, 201 (DC CA 2006); *McConnell v. Howard Univ.*, 818 F.2d 58, 62-63 (CA DC Cir. 1987).

personnel decision, whether positive or negative, by the University that would affect his

standing as tenured faculty would strictly comply with the *1993 Faculty Handbook*.

53. Based on this reasonable expectation, where Howard's personnel

decisions failed to comply strictly with known and published rules and procedures,

including the *1993 Faculty Handbook* and the Policy, Plaintiff as an eligible faculty could

file a complaint, alleging that:

> action has been taken that involves the faculty member's personnel status
> or terms and condition of employment, and that is a violation of academic
> freedom, arbitrary and capricious (i.e., act action that is unsupported by
> the record presented to support the action taken), or a violation of
> established rules and procedures.

(1993 Faculty Handbook, Ex. 2, at 2-62)

54. In the District of Columbia, Plaintiff's employment contract and the *1993*

*Faculty Handbook* are valid and enforceable contracts. (*McConnell v. Howard Univ.*, 818

F.2d 58, 62-63 (CA DC Cir. 1987))

55. Under the *1993 Faculty Handbook*, "Sexual Harassment" has been defined

as

> verbal or physical conduct of a *sexual* nature when submission to such
> conduct is made either explicitly or implicitly a term or condition of [a
> student's educational opportunities or activities], submission to or
> rejection of such conduct by an individual is used as the basis of an
> [educational opportunity or activity] affecting such [student], or such
> conduct has the purpose or effect of unreasonably interfering with [a
> student's] opportunities or activities or creating an intimidating, hostile, or
> offensive [educational] environment.

(1993 Faculty Handbook, Ex. 2, § 2.2.1.2, at 2-20) (italics added).

56. Under the Policy, "Sexual Harassment" is defined, in relevant part, as

"Unwelcomed *sexual* advances, requests for *sexual* favors, **and** other verbal or physical

conduct of a *sexual* nature when:

20

"(1)    Submission to such conduct is made either explicitly or implicitly a basis for any decision affecting the terms or condition of participation in any such program or activity or status in an academic course; or

"(2)    Such conduct has the purpose or effect of unreasonably interfering with a student's educational right, privilege, advantage, or opportunity; or

"(3)    Such conduct is so pervasive or severe that it creates an intimating, hostile, or offensive environment for learning **and** has no reasonable relationship to the subject matter of the relevant course of instruction." (Policy, Ex. 12b, § IV. N.(1)-(3), at 6 (italics and bold added).

57.    Pursuant to the *1993 Faculty Handbook* and Howard's Policy, "sexual harassment" requires at the very least that on September 17, 2015, Plaintiff's Question 5 and his words and conduct be *sexual* or of a *sexual* nature. (Ex. 2)

58.    Per the Policy, Howard's proper investigation required Smiley, the investigator, to draft a Report of Investigation ("Report"). That Report also contained a Report of Interviews ("Interviews") prepared by Love.

59.    Per the Policy and OCR Guidance, it is through the Report, even if the Report was an internal document, that Howard must show that the Complainants 1 and 2's ("C1" and "C2") allegations were legally sufficient to establish proper allegations of sexual harassment. Based on this sufficiency, the Title IX Office can assert proper jurisdiction over C1 and C2's allegations of December 4, 2015.

60.    Per the Policy and OCR Guidance, it is through the Report that Howard must show that it has met its burdens of production and persuasion under the preponderance of the evidence standard.

21

61. Per the Policy, and ¶¶ 60-61, the Report must be the factual and legal bases for supported, *material* findings that allegations of sexual harassment against Plaintiff have been properly sustained.

62. Per the Policy, the Report's factual and legal bases must have a stated methodology *and* findings of *material* facts and conclusions.

63. Per the Policy, the Report failed to make findings of *material* facts and conclusions. The material facts would be significant and essential to determine whether on September 17, 2015 Plaintiff's Question 5 and his words and conduct were unwelcomed *sexual* advances, requested *sexual* favors, and were verbal or physical conduct of a *sexual* nature. Without the legal sufficiency of these indispensable predicates of sexual harassment, the Report cannot make findings of material fact that would sustain a legal, sound conclusion that on September 17, 2015 Plaintiff violated the Policy.

64. The Report's Rationale made immaterial findings against Plaintiff. Those findings were not material to central query of whether sexual harassment occurred on September 17, 2015. Those findings lacked legal sufficiency on the indispensable predicates of sexual harassment. The Rationale and its immaterial findings concluded illogically that Plaintiff engaged in sexual harassment. Without material findings, the Rationale's conclusions were arbitrary and capricious.

65. Per the Policy, the Report must make recommendations of sanctions and disciplinary actions. The Report's rationale failed to make findings of a material fact to sustain a conclusion that Plaintiff violated the Policy. Smiley's disciplinary recommendations must follow from appropriate findings of material facts. Lacking

material facts, Smiley's recommendations, which were adopted by Wutoh, were arbitrary and capricious.

66.     On May 4, 2017, Howard issued its Notice against Plaintiff. The finding against Plaintiff was conclusory, i.e., sufficient evidence existed to sustain the allegations of sexual harassment against Plaintiff.

67.     On May 4, 2017, Plaintiff met with Wutoh and Love for the reading of the Notice. At this meeting, Wutoh said, in response to Plaintiff seeking help to understand the finding against him, "it's not like you were chasing a student around your office." Wutoh's statement offered *prima facie* evidence that Plaintiff had not violated the Policy.

68.     That Notice contained no findings of material facts. The Notice presented no legal sufficiency on the central question on which the Policy's jurisdiction could be properly asserted. That central question was: did Plaintiff's Question 5 and his words and conduct constituted unwelcomed *sexual* advances, requested *sexual* favors, and were verbal or physical conduct of a *sexual* nature?  This central question goes to the legal sufficiency of the indispensable predicates of any sexual harassment claim.

69.     The Notice draws its substance and force from the Report. The Report was arbitrary and capricious.   The Notice was unsupported and conclusory; its finding was consistent with Smiley's Report and its Rationale.

70.     Due to several reasons, especially the absence of findings of material facts, the Notice evidenced that Howard had failed to meet its burdens of production and persuasion under the preponderance of the evidence standard as set forth by OCR Guidance.

71.     The Notice and Disciplinary Action of May 15, 2017 were personnel

action. Howard's personnel decisions, whether positive or negative, must comply with his employment contract and the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings. Howard's personnel decision did not comply with known and published rules, regulations, and procedures.

72.     Per § 2.8.2, Plaintiff filed an appeal memorandum with Wutoh on or about May 14, 2017. In the appeal memo, Plaintiff analytically showed Wutoh that the Notice made no findings of material facts. Without such material findings, no objective basis or legal sufficiency existed to support the findings against Plaintiff. Without such legal sufficiency, the Notice was arbitrary and capricious. The Notice thus violated Plaintiff's reasonable contractual expectations to be free of arbitrary and capricious actions by the University as set forth in the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

73.     Plaintiff's appeal memo was sent to Wutoh, the Provost, the second highest-ranking agent/Officer at Howard, and the Title IX Decisional Authority. Per the Policy, Plaintiff could not appeal Wutoh's final decision to any other University official. Wutoh, who had received Plaintiff's appeal memo, was the proper and only person to whom Plaintiff could appeal. Under the Policy, Wutoh was initially required to read the Report and the Rationale, to review its Recommendations, and to adopt the Report and its Recommendations as he saw fit.     Under this due diligence burden, Wutoh had institutional authority to take corrective action. Without addressing any of Plaintiff's cogent claims, Wutoh on May 25, 2017 summarily, arbitrarily, and capriciously rejected Plaintiff's appeal. (Provost Wutoh's Email Rejecting Plaintiff's Appeal, dated May 24, 2017, received on May 25, 2017 at 1:43am, attached hereto as Ex. 13)

74.    In Wutoh's rejection, he did not state that he had revisited the Report, reviewed the rationale, and reconsidered the recommendations. (Wutoh's Email to Reggie, dated May 24, 2017, at 1:4__am, attached hereto as Ex. 13). Wutoh stated that he had relied on the personnel in the Title IX Office. Per the Policy, Wutoh had a duty of due diligence. (Policy, Ex. 12b, § ___, at 14)

75.    After filing his appeal memo on or about May 14, 2017, Plaintiff told Wutoh that he was sending his documents to a FIRE, a nonprofit, nonpartisan, disinterested third-party organization. Plaintiff believed that FIRE, if it agreed with him, could help him to reverse the Notice, to rescind the Disciplinary Action, and to end the sex discrimination he faced. (Reggie's Email to Wutoh, dated May 18, 2017, at 11:41pm, attached hereto as Ex. 14).[11]

76.    Upon receiving Wutoh's summary rejection, Plaintiff notified him that he would appeal to the Faculty Grievance Commission ("FGC") as set forth under § 2.8.2. of the *1993 Faculty Handbook*. (Reggie's Email to Provost Wutoh, dated May 25, 2017, attached hereto as Ex. 15).

77.    Per the *1993 Faculty Handbook*, Plaintiff had to undertake good faith mediation to resolve the dispute between Plaintiff, Wutoh, Smiley, and thus Howard. Plaintiff satisfied that statutory requirement when he filed his appeal memo with Wutoh. (See 1993 Faculty Handbook, Ex. 2, § 2.8.3.2, at 2-__)

78.    On May 25, 2017, Plaintiff sent a copy of the appeal memorandum to President Frederick and Chair of the Board of Trustees, Mr. Stacey Mobley. Plaintiff

---

[a]    Prior to Plaintiff notifying Wutoh that he would send the record to FIRE, Wutoh had expressed some interest in talking to Plaintiff the University or Law School graduation ceremonies. *See* Wutoh's Email to Reggie, dated May 15, 2017, at 9:49am, attached hereto as Ex. 14a. After Plaintiff notified Wutoh of FIRE's external review of the record, Plaintiff did not hear from Wutoh until Plaintiff received his summary rejection of his appeal memo.

used email addresses to which he had sent notes previously and from which he had received responsive replies. Neither the President nor Mr. Mobley responded to Plaintiff's effort to seek relief, even though they had the institutional authority to make corrective action. (Reggie's Email and Attachments to President Frederick, dated May 25, 2017, attached hereto as Ex. 16).

> ### 4. Wutoh and Mr. Teeling Acknowledged that Plaintiff Did Not Violate the Policy at the July 12, 2017 Mandatory Mediation Between Grievant and Respondents, & Notice Is Thus Arbitrary and Capricious

79. On June 6, 2017, Plaintiff filed a timely grievance with FGC under § 2.8.2. (1993 Faculty Handbook, Ex. 2, § 2.8.3.3, at 2-63). Plaintiff also sent a copy of the grievance to Mr. Mobley, President Frederick, Dean Holley-Walker, Dr. Taft Broome, Chair, Faculty Senate, and the FGC Commissioners. *Professor Robinson Grievance against Provost Wutoh and Candi N. Smiley, Esq.*, dated June 6, 2017, attached hereto as Ex. 9.) (General Allegations, Ex. 17a; Legal Analyses, Ex. 17b).

80. On or about June 10, 2017, Plaintiff met with the FGC and presented his grievance to the Commissioners who attended the meeting.

81. On June 14, 2017, the FGC preliminarily found that Plaintiff's grievance "merited detailed investigation." The FGC notified Wutoh and Smiley of its preliminary finding. The FGC based its preliminary finding on the following: (a) Wutoh and Smiley had violated the implied duty of good faith and fair dealings; (b) the Notice was arbitrary and capricious; (c) the Notice violated rules and regulations; and (d) the Notice and Disciplinary Action altered the terms and conditions of Plaintiff's employment contract. (FGC's Disposition Letter to Reginald Leamon Robinson, dated June 14, 2017, attached

hereto as Ex. 18).

82.     Per the *1993 Faculty Handbook*, the FGC's preliminary finding triggered mandatory mediation. Such mediation fell under § 2.8.3.3, which removed the "good faith" requirement. Section 2.8.3.3 is not governed by any confidentiality and/or privilege communication rule. (See 1993 Faculty Handbook, Ex. 2, § 2.8.3.3, at 2-__)

83.     In advance of the mediation of July 12, 2017, none of the parties, in writing or otherwise, asked for confidentiality and/or privilege communication rule.

84.     No confidential or privilege information was disclosed.

85.     Upon information and belief, Wutoh and Mr. William Teeling, Office of the General Counsel ("Teeling"), were recording the mediation meeting.

86.     On July 12, 2017, the mediation meeting between Plaintiff, his then-legal counsel, Mr. GT Hunt, Wutoh, Smiley, and Teeling was not governed by the District of Columbia's Uniform Mediation Act as no mediator or a person who provided services as a mediator was present and/or acting within such a role at the meeting. The mediation meeting was not mandated by a federal or local rule, or an administrative agency.

87.     On July 12, 2017, the parties in ¶ 86 met for mediation. Per the *1993 Faculty Handbook*, § 2.8.3.3, this mediation was not covered by confidentiality and privilege. At this mediation, Wutoh acknowledged that Plaintiff had not violated the Policy.

   B.     **Complainants 1 and 2's Allegations, Smiley's Anti-Male Bias/the Subjective Experience Test, and Howard's Failure to Follow its Published Rules and Procedures**

      1.     **Complainants 1 and 2's Allegations Attack Plaintiff's Academic Freedom and Free Speech on December 4, 2015**

88.     On December 4, 2015, Complainants 1 ("C1") and ("C2") 2 did not file sexual harassment complaint against Plaintiff with the Title IX Office.

89.     C1 and C2 never alleged that Plaintiff had made unwelcomed *sexual* advances, requested *sexual* favors, and engaged in words or other physical conduct of a *sexual* nature.   (See Defendant's Motion to Dismiss and/or Motion for Summary Judgment, ECF. No. ___, June 6, 2018, Ex. ___).

90.     C1 and C2 never alleged that apart from facilitating KDO5, Plaintiff engaged in an independent series of actionable conduct under Title IX.

91.     After nearly three months of talking to each other (and to other students and faculty), sharing ideas, formulating objections, and developing strong odious feelings against Plaintiff, C1 and C2 filed formal allegations against Plaintiff.

92.     C1 directly and C2 implicitly sought institutional corrective action against Plaintiff's beliefs, ideas, thoughts, and arguments, against his casual communication style, against his pedagogical tools and models, and against his presence at Howard Law School, including at the very least punishment and at best termination.

93.     C1 and C2 principally filed their complaint after seeking to make sense of Question 5 on September 17, 2015 and finding that sense in Plaintiff's two peer-reviewed articles.

94.     C1 and C2 both perceived Plaintiff's casual communication style as intimate, unprofessional, "overly familiar," "overly comfortable," and too relaxed an interaction for the Agency Law class and for Howard law students generally. C1 stated that Plaintiff's communication style like using his first name ("Reggie") in class and in emails was a negative, too intimate, and uncomfortable experience for her.  C2 too stated

that by using Plaintiff's first name in emails, he was "overly comfortable."

95.     C1 and C2 objected to Plaintiff's academic freedom and free speech, stating that he believed that black women (and mothers) abused their children. C1 and C2 stated that Plaintiff's published beliefs advocated for or justified misogyny and violence against black women. C1 stated that she did not "understand how in an academic and intellectual environment I'm supposed to look at the things that my professor has published and feel okay, being in his class." (Id. at 4)

96.     C2 stated that she did not have multiple issues with Plaintiff. C2 had heard stories about Plaintiff from other students. Based on these stories, C2 did not attend Plaintiff's office hours. C2, based on these stories, wrongly reported that Plaintiff had used an "explicitly sexual fact pattern" in prior semesters. C2 stated as incorrect hearsay that, referring to a past KDO's "explicitly sexual fact pattern," Plaintiff gave all students the same grades except for failing one. C2 stated that she did not like the tone of the conversation on Question 5, and C2 left the classroom during the discussion.

97.     C1 and C2 talked about Plaintiff's published ideas. C1, sharing how C2 felt, said: "'You should see the crazy stuff that he has actually published' looking at it, and knowing that there is someone who represents the Howard name at all that has put this kind of black woman hate um out into the public is disturbing to me." (Id. at 5)

98.     In ¶ 96, C2 stated that Plaintiff's published ideas should be punished by students who could use an institutional means to say that his intellectual ideas and thoughts were incompatible with Howard's brand or mission. C2 stated explicitly that Plaintiff must be punished for offending black women or for writing inappropriate things about black women, to wit:

29

> I really feel like there should be at least some kind of action that
> students or [sic] able to take to say this is inappropriate. Ah we're not
> comfortable with this. I'm not comfortable reading this as a black woman.
> I'm not comfortable having to sit in this man's class and know that these
> are the kinds of things that he writes in his personal time.

(Id. at 5).

99.    C1 stated that Plaintiff was "being so difficult." C1 did not give examples

of such difficulties. C1 did not like Plaintiff's casual professionalism and use of his first

name in class. C1 did not like that Plaintiff used storytelling of potential child abuse in a

class in which she was not enrolled. (In fall 2015, Plaintiff taught a Jurisprudence

seminar.) Then, at some time after September 17, 2015, C1 stated that she came across

Plaintiff's peer-reviewed articles. C1 stated (apparently in response to a question from

Smiley) that she took meaning from them about Plaintiff's place at Howard, stating: "I

don't know, I, the only way that I can make the point is to say that if I had found out my

white professor was a Klansmen, I would feel exactly the same way." (Id. at 4)

100.    Smiley asked C1 for specific examples of conversations or things Plaintiff

had said in class that made her feel uncomfortable about going to Plaintiff's office hours.

C1 responded by stating: (a) Plaintiff's pedagogical choice to use storytelling in the child

welfare seminar; (b) Plaintiff's salutations ("Dear loving students") and sign offs ("Peace,

love, and namaste. Reggie")[12] in emails; (c) Plaintiff's use of his first name was "overly

familiar"; and (d) Plaintiff's beliefs in his peer-review articles.

101.    Based on ¶¶ 90-99, C1 and C2 proffered not one jot of actionable words or

conduct by Plaintiff. C1 and C2 gained some insight into Question 5 from reading

Plaintiff's peer-reviewed articles after September 17, 2015. C1 and C2 stated that

---

[12]    On January 13, 2016, Plaintiff told Smiley that his spiritual practice is East and West, i.e.,
Christian/New Age Philosophy and Buddhism.

Plaintiff's beliefs hurt Howard's brand and like black hating white Klansmen, Plaintiff ought to be punished or terminated.   Based on hearsay, C1 and C2 did not attend Plaintiff's office hours.  C1 and C2 reported factually incorrect hearsay about a prior KDO question that led to flat grading and one failing grade.

102.   Based on ¶¶ 90-99, C1 and C2's complaint on December 4, 2015 constituted nothing more than an attack on Plaintiff's contractual entitlement of academic freedom and free speech.

103.   Neither C1 nor C2 stated that Plaintiff made unwelcomed sexual advances, that he requested sexual favors, and that he engaged in verbal or other physical conduct of a sexual nature.  C1 and C2 likewise did not state that Plaintiff engaged in independent words or conduct of a sexual nature while he facilitated KDO5.

104.   C1 and C2 never stated that Plaintiff conditioned their participation in the Agency Law course or their matriculation at Howard or submitting to non-sexual words or conduct.

105.   C1 and C2 never stated that Plaintiff's non-sex-based words or conduct had the purpose or effect of unreasonably interfering with their right to continue in the Agency Law course or to matriculate at Howard.

106.   C1 and C2 never stated that Plaintiff's Question 5, pedagogical style, and testing modalities were so pervasive or severe that he created an intimidating, hostile, or offensive environment for learning *and* his Question 5 and his pedagogical queries had no reasonable relationship to Agency Law.

107.   Based on the interviews of December 4, 2015, C1 and C2 did not allege that Plaintiff engaged in sexual misconduct, i.e., sexual harassment.  C1 and C2's

31

statements did not sound directly or implicitly in a legally sufficient claim of sexual harassment. C1 and C2's complaint cannot properly fall within the jurisdiction of the Policy.

### 2.   Smiley's Subjective Experiences of the Female Complainants & the Rationale's Failed Burden of Proof

108.   On December 4, 2015, based on the interviews, Smiley knew or had reason to know that C1 and C2's allegations fell outside of the Policy's purview.

109.   Under the Policy, the December 4, 2015 interviews permitted Smiley or the Title IX Office to vet C1 and C2's allegations. C1 and C2's allegations must make out a *prima facie* on actionable conduct under the Policy. C1 and C2's allegations must contain relevant and material facts. Such facts must be either actionable words or conduct sounding in sexual harassment or "inappropriate behavior." Complaint, Ex. 10a, at 2)

110.   Under the Complaint, an accused person may be sanctioned for engaging in inappropriate behavior. The Complaint does not define "inappropriate behavior." (Complaint, Ex. 12a). In the Policy, "inappropriate behavior" is not defined. (Policy, Ex. 12b, at 1-16).

111.   On the issue of "inappropriate behavior," the Complaint and Policy stand in conflict. With such a conflict, the Complaint cannot override the Policy. The Policy has no working definition or elements of "inappropriate behavior." The Notice sustained the false allegations of sexual harassment against Plaintiff. Howard cannot now apply the undefined "inappropriate behavior" standard.

### a.   Subjective Experience Test

112.   On January 13, 2016, Smiley informed Plaintiff for the very first time that

the Title IX Office, and thus Howard, would apply the subjective experience of the female victim to determine conclusively whether Plaintiff violated the Policy.

113.    On May 4, 2017, at the reading of the Notice, Love told Plaintiff: "You have to understand that by requiring them to answer the question, they were harmed," or words to that effect. (Plaintiff's Complaint, Docket No. 1, filed Feb. 24, 2018, at ¶ 324).

114.    Smiley (and Love) is not objective, impartial, and fair.  She did not operate on a case-by-case basis.  She did not consider the totality of circumstances.

115.    C1 and C2 are third-year law students.  C1 and C2 have a preexisting duty to attend class and to be prepared substantively for that class.  Despite C1 and C2's duty, Love made this statement in Wutoh's presence. (Wutoh did not correct Love's use of the subjective experience test.)  Love's statement established preliminarily that Howard knowingly adopted and applied an unknown and unpublished evaluative standard. Under this standard, Plaintiff cannot easily defend himself against such allegations.  So long as C1 and C2 alleged that they were uncomfortable and felt that they had to participate, then the Title IX Office can assert wrongly that Plaintiff harmed C1 and C2.

116.    On May 10, 2017, during his mandatory sexual harassment sensitivity training, Love presented Plaintiff with a computer slide show, one slide of which was labeled "subjective experience."    Love told Plaintiff that all allegations of sexual harassment are evaluated from the subjective experience of the complaining (female) party.  That test has not been published in the Policy.

117.    On December 4, 2015, Smiley applied this subjective experience test to C1 and C2's allegations against Plaintiff.

118.    Under the Policy, Smiley must keep an open mind.  She must consider any

and all information that ensures that Howard reaches a "sound conclusion." Smiley must seek information that is relevant. Relevancy "would tend to establish either the truth or falsity of the allegations." Any person who has such information should be name, so that Smiley can contact him or her. (Complaint, Ex. 10a, at 4)

119.    Upon information and belief, based on C1 and C2's statement, Smiley did not vet the legal sufficiency of their allegations. Smiley never asked C1 to describe "interact."

(a)    She never asked C1 and C2 how were Plaintiff's published ideas and beliefs material prohibited by the University.

(b)    She never asked C1 and C2 if Plaintiff used vulgar and explicit language during the Agency Law class.

(c)    She never asked C1 and C2 if Plaintiff required them to read his two peer-reviewed articles.

(d)    She never asked C1 and C2 if Plaintiff were entitled to think as he believed.

(e)    She never asked C1 and C2 if Plaintiff said something directly to them that kept them from attending his office hours.

(f)    She never asked C1 and C2 if Plaintiff asked them to rely on their personal grooming habits to analyze Question 5.

(g)    She never asked C1 and C2 if in Question 5 T drinking tea or T falling into a light sleep red herrings.

(h)    She never asked C1 if analogizing Plaintiff to (presumably white) Klansmen was appropriate simply because they disagreed with his free speech

that black mothers abuse their children.

(i)     She never asked C1 and C2 if they had asked Plaintiff not to address them with his salutations, i.e., "Dear loving students."

(j)     She never asked C1 and C2 whether they were offering character evidence that Plaintiff should be punished or terminated from Howard.

(k)     She never asked C2 if Plaintiff treated her differently or negatively throughout the balance of the semester.

(l)     Smiley never asked C1 and C2 why they appeared to use similar phrases, i.e., "overly familiar," and "overly comfortable."

120.    Upon information and belief, Smiley more than likely did not ask such relevant question as she relied on the subjective experience text, i.e., believe the victim. Believe the victim prefers to support females.  Believe the victim has an anti-male bias.

121.    Even if Smiley's subjective experience might be otherwise acceptable, the Notice and the Rationale proffered no other objective and/or independent basis that satisfies the legal sufficiency requirements for sustaining allegations of sexual harassment against Plaintiff.  On December 4, 2015, C1 and C2 never alleged that Plaintiff had sexually harassed them.

### b.    The Rationale Failed to Meet Howard's Burden of Proof

#### i.    Overview

122.    In determining whether Plaintiff's Question 5 and his pedagogical queries constitute sexual harassment, Howard must look at the entire record as a whole. Howard must consider the totality of the circumstances.  Howard must undertake a thorough and comprehensive review of relevant facts on a case-by-case basis.

123.    Howard's inquiry must consider the nature of the *sexual* advances, the sought-after sexual favors, *and sexual* nature of the words or physical conduct.

124.    Howard must examine the context in which such *sexual* advances occurred.  Howard must determine the appropriateness of Plaintiff's actions.

125.    Per OCR Guidance, Howard must use the preponderance of the evidence standard.  (Policy, Ex. 12b, at 8)

126.    By the preponderance of the evidence, Howard has the burden to show based on relevant evidence that the existence of a fact (i.e., sexual harassment) is more probable than its nonexistence before Howard, the party who has the burden to persuade, can conclude that factual evidence exists of sexual harassment against Plaintiff.

127.    Howard, adopting the highly subjective experiences of C1 and C2, the only students interviewed by Smiley, did not examine the record as a whole.  Smiley gave evidentiary weight only C1 and C2's hearsay, speculations, subjective experiences, and rejection of Plaintiff's published ideas.  Smiley dismissed Plaintiff's contractual entitlement to academic freedom and his freedom of expression.

128.    Smiley, having adopted only C1 and C2's subjective experiences, cited Plaintiff's exculpatory and explanatory materials, as further evidentiary of Plaintiff's character evidence or character trait to prove that he engaged in sexual harassment.  Character or character trait evidence is more prejudicial than probative.  In civil matters or litigation, such evidence is inadmissible.

129.    Smiley failed to consider the totality of the circumstances.  Plaintiff required C1, C2, and other registered students in the Agency Law class to read cases on rape, sexual misconduct, pedophilia, etc. Plaintiff was teaching bedrock legal doctrine

through which agents, employees, and/or servants expose innocent (and negligent) employers to vicarious liability, i.e., Respondeat Superior. As the annotated materials of § 261 illustrated, and Plaintiff sent this document to Smiley, a held-out agent can use fraud to induce third parties to their personal and legal detriment and cause them to suffer tortious touching. Question 5, one logical black box question out of seven, tested whether Plaintiff's students knew not about depilatory personal service, but about the element of § 261 in a hypothetical context where the customer alleged tortious touching. (See Reggie's Email to Smiley, dated Jan. 19, 2016 with annotated materials for § 261, attached hereto as Ex. 19).

130. Under the totality of the circumstances text, Smiley cannot pick out one factors, i.e., how C1 and C2 subjective felt or experienced Question 5, and draw inferences of liability against Plaintiff.

131. Smiley's Rationale never established that Plaintiff, Question 5, or his pedagogical queries were unwelcome sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature.

132. Smiley's Rationale was disorganized, conclusory, and devoid of the required legal standards and analytical assessments of facts and elements. The Rationale lacked systematic analyses that logically drove Smiley objectively to either a valid deduction or a strong inference. Rather, the Rationale was replete with speculations that always concluded that Smiley felt, having adopted the subjective experiences of C1 and C2, that Plaintiff had the propensity based on character evidence and character traits over the arc of his nearly entire employment history at Howard to engage in sexual harassment.

133.    Smiley's Rationale never discuss the lack of credibility of C1 and C2 who filed a complaint against Plaintiff after they chose to read his published ideas and beliefs, and after they were contaminated by the biases and emotions of others, including students and perhaps faculty. Smiley treated C1 and C2's subjective experiences as conclusive presumptions that Plaintiff violated the Policy.

134.    In the Rationale, Smiley referred to Plaintiff's exculpatory and explanatory statements as "allegations", as mere protestations of innocence, as lacking evidence, and as avoid of creditability.

135.    Smiley's Rationale proffered no specifically reliable and probative raw evidence that Plaintiff, Question 5, and his pedagogical queries caused C1 and C2, or any other student in the Agency Law class, to suffer with the requisite degree of certainty sexual harassment in violation of the Policy.

136.    Smiley, adopting the believe the victim stance, took up C1 and C2's emotional cause against Plaintiff.

137.    Smiley gave weight to one half of the record, not the whole record. Smiley's Rationale failed to satisfy the preponderance of the evidence standard.

### ii.    Howard's Adoption and Application of the Subjective Experience Test Shifts Burden of Proof Impermissibly to Accused Males like Plaintiff

138.    Howard and its Title IX Office have adopted and applied the subjective experience of the complaining (female) student test to determine conclusively whether Plaintiff violated the Policy.

139.    On January 13, 2016, Smiley announced that the interview that Howard had abandoned the required reasonable person standard, which is objective, and would

apply the unknown and unpublished evaluative standard called the subjective experience of the (female) victim test.

140. On May 10, 2017, during a mandatory sensitivity training session on sexual harassment, Love showed Plaintiff a computer slide, the frame of which was labeled "Subjective Experience."

141. Based on the interview of December 4, 2017, when C1 and C2 deliver their allegations to Smiley and Howard, Smiley accepted C1 and C2's statements as if they were true, correction, and legally sufficient on which to bring their allegations within the jurisdiction of the Policy.

142. From the narrative of Smiley's interview of Plaintiff, and from Smiley's statement in the Rationale, Howard did not credit any exculpatory and/or explanatory statements by Plaintiff.

143. The foregoing permits the valid deduction that Smiley had shifted its burden of legal sufficiency by the preponderance of the evidence to Plaintiff. Under this impermissible institutional burden shifting, Plaintiff had unring the proverbial bell, thus requiring Plaintiff to prove that C1 and C2 did not subjective experience Plaintiff, Question 5, and his pedagogical queries as verbal or physical conduct of a sexual nature.

144. Under that burden shifting standard, Howard has destroyed Plaintiff's presumed innocence until he either admits responsibility or Howard adduced findings of material facts of sexual harassment that satisfy the requirements of legal sufficiency.

145. Given that most accused respondents under the Policy are males, then Howard's impermissible burden shifting, which violates Title IX regulations and/or guidance by OCR, means that Plaintiff was subject to sex discrimination at the very

beginning of Smiley's investigation.

146.    Upon information and belief, given that allegations against a male of sexual harassment is tantamount to a declaration of responsibility, it would follow that Smiley need not engage in a thorough investigation, considering the social context and the case as a whole, and the totality of the circumstances on a case-by-case basis.

147.    Upon information and belief, Smiley simply needs to stonewall Plaintiff's effort to get actual notice of the relevant facts of C1 and C2's allegations, as she in fact did, which exposes Plaintiff to the unfair likelihood of a finding of responsibility because Plaintiff simply cannot defend himself as spurious complaint that Smiley converts into allegations of sexual harassment.

### iii.    Smiley's Believe the Victim Interview of December 4, 2015 of C1 and C2

148.    On January 13, 2016, Smiley first informed Plaintiff that she would rely on an unpublished and unknown subjective experience of the complaining students' test to determine conclusively whether Plaintiff violated the Policy.

149.    Upon information and belief, Smiley believed the alleged victim because she never asked C1 to give very specific examples of what she meant by "interacts," and required her to relate Plaintiff's "interactions" generally and/or specifically to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

150.    Upon information and belief, Smiley believed the alleged victim because she never asked C1 why Plaintiff's articles and his analyses of gangsta rap artists' vulgar lyrics, which she and C2 had brought with them to the interview, were generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other

conduct of a sexual nature.

151.    Upon information and belief, Smiley believed the alleged victim because she never asked C1 why Plaintiff's professional personality, which made him disturbing and personally offensive (e.g., he's a black hating white racist Klansmen) was generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

152.    Upon information and belief, Smiley believed the victim because she never asked C1 why Plaintiff's regarding black mothers as abusers to their children gave offensive meaning to the way Plaintiff interacted with the Agency Law class and to the unspecified "all the things he's done," and she never asked C1 to relate Plaintiff's intellectual views to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

153.    Upon information and belief, Smiley believed the victim because she never asked C1 if Plaintiff had asked her to defend her answer choice to Question 5 by using her intimate knowledge of Brazilian waxing, or if she could have answered Question 5 by simply applying the elements of § 261.

154.    Upon information and belief, Smiley never asked C1 for very concrete examples of why Question 5 was "inappropriate," but rather Smiley identified with her assessment when Smiley said: "I was wondering," which led to C1 saying: "Yes! I think that's inappropriate on its face."

155.    Upon information and belief, Smiley never asked C1 why Plaintiff's KDO policy was related specifically to her complaint about Plaintiff's informality and casualness with his Agency Law class and with students generally.

156.  Upon information and belief, Smiley never asked C1 and C2 how Plaintiff's email salutations and sign offs and the use of his first name, which she described as overly familiar, were generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

157.  Upon information and belief, Smiley never asked C1 and C2 why Plaintiff's academic writings and publications didn't belong in an intellectual environment of Howard Law School, and why Plaintiff's published thoughts and analyses were generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

158.  Upon information and belief, Smiley never asked C2 to describe Plaintiff's tone about Question 5, so that she could objectively assess how such tone was generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

159.  Upon information and belief, Smiley never asked C2 to explain when during the feedback and analyses of Question 5 did she get and leave the class, and during her absence from the class, how could she assess cogently the conversation around Question 5.

160.  Upon information and belief, given that C1 and C2's allegations against Plaintiff were generally and/or specifically unrelated to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature, Smiley never asked C2 if she were using the Title IX Office to punish Plaintiff because she was uncomfortable reading what she purported that he had said about black women.

161.  Upon information and belief, Smiley never asked C1 and C2 whether they

had biased each other because they can talk to each other, because they both used similar phrases like "overly familiar" and "over comfortable", because they both didn't like that Plaintiff used his first name, and because they both raised similar complaints about Plaintiff's peer-review articles.

> iv. **Plaintiff, Question 5, and Pedagogical Queries Did Not Make Unwelcomed Sexual Advances, Request Sexual Favors, and Engage Verbal or Physical Conduct of a Sexual Nature**

162.    In the Report's Rationale, Smiley declared, "Per the Title IX Policy, KDO5 does in fact, meet the requirements for Sexual Harassment." (Smiley's Report of Investigation, ECF No. ___, Ex. ___, ¶ 2, at 6 of 274). The Smiley did not state facts to support this conclusion. She did not tie any relevant facts to required elements of the standard against sexual harassment. Smiley offered only a conclusion.

163.    Per the Policy, Howard has the burden to show that sufficiently reliable and probative facts existed on the threshold legal predicates for sexual harassment: (a) "unwelcomed sexual advances", (b) "requests for sexual favors", *and* (c) "other verbal or physical conduct of a sexual nature."

164.    Once Smiley has made findings of material facts on these threshold elements, then she must make material findings on the disjunctive tests on: (a) whether Plaintiff asked C1, C2, or any other student on September 17, 2015, to submit to conduct that falls under the legal predicate explicitly or implicitly if they wanted to succeed in the Agency Law course or at Howard Law School generally; or (b) on whether Plaintiff's conduct which fell under the legal predicate had either the purpose or effect of unreasonably interfering with C1, C2, or any other student's educational rights, privilege,

advantage or opportunity on September 17, 2015; or (c) on whether Plaintiff's conduct which fell under the legal predicate was so pervasive or severe that it created an intimidating, hostile, or offensive environment for learning *and* had no reasonable relationship to the subject matter of Agency Law.

165.    Smiley's Rationale made no findings of material facts on the threshold elements of the required legal predicate and then on the disjunctive tests for actual harm suffered by C1 and C2, or any other student registered in the Agency Law class. Upon information and belief, Smiley never asked C1 and C2 whether they believed that Plaintiff, Question 5, and his pedagogical queries during the feedback were sexual or an act of sex, and/or sexual activities.

166.    Under federal jurisprudence, in this social context of teaching law to upper-level law students, Smiley's findings of material facts must be show that on September 17, 2015 Plaintiff, Question 5, and his pedagogical queries were laced or tainted with an objective sexual interest or activity. Such interest or activity would be independent actionable consider under Title IX. Smiley, having adopted the subjective experiences of C1 and C2 as a conclusively presumption, must adduce factual evidence that rise above C1 and C2's mere subjective belief that Question 5 was inappropriate, i.e., words or physical conduct of a sexual nature.

167.    Smiley's conclusive presumption in the Rationale cannot be permitted to stand. By adopting the subjective experience of C1 and C2, Smiley would be in an inquisitorial position or a star chamber jurist by which she can indict every law professor who teaches rape, sexual misconduct, sexual battery, and even domestic violence or child abuse cases. Such faculty would risk having any student who feels subjectively

uncomfortable filing allegations of sexual harassment, or having Smiley contort such uncomfortable feelings into claims of sexual harassment. Even without objective words or conduct, the law professor would risk facing naked, highly subjective allegations. Thus a faculty's pedagogical material would thus become words or physical conduct of a sexual nature." Under Smiley's obviously adopted subjective experience of C1 and C2 evaluative test, no faculty's exculpatory material or explanatory statements would not spare the faculty from a finding of sexual harassment, borne exclusively out of and flowing inexorably from an erroneous outcome.

168.    Under federal jurisprudence, Smiley's must make findings of material facts that Plaintiff, Question 5, and his pedagogical queries were not only sexual but also targeted C1 and C2, and any other student registered in the class, because of their sex.

169.    On December 4, 2015, C1 and C2, the only students interviewed by Smiley, never made any allegations or filed any complaint that Plaintiff had made unwelcome sexual advances, requested sexual favors, and engaged in verbal or physical conduct of a sexual nature.

170.    Rather, Smiley, in the absence of objective facts or for unexplained reasons, converted C1 and C2's complaint into allegations of sexual harassment.

---

[13]    *Cf. Graham v. Blissworld*, LLC, 2009 WL 2729841 (NY Sup. 2009) (a plaintiff, Graham, received a Brazilian wax and then later claimed an injury to her genitals or vagina, seeking thus to hold the principal, Blissworld, vicariously liable for the negligent conduct of the employee/agent, Normatov, who performed the waxing. The court used "genitals," "genitalia," and "vagina"); *Werts v. Grand Spa, Ltd*, 2008 WL 6983344 (2008) ("A 24-year-old female event planner alleged that she suffered a vaginal skin tear of the labia minor when she received a Brazilian bikini wax at the defendant spa where the plaintiff was a customer. The plaintiff contended that the defendant failed to properly train and supervise its employees, [and] negligently allowed a non-licensed beautician to perform the waxing, and that it was liable under the doctrine of respondeat superior. The defendant admitted liability.").

In Question 5, Plaintiff did not use such language due to the sex and gender neutrality of the hypothetical. In the above cases, the courts' language, which described the correct anatomical part of the female plaintiffs' body, was not sexually suggestive or offensive language as noted in the Letter of Reprimand. However, based on the Report, once Smiley applied the evaluation framework of subjective experience of the female complainants, which would be determine whether an accused male like Plaintiff violated Howard's Policy, she would have declared the anatomical language in *Graham* and *Werts* to be "sexually suggestive and or offensive language." Equally important, Smiley would have declared that the cases bore no reasonable relationship to the substantive issues of Agency Law.

171.    In the Report's Rationale, Smiley misstated facts of Plaintiff's pedagogy and its legal implication. She wrongly declared that Plaintiff obligated the students to discuss their personal intimate knowledge or experiences of bikini waxes. Smiley's declaration is not a finding of material facts that is sufficiently reliable and probative.

172.    She observed that because C2 left the class, then it followed that this Title IX Policy's section applied. That section provides, "Such conduct has the purpose or affect [sic] of unreasonably interfering with a student's educational right, privilege, advantage or opportunity." (Id. at 4 of 274).

173.    However, this provision of the Policy requires that Smiley make a finding of material fact on the threshold legal predicates for sexual harassment. This provision required a condition precedent, i.e., Plaintiff, Question 5, and his pedagogical queries constituted at the very least unwelcome sexual advances. They did not. She did not make any finding of material fact on the legal predicates to sexual harassment.

174.    Related to ¶ 172, Smiley stated, "I contend that the conduct of the question paired with the required discussion unreasonably interfered with the student's education rights, especially since there is no documented relation to this KDO example and the cases listed in the syllabus."⁴ (Id. at 5 of 274).

175.    In response to ¶¶ 172 and 173, C2 stated that she was uncomfortable with the discussion. C2 did not state what specifically made her uncomfortable about the analyses and feedback on Question 5. Upon information and belief, C2 did not say that Plaintiff's comments during the feedback caused her discomfort. Upon information and

---

⁴       Plaintiff was confused by Smiley's unsupported conclusion. He was also confused when Smiley conceded that men and women get bikini waxes and full Brazilian, and so depilatory services are not just primary for women. Yet, in the Rationale where she suggested that for sexual harassment purposes, Question 5 was sexually inappropriate and/or indecent material because waxing as a traditionally female activity draw the students' attention to genitalia, i.e., vagina. Neither portion of the Rationale makes logical or legal sense.

46

belief, C2 did not say that her peers' analyses made her feel uncomfortable. From the interviews, and upon information and belief, after C2 read Plaintiff's articles, and after C2 talked to C1 and a host of students and faculty, and after C2 formed very odious opinions about Plaintiff, C2 did not allege that C2 could not complete the Agency Law class. C2 likewise did not allege that C2 could not focus in class. C2 did not allege that she sought out counseling so that she could attend class. C2 did not allege that she considered dropping the class. In the interview, C2 made it clear that after she read Plaintiff's articles, C2 believed that Question 5 and Plaintiff's beliefs were connected. C2 took subsequent KDOs. C2 completed the course. C2 took the final examination. C2 passed the final examination (no one failed). C2 graduated as scheduled.

176.   On September 17, 2015, Plaintiff did not make unwelcome sexual advances to any student.

177.   On September 17, 2015, Plaintiff did not discriminate against any student due to his or her sex.

178.   On September 17, 2015, no student was required to participate in the feedback. Any student who wished to participate had to volunteer. Non-participating students did not suffer a final grade penalty.

179.   Question 5, like all KDO questions, is logical black box. Participating students must pick only one of four choices, and if they knew the elements of § 261, they could answer the Question 5 without the irrelevancy of personal grooming habits or whether T could in real life sleep lightly. For purposes of black box logic, the real world outside of the box becomes, for the purposes of disciplining the legal mind and developing technical legal reasoning, irrelevant.

180.    The Report's Rationale presents no facts, either for verbal or conduct, that Plaintiff, Question 5, and his pedagogical queries constituted verbal or physical conduct of a sexual nature.

### v.    Question 5 Was Reasonably Related to the Subject Matter of Agent Law

181.    Smiley argued from ignorance that rape and sexual assault cases in Plaintiff textbook "did not put the students in a position to have to disclose intimate details about their genitalia to the class or to the professor in order to defend an answer choice." (Id. at 6 of 274).

182.    Smiley also argued "there is no document that suggest [sic] a relevant nexus to the current KDO and the lesson being taught in Chapter 5." (Id.)

183.    First, Plaintiff has not given classroom participation point in doctrinal classes since 1995. Second, no student is required to participate in classroom discussion, even on KDOs. Third, all students must volunteer. After the interview meeting on January 13, 2016, Plaintiff informed Smiley of his classroom pedagogy. (Reggie's Email to Smiley, dated Jan. 19, 2016, Ex. 19). Upon information and belief, Smiley did not give Plaintiff's objective, exculpatory information any evidentiary weight. The Rationale does not credit any of Plaintiff's statements and documents.

184.    In discussing rape and sexual assault, Plaintiff has always discouraged students from sharing personal stories. During rape and sexual assault discussions, Plaintiff recounts the facts, unless a student volunteers. As in Question 5, Plaintiff focuses the students' analyses on the applicable rule, its elements, and legally relevant facts.

185.    On September 17, 2015, even if C1 and C2 subjectively and absurdly

48

believed that Plaintiff required them to discuss their personal grooming habits, they did not do so after Plaintiff issued the caveat. C1 and C2, the only students interviewed by Smiley, stated that they felt the need to defend their answer choice by resorting to their personal grooming habits. However, no student revealed any personal grooming habits after Plaintiff's caveat.

186.   Smiley could only make this argument in ¶ 181 if she had adopted and relied upon the subjective experiences of C1 and C2. Unfortunately, even if C1 and C2 subjectively experienced the feedback on Question 5 as requiring revelations about their personal grooming habits, C1 and C2 were not harmed because they did not disclose whatever their personal grooming habits were to Plaintiff or the class. Speculative harm cannot be actionable words or conduct under a Title IX analysis.

187.   Relating to ¶ 182, Plaintiff sent Smiley several emails after the interview of January 13, 2016. In one such email, Plaintiff explained how § 261 is related to tortious touching based on the fraudulent acts of the agent. Plaintiff also attached the annotated materials for § 261. That annotated material clearly link the fraudulent acts of the agent, which was covered in chapter 5, with tortious touching. Smiley gave Plaintiff's exculpatory and explanatory material no evidentiary weight. Under § 2.2.4's entitlement, Plaintiff can choose to introduce new, additional materials into the classroom and to test such materials in a KDO format.

> vi.   **Smiley's Rationale Relies on Inadmissible Character Evidence to Prove that on September 17, 2015, Plaintiff Used Question 5 to Engage in Sexual Harassment**

188.   Smiley argued, "While Professor Robinson seems to advocate his innocent

[sic] of wrong doing, he is lacking in both evidence and credibility.  He did not tell the truth in regard to previous incidents of changing exam questions due to inappropriate hypotheticals, and he did not disclose any of the information regarding past incidents or allegations of sexual harassment made against him." (*Id.* at 8 of 274).

189.    Smiley also stated that "The level of professionalism in written publications and emails appears to be problematic for some students." (Id.)    Smiley meant C1 and C2, the only students she interviewed. (Smiley appears to pluralize singular events or people, perhaps so that her statements or conclusions have added weight.)

190.    Although Smiley stated that Plaintiff's written publications fall under academic freedom and freedom of speech, "they should be at least noted in this report as they (Professor Robinson's publications) contain very contentious inflammatory views regarding black women and black mothers." (Id.)

191.    Smiley stated, "Professor Robinson has also exhibited a past pattern of behavior that makes it more likely than not, that he has created hypotheticals of a sexual nature that made students uncomfortable." (Id.)

192.    Smiley stated, "This pattern of behavior is evidenced by both the KDO 5 question regarding a sexual nature, the inappropriate situations he was asked to change on exams, and previous incidents in which Professor Robinson was inappropriate with faculty members." (Id.)

193.    Smiley stated, referring to past events at least 16 years ago and referring to *Martin v. Howard*, of which Plaintiff was not a party, "It stands to reason that if Professor Robinson exhibited behavior that was inappropriate with faculty members, that the same

behavior could also be exhibited with his students."

194. Smiley stated, again referring to past events at least 16 years ago and referring to *Martin v. Howard*, of which Plaintiff was not a party, "This pattern of behavior adds credibility to the allegations that Professor Robinson was inappropriate with his students and also adds to the more likely than not standard required by the OCR for finding of a Title IX violation."

195. Smiley stated that no record existed in Plaintiff's personnel file to "designate an investigation took place." (Id. at 11 of 274).

196. Smiley then speculated about a note in Plaintiff's personnel file referring to tenure application, in which in June 1996, more than 22 years, a University official expressed concerns about Plaintiff's teaching evaluations. Given that Smiley took more than 504 impermissible days to investigate the allegations against Plaintiff, she simply speculative in a manner that was highly prejudicial to Plaintiff. As for the hypo, Plaintiff began using KDO in 2009.

197. Smiley statements and argument in ¶¶ 190 to 195 are character evidence or traits.

198. Such evidence or traits are likely to be more prejudicial than probative.

199. Smiley's Rationale is sprawling, unfocused, and discursive but not analytical.

200. Smiley relied on character evidence or traits to assert, as she does, that Plaintiff alleged past events proves that on the particular occasion of September 17, 2015, he used Question 5 to inappropriate test § 261. Such inappropriateness constituted a

violation of the Policy.[15]

## C.   Plaintiff's Interview of January 13, 2016

201.   Smiley never asked Plaintiff if on September 17, 2015 he had engaged generally and/or specifically in words or conduct that could constitute unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

202.   Based on C2's false statement about a vaguely possible incident of an explicit sexual fact pattern, Smiley had adopted the naked, unsubstantiated allegations by the students, when she asked whether Plaintiff had had such a prior complaint filed against him, to which he answered no.[16]

203.   Based on the allegations by C1 and C2, Smiley had adopted the students' view that Plaintiff used his KDOs to interact with his students inappropriately, even though no objective evidence existed to support their naked, unsubstantiated allegations.

204.   Based on the allegations by C1 and C2, Smiley had adopted students' view that Plaintiff had no (academic freedom or intellectual property right) right to prevent his students from taking KDO questions outside of the classroom.

205.   Based on the allegations by C1 and C2, Smiley adopted the students' position that Question 5 of September 17, 2015 was inappropriate, asking if his KDOs were vetted or reviewed by the academic dean's office.

---

[15] In the Rationale, Smiley declared that Plaintiff lied when she asked him if he had been asked to change an exam question. Smiley also declared that Plaintiff lied about a formal complaint of sexual harassment. However, the Rationale proffered no objective proof of an exam change due to a complaint. Likewise, the Rationale adduced no documentary proof that Plaintiff had been the subject of a past formal or informal sexual harassment complaint. Plaintiff answered honestly, and given that Howard took more than an impermissible 504 days to investigate the allegations against Plaintiff under the duty of thoroughness, Smiley should rest her Rationale on more than speculation. After all, she didn't find any such complaints in Plaintiff's personnel file. The only thing that sullies Plaintiff's employment file is the erroneous finding of May 4, 2017.

[16] Although Defendants in their Motion to Dismiss and/or Motion for Summary Judgment stated that Plaintiff had lied about a prior formal complaint about an explicit sexual fact pattern, they did not produce any record evidence of such a complaint. Moreover, Plaintiff did not test tortious touching in his Agency, Partnerships, and LLC class until September 2015 after he researched the annotated materials related to § 261 of RESTATEMENT (SECOND) AGENCY (1958).

206. Based on the allegations by C1 and C2, Smiley adopted the students' view that testing § 261 by using a Brazilian waxing service, interjecting: "a Brazilian wax has to do with body parts, what do you mean there's nothing about body parts?"

207. Having adopted C1 and C2's misunderstanding of Question 5, and having no working substantive knowledge of Agency Law, Smiley was convinced that Plaintiff's Question 5 was inappropriate, and so she never asked Plaintiff if his students could have analytically discussed Question 5 without having to introduce personal, intimate experiences.

208. Having adopted C1 and C2's emotional reaction not only to Question 5 but also to Plaintiff's peer-review article, Smiley clearly misunderstood how to apply the reasonable person standard in the context of Title IX, when she stated that a "reasonable person would think genitalia (actually, she said vagina) when you are talking about a Brazilian wax." However, even if a reasonable person thought vagina, it does not follow that Question 5, without more going to the legal and/or factual predicate of sexual harassment, violates the Policy.

209. Smiley omitted that in the discussion of the reasonable person standard, she stated that she would apply the subjective experience test of the complaining students to determine whether Plaintiff violated the Policy.

210. Smiley again misunderstood how to apply Title IX and its jurisprudence, for long before determining how the Complainants 1 and 2 were impacted (i.e., purpose or effect of unreasonably interfering or pervasive or severe that it creates an intimidating, hostile, or offensive environment), Smiley had to established by the preponderance of the evidence that Plaintiff made unwelcomed sexual advances, requests for sexual favors,

and engaged in words or other physical conduct of a sexual nature. Based on allegations and the events of September 17, 2015, Smiley's Notice of Findings of May 4, 2017 did not make findings of material facts and conclusions on these legal and/or factual predicates of sexual harassment.

211. Having adopted C1 and C2's view that Question 5 as offensive and inappropriate, Smiley questioned Plaintiff, made general statement about what all of his students felt, and explained how Title IX operates. However, Smiley never critically engaged or questioned C1 and C2. But Smiley said to Plaintiff: (a) "people have been impacted by your behavior";[17] (b) "People have been offended by what's going on";[18] (c) "there doesn't seem to be a reasonable explanation for using this (KDO Brazilian wax example) over any other example that you could have used in a class;"[19] and (d) "She further advised Professor Robinson that people were offended by the fact pattern."[20] (Id. at 8)

212. Having adopted C1 and C2's view of Plaintiff's interactions with the students in the class and students generally, Smiley completely disregards Plaintiff's contractual entitlement of academic freedom, and mischaracterizes a legitimate quizzes on the substantive materials of Agency Law as an unwelcomed sexual advances, when she writes: "Even if Professor Robinson was not aware that this KDO was unwanted, or

---

[17] During the interview of January 13, 2016, Smiley did not use this language. Rather, Smiley stated that if Plaintiff had use a doctor-patient hypothetical, perhaps the students would have not reacted. To see the degree to which Smiley was biased by the students, and to see the degree to which she was determined to "get the bad guy," Plaintiff would have to get an actual transcript of the interviews with the two students and Plaintiff. Accordingly, the narrative of the interviews, which were prepared by Vanessa Love, contains lots of inaccuracies.

[18] Smiley never used this language.

[19] Smiley never used the phrase "reasonable explanation" during the interview; but she did suggest that I could have used a doctor-patient hypo, to which Plaintiff responded that there would still have to be tortious touching.

[20] Smiley never used this language. She limited her language to "the students," referring to the two complaining female law students.

could cause some students to be uncomfortable, his awareness of whether he conduct complained of was unwelcomed by the students is not required by the Title IX Policy."[21] (Id. at 8-9)

213. Having adopted the subjective experiences of the C1 and C2 as determinative, even though their allegations were specious and emotionally biased, Smiley falsely premised the element of "unwelcomed" not on sexual advances, but on Plaintiff's unspecified conduct, which was non-sexual. (Id. at 9)

### D. Howard Failed to Follow its Published Rules and Procedures.

#### 1. Actual Notice of Material Facts.

214~~108~~. Given that the *1993 Faculty Handbook* and its implied covenant of good faith and fair dealing, Howard had to give Plaintiff actual notice of the material facts.

215~~109~~. Pursuant to its Policy, Howard must provide the accused with the complaint, so that the accused can "submit a written response to the charges." (*Notice of Complaint*, at 3, attached hereto as Ex. 12~~10a~~.)

216~~110~~. Pursuant to its Policy, Howard's notice to the accused must be sufficient enough to permit the accused's written statement to respond "only [to] those relevant statements and materials that you reasonably believe support your view of the important facts." (*Id.*)

217~~111~~. Based on Policy's language, an accused cannot submit a written response that rebuts the allegations unless the accused had received actual notice of the

---

[21] First, this sentence is narrative and argument, and either Love or Smiley is using the interview transcript (or narrative) to apply the elements of the legal and/or factual predicates of sexual harassment analytically to the "facts". But the facts as alleged by Complainants 1 and 2 don't sound in sexual harassment. Second, Smiley never made this statement to me on January 13, 2016. Considering this statement. I don't trust that Love has faithfully transcribed the interview, which Smiley taped on January 13, 2016.

material and important facts and of "relevant statements." (*Id.*)

218~~112~~. Pursuant to Policy's language, the accused may "provide a written analysis of whether . . . the facts support a finding that you have violated the standards contained in the Policy." (*Id.*)

219~~113~~. The foregoing language permits the valid deduction that Howard must provide the accused with meaningful notice, so that the accused can analyze material and relevant facts before the accused might conclude that the accused has violated the standards in Howard's Policy.

220~~114~~. Pursuant to Policy's language, it provides that the accused "will be afforded an opportunity to verbally present [the accused's] position to the Deputy Title IX Coordinator during a personal interview." (*Id.*)

221~~115~~. Unfortunately, the accused cannot possibly present an effective, relevant, and material rejoinder to allegations of sexual harassment if the accused cannot possibly present a defense based on exculpatory evidence, witnesses, and documents, when the Investigator, in violation of the Policy, can lie about providing the accused with actual notice of material facts or simply refuse to provide such facts.

222~~116~~. Pursuant to its Policy, Howard requires the accused to cooperate with its Investigator and the investigation, perhaps to the prejudice of the accused, where the accused cannot get actual notice of the material facts, where the accused unwittingly might admit to violations of Howard's Policy when the accused writes a response hoping to hit a moving, elusive bull's eye buried deep within meaningfully undisclosed facts in general allegations, and where the Notice of Complaint stated: "WE EXPECT THAT YOU WILL COOPERATE WITH THIS INVESTIGATION." (*Id.*)

223~~117~~.      Pursuant to Policy's language, Howard demands that the accused cooperate with the Investigator's investigation due to Howard's concern that it "reach[es] a sound conclusion." (*Notice of Complaint*, at 4, Ex. 10a.)

224~~118~~.      To ensure that it reaches a sound conclusion, Howard invites the accused to identify "specific individuals who may have relevant information that would tend to establish either the truth or falsity of the allegations." (*Id.*)

225~~119~~.      In order for him to bring forth such names to Howard, Plaintiff would have had to receive not only actual notice of the material facts, but also the names of the two female complaining students.  However, Plaintiff could not avail himself of such due process principles where Howard either lies about providing such actual notice of material facts or refuses with impunity to provide them.

226~~120~~.      Given a fair reading of the foregoing language in the *Notice of the Complaint* and its Policy, Plaintiff was entitled to actual notice of the material facts.

E.    **Howard's Had Been Under Public Fire for Its Mishandling of the Jane Doe 5's Sexual Assault Complaints Prior to May 4, 2017, and its Notice Against Plaintiff on May 4, 2017 Created a "Get Tough" Stance for Public and OCR**

227~~175~~.      Between 2014 and 2016, five female students filed sex assault complaints with Howard, alleging that they had either been raped or suffered sexual misconduct by male students and employees at Howard.  (*Jane Doe 5 v. Howard University*, Case No. 1:17-cv-00870-TSC, filed May 10, 2017.)[22]

228~~176~~.      According to *Jane Doe 5 v. Howard University*, as reported by a *BuzzFeed New Article*, entitled *Howard University Refused to Help Suicidal Rape Victims, Explosive Lawsuit Claims*, Jane Doe 1 reported her assault to Smiley on

---

[22]      This federal complaint has been amended to include Jane Doe 6.

February 28, 2016.  Thereafter, Jane Doe 1 called for an update on her request to have the alleged assailant removed from her space on campus.  Despite Jane Doe 1's calls to Smiley, she did not hear from her until March 2016, when Smiley inquired of her "if she was talking about her rape report in text messages with her friends."  Several days later, according to *Jane Doe 5 v. Howard University*, Howard fired Jane Doe 1 from her Resident Advisor's position.[23]

229~~177~~.        On or about March 22, 2016, Jane Doe 1, needing to vent about ~~the manner in which~~ way Howard was treating her and handling her sexual assault complaint, started what *Jane Doe 5 v. Howard University* termed a "Twitter storm."  According to ¶ 3 of Jane Doe 5's federal complaint:

> Plaintiff Doe 1 started a Twitter storm criticizing Howard's mishandling of her complaint of sexual assault. When other students came forward to disclose their similar experiences of indifference at the hands of Howard, Doe 1 learned that Plaintiff Jane Doe 2 reported to Howard in October 2015 that she was also raped by the same male Howard student. Plaintiff Doe 2 left Howard when her case was not investigated because she felt unsafe on campus and was receiving no information or support from Howard. Howard's failure to investigate and effectively resolve Doe 2's complaint meant the assailant remained on campus as an RA and raped Doe 1 over five months later. Only after public criticism brought attention to Howard's deliberate indifference in April 2016 did Howard's Title IX Coordinator reach out to Doe 2 to conduct an investigation into her October 2015 report. Then, in response to Doe 1's Twitter activity, Howard's Dean of Student Affairs told her, "You embarrassed your family by doing that." Doe 1's sexual assault investigation still has not been resolved.

(*Jane Doe 5 v. Howard University*, at 2, ¶ 3.)

230~~178~~.        On or about March 23, 2016, Jane Doe 1's Twitter storm led to #NoMeansNo protest on Howard's campus.

231~~179~~.        On or about March 23, 2016, Garrett Haake, WUSA, reported that

---

[23]        Tyler Kingkade, *Howard University Refused to Help Suicidal Rape Victims, Explosive Lawsuit Claims:  One Howard University Office Allegedly Told a Student "You Embarrassed Your Family" by Going Public About Being Raped*, at 4\*, https://www.buzzfeed.com/tylerkingkade/howard-university-sexual-assault-lawsuit?utm_term=.ce6mPdkaAx#.djxxY3QLZj.

more than 100 Howard students protested Howard's failure to investigate and respond to two rape complaints that dated back to May 2015.[24]

232~~180~~.        On March 26, 2016, in response to the allegations of rape by Jane Doe 1 and 2, this Twitter feed went viral, and it called for change at Howard:[25]



233~~181~~.        According to the BuzzFeed article, Howard has received more $1 million from the U.S. Department of Justice ("DOJ") over the past decade. With such DOJ funding, Howard must make improvements in how it handles sexual assault complaints, "including training campus official about how best to respond to rape reports." Although Howard says it has institutional resources for preventing and assisting victims of sexual assaults, according to the Jane Doe 5's attorney, "the university is falling far short when cases crop up in real life."

234~~182~~.        According to *Jane Doe 5*, Howard had been deliberately indifferent to the sexual assault complaints that were filed by the female students by the glacial way ~~manner in which~~ Howard investigated their complaints, in which Howard

---

[24]        (*Students     Protest     Howard     University's     Handling     of     Alleged     Rapes*, http://www.wusa9.com/news/local/students-protest-howard-universitys-handling-of-rape-investigation/97006950.)

[25]        https://twitter.com/Savage_Glam/status/712319775150624768/photo/1?ref_src=twsrc%5Etfw&ref_url=http%3A%2F%2Fwww.wusa9.com%2Fnews%2Flocal%2Fstudents-protest-howard-universitys-handling-of-rape-investigation%2F97006950

accommodated the needs of these victims, and in which these victims were not afforded a safe educational environment by Howard. (*Jane Doe 5 v. Howard University*, at ¶¶ 132-138.)

235~~183~~.    According to *Jane Doe 5*, Howard retaliated against Jane Doe 2 when it charged her for relocating to another dormitory, against Jane Doe 1 when it fired her from the RA position after she began texting about how Howard was handling her sexual assault complaint, and against Jane Doe 5 when Howard failed to accommodate her, to investigate in a timely manner, and to notify her that Howard needed more time to investigate her sexual assault complaint. (*Jane Doe 5*, at ¶¶ 56-61, 137, 365, 383-387, and 430-433.)

236~~184~~.    Upon belief and information, after the March 2016 protest went viral, Howard was concerned about the negative social publicity.  Howard was concerned that ~~the likelihood that~~ the Jane Doe 5 would likely sue Howard. Howard was concerned ~~and~~ that the public revelations about its mishandling of sexual assault investigations and report management might trigger an OCR investigation.

237.    At the July 12, 2017 mandatory mediation, Teeling acknowledged that Howard was more concerned about an OCR investigation.

238.    Since October 2015, Howard was on actual notice that Jane Doe 1 had alleged that she had been raped.  Protestors accused Howard of sheltering black men, even if they were accused of sexual assault.

239.    According to *Jane Doe 5 v. Howard University*, despite that actual notice, Howard lied when on March 22, 2016 it said: "The University administration is aware of the allegation and took immediate action as soon as we learned of this matter."   In

response, the *Jane Doe 5* complaint alleged: "Howard's statement was knowingly false."

240.    Upon information and belief, Howard had several institutional concerns. ~~In light of~~ First, Howard had ~~the~~ actual notice of sexual assault complaint by the Jane Doe 5.  Second, Howard had a ~~, of~~ poor to no response by Smiley and the Title IX Office. Third, some of the Jane Doe 5 were accusing Howard~~, and of accusations~~ of retaliation and deliberate indifference.  Fourth, given the student protests, negative local news coverage, and outrage of the community, Howard needed a respondent on which it could build a different image – of overly aggressive enforcement of Title IX and its regulations. Finally, Howard needed to create a "get-tough" stance.

241.    Howard's Findings of May 4, 2017 revealed its belated "get tough" enforcement stance.

242.    Upon information and belief, through the Findings of May 4, 2017, Howard deliberately chose the timing that would maliciously harm Plaintiff and that would shore up its flagging institutional standing in the Title IX arena based on what it knew would be the soon-to-be-filed *Jane Doe 5* case.

243~~187~~.       Upon belief and information, knowing that it would soon be sued by the *Jane Doe 5* six days later, ~~six days before Howard knew that it would be sued by the *Jane Doe 5*,~~ Howard announced the Finding against Plaintiff just ahead of May 10, 2017 when the Jane Doe 5 filed their complaint in federal court.  ~~Howard needed proof that it could sanction a male respondent firmly .~~ Upon information and belief, before a federal jury and/or OCR investigators, Howard's Findings would be proof that it would sanction and discipline an accused male employee of sexual misconduct firmly, even a male law professor.

244~~188~~.        On May 4, 2017, Howard~~'s attempt to~~ disciplined and punished
Plaintiff. The Reprimand lacked legal sufficiency.  The Reprimand rested on Notice,
which lacked the required Findings of Material Facts and Conclusions.  Without such
required Findings, Howard has not met its burdens of going forward and ~~burden~~ of
persuasion.  At present, especially considering the weak and disorganized Rationale, the
Findings are thus unsupported and lack legal sufficiency.

245.    Howard's Sanctions/Disciplinary Measures under the Reprimand were
based on the unsupported Findings of May 4, 2017. (Policy, § V. B. (7) & (9), at 13, 14,
Ex. 10b)

246.    Upon information and belief, Howard's Findings of May 4, 2017, on
which it would rely to support its likely assertion that it can "get tough" on accused
males, meant that Howard would take more than 504 days to investigate the allegations
against Plaintiff, even though no objective bases exist to find that Plaintiff's September
17, 2015 quiz and his pedagogical questions constituted unwelcomed *sexual* advances, a
request for *sexual* favors, and other verbal, nonverbal, or physical conduct of a *sexual*
nature.

247.    Upon information and belief, and based on ¶¶ 226 to 228, Wutoh and
Smiley had improper motives, upon which they acted intentionally and purposefully
when Wutoh issued the unsupported Findings of May 4, 2017 against Plaintiff.

248.    Upon information and belief, especially given that Wutoh and his Title IX
staff are required to have ongoing training, Wutoh and Smiley knew, had reason to know,
or should have had reason to know that nothing Plaintiff did on September 17, 2015 in
full view of his students constituted sexual harassment as defined by the *1993 Faculty*

*Handbook*, by the Policy, by OCR guidance, and by federal court jurisprudence.

249.   Upon information and belief, and especially given their familiarity with the Policy and Title IX rules and regulations, Wutoh and Smiley knew, had reason to know, or should have had reason to know that the Findings of May 4, 2017 required findings of material facts and proper conclusions of which material facts violated the elements of the Policy's standards against sexual harassment to satisfy minimally the implied covenant of good faith and fair dealing of the *1993 Faculty Handbook*.

250.   Upon information and belief, especially given their familiarity with the Policy, Title IX rules and regulations, and the implied covenant of good faith and fair dealings of the *1993 Faculty Handbook*, and given that they had to know that the Findings of May 4, 2017 were unsupported by findings of material facts, Wutoh and Smiley were principally and improperly motivated to respond to an institutional conflict of interest.

251.   Upon information and belief, by responding to Howard's institutional conflict of interest through the improper issuing of the unsupported Findings of May 4, 2017, neither Wutoh nor Smiley were impartial, objective investigators who could properly render an impartial, objective and sound conclusion on the subjective allegations of the two female law students, and Wutoh and Smiley conspired to deliberately and maliciously harm Plaintiff.

252.   Upon information and belief, Wutoh and Smiley, now institutionally conflicted, were principally motivated to thwart, if possible, an DOE/OCR investigation based on the *Jane Doe 5* federal complaint, and Plaintiff served as road kill for their illegal and improper purpose.

253.    Upon information and belief, and to deal with the institutional conflict of interest caused by Howard's mishandling of the *Jane Doe 5* complaints of sexual assault, Howard's leadership, even when Plaintiff and FIRE put such leadership on at the very least inquiry notice, has refused to vacate the erroneous Notice of May 4, 2017 and to rescind the vague, baseless, and unreasonable Sanctions/Disciplinary Measures as set forth in the Notice and Reprimand of May 4, 2017.

## COUNT 1

### (Breach of Contract by Howard)

254~~215~~.    The foregoing allegations are incorporated herein by reference.

255~~216~~.    Plaintiff's employment relationship with Howard is governed by and understood through the *1993 Faculty Handbook*, of which §§ 2 and 3 are expressly incorporated into Plaintiff's employment contract with Howard.

256~~217~~.    Plaintiff~~,~~ was appointed to the faculty in the School of Law in July 1994, and was tenured and promoted under the *1993 Faculty Handbook*, and each of those decisions had to satisfy not only Law School bylaws and Howard's tenure and promotion requirements of Howard, but also the express language and implied duty ~~covenant~~ of good faith and fair dealing of the *1993 Faculty Handbook*.

257~~218~~.    From ~~Since~~ 1994 to May 4, 2017, Plaintiff and Howard have been in a twenty-three (23) year employment relationship.

258~~219~~.    Based on the *1993 Faculty Handbook*, to which Howard's Policy is appended, Plaintiff has reasonable contractual expectations that all decisions by Howard, its agents, and employees that affected his personnel status, and/or his academic freedom and free speech, and/or ~~his employment's~~ terms and conditions of his

employment would comply with the express processes and procedures of the Policy as understood through and satisfied by ~~and satisfy~~ the implied duty ~~covenant~~ of good faith and fair dealing.

259.    Even if Howard posits that the Policy is a stand-alone set of rules and regulations, Howard and its agents and employees cannot in the application of the Policy unilaterally alter the express language and the implied duty of the good faith and fair dealings, under which Plaintiff had the reasonable contractual expectations that he would be free from arbitrary and capricious decisions that affects his personnel status, his academic freedom and free speech, and the terms and conditions of his employment.

260~~220~~.        Based on the *1993 Faculty Handbook*, to which Howard's Title IX Policy is appended, administrators and faculty who participate in shared governance have a mutual obligation to avoid acting in bad faith, or, stated positively, to make decisions that are unbiased, objective, impartial~~,~~ and that abide the established and published rules, regulations, and procedures of ~~HU's~~ the Policy and of Title IX.

261~~221~~.        Based on the ~~aforementioned~~facts and circumstances, Howard owed duties ~~a duty~~ to Plaintiff when enforcing ~~HU's~~ the Policy and the rules and regulations under Title IX, and given the foregoing facts, pleadings, and circumstances, Howard breached the express and/~~or~~ implied ~~covenants~~ duties of good faith and fair dealing ~~with~~ owed to Plaintiff.

262~~222~~.        Howard committed several breaches ~~covenants~~ duties of the *1993 Faculty Handbook* and rules, processes, and procedures of Title IX and its ~~Title IX~~ Policy with Plaintiff, including, without limitation when ~~it~~ Howard:

(a) [a] refused to give Plaintiff proper, meaningful notice of the fact specific and spurious allegations made by the two complaining female law students from December 17, 2015 to the present day;

(b) [b] adopted and applied a subjective experience test, which gave undue evidentiary weight and institutional imprimatur to the female victims' victim's narratives, which rejected the reasonable persons standard under Title IX, which a priori made Plaintiff responsible for violating the Policy, which shifted the burden of proof to Plaintiff rebut that implicit finding of responsibility by dislodging the highly subjective experiences of the two complaining females, thus rendering Plaintiff's exculpatory evidence and objective materials moot, and which destroyed permitted Wutoh, Smiley, and/or Love to ignore requirements under Title IX regulations and OCR Guidance that in the investigation of allegations of the accused they would be Smiley's required fairness, objective objectivity, and impartiality;

(c) [c] became motivated by improper considerations due to the institutional conflict of interest by the Office of the Provost and the Title IX Office to purposefully and intentionally engage in overly aggressive enforcement of its Title IX Policy against Plaintiff, so that Howard, anticipating a suit the Jane Doe 5 for its mishandling of their complaints of sexual assault, could have use Plaintiff's finding of responsibility ease to show that it Howard can and will adopt takes a "get-touch" stance on male employees who found responsible for sexual misconduct like sexual harassment allegations;

(d) [d] failed to complete the investigation of the spurious and specious allegations against Plaintiff within the required 60-calendar days, and chose to keep the

investigation hanging over Plaintiff's professional head and personal life for more than 504 days and then ~~to~~ issued the Notice ~~of Finding~~ on a timing that conveniently would allow~~ed~~ ~~HU~~ Howard to say to the public, the OCR, and the Jane Doe 5 that it punishes sexual harassers firmly and thoroughly; and

(e) ~~[e]~~ issued the Notice ~~of Findings, under which it found sufficient evidence of *quid pro quo*~~ sexual harassment ~~and hostile environment sexual harassment~~, even though Smiley's Rationale completely lacked the required findings of material fact on the legal predicate for sexual harassment, even though Smiley's Rationale rested largely on her conclusive presumptions that credited spurious allegations of two female students, and even though Smiley's Rationale gave weight to inadmissible character evidence and character trait that purported to show that due to 20-year old acts, Plaintiff more than likely created a depilatory hypo to test § 261 that was in her ungrounded estimation of a sexual nature.

(f) Based on the foregoing, Howard's Notice of May 4, 2017 was arbitrary and capricious.

(g) Based on the foregoing, the Notice was an erroneous outcome, due to the Title IX Office adopting the unknown and unpublished subjective experience test.

(h) Based on the foregoing, the Notice violated the rules and regulations of Title VII and Title IX, and breached the express and implied duties of the *1993 Faculty Handbook*, against sex discrimination~~:~~.

263. Howard's violations and breaches were wrongful, without lawful and contractual justification or excuse.

264~~223~~.      As a direct and foreseeable consequence of these violations and breaches, Plaintiff has sustained, and will continue to sustain, substantial injury, damages, and loss, including, but not limited to: severe emotional distress; injury to reputation; future economic loss; past pain and suffering, future pain and suffering, and loss of future legal and legal academic opportunities; suicidal ideation.

~~229~~.      As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

## COUNT 2 ~~H~~

### (Breach of Implied Duty of Good Faith and Fair Dealing by Howard)

265~~230~~.      The foregoing allegations are incorporated herein by reference.

266~~231~~.      Howard violated the implied duty ~~covenant~~ of good faith and fair dealing in its employment contract and under the *1993 Faculty Handbook* with Plaintiff by subjecting him to an unfair, arbitrary, capricious, and malicious investigative procedures, and denying him the fruits of his contract with Howard.

267.      Howard illegally and improperly used an accused male employee like Plaintiff as the patsy in Howard's scheme to remedy the deep, institutional conflict of interest that arose out of and under the Title IX Office's failure to timely and properly investigate complaints of sexual assault by five female students against male students and employees as alleged in the pleadings of the *Jane Doe 5 v. Howard University*.

268.      To respond to the anticipated allegations by *Jane Doe 5 v. Howard University*, Howard needed a clear institutional showing that it would take a "get tough" stance against male employees, especially a law professor, who were accused of sexual misconduct.  Howard needed to find Plaintiff responsible for violating the Policy.

Howard then needed strong, near invasive sanctions and disciplinary action against Plaintiff. On May 4, 2017, days before the Jane Doe 5 sued Howard, Howard unveiled its Notice against Plaintiff, even though Howard knew or in the exercise of due care should have known that Smiley's Rationale was factually and legally flawed, even though Howard knew or had reason to know that the Rationale failed to make the required findings of material facts, and even though Howard knew and had reason to know that it had not met its burdens of production and persuasion.

269232. As a direct, proximate, and foreseeable consequence of these breaches, Plaintiff's academic and career opportunities, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to his physical well-being, emotional and psychological damages, damage to reputation, past and future economic losses, loss of professional opportunities, and other direct and consequential damages.

270233. As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, prejudgment interest and attorney's fees and costs.

## COUNT 3

### (Violation of Title IX – Erroneous Outcome Theory by Howard)

271. The foregoing allegations are incorporated herein by reference.

272. Title IX of the Education Amendments of 1972 provides, in relevant part that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

273.    Title IX of the Education Amendments of 1972 applies to the entire school or institution if any part of that school receives federal funds; hence, the School of Law is subject to Title IX of the Education Amendments of 1972.

274.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder, 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (DOJ) (emphasis added).    Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[a]

275.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."[b]

276.    Howard is a private educational institution and is a recipient of federal educational funds.    It is not subject to the constitutional due process guarantees in the enforcement of its Policy.    However, the due process requirements and basic fairness, to which Plaintiff is entitled, are contractual obligations that arise out of and under Plaintiff's employment contract with Howard, the *1993 Faculty Handbook*, and its implied duty of good faith and fair dealings.    One of the fundamental reasonable contractual expectations held by Plaintiff is that in the enforcement of its rules and

---

[a]    *See generally* U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX (2001), at 19-20, 21 & nn. 98-101.

[b]    *Id.* at 22.

regulations, Plaintiff must be free from arbitrary and capricious decisions by the University.

277.   The "prompt and equitable" procedures that a school like Howard must implement to "accord due process to both parties involved" or to fulfill its express and implied contractual obligations to Plaintiff, must include, at a minimum: (a) "Notice . . . of the procedures, including where complaints may be filed"; (b) "Application of the procedures to complaint alleging [sexual] harassment"; (c) "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; (d) "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and (e) "Notice to the parties of the outcome of the complaint."[a]

278.   A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

279.   On September 17, 2015, Plaintiff tested his students' knowledge of § 261 through a depilatory service (Brazilian wax) hypo, in which T, the customer, would allege tortious touching. Apart from distributing the KDO, providing feedback during the analyses of the seven questions, and asking relevant pedagogical questions, Plaintiff used no words or engaged in no physical conduct that would independently subject him to an actionable cause under Title IX.   For example, Plaintiff did not invite expressly or otherwise male or female students to reveal personal grooming habits a la Brazilian

---

[a]      *Id.* at 20.

waxes. In his issued caveat, he specifically asked students not to use what they know or might know or belief to challenge Question 5.

280. In law school pedagogy, a logical black-box hypo on tortious touching, which substantively arises in the teaching of first-year courses like Torts and Criminal Law and in upper-level courses like Agency Law, Employment Law, Domestic Violence Law, Child Welfare Law, cannot be in and of themselves actionable examples of verbal or physical conduct of a sexual nature. Were such hypos to become actionable causes in and of themselves, law professors could not, and would not, teach fundamental legal concepts that have helped attorneys represent their clients in matter related to assault, battery, and other sex-related violent acts either by the state or by private individuals.

281. By issuing the Notice of May 4, 2017, despite the absence of findings of material facts and proper conclusions of which material facts applied to the elements of the Policy's standards against sexual harassment, Howard violated its Policy, Title IX, and/or guidance promulgated by OCR.

282. By issuing the Reprimand of May 4, 2017, which sanctioned and disciplined Plaintiff, despite the absence of findings of material facts and proper conclusions under the Notice of May 4, 2017, Howard violated its Policy, Title IX, and/or guidance promulgated by OCR.

283. Based on Wutoh, Love, and/or Smiley adopting and applying the subjective experience of the two complaining female students, which gave undue evidentiary weight to their spurious allegations, and which confessed that Howard would use as an evaluative tool a perspective that had an anti-male bias, Howard's Notice constituted an erroneous outcome. Upon information and belief, Howard knows that

agents and employees in the Title IX Office have an anti-male bias. However, Howard has not shown that Smiley had an independent, objective (i.e., factual and legal) basis for the unsupported conclusions that she reached in the Rationale of the Report. Howard knew or in the exercise of due care should have known that Smiley's Rationale stood upon inadmissible character evidence or character traits, so that in lieu of grounded material facts and cogent legal analyses, Howard could yet again attempt to impugn Plaintiff's professional reputation, even to this Honorable Court, by saying that Plaintiff's past screams that he more than likely drafted a depilatory hypo of a sexual nature. Moreover, Howard knew or in the exercise of due care should have known that Smiley's anti-male bias from the way she littered the Rationale with factual and legal irrelevancies, e.g., Plaintiff's published academic writings.

284. At the very least, Wutoh, Love, and/or Smiley's anti-male bias, which was clear in Smiley's interview of C1 and C2, the only students that she interviewed of the 34 students in the Agency Law class, in her interview with Plaintiff, and in the unsupported conclusions in the Rationale, informed the Notice of May 4, 2017.

285. Howard has deprived Plaintiff, based on his sex, of his rights to contractual-based due process, basic fairness, and equal treatment as understood through Title IX regulations and the Policy.

286. Given the foregoing, Howard unlawfully found that Plaintiff had violated its Policy and wrongfully disciplined Plaintiff because he was an accused male employee.

287. By erroneously finding and disciplining Plaintiff, Howard violated its Policy, Title IX regulations, and/or guidance promulgated by OCR regarding Title IX.

288. By erroneously finding and disciplining Plaintiff, Howard breached Plaintiff's reasonable contractual expectations that in enforcing its rules and regulations like the Policy and Title IX regulations, Howard would not engage in arbitrary and capricious conduct and decisions that would violate the express and implied duties of the *1993 Faculty Handbook*.

289. Howard unlawfully failed to exercise its institutional authority to take corrective measures to remedy: (a) the Title IX Office's improper assertion of jurisdiction over the spurious allegations against Plaintiff; and/or (b) the Title IX Office's adoption and application of the subjective experience of the female victim, which gave irrebuttable presumption that their allegations against Plaintiff were true and actionable under Title IX; and/or (c) the Title IX Office's erroneous determination that Plaintiff violated the Policy that Howard adopted pursuant to federal laws and regulations related to Title IX.

290. Howard, once it had actual or at the very least inquiry notice, was deliberately indifferent by refusing to remedy: (a) the Title IX Office's failure to follow its rules, regulations, and procedures under its Policy, Title IX regulations, and/or guidance issued by OCR; and/or (b) the Title IX Office's adoption and application of the subjective experience test, which grants undue evidentiary weight and/or irrebuttable presumption to spurious allegations against Plaintiff, which prejudices accused males by requiring them to shoulder the burden of proof to discredit highly subjective experiences by two female students, and which leads inexorably to erroneous outcomes; and/or (c) the Title IX Office's erroneous determination that Plaintiff violated the Policy that Howard adopted pursuant to federal laws and regulations related to Title IX.

291.    Upon    information    and    belief,    Howard    possesses    additional
communications evidencing Howard's unlawful finding and discipline of Plaintiff based
on his sex and gender. Evidence supporting this allegation includes, but is not limited to,
Howard's refusal to provide Plaintiff documents and information he requested during the
interview, e.g., the complete and unedited transcript of the Smiley's recorded interviews
with C1 and C2, Plaintiff, Associate Dean Crooms-Robinson, former acting dean Okianer
Christian Dark, and current Dean Danielle Holley-Walker.

292.    As a direct and proximate causes, and foreseeable consequence of these
breaches, Howard has cause Plaintiff to suffer now and in the future the loss of academic
and career opportunities, earning potential, and severely harmed reputation. He has
sustained significant damages, including but not limited to, damages to his physical well-
being, emotional and psychological damages, mental and emotional anguish, past and
future economic losses, past and future pain and suffering, and other direct and
consequential damages. Due to harmful, near unforgiving social climate against males
who have been found to be sexual harassers, of which Howard is aware, Plaintiff is
reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled
to the rights and remedies at law provided by Title IX and 42 U.S.C. § 1981a, including
actual damages, emotional distress, emotional harm, compensatory damages in an
amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys'
fees, punitive damages, expert witness fees, and attorneys' fees, expenses, costs, and
disbursements.

## COUNT 4

**(Violation of Title IX – Deliberate Indifference Claim by Howard)**

293. The foregoing allegations are incorporated herein by reference.

294. Title IX of the Education Amendments of 1972 provides, in relevant part that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

295. Title IX of the Education Amendments of 1972 applies to the entire school or institution if any part of that school receives federal funds; hence, the School of Law is subject to Title IX of the Education Amendments of 1972.

296. Howard, agents, and employees, including but not limited to Wutoh, Smiley, and/or Love, acted with deliberate indifference toward Plaintiff because he is a male.

297. Howard, agents, and employees, including but not limited to Wutoh, Smiley, and/or Love, due to improper motives arising out of and under the failure to investigate allegations of sexual assault as alleged by the *Jane Doe 5*, were deliberately indifferent to Plaintiff's actual notice to Howard's leadership that he had suffered an erroneous outcome.

298. Upon information and belief, Howard needed Plaintiff, a male employee, to serve as an example of Howard's recent "get tough" stance against male employees who have been accused of sexual misconduct.

299. Upon information and belief, Howard, if it properly vacated the finding against Plaintiff, the C1 and C2 might complain that yet again, as in the Jane Doe 5 cases, Howard has refused to punish male employees like Plaintiff who have been accused of sexual misconduct like sexual harassment.

300.    Howard unlawfully failed to exercise its authority to take corrective measures to remedy:  (a) Howard's violation of Plaintiff's rights under the Policy, Title IX regulations, and/or guidance issued by OCR; and/or (b) Howard's erroneous determination that Plaintiff violated its Policy, which Howard adopted pursuant to federal laws and regulations related to Title IX.

301.    Howard was deliberately indifferent by refusing to remedy:  (a) Howard's violation of Plaintiff's rights under the Policy, Title IX regulations, and/or guidance issued by OCR; and/or (b) Howard's erroneous determination that Plaintiff violated its Policy, which Howard adopted pursuant to federal laws and regulations related to Title IX.

302.    Upon information and belief, Howard possesses communications evidencing its agents and/or employees' sex and gender deliberate indifference towards Plaintiff and/or other similarly situated male students.

303.    Howard, including, but not limited to, the Board of Trustees and the President, who had the institutional authority to take corrective actions and who refused to vacate the erroneous Findings of May 4, 2017 and the baseless Reprimand of May 4, 2017, was the direct and proximate causes of Plaintiff's suffering physical harm, including severe emotional distress, panic attacks, depression, anxiety, loss sleep, and suicidal ideation.

## COUNT 5 ~~III~~

### (Violation of Title VII – Sex Discrimination by Howard)

304~~234~~.    The foregoing allegations are incorporated herein by reference.

305~~235~~.    Plaintiff is a male employee of Howard, and brings this action under Title VII of the Civil Rights Act of 1964 to redress the wrongs done to him by Howard's decision to find Plaintiff in violation of its ~~Title IX~~ Policy after Howard adopted and applied an unknown and unpublished subjective experience test, ~~"subjectivity test,"~~ on which Smiley, the investigator, relied ~~investigators rely~~ to determine conclusively ~~whether~~ that (mostly if not exclusively male) accused employees ~~respondents~~ have violated its Policy, based solely on how (mostly if not exclusively female) complainants subjectively experienced, believed, and felt about respondent's words, actions, or conduct

306.    By adopting and applying this conclusive presumption in favor of female complainants, Smiley, and thus Howard, gave no evidentiary weight to Plaintiff's objective, exculpatory evidence, documents, and/or statements.

307.    By adopting and applying this conclusive presumption in favor of female complainants, and by thus shifting the burden of proof to the accused male employees like Plaintiff, Smiley, and thus Howard, failed to set forth the required findings of material facts, including but not limited, the presence of absence of independent conduct beyond Plaintiff, and without regard to the absence of threshold legal predicates for sexual harassment, *viz.*, unwelcomed *sexual* advances, request for *sexual* favors, and other verbal, nonverbal, or physical conduct of a *sexual* nature.

308.    Plaintiff has been the victim of unlawful discriminatory conduct in the workplace through Howard's arbitrary, capricious, malicious, and negligent applications of its rules, regulations, processes, and procedures for investigating subjective allegations of sexual harassment to determine whether Plaintiff's actions on September 17, 2015

violated the Policy. Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by Howard on the basis of his sex. These employment actions were unlawful and in violation of Title VII, 42 U.S.C. § 2000e-2(a).

309. Howard agents and employees, including but not limited to Wutoh, Smiley, and Love, have discriminated against Plaintiff by treating him differently from and less preferably than similarly situated female who might be subjected to highly subjective allegations of sexual harassment.

310. Howard's processes and procedures have had a disparate treatment on Plaintiff with respects to the terms and conditions of his employment contract and under the implied covenant of good faith and fair dealing of the *1993 Faculty Handbook*.

311. Howard's agents and its employees's, including but not limited to Wutoh, Smiley, and Love, conduct has been intentional, deliberate, willful, malicious, reckless, and/or conduct in callous disregard for Plaintiff's reasonable contractual expectations and entitlement that arise out of and under his employment contract with Howard as understood through and enforced under the implied covenant of good faith and fair dealings of the *1993 Faculty Handbook*.

312. Plaintiff also suffered disparate treatment in violation of Title VII, where Howard seeking to deal with the deep, institutional conflict of interest arising out of and under Howard's failure to properly investigate the allegations of sexual assaults as set forth in the pleadings of *Jane Doe 5 v. Howard University*, Wutoh and Smiley needed not females who are generally viewed as victims of sexual misconduct, but males who society and they might regard to having a predilection of commit acts of sexual assault as alleged in *Jane Doe 5 v. Howard University*. Plaintiff is a male faculty member who,

based on timing controlled by Howard, was conveniently found to have violated the Policy in the Findings of May 4, 2017 in the immediate days before the Jane Doe 5 filed their federal complaint against Howard on May 10, 2017.

313. Howard's leadership, including Wutoh, knew, had reason to know, or should have had reason to know that their conduct, actions, omissions, whether willful or otherwise, would cause Plaintiff to suffer disparate treatment, and on July 12, 2017, Wutoh and Teeling acknowledged that Plaintiff had not violated Howard's Policy.

314. On July 12, 2017, Teeling acknowledged that Howard was less concerned about making the proper finding in its investigation of the allegations against Plaintiff and more concern about a DOE/OCR investigation.

315. After filing a timely complaint with the EEOC, Plaintiff received on November 27, 2017 a "notice of suit rights" to sue within 90 days from the EEOC. (EEOC, Notice of Suit, dated Nov. 27, 2017, attached hereto as Ex. 31)

316. As direct and proximate causes, and foreseeable consequences of these breaches, Plaintiff's academic and career opportunities, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to his physical well-being, emotional and psychological damages, mental and emotional anguish, damage to reputation, past and future economic losses, past and future pain and suffering, loss of future professional opportunities, and other direct and consequential damages. Due to this harm, in near unforgiving social climate against males who have been found to be sexual harassers, Plaintiff is reasonably certain to continue to suffer these damages in the future. Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981a, including actual damages,

compensatory damages in an amount to be determined at trial, plus prejudgment and
post-judgment interest, attorneys' fees, punitive damages, and attorneys' fees, expenses,
costs, and disbursements.

## COUNT 6

### (Title IX Violation – Retaliation by Howard)

317.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a),
provides, in relevant part that:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to
> discrimination under any education program or activity receiving Federal
> financial assistance.

318.    Title IX of the Education Amendments of 1972 applies to the entire school
or institution if any part of that school receives federal funds; hence, the School of Law is
subject to Title IX of the Education Amendments of 1972.

319.    The Department of Education regulations expressly prohibit retaliation.

320.    Howard is a recipient of federal education funding, and it is subject to
OCR Guidance and Title IX regulations.

321.    Plaintiff has a private right of action under Title IX when he suffered
retaliation for protesting the sex discrimination that he suffered because Smiley and the
Title IX Office adopted and relied upon an unknown and unpublished subjective
experience test as an evaluative process for determining conclusively when Plaintiff
violated the Policy.

322.    Under Title IX, retaliation is sex discrimination because it is an intentional
response to the nature of the complaint: an allegation of sex discrimination.

323.    After taking a KDO on September 17, 2015, two third-year female law students waited almost three months to file a complaint against Plaintiff, in which they did not allege that Plaintiff at the very least made unwelcome sexual advances toward them. When asked, they stated that they did not like Plaintiff's professional casualness, his email salutations and signs off, his use of his first name in class or emails, his depilatory hypo that tested § 261, and two of his scholarly articles.

324.    During the three months, the complaining students developed strong odious feelings toward Plaintiff after they read two of his peer-review articles. After talking to other students, their friends, and law faculty, they concluded that Plaintiff didn't like black women and that he encouraged or justified misogyny and violence against black women. They objected to Plaintiff's published ideas and thoughts that black mothers abused their children.

325.    On December 4, 2015, the two female students complained about Plaintiff to Smiley, who believed the complaints as holy writ. She completely accepted their allegations against Plaintiff and their desire to punish him or to have him terminated. After more than 504 days, Howard issued a Notice against Plaintiff that stood upon the Report of Investigation, both of which drew institutional force from Smiley's Rationale.

326.    Smiley's Rationale clearly embraced the subjective experience test to determine conclusively that Plaintiff had violated the Policy. Smiley had adopted the two females point of view. Smiley questioned, rejected, belittled, and dismiss Plaintiff's exculpatory documents/materials and his explanatory statement.    Most importantly, Smiley's Rationale adduce not sufficiently reliable and probative fact and material findings on the legal predicates of sexual harassment, without which no threshold

analyses can take place. Her Rationale was rambling, disorganized, lacking in analyses, and highly speculative as she strained to give institutional force to the two females' highly subjective allegations against Plaintiff.

327.  Far worse, Smiley's Rationale rested impermissibly on inadmissible character evidence and character traits. Offering Plaintiff's past to prejudice him and to bolster her ineffective claims that he violated the Policy, Smiley traveled back in time to 1998, hoping to drudge up "dirt" so that she could convince Wutoh of Plaintiff's propensities where her thinly purported analyses clearly failed her. Smiley was thus not objective, fair, and impartial. She stated, "Professor Robinson has also exhibited a past pattern of behavior that makes it more likely than not, that he has created hypotheticals of a sexual nature that made students uncomfortable." Under Title IX and the Policy, a student's subjective feelings of discomfort born by no behavior that falls under the legal predicates of sexual harassment are not actionable under the Policy.

328.  Based on the Rationale, and Smiley and Love's adoption of the subjective experience test to determine conclusively whether an accused male has violated the Policy, Smiley has no independent basis for her unsupported conclusions, which were devoid of any findings of material fact. Without an independent, objective basis for her conclusions, Smiley then must have held an anti-bias or a pro-female bias.

329.  On or about May 14, 2017, Plaintiff appealed to Wutoh, the second highest-ranking agent at the University and the Title IX Decisional Authority. After appealing to him, Plaintiff informed Wutoh that he would send his entire record to a disinterested, nonprofit, nonpartisan organization, i.e., FIRE. Plaintiff did send those documents to Ms. Susan Kruth. Plaintiff accepted FIRE's help because he was seeking to

reverse the unsupported Notice and to end the sex discrimination he faced from the Title IX Office.

330.    After giving Wutoh actual notice that Plaintiff would seek FIRE's help to reserve the erroneous decision against him, Wutoh and Howard had actual or constructive notice that Plaintiff was engaged in protected activities under Title IX.

331.    In an email dated May 24, 2017, which Plaintiff received at or around 1:40am on May 25, 2017, Wutoh summarily rejected Plaintiff's appeal.    Under the Policy, Wutoh has a due diligence duty, which requires him to read the Report, the Rationale, the findings of material fact, and the Recommendations.    After so reading, Wutoh must use his own independent judgment in deciding whether to accept, reject, or modify Smiley's findings and recommendation.    Wutoh, as the Title IX Decisional Authority who has terminal, unappealable authority, cannot delegate such authority to employee or non-agents.    First, Wutoh gave Plaintiff's appeal to Smiley who, based on adopting and relying upon the subjective experience test, held an anti-male, should not have received it.    Second, in summarily rejecting Plaintiff's appeal, Wutoh stated that not that he revisited Smiley's Report and reconsidered Plaintiff's specific claims, but that he relied on the Title IX Office.

332.    On May 25, 2017, Plaintiff sent by email a copy of his appeal memo to President Frederick and Mr. Stacey Mobley, Chair, Howard Board of Trustees.    Plaintiff used email address to which he had sent messages, and from which he had received replies.    In Plaintiff's appeal memo, he pointed out that Smiley, the investigator, was biased against him.    Neither President Frederick nor Mr. Mobley replied.

333. Wutoh was the only institutional authority and agent/officer to whom Plaintiff could appeal under the Policy.

334. Wutoh's summary rejection was an adverse decision that has frustrated Plaintiff's effort to overturn the erroneous outcome and sex discrimination because under the Policy, Plaintiff cannot appeal the Provost's Findings and summary rejection to any other University's official.

335. Upon information and belief, Wutoh sought to frustrate and/or undermine Plaintiff's protected activities under Title IX, so that Howard could still have an answer to any claim by the *Jane Doe 5 v. Howard* case that Howard does not sanction accused male employees who engage in sexual misconduct.

336. Upon information and belief, Wutoh's adverse decision, especially if Plaintiff was not prepared to sue and if Howard stonewalled FIRE attempts to help Plaintiff (and Howard did stonewall FIRE), was designed to redress an institutional conflict of interest and to achieve through sex discrimination against Plaintiff an improper purpose.

337. Howard's violation of Title IX caused Plaintiff to suffer emotionally, physically, and psychologically in an amount to be determined at trial.

## COUNT 7 ~~IV~~

### (Intentional Infliction of Emotional Distress Against Howard, Wutoh, Love, and Smiley)

338~~261~~. The foregoing allegations are incorporated herein by reference.

339. The foregoing allegations are incorporated herein by reference.

340. Howard's, Wutoh's, Love's, and Smiley's actions and omissions were intentional, extreme, and outrageous during all matters from December 17, 2015 to the

present when he: (a) deliberately refused to give Plaintiff proper, meaningful notice; (b) knowingly used the Interview setting to induce prejudicial or injurious statements from Plaintiff; (c) authorized Smiley to announce an unpublished subjective experience test, by which Smiley would give undue evidentiary weight to the two female law students' victim narrative, and on which Howard would rely to determine conclusively that Plaintiff violated its Policy; (d) allowed for an interview that was not a fair, objective, and impartial hearing; [e] authorized and/or permitted the 504-calendar day investigation; (f) agreed with the Report that lacked findings of material facts and proper conclusions on which material facts was related to the elements of the Policy's standards against sexual harassment, despite his duty of due diligence under the Policy; (g) agreed with Smiley's Recommendations, despite his duty of due diligence under the Policy; (h) authorized the drafting of the unsupported Findings of May 4, 2017; (i) signed the unsupported Findings of May 4, 2017; (j) admitted at the reading of the Findings meeting of May 4, 2017 that under the reasonable persons' objective test Plaintiff had not engaged in sexual harassment; (k) avoided his clear obligations under the *1993 Faculty Handbook*, Howard's Policy, and Title IX's rules and regulations by delegating his nondelegable duty of reviewing Plaintiff's appeal memo and his good faith obligations to Smiley when he had inquiry notice from Plaintiff that Smiley had violated Title IX's rules and regulations and the Policy; (l) authorized the drafting and submission of sanctions and disciplinary actions of the Reprimand of May 4, 2017, even though the Findings of May 4, 2017 were unsupported and demonstrated that Howard had not met its burdens of production and persuasion; and (m) refused to take corrective action to mitigate or end

the harm suffered by Plaintiff after Howard labeled him a sexual harasser and after receiving credible inquiry notice from FIRE and Plaintiff.

341. Howard's, Wutoh's, Love's, and Smiley's actions and omissions were done purposefully and intentionally to injure Plaintiff, who was in fact injured, and to assure a result that found Plaintiff responsible for the alleged sexual harassment of which he was wrongly accused.

342. Howard's, Wutoh's, Love's, and Smiley's actions and omissions were intentional and was motivated by an improper purpose of ensuring that Plaintiff was found liable for violating the Policy to: (a) protect himself, the Provost's Office, and Howard from the consequences of Smiley failing to timely investigate the Jane Doe 5's sexual assault complaints; (b) quell the student and community unrests related to #NoMeansNo; (c) redress the deep, institutional conflict of interest that arose out of and under the alleged failure by the Title IX Office, *viz.*, Smiley, to investigate the sexual assault complaints against Howard male students and employees from 2014 to 2016 as pled in *Jane Doe 5 v. Howard University*; (d) present an aggressive enforcement and get-tough stance to a potential jury in *Jane Doe 5 v. Howard University*; and (e) stave off a related OCR investigation.

344. Since December 17, 2015, Howard, Wutoh, Love, and Smiley disregarded Plaintiff's well-being by purposefully ensuring that Plaintiff could not properly defend himself from December 17, 2015 to May 4, 2017 by *inter alia*: (a) not allowing Plaintiff to investigate the case due to the gag order that was enforced by disciplinary action and sanctions, (b) denying Plaintiff access to fact specific allegations, (c) preventing him from calling witnesses who by May 4, 2017 had stale memories or have relocated to

different parts of the country, thus imposing additional cost on Plaintiff to depose or garner their testimonies, and (d) allowing the processes and procedures to become tainted by the subjective experiences, beliefs, and feelings of two female law students, which gave them complete access to Smiley, which gave undue evidentiary weight and institutional imprimatur to their subjective allegations, which burdened the processes and procedures with an anti-male bias, and which caused Plaintiff to suffer sex-based discrimination.

345. As a result of Wutoh's actions and omissions, Plaintiff has suffered severe emotional distress and physical harm that continue to this day.

346. This malicious intentional conduct allows for the recovery of compensatory and punitive damages.

## COUNT 7

### (Negligent Infliction of Emotional Distress Against ~~Defendant~~ Howard, Wutoh, Love, and Smiley)

347~~262~~. The foregoing allegations are incorporated herein by reference.

348~~263~~. Since July 1994, Howard, through its agents and employees, and Plaintiff have been in an employment contractual relationship, the mutual duties and obligations of which are understood through and defined by the implied duty ~~covenant~~ of good faith and fair dealings of the *1993 Faculty Handbook*.

349~~264~~. Since 1994, Plaintiff has been tenured and promoted to Professor of Law, and has been granted sabbatical leaves on at least two occasions under Howard's rules and regulations, School bylaws, and the implied duty ~~covenant~~ of good faith and fair dealing under the *1993 Faculty Handbook*.

350~~265~~. Howard, Wutoh (~~, as~~ the second highest-ranking agent at Howard), Love, and Smiley~~,~~ must discharge their ~~his~~ duties and obligations within bounds of Plaintiff's reasonable contractual expectations as understood through implied duty ~~covenant~~ of good faith and fair dealings in the *1993 Faculty Handbook*.

351~~266~~. Under such expectations, any administrator or faculty who participate in shared governance and whose decisions affect Plaintiff's academic freedom, personnel status, and the terms and conditions of his employment must comply with the implied duty ~~covenant~~ of good faith and fair dealing, so that such decisions do not violate academic freedom, are not arbitrary and capricious, and do not violate established rules and procedures. Howard is the employer, and Wutoh, Smiley, and Love are administrators.

352~~267~~. Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley ~~Wutoh~~ knew, had reason to know, or should have had reason to know that in carrying out the duties and obligations of the Office of the Provost, they ~~he~~ must make all governance and enforcement decisions or adopt the recommendations of deans at the various colleges in a manner or under processes and procedures that per § 2.8.2 comply with the implied duty of good faith and fair dealings.

353. Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley has been in an institutional relationship with Plaintiff since he was appointed Provost and Chief Academic Officer in June 15, 2015.

354. Since June 15, 2015, Wutoh has evaluated Plaintiff's academic file for Faculty Performance Evaluations, merit increases, and fall 2017 sabbatical leave.

355.    In order to discharge his duties and obligations, Wutoh, as the Title IX Decisional Authority, was required to have proper and ongoing training so that he and others within his office could recognize sexual harassment and would be able to assist employees and students who have been targeted by sex-based discrimination.

356.    Howard, Wutoh (,the second highest-ranking agent at Howard), Love, and Smiley failed to discharge their varying duties to Plaintiff within the meaning of good faith and fair dealing when he adopted without a proper factual basis Smiley's Report, where she had failed to make findings of material facts and proper conclusions on which material facts violated the elements of the Policy's standards against sexual harassment.

357.    Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he adopted without a proper factual basis Smiley's Recommendations, where she had failed to make ~~Findings of Material Facts~~ findings of material facts and proper conclusions on which material facts violated the elements of the Policy's standards against sexual harassment.

358.    Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he signed the Findings dated May 4, 2017.

359.    Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he signed the Reprimand dated May 4, 2017.

360.    Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he stated at the Notice of Findings' meeting on May 4, 2017: "It's not like you were chasing a student around your office." Wutoh's statement revealed that he knew or had reason to know that under a reasonable person standard, Plaintiff's conduct on September 17, 2015 had not violated Howard's Policy.

361.   On or after December 17, 2015, Howard, Wutoh (,the second highest-ranking agent at Howard), Love, and Smiley undertook to make decisions through the processes and procedures of Policy that necessarily implicated the Plaintiff's emotional wellbeing, especially by making a proper and correct decision.

362.   On December 17, 2015, when Smiley first told Plaintiff by telephone that the two female students have filed a sexual harassment complaint against him, Plaintiff was emotionally distressed, shocked, and angry.

363.   On and since December 17, 2015, Howard, Wutoh (, as the second highest-ranking agent at Howard), Love, and Smiley Wutoh knew, had reason to know, or should have had reason to know that a special likelihood existed that if Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley Wutoh negligently failed to abide or ignored the processes and procedures under Howard's Policy, *viz.*, failing to provide Plaintiff with actual notice of the fact specific allegations by the two female complainants, that Plaintiff would suffer emotional distress, as he could not adequate defend himself against such allegations.

364.   Prior to May 4, 2017, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley knew, had reason to know, or should have had reason to know that a special likelihood existed that Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley's negligence, which was motivated by the improper purpose, would cause Plaintiff to suffer emotional distress (a) when he failed to investigate properly the five sexual assault complaints filed between 2014 and 2016, (b) when he was subject to negative publicity during the #NoMeansNo protests, (c) when he sought to redress the deep, institutional conflict of interest that arose out of and under the

alleged failure by the Title IX Office, *viz.*, Smiley, to investigate the sexual assault complaints against Howard male students and employees from 2014 to 2016 as pled in *Jane Doe 5 v. Howard University*; (d) when he realized that the Jane Doe 5 would sue Howard before the end of May 2017, and [d] (e) when he feared that his mishandling of these complaints could prompt an OCR investigation.[29]

365. Per ¶ 364 ~~279~~, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley ~~Wutoh~~, in the absence of a Finding of Material Facts and in the course of performing their varying ~~his~~ obligations to Plaintiff under the *1993 Faculty Handbook*, adopted an anti-male bias against Plaintiff, ~~as reaction against Plaintiff,~~ an accused male, to show OCR principally that Howard would take action, as it had not done based on the allegations in *Jane Doe 5 v. Howard University*.

366. Per ¶ 285, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley breached their varying ~~his~~ duties and obligations owed to Plaintiff when in the absence of a Finding of Material Facts and in the course of performing their varying duties obligation under the *1993 Faculty Handbook*, he signed the Findings and Reprimand on May 4, 2017.

367. On May 15, 2017, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley ~~Wutoh~~ breached their varying ~~his~~ duties and obligations owed to Plaintiff when in the absence of a Finding of Material Facts and in the course of performing their varying ~~his~~ duties and obligations within the meaning of implied duty ~~covenant~~ of good faith and fair dealings of the *1993 Faculty Handbook*, he allowed Smiley to review and to make recommendations on Plaintiff's 32-page appeal memo, even though Howard, Wutoh (the second highest-ranking agent at Howard), Love, and

---

[29]     *See Wells v. Xavier Univ.*, 7 F. Supp.3d 746, 751 (S.D. Ohio 2014).

Smiley knew or had reason to know, through the doctrine of imputed knowledge, that Smiley and Love negligently failed to abide the processes and procedures for the equal treatment of the two female complainants and Plaintiff.

368.    On May 25, 2017, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley breached their varying ~~his~~ duties and obligations owed to Plaintiff when in the absence of a Finding of Material Facts and in the course of performing their varying duties and obligations under the Policy as understood through and governed by the implied duty of good faith and fair dealing of the *1993 Faculty Handbook*, he failed to read Plaintiff's appeal, and he failed to provide Plaintiff with a full and detailed report for rejecting his appeal, even though per § 2.7.4.6.1 Wutoh's decision to find Plaintiff in violation of Howard's Policy "is of far-reaching importance both to the individual and to the university."[30] Given the pariah status that society has assigned to men who are found responsible for engaging in sexual harassment, it must be of far-reaching importance to Howard and Plaintiff that Wutoh, the Title IX Decisional Authority, not breach his duties and obligations to Plaintiff in the course of performing this obligation under Howard's Policy, under Title IX rules and regulations, and under the *1993 Faculty Handbook*.

369.    As a result of Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley's failure to abide their varying ~~his~~ duties and obligations to Plaintiff while they were ~~he was~~ in the course of performing enforcing the Policy as understood through and governed by the *1993 Faculty Handbook*, to which Howard's

---

[30]    *Cf.* 1993 FACULTY HANDBOOK, § 2.7.4.6.1, at 2-50 ("When a review for tenure recommendation is conducted, it is required to be thorough and well documented, since the decision that is made is of far-reaching importance both to the individual and to the university.").

Policy is appended, they ~~he~~ caused Plaintiff to suffer emotional pain, mental distress, physical harm, and psychological stress.

370.   Since December 17, 2015, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley's failure to abide their varying ~~his~~ duties to enforce the Policy as understood through and governed by the *1993 Faculty Handbook*, to which Howard's Policy is appended, was the direct and proximate of Plaintiff's emotional pain, mental distress, physical harm, and psychological stress.

371.   On December 17, 2015 to the present, Plaintiff has not been contributorily negligent, having made every institutional effort to give at the very least inquiry notice to Wutoh that he was breaching his duties and obligations to Plaintiff under the *1993 Faculty Handbook*, to which Howard's Policy is appended, when:

(a)   Plaintiff demanded actual notice of the fact specific allegations against him,

(b)   he delivered email missives to Howard and Wutoh that provided his Office with objective evidence and exculpatory statements, which received no evidentiary weight due to the subjectivity test that gave undue evidentiary weight and institutional imprimatur to the two females' victims' narrative,

(c)   he notified Howard and Wutoh that Smiley had failed to apply the reasonable person standard,

(d)   he filed his 32-page appeal memo with Howard and Wutoh,

(e)   he sought to correct the sex and gender-based discrimination that he had suffered by submitting the relevant documents to FIRE,

(f)      he filed a complaint with the AAUP, which sent a letter to Howard's leadership,

(g)      he gave actual notice to Howard's leadership on May 25, 2017, and

(h)      he filed a timely formal grievance under the *1993 Faculty Handbook* on June 6, 2017.[31]

372.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, post-judgment interest, attorneys' fees, expert witness fees, expenses, costs, and disbursements.

## COUNT 9

### (Negligence by Howard)

294.    The foregoing allegations are incorporated herein by reference.

373.    On May 4, 2017, Plaintiff and Howard had been in an employment relationship for approximately 24 years.

374.    That relationship has been governed by and understood through the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

375.    The *1993 Faculty Handbook* and its implied duty of good faith and fair dealings fully determine the duties, rights, privileges, obligations, and procedures between Howard and faculty like Plaintiff.

376.    Under the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings, Howard owed duties of care, good faith, and fair dealings to Plaintiff. Such

---

[31]      Per § 2.8.3.2 of the *1993 Faculty Handbook*, and per the statements in ¶ 324, Plaintiff made good faith attempt to mediate any dispute with the Defendant Wutoh, the administrative officer, at the level of his office and the School of Law.  Having failed to get Defendant Wutoh to take corrective actions, Plaintiff filed a formal grievance. *See* 1993 FACULTY HANDBOOK, § 2.8.3.2, at 2-62.

duties included, without limitation, a duty of reasonable care in selecting and supervising competent, well-trained, and unbiased agents, administrators, and/or employees to conduct and/or supervise investigations by ~~of~~ the Title IX Office.

377.   Howard breached its duty of care by appointing as a quasi-final decision maker, Candi N. Smiley, Esq., who was negligently and/or intentionally ~~not~~ unfamiliar with ~~the~~ fair and impartial investigative ~~investigation~~ process and procedures, with known and published Title IX rules and regulations, and with the reasonable contractual expectations of faculty under the *1993 Faculty Handbook.*

378.   Howard breached its duty of care to Plaintiff by permitting Smiley (investigator), Love (the supervisor), and Wutoh (the Provost and Title IX Decisional Authority), who were so unfamiliar with, or indifferent to, the proper investigative processes and procedures to completely eliminate the basic fairness of Plaintiff's reasonable contractual expectations. Under the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings, Plaintiff was entitled to receive actual notice of the spurious students' allegations against him.

379.   Howard breached its duty of care, good faith, and fair dealings to Plaintiff by permitting Wutoh, Love, and Smiley to adopt an unknown and unpublished evaluative standard called ~~and unilaterally decided the case against Plaintiff based solely on~~ the ~~subjectivity~~ subjective experience of the victims test to determine conclusively whether Plaintiff had violated the Policy.   That irrebuttable presumption~~, which lowered~~ eliminated the required preponderance of the evidence standard, which shifted the entire evidentiary burden to Plaintiff to show why he was not responsible for violating the Policy, and replaced it with ~~to~~ an unheard of slightest evidence standard under Title IX,

which "tilted the playing field against"

380. Howard breached its duty of due care, good faith, and fair dealings to Plaintiff when in. In the worst instance, Wutoh, Smiley, and/or Love willfully, deliberately, and maliciously targeted Plaintiff to conceal their malfeasance or misfeasance in the matters under and leading up to *Jane Doe 5 v. Howard University*.

381. Howard breached its duty of care, good faith, and fair dealings when Wutoh accepted the Smiley's Report, Rationale, and Recommendations uncritically, as evidenced by him signing the Notice of Findings even though it completely lacked the required Findings of Material Facts and Conclusions. Howard breached its duty of care, good faith, and fair dealings when Wutoh failed to undertake his burden of due diligence during his evaluation of Smiley's Report, Rationale, and Recommendations. Howard breached its duty of care, good faith, and fair dealings when Wutoh permitted Smiley, who had adopted the subjective experience test of (the female) students and who would be sufficiently biased to shield herself from scrutiny, to review Plaintiff's appeal memo.

382. Howard further breached its duty of care owed to Plaintiff by intentionally, recklessly and/or negligently failing to conduct a proper conflicts check to assure that Plaintiff's appeal was decided by an unbiased investigator other than by Smiley who was biased and conflicted; or, given his duty and obligation as Provost and Title IX Decisional Authority, Wutoh negligently delegated the review of Plaintiff's appeal to Smiley who already had a palpable conflict of interest based on her use of the subjectivity subjective experience test to determine conclusively whether Plaintiff had violated Howard's Policy, and based on her Wutoh, Smiley, and/or Love maliciously targeting Plaintiff to serve as an example of Howard's present-day "get tough" approach

to ~~males~~ male employees accused of sexual misconduct in the days immediately preceding the filing of the *Jane Doe 5 v. Howard University* on May 10, 2017.

383.    As a direct, proximate, and foreseeable consequence of Howard's ~~aforementioned~~ conduct, Plaintiff's legal and legal academic career prospects, including decanal appointments or lateraling opportunities, and his reputation, and new earning potential have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

384.    As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT 10

### (Declaratory Judgment and Permanent Injunctive Relief)

385.    The foregoing allegations are incorporated herein by reference.

386.    Howard has violated contractual obligations, and federal and state law.

387.    Plaintiff's career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to Howard's deeply flawed and institutionally conflicted process will continue to label Plaintiff as a sexual harasser, greatly jeopardizing his prospects for future legal and legal academic employment opportunities, with no end in sight.

388.    As a result of the foregoing, a justiciable controversy exists between the parties with respect to the outcome, permanency, and future handling of Plaintiff's

personnel file in the Office of Human Resources and the Office of the Provost, including the Title IX Office.

389.    By reason of the foregoing, pursuant to 28 U.S.C. § 2201, Plaintiff requests a declaration that: (a) [a] the Notice of Findings and Reprimand against Plaintiff made by Howard pursuant to the investigation by the Office of the Provost's Title IX Office be reversed; (b) [b] Plaintiff's disciplinary record pursuant to the investigation by the Title IX Office be expunged and removed from his personnel files in the Office of Human Resources and the Office of the Provost; (c) [c] Howard shall provide Plaintiff with a notarized letter confirming that the Findings and Reprimand have been reversed, vacated, rescinded, and expunged from Plaintiff's personnel files wherever they might be located at Howard or elsewhere; and (d) [d] Howard shall restore Plaintiff's reputation to third parties to whom Howard has leaked, sent, and/or failed to adequately safeguard the Notice of Findings and Reprimand of the investigation of the Title IX Office.

## PRAYER FOR RELIEF

WHEREFORE, the premises considered, Plaintiff respectfully prays that this Honorable Court:

1.    Order Howard to reverse and expunge its Notice of Findings of responsibility and Reprimand from Plaintiff's employment record and personnel file, and to publicly state that Howard has reversed and expunged the Findings and Reprimand;

2.    Order Howard to verify this reversal and expungement of Plaintiff's employment record and personnel file by providing Plaintiff with a Letter to that effect signed by the Board of Trustees certifying to any third parties that the Notice of Findings

and Reprimand have been reversed and expunged from his employment records and personnel file;

3.    Enter judgment in favor of Plaintiff against Howard;

4.    Enter judgment in favor of Plaintiff against Anthony K. Wutoh;

5.    Enter judgment in favor of Plaintiff against Candi N. Smiley, Esq.;

6.    Enter judgment in favor of Plaintiff against Vanessa Love;

7.    Order permanent injunctive relief requiring Howard ~~University~~ to immediately revise and remedy its Title IX Policy ~~policies~~, through its language and application, to eliminate the anti-male bias and improper, unknown and unpublished processes and procedures against Howard employees and students who are subject to allegations of sex-based discrimination;

8.    Award Plaintiff general and compensatory damages against Defendants in an amount not less than Four Million Nine Hundred Ninety Nine Dollars ($4,999,000.00), including, without limitation, damages to his physical well-being, emotional and psychological damage, damages to reputation, past and future economic losses, loss of professional opportunities, and other direct and consequential damages, declaratory relief, injunctive relief, attorney's fees, including expert fees, and any other relief this Court deems appropriate;

9.    Award Plaintiff his court costs and expenses, including reasonable attorneys' fees and expert witnesses' fees under 42 U.S.C. § 1988;

10.   Award Plaintiff prejudgment interest and post-judgment interest;

11.     Declare Howard ~~Defendants~~' conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681;

12.     Award attorney's fees and costs pursuant to statutory or common law doctrines providing for such award; and

13.     Grant such other relief as this Honorable Court deems just and proper.

JURY DEMAND

Respectfully submitted,

Reginald Leamon Robinson, Plaintiff Pro Se
1904 Autumn Ridge Circle
Silver Spring, MD 20906

Dated:  June 28, ~~February 24~~, 2018


## CERTIFICATE OF SERVICE

I hereby certify that this document filed with D.C. District Court and paper copies will be sent via email to those indicated as non-registered participants on June 28 ~~February 24~~, 2018

Reginald Leamon Robinson, Plaintiff Pro Se

# Exhibits

Reginald Leamon Robinson
1904 Autumn Ridge Circle
Silver Spring, Maryland 20906
(202) 806-8059 (O)
(240) 876-7439 (CP)
heru.hermes@gmail.com

**Education**

**University of Pennsylvania Law School**, Philadelphia, PA
*J.D., Cum Laude*, May 1989
*Earl Warren Legal Training Scholarship*, NAACP Legal Defense Fund, 1986-89
*Senior Associate Editor*, Comparative Labor Law Journal, Vol. 10, 1988-89
*Associate Editor*, Comparative Labor Law Journal, Vol. 9, 1987-88

**University of Chicago**, Chicago, IL
*ABD/PhD. Student*, Department of Political Science, July 1983-1996
*M.A.*, Department of Political Science, June 1983
*Dorothy Danforth-Compton Scholarship*, 1981-84

**Yale University**, New Haven, CT
*Exchange Scholar*, Departments of Political Science and Economics, 1984-85

**Universidad Nacional Autonoma De Mexico**, Mexico, DF
*Centro De Ensenanza Para Extranjeros*, Summer 1984
*Tinker Travel Grant for Iberian and Latin American Studies*, Summer 1984
*Arthur Stadelmann Scholarship for International Relations*, Summer 1984

**Howard University**, Washington, DC
*B.A.*, Political Science (Major); English Literature (Minor, but Courses for Major), 1981
*Phi Beta Kappa, Magna Cum Laude* (GPA 3.73), *Academic Scholarship*, 1980-81
*George N. Leighton Award for Academic Excellence*, Phi Beta Kappa, 1981

**Publications**

> *Searching for the Parental Causes of the School to Prison Pipeline Problem: A Critical, Conceptual Essay*, ___ St. John's Journal of Civil Rights and Economic Development ___ (2017 or 2018).

> *A Dark Secret Too Scandalous to Confront: Did the Moynihan Report Imply that Poor Black Caregivers' Parenting Style and Childhood Cruelties Were Strongly Correlated with Self-Perpetuating Pathologies?*, 8 Georgetown Journal of Law and Modern Critical Race Perspectives 103 (June 2016).

> *Gangsta Rap Lyrics and Early Childhood Cruelties: Are These Artists Searching for Enlightened Witnesses and Seeking to Reveal the Real Truth of Black Mother-Son Love?*, 5 Journal of Research in Gender Studies 73-92 (2015) (Peer-Reviewed Journal).

> *Seen But Not Recognized: Black Children, Obedience Training, and the Limits of the Civil Rights Act of 1964 in an Increasing Colored America*, 117 West Virginia Law Review 1273-1364 (2015).

> *Ho's, Bitches, and the Search for the Enlightened Witness: Gangsta Rap Lyrics and the Real Truth of Black Mother-Son Love, in* Hip Hop and the Law: The Key Writings that Formed the Movement (Donald Tibbs, Pamela Bridgewater, and andré douglas pond cummings, eds. 2015, Carolina Press) (original chapter in an edited volume).

> *Dark Secrets: Obedience Training, Black Parenting, and Reassessing the Origins of Instability in the Black Family Through a Re-Reading of Fox Butterfield's All Gods Children*, 55 Howard Law Journal 393-454 (2012) (Symposium Essay: The State of the Ordinary Family).

> *Introduction: The State of the Ordinary Family*, 55 Howard Law Journal 283 (2012) (Symposium on *The State of the Ordinary Family*).

1

*"Precious": A Tale of Three Explanations for Childhood Maltreatment*, 1 COLUMBIA JOURNAL OF RACE AND LAW 434-467 (2012) (Invited Paper, Symposium Issue on Critical Race Theory and Marxism).

*Trauma, Creativity, and Unconscious Confession: The Lost Childhood History Behind L. Frank Baum's* The Wizard of Oz, 20 SOUTHERN CALIFORNIA INTERDISCIPLINARY LAW JOURNAL 145 (2010).

*The Word and the Problem of Human Unconsciousness: An Analysis of Charles R. Lawrence's Meditation on Racism, Oppression, and Empowerment*, 40 CONNECTICUT LAW REVIEW CONNTEMPLATION 1 (2008) (On-Line Version of CONNECTICUT LAW REVIEW – www.contemplations.org/pdf/robinson.pdf; Invited Paper for Symposium on Charles R. Lawrence).

*The Sacred Way of Tibetan CRT Kung Fu: Can Race Crits Teach the Shadow's Mystical Insight to Law Students and Help Them to "Know" the Heart of the Law in the First-Year Curriculum? A Critical Rejoinder to Dorothy A. Brown*, 10 MICHIGAN JOURNAL OF RACE & LAW 355 (2005).

*Human Agency, Negated Subjectivity, and White Structural Oppression: A Critical Analysis of Critical Race Practice/Praxis*, 53 AMERICAN UNIVERSITY LAW REVIEW 1361 (2004).

*Poverty, the Underclass, the Role of Race Consciousness: A New Age Critique of Black Wealth/White Wealth and American Apartheid*, 34 INDIANA LAW REVIEW 1377 (Spring 2001) (Book Review).

*Race Consciousness: Can Thick, Legal Contextual Analysis Assist the Poor, Low-Status Worker in Overcoming the Hurdle to Liberation and Advancement?*, 34 THE JOHN MARSHALL LAW REVIEW 245 (Spring 2001) (invited).

*The Shifting Race-Consciousness Matrix and the Multiracial Category Movement: A Critical Reply to Professor Hernandez*, 20 B.C. THIRD WORLD LAW JOURNAL 231 (Spring 2000, Lead Article).

*The "Expert" Knowledge: Introductory Comments on Race Consciousness*, 20 B.C. THIRD WORLD LAW JOURNAL 145 (Winter 2000) (Symposium Issue).

*Race Consciousness: A Mere Means to Preventing Escapes From the Control of Her White Masters*, 15 TOURO LAW REVIEW 401 (Winter 1999) (Symposium Issue).

*Race, Myth, and Narrative in the Social Construction of the Black Self*, 40 HOWARD LAW JOURNAL 1 (Spring 1997) (Lead Article).

*Teaching From the Margins: Race as a Pedagogical Sub-Text*, 34 WESTERN NEW ENGLAND LAW REVIEW 151 (Fall 1997).

*Split Personalities: Teaching and Scholarship in Nonstereotypical Areas of the Law*, 34 WESTERN NEW ENGLAND LAW REVIEW 73 (Fall 1997).

*White Cultural Matrix and the Language of Nonverbal Advertising in Housing Segregation: Toward an Aggregate Theory of Liability*, 25 CAPITAL UNIVERSITY LAW REVIEW 117 (1996) (invited).

*The Racial Limits of the Fair Housing Act: The Intersection of Dominant White Images, the Violence of Neighborhood Purity, and the Master Narrative of Black Inferiority*, 37 WILLIAM & MARY LAW REVIEW 69 (1995) (Lead Article).

*"The Other Against Itself": Deconstructing the Violent Discourse between Koreans/African Americans*, 67 SOUTHERN CALIFORNIA LAW REVIEW 15 (1993) (Lead Article).

*Impact of Hobbes' Empirical Natural Law on Title VII's Effectiveness: A Hegelian Critique*, 25 CONNECTICUT LAW REVIEW 607 (1993) (Lead Article).

### Pending Publication/Recently Submitted for Publication to Peer-Review Journal

*Kip's Revenge: Race, Money, Property, and Parental Cruelty in Rhinelander v. Rhinelander* (Book Review: Elizabeth M. Smith-Pryor, Property Rites: The Rhinelander Trial, Passing, and the

Protection of Whiteness. UNC Press, 2009. 391 pp.) (Accepted by the Law, Culture, and the Humanities)

## Published Articles in Edited Volume

*The Shifting Race-Consciousness Matrix and the Multiracial Category Movement: A Critical Reply to Professor Hernandez,* 20 B.C. Third World Law Journal 231 (Spring 2000, Lead Article), *in* MIXED RACE AND THE LAW: A READER (Kevin R. Johnson, ed., 2003).

## Books Discussing and Analyzing Published Articles

MARGARET DAVIES, ASKING THE LAW QUESTION (2d & 3d eds., 2002 & 2008).

## Blog/SSRN Publications

*Hoes, Bitches, and the Search for Enlightened Witnesses: Gangsta Rap Lyrics and the Real Truth of Black Mother-Son Love,* published SSRN.com/author=937283, June 25, 2014 (rewritten, reformatted, and new footnotes added).

*Kip's Revenge: Race, Money, Property, and Parental Cruelty in Rhinelander v. Rhinelander* (Book Review: Elizabeth M. Smith-Pryor, *Property Rites: The Rhinelander Trial, Passing, and the Protection of Whiteness.* UNC Press, 2009. 391 pp.), http://humangodsandsocialrealities.blogspot.com/2010/01/kips-revenge-race-money-property-and.html.

*Beyond the Race Card's Two-Value Logic: Thoughts on Richard Ford's "Race Card at Your Own Peril,"* http://humangodsandsocialrealities.blogspot.com/2008/02/beyond-race-cards-two-value-logic.html (a critical response to Professor Richard Ford's *Op-Ed Piece,* Washington Post, Feb. 16, 2008) (post Feb. 16, 2008).

*Believe in White Racism and Attract Bad Things,* http://humangodsandsocialrealities.blogspot.com /search?updated-min=2007-01-01 (a critical reply to Joe r. Hicks' *Drop the Race Card,* Washington Post, *Outlook,* April 15, 2007) (posted May 3, 2007).

## Completed Manuscripts

Book Proposal: "The Slave's Mind: Self-Empowerment by Overcoming the Limited Concepts of Race" (completed January 5, 2005).

*Mind, Agency, Race Consciousness, and Structural Determinism: An Analysis of Critical Race Practice.* (completed October 2003).

*The Death of the Critical Race Theorist: Deconstructing CRT and the End of Race Consciousness* (rewriting completed manuscript).

## Current Research/Writing Projects

Fearing the Loss of the Black (Self) Body: Present History of Racialized Structural Murder or Lost Neurobiological History of ACE, and Critically Interrogating Ta-Nehisi Coates' Creation Myth/Origin Stories in Between the World and Me (work-in-progress; forthcoming & copyright © 2019)

"Lies, Plunderers, and Dreamers in the Black Family's Dark Secrets and the Origins of Fearing the Loss of the Black Body: Reading Coates "Between the World and Me" Through Interpersonal Neurobiology" (forthcoming manuscript, copyright © 2016).

"STPP and Exiled Black Children: Can Thematic Apperception Testing Help Us Understand the Early Childhood Source of Disruptive Behavior and Disrespect for Authority in Public Schools?" (forthcoming manuscript, © 2016).

*Searching for the Parent-Based Causes of the School-to-Prison Pipeline* (essay based on keynote address at National Bar Association Meeting, October 2014) (forthcoming © 2016).

Bell's *Space Traders*:  Childhood Maltreatment as the Proper Locus for Interrogating the Meaning of Full Citizenship.

Primal Fear and the "Death" of Racial Identity:  A Psycho-Existential Analysis of the Black Stakeholder's Reactions to *Grutter v. Bollinger*.

Derrick Bell's Space Traders and the Existential Problem of "Seeing" Racist Evil – Symposium Essay.

## Abstracts & Submitted Proposals for Conference Presentations

*Paper Proposal*: "*Precious* and the Parent's Failure to Protect Doctrine:  Why the State Must Prosecute Intergenerational Neglect to Minor Child, for Theme – Intergenerational Obligations, at **XIV World Conference of the International Family Law Society**, Lyon, France, July 19-23, 2011 (Accepted).

## Short-Term Writing/Essay Projects

Strapped:  How the State and Caregivers Destroy Children's Natural Well-Being Through the Doctrine of Parental Privilege (copyright © 2009)

Neglected, Degraded, and Excessive, But Not Abused:  An Analysis of the Court's Inability to Understand a Child's Emotional, Physical, and Existential Trauma (copyright © 2009).

Reasonable Discipline:  An Analysis of How Courts' Evolving Standard Empowers Parents to Existentially "Murder" their Children (copyright © 2009).

"Racial Identity and Human Trauma:  Does Racializing a Child Suppress Her Natural Sense of Self and Potentia? – An Analysis of *State v. John White*" (copyright © 2009 & forthcoming 2010).

"Inception" and the Problem of a Dream within a Dream:   Can Howard Law School Empower its Stakeholders to Participate in a Post-Racial or Transformative Era?

## Long-Term Book-Length Manuscript Projects

"Dark Secrets:  Black Parenting, Obedience Training, Rigid Physical Violence, and the Distorted Perceptions of Black Children & Adults" (forthcoming book-length manuscript, copyright © 2012).

"ACEs & Eight:  The Basic Reasons Blacks Fail in School and Enter the Prison Pipeline" (book-length manuscript, copyright © 2018).

"ACEs & Spades:  Early Childhood Adversities and the Making of Feared Black Man" (book-length manuscript, copyright © 2018).

"ACEs & Hates:  Adversity in Early Childhood and the Existential Limits of the Black American Experience" (book-length manuscript, copyright © 2018).

"Quantum Racism™:  How Fearful Thinking Affects Our Experiences, Relationships, and Joy" (book-length manuscript, copyright © 2008).

"Conscious Parenting:  Deliberately Raising Whole, Spiritual Awake and Self-Aware Children" (book-length manuscript, copyright © 2009)

"Co-Creating Racism:  The Jena Six Case" (book-length manuscript, copyright © 2009).

## International Instructor

Professor, Critical Race Theory Seminar, *Byron Bay Summer Program*, **Southern Cross University**, Byron Bay, Australia, December 3-17, 2002.

## Employment

| | |
|---|---|
| **Professor**<br>August 1998 | HOWARD LAW SCHOOL, Washington, DC<br>*Courses*:   Agency, Partnership, & LLC; Family Law; Jurisprudence (S);<br>Critical Race Theory (S); Law and Social Science (S); Child, Family, and<br>State (S); Business Organizations; LL.M. Thesis Supervisor. |
| **The Distinguished**<br>**University Visiting**<br>**Professor of Law**<br>**and Critical Theory**<br>2007-2008 | *School of Law and College of Liberal Arts*, SOUTHERN ILLINOIS UNIVERSITY<br>Carbondale, Illinois<br>*Courses*: Family Law; Race and the Law (S); Gender, Identity, and<br>Separation Violence (S); Law, Culture, and Art (Film) (S) (College of Liberal<br>Arts: History and Black American Studies). |
| **Associate**<br>**Law Professor**<br>August 1994 | HOWARD LAW SCHOOL, Washington, DC<br>*Courses*: Property; Contracts; American Legal History (S); Jurisprudence<br>(S); Race, Class, Gender, Sexual Orientation & Property in American Legal<br>History (S); Critical Race Theory (S); Housing Discrimination (S); Family<br>Law. |
| **Visiting Associate**<br>**Law Professor**<br>Spring 1994 | UNIVERSITY OF CONNECTICUT LAW SCHOOL, Hartford, CT<br>*Courses:* Real Property; American Legal History (S). |
| **Visiting Assistant**<br>**Law Professor** | UNIVERSITY OF SAN FRANCISCO LAW SCHOOL, San Francisco, CA<br>*Courses:* Real Property II (Land Use Planning); Race Discrimination<br>Fall 1993 (seminar). |
| **Assistant**<br>**Law Professor**<br>August 1991-<br>June 1994 | WHITTIER LAW SCHOOL, Los Angeles, CA<br>*Ross McCollum Law Center*<br>*Courses:* Real Property I & II; Advanced Legal Skills; Professional<br>Responsibility Practicum; Legal History; Jurisprudence; Employment<br>Discrimination; Lawyering Skills; Director, Externship Program |
| **Assistant City**<br>**Solicitor**<br>April 1990 -<br>July 1991 | CITY SOLICITOR'S OFFICE OF PHILADELPHIA, Philadelphia, PA<br>*Law Department/Enforcement Division*<br>Researched and drafted memoranda and enforced the Philadelphia Code<br>through litigation and negotiation; prosecuted, in civil trials and hearings,<br>delinquent water and sewer accounts for the Water Revenue Bureau and the<br>Water Department before the Philadelphia Court of Common Pleas, the<br>Commonwealth Court, the Tax Review Board and the Arbitration Court;<br>filed 300 cases per week; involved in all aspects of civil litigation issues, filing,<br>motions, and appeals; entered into stipulated agreements falling outside of<br>the Bureau's standards; communicated orally and in writing with opposing<br>counsel; rendered opinions on legal and procedural issues and on accounts in<br>trust, husband/wife divorced, husband/wife deceased, unrecorded deed,<br>estates, etc.; executed owner-occupied default judgment; responded to<br>defendant petitions on charges, liening process and service. |
| **Assistant Staff**<br>**Attorney**<br>June 1989 -<br>April 1990 | CITY COUNCIL OF PHILADELPHIA, Philadelphia, PA<br>*Technical and Planning Staff/Legislative Reference Unit*<br>Researched and drafted ordinances, memoranda and legal advisory letters<br>for members of City Council in all areas of law; provided legal<br>representation to City Council members; met with members of City<br>Council and the public to formulate legislative strategy and policy. |
| **Winter/Spring**<br>**Associate**<br>1988-89 | SARNER/LEWIS, Philadelphia, PA<br>Researched and drafted memoranda, briefs and interrogatories in the areas<br>of contracts, tax, estates, and corporate law. |
| **Summer Associate**<br>1988 | REED SMITH SHAW & McCLAY, Philadelphia, PA<br>Researched and drafted memoranda in the areas of tax, securities, corporate<br>and environmental law. |
| **Summer Clerk**<br>1988 | HON. A. LEON HIGGINBOTHAM, JR., *United States Court of Appeals for the*<br>*Third Circuit.* |

Researched and drafted bench memoranda and a legal memorandum; organized July cases.

**Spring Clerk**
**1988**
HON. CLIFFORD SCOTT GREEN, *United States District Court for the Eastern District of Pennsylvania*
Researched and drafted memoranda; assisted judicial clerks.

**Summer Associate**
**1987**
MONTGOMERY MCCRACKEN WALKER & RHOADS, Philadelphia, PA
Researched and drafted memoranda in litigation, tax, corporate, securities, evidence and public corporation law.

### Pro Bono Publico

Drafted response letter to a major company's demand for repayment of $50,000.00 on draw taken when respondent was a sales employee. Resolution: company withdrew demand letter because it was not supported by any consideration under New York law. July 2006.

Consulted with client in small claims proceeding in Washington, D.C. court on whether client owed third-party customer a refund on installment payments for cruise to Jamaica when customer refused to complete installments and to take vacation cruise. Resolution: client not found liable for repayments. April 2006.

Reviewed and advised client of her rights under an existing Installment Sales Contract (with Stephen Rymal, Esquire, Cozen & O'Connor), August 1989.

*Robert G. Johnson, Sr. v. McKenzie Coach, Inc., d/b/a McKenzie Bus Co.*, April Term, No. 4914, filed Apr. 25, 1990. (Resolution: Settlement Agreement for Plaintiff.)

Reviewed file, advised client and prepared for litigation against New Jersey Chevrolet Dealership on collateral contract issues, Mar. 1990. (Resolution: Client received full refund for unauthorized collateral services.)

### Bar Admissions

Pennsylvania Supreme Court, 1989
United States District Court for the Eastern District of PA, 1989

### Affiliations

*Elected Member*, American Law Institute, April 2011
*Founder & Executive Director* (Managing Member), Aiki-OM-Do, LLC, 2018
*Founder, Chair, and Executive Director*, Institute for Social Justice and World Peace, 2003-2013
*Co-Founder*, National People of Color Legal Scholarship Conference, 1998
*Founder*, Mid-Atlantic People of Color Legal Scholarship Regional Conference, Spring 1994
*Member*, American Bar Association
*Member*, Pennsylvania Bar Association, 1989-1991
*Member, Young Lawyer's Division*, Philadelphia Bar Association, 1989-1991
*Member/Volunteer Attorney*, American Civil Liberties Union, 1989-1990
*Member*, Society for American Law Teachers (SALT), 1994-97
*Member*, Phi Beta Kappa Society – Gamma Chapter, 1981 to present
*Board Member*, International Alliance of Holistic Lawyers, 1994-1996

### Professional/Service Activities

*Chair*, Faculty Grievance Commission, Faculty Senate, Howard University, Jan. 2016-May 2017
*Chair-Elect*, Faculty Grievance Commission, Faculty Senate, Howard University, Fall 2015
*Commissioner*, Faculty Grievance Commission, Faculty Senate, Howard University, 2013-2015
*Chair*, Appointments, Promotions, and Tenure Committee, Howard Law School, 2012-Spring 2014, March 2016 to March 2017
*Reporter/Samaritan*, AALS Report, March 2009 (Northwest Region)
*Member*, ABA Site Evaluation Team (AALS Representative), March 2009 (Northwest Region)
*Member*, AALS Site Evaluation Team, March 30- April 2, 2008 (Southeast Region)

*Member*, ABA Section on Real Property, Probate, and Trust, October 2006
*Member*, ABA Section on Family Law, October 2006
*Member,* Diversity Committee, ABA Section on Legal Education and Admissions to the Bar, 2001-03
*Member*, Executive Committee, AALS Property Section, Jan. 2000-Jan. 2003
*Member*, Executive Committee, AALS Poverty Section, Jan. 2002-03
*Editor*, Newsletter, AALS Minority Section, Jan. 1995-Jan. 1997
*Member*, Executive Committee, AALS Minority Section, Jan. 1995-Jan. 1997

## Conference Organizing/Planning/Attending

*Chair, 2016 Planning Committee*, "The Rights of Children," **21ˢᵗ Annual Mid-Atlantic People of Color Legal Scholarship Conference**, hosted by American University College of Law, Washington, DC, Jan. 28-30, 2016.

*Chair, 2015 Planning Committee*, "The New Colorlines: What Will It Mean to be an American?", **20ᵗʰ Annual Mid-Atlantic People of Color Legal Scholarship Conference**, hosted by West Virginia University School of Law, Morgantown, WV, Jan. 29-31, 2015.

*Chair, 2014 Planning Committee*, "President Lyndon B. Johnson's Great Society and Beyond: The Historical and Contemporary Implications of Progressive Action and Human Fulfillment – Honoring and Critiquing the 50ᵗʰ Anniversary of Johnson's Vision," **19ᵗʰ Annual Mid-Atlantic People of Color Legal Scholarship Conference,** hosted by the University of Baltimore School of Law, Baltimore, MD, Jan. 25-27, 2014.

*Chair, 2013 Planning Committee*, "President Lincoln's Emancipation Proclamation: On the Doubts, Questions, and Problems of Full Citizenship," **18ᵗʰ Annual Mid-Atlantic People of Color Legal Scholarship Conference**, hosted by The University of Pennsylvania Law School, Philadelphia, PA, Jan. 24-26, 2013.

*Organizer*, **The State of the Ordinary Family – a Symposium**, Howard Law Journal, Volume 55, Issue 2 (2012). Scholarly contributors: Professor Kimberly Alderman, andré douglas pond cummings, Theodore J. Davis, Cynthia Hawkins DeBose, Zanita E. Fenton, Lenese C. Herbert, Mariela Olivares, Reginald Leamon Robinson, and Leland Ware.

*Organizer & Chair*: "The Black Family: Can We Look Beyond Slavery, Jim Crow, and Modern Discrimination to Explain Its Instability?," **14ᵗʰ Annual Meeting – The Association for the Study of Law, Culture, and Humanities**, Hosted by University of Nevada, Nevada, March 2011.

*Chair, Finance Committee*, National Conference Planning Committee, **Third National People of Color Legal Scholarship Conference**, hosted by Seton Hall School of Law, Newark, New Jersey, September 9-12, 2010 (raised $132,500.00 in 11 months).

*Organizer & Chair*, Panel: From Victim to Destroyer: The Individual, Social, and Global Implications of Corporal Punishment, **13ᵗʰ Annual Meeting – The Association for the Study of Law, Culture, and Humanities**, Hosted by Brown University, Providence, RI, March 19-20, 2010.

*Organizer & Chair*, Existentialism: A Relational Construct of the Self – Panel, **12ᵗʰ Annual Meeting – The Association for the Study of Law, Culture, & Humanities Conference**, hosted by Suffolk University Law School, Boston, Massachusetts, April 4, 2009.

*Attended*, **Site Evaluation Workshop at the InterContinental – O'Hare**, Section on Legal Education and Admissions to the Bar, American Bar Association, November 15, 2008.

*Organizer*, Law's Body – Panel, **11ᵗʰ Annual Meeting – The Association for the Study of Law, Culture, & Humanities Conference**, San Francisco, California, March 29, 2008 (with Anthony Farley (Albany) and John Kang (St. Thomas)).

*Attended*, **9ᵗʰ Annual Mid-Atlantic People of Color Conference**, hosted by University of Baltimore Law School, February 2004.

*Attended*, **LSAC's Dreamkeeper's Conference**, Sponsored by the Law School Admissions Council, Seattle, WA, Oct. 2003.

*Attended*, **National Conference**, Business for Social Responsibility, Los Angeles, CA, Nov. 2003.

*Organizer, Stream: Nomos, Culture, and Consciousness*, **Critical Legal Conference 2001**, *Theme: Another Politics – in Form and Voice*, University of Kent, Canterbury, England, September 7-9, 2001.

*Chair, 2001 Conference Planning Committee*, 6th **Annual Mid-Atlantic People of Color Legal Scholarship Conference**, *Requiem for a Century to Renaissance: A Legal-Historical Critique of the Traditional Paradigm. Part II*, hosted by Pennsylvania State University-Dickinson Law School, February 1-3, 2001.

*Program Chair, AALS Property Section*, **AALS Annual Meeting**, San Francisco, CA, Jan. 2001.

*Moderator*, Panel: "Property, Wealth, and Inequality." Panelists: John Brittain, Martha Mahoney, Frank Michelman, and Laura Padilla. *AALS Property Section*, **AALS Annual Meeting**, San Francisco, CA, Jan. 2001.

*Co-Chair*, 2000 Conference Planning Committee, 5th **Annual Mid-Atlantic People of Color Legal Scholarship Conference**, *Requiem for a Century to Renaissance: A Legal-Historical Critique of the Traditional Paradigm. Part I*, hosted by Widener University School of Law, February 10-13, 2000.

*Program Chair, Program Committee*, National Steering Committee, 1st **Annual National People of Color Legal School Conference**, March 25-28, 1999; hosted by John Marshall Law School, Chicago, IL.

*Chair, 1998 Conference Planning Committee*, "Law and Literature: Examining the Limited Legal Imagination in the Traditional Canon," 4th **Annual Mid-Atlantic People of Color Legal Scholarship Conference**, February 12-15, 1998. Sponsored by Howard Law School, Rutgers-Camden Law School, and Mississippi College School of Law. Hosted by Rutgers-Camden School of Law, Camden, New Jersey.

*Chair, Work-in-Progress Program*, 2nd **Annual Northeastern People of Color Legal Scholarship Conference**, Boston, Massachusetts, March 21-22, 1997. Hosted by New England School of Law.

*Planning Committee Member, 1997 Conference Planning Committee*, 3rd **Annual Mid-Atlantic People of Color Legal Scholarship Conference**, held at University of Louisville Law School, February 15-17, 1997.

*Co-Chair, Planning Committee*, **Critical Race Workshop Conference**, Sponsored by Howard Law School, Georgetown Law School, and American University Law School, held at Georgetown and American Universities, November 14-17, 1996. Sponsored by American, California Western, DePaul, Georgetown, Howard, Maryland, Miami, and Temple Universities.

*Regional Liaison*, **Mid-Atlantic People of Color Legal Scholarship Conference**, AALS Minority Section, Association of American Law Schools, 1996-2002.

*Chair, 1996 Conference Planning Committee*, 2nd **Annual Mid-Atlantic People of Color Legal Scholarship Conference**, Howard University School of Law, Washington, D.C., February 15-17, 1996.

*Program Director & Commentator*, Section on Property, **Fair Housing: Developing Fair Housing Policy in a Multiracial Society**, Annual Meeting of the Association of American Law Schools, San Antonio, Texas, January 1996 (panelists: Professors Michelle Adams (Rutgers-Newark), John O. Calmore (Loyola-L.A.), Richard Ford (Stanford), Linda

Crane (John Marshall), and Martha Mahoney (Miami)).  Professor Joseph Singer, Chairperson, Property Section.

*Program Director*, **Section on Minorities' Luncheon**, Annual Meeting of the Association of American Law Schools, San Antonio, Texas, January 1996.

*Program Director & Panelists, Minority Section's Breakfast Panel: "Teaching, Scholars, Service, and Mentoring: The Life of the Minority/Gendered Law Professors,"* **New Law Teachers' Conference**, Association of American Law Schools, Washington Vista Hotel, July 1995 (with Professors Tracey Meares (Chicago), Veryl Miles (Catholic), and Carlos Vasquez (Georgetown)).

*Chair & Founder, 1995 Conference Planning Committee*, 1st **Annual Mid-Atlantic People of Color Legal Scholarship Conference**, Howard Law School, February 16-18, 1995. Sponsored and hosted by Howard University School of Law.

*Co-Coordinator, Contracts Workshops*, **SALT Teaching Conference**, University of Minnesota, Minneapolis, MN, September 23-24, 1994.

*Chair: Planning Committee*, **Southwestern and Southeastern People of Color Legal Scholarship Conference**, Albuquerque, NM, Apr. 29 - May 1, 1993.  Sponsored by University of New Mexico, Brigham Young University, University of Alabama, and Whittier Law School.

## Paper Presentations/Panelist/Moderator

*Paper Presentation*, "Searching for the Parental Cause of the School to Prison Pipeline Problem," Panel:  *Ecological Development, Parenting, Teachers, and Institutions in the School to Prison Pipeline Problem:  Explaining the Secrets and Causes of What Happens in Public School*, 21st **Mid-Atlantic People of Color Legal Scholarship Conference**, Theme:  ON THE RIGHTS OF CHILDREN, hosted by American University College of Law, Washington, DC 20016 (with Professors Christi Cunningham (Howard) and Leland Brett Ware (Delaware)).

*Invited Speaker*, "STPP and Exiled Black Children:  Can Thematic Apperception Testing Help Us Understand the Early Childhood Source of Disruptive Behavior and Disrespect for Authority in Public Schools?" (forthcoming manuscript, © 2014), **Freedom From Fear: On the Black Childhood and Other Dangers**, LASSITER CONFERENCE, hosted by the University of Kentucky College of Law, Lexington, Ky, November 20-21, 2014.

*Keynote Speaker*, Topic:  "Searching for the Parent-Based Causes of the School-to-Prison Pipeline," 2014 Wiley A. Branton Symposium Issues, **National Bar Association**, Western State College of Law, October 17, 2014.

*Faculty Presentation* (Invited), *Ho's, Bitches, and the Search for the Enlightened Witness: Gangsta Rap Lyrics and the Real Truth of Black Mother-Son Love*, **Faculty Forum Program**, University of Maine School of Law, Portland, ME, March 29, 2013.

*Paper Presentation*, "Derrick Bell's *Space Traders* and the Existential Problem of "Seeing" Racist Evil" – **Building the Arc of Justice:  The Life and Legal Thought of Derrick Bell**, a symposium hosted by the Center for Gender and Sexuality Studies at Western New England Law School, Springfield, MA, September 28, 2012.

*Submitted Paper*:  "Dark Secrets I:  Can Obedience Training and Self-Denial by Black Parents Also Explain the Failure, Anger, Joblessness, Hopelessness, and Killing of their Children that Destabilizes Families and Communities?", 14th **Annual Meeting – The Association for the Study of Law, Culture, and Humanities**, Hosted by University of Nevada, Nevada, March 2011 (with Susan Bitensky (MSU), Zanita Fenton (Miami), and Paul Finkelman (Albany)).

*Paper Presentation*, "Dark Secrets II:   Masculinity, Down-Low Phenomenon, and the Myth of Mother-Son Love," at **Multidimensional Masculinities and Legal Theory:  A Colloquium**, hosted UNLV Boyd School of Law, Las Vegas, Nevada, and organized by Professor Ann McGinley, February 18-19, 2011.

9

*Panelist*, "Victim-Destroyer: Is Ending Corporal Punishment the Gateway to Eradicating Racism, Social Violence, and Global Conflicts?," **13th Annual Meeting – The Association for the Study of Law, Culture, and Humanities**, Hosted by Brown University, Providence, RI, March 19-20, 2010 (with Susan Bitensky (Panelist, MSU), Zanita Fenton (Panelists, Miami), and John Kang (Moderator/Discussant, St. Thomas)).

*Symposium Presentation*, "The Origins of the Wonderful Wizard of Oz: Abuse, Trauma, and Creative Imaginations in Adult Children," **Taking Oz Seriously**, Hosted by Albany Law School, Albany, New York, November 2009.

*Panelist & Paper Presentation*, "Racial Identity and Human Trauma:  Does Racializing a Child Repress Her Natural Sense of Self and Potentia? – The Case of *State v. John White*," on *Existentialism: A Relational Construct of the Self*, **12th Annual Meeting – The Association for the Study of Law, Culture, & Humanities Conference**, hosted by Suffolk University Law School, Boston, Massachusetts, April 4, 2009 (with Lissa Lincoln, American University in Paris).

*Roundtable Panelist*, "Thou Shall Not Speak Of It – The Interdisciplinary Challenges of Teaching Domestic Abuse and Violence:  An Analysis of *Thelma & Louise*," *Roundtable on Interdisciplinary Teaching of Law in the Liberal Arts*, **12th Annual Meeting – The Association for the Study of Law, Culture, & Humanities Conference**, hosted by Suffolk University Law School, Boston, Massachusetts, April 2009 (with Marilyn Tayler, Montclair State University)).

*Work-In-Progress Presentation*, "Ho's, Bitches, Hollerin', Strippin', and the Search for the Enlightened Witness:   Gangsta Rap and the Real Truth of Black Mother-Son Love," **13th Annual Meeting – Mid-Atlantic People of Color Legal Scholarship Conference**, hosted by Temple University School of Law, Philadelphia, PA, January 2009.

*Paper Presentation*, "Racial Identity and Human Trauma:  Does Racializing a Child Suppress Her Natural Sense of Self and Potentia? – The Case of *State v. John White*," **Central States Law School Association**, Hosted by Southern Illinois University at Carbondale, School of Law, IL, October 24-25, 2008.

*Paper Presentation/Invited Speaker*, "The Race Concept and the Problem of Human Suffering," **Open Minds Society of the Carbondale Unitarian Fellowship**, Carbondale, IL (May 11, 2008).

*Paper Presentation*, "Yin, the Female Body, and the Inner Journey to Spiritual Empowerment and Substantive Justice:  A Critical Analysis of Sex in Family Law*," on the *Law's Body* Panel, **11th Annual Meeting – The Association for the Study of Law, Culture, & Humanities Conference**, hosted by University of California – Berkeley, Berkeley, California, March 29, 2008 (with Anthony Farley, and John Kang, chair and presenter).

*Invited Keynote Respondent* (to Gary Younge), "The Climate of Fear: Human Rights, Law, Politics, and Media," **International Interdisciplinary Symposium – Muse and Mimesis: Wole Soyinka, African and the World**, Southern Illinois University College of Liberal Arts, February 29, 2008.  (Other speakers:  Biodun Jeyifo (Harvard), Randall Robinson (TransAfrica), Gary Younge (London Guardian), Awam Amkpa (NYU), Dele Jegede (Miami Univ.), Robert Fox (SIUC), and Senator Dick Durbin (U.S. Senator – Illinois)).

*Keynote (Invited) Speaker*, "Wake Up!  It's a Bleeping Con:  Reawakening the Great Potential in Black Americans," **Wabruda Organization**, University of Notre Dame, Notre Dame, Indiana, February 23, 2008 (Canceled Appearance Due Bad Weather).

*Presenter, "Co-Creating Racism: An Analysis of Jena 6"* (Work in Progress), **Central States Law School Association, hosted by Wayne State University and the Journal of Law in Society**, Detroit, Michigan, October 26-27, 2007.

*Presenter, "Sex, Adultery, and Separation Violence in Traditional Marriage:  Is Tantric Yoga the Answer?,"* **10th Annual Meeting – The Association for the Study of Law, Culture, and Humanities Conference**, hosted by Georgetown Law Center, March 23-24, 2007.

*Presenter*, "*Lies and Self-Deception on the Board:  A Critical Analysis of HP and the End of Director Independence*," 10th **Annual Meeting – The Association for the Study of Law, Culture, and Humanities Conference**, hosted by Georgetown Law Center, March 23-24, 2007.

*Presenter*, "Race, Identity, and Consciousness:  A Critical Analysis on Self-Oppression through Racial Terminology," under the Program entitled:  **"What's in the Name?:   A Comprehensive Panel Discussion on Race Terminology, What We Are Calling Ourselves, and Its Implications,"** held at American University College of Law, Washington, D.C., November 7, 2006 (with co-presenter, Ms. Zakiya Carr Johnson).

*Presenter*, "*Acting Against their Wills:  A Critical Analysis of Black Land Holding Before, Under, and After Tenancy in Commons*," under the Program entitled:  "Intersection of Race – How Does Race Affect Tax, Probate and Real Estate Policy?", **ABA Joint Real Property, Probate, and Trust Section/Tax Section Diversity Luncheon**, Denver, Colorado, October 21, 2006.

*Moderator*, Panel – *Perspectives on Interracial Coalition Building*, **The 2006 Wiley Branton Symposium:  What is Black?  Perspectives on Coalition Building in the Modern Civil Rights Movement**, Howard University School of Law, Washington, DC, October 20, 2006.  Sponsored by Sidley & Austin, LLP, and with Professors Katherine Russell-Brown (Florida), Christi Cunningham (Howard), and Thomas Ross (Pittsburgh).

*Panelist*, "Expanding the Conversation:  The Future of Critical Race Theory", **Voices and Vistas:  The Future of Critical Race Theory**, Organized and hosted by Georgetown Law Center, Washington, DC., April 22, 2006.

*Presenter*, Concurrent Session, "The Aiki Way of Legal Education," **Spirituality, The Place of Spirituality in the Search for Balance in the Whirlwind of Law School, AALS Annual Meeting**, Washington, D.C., January 4, 2006.

*Panelist/Debater* (with Professor Emma Coleman Jordan), **Debating the Tenets of Critical Race Theory?**, Georgetown Law Center, Washington, DC., November 2005.

*Moderator*, **The International Conference on Industrial Organization, Law, & Economics**, Athens, Greece, June 9-11, 2005.

*Paper Presentation*, "Being and Nonbeing:  Race, Fear, Existential 'Death,' and the Affirmative Action Cases of *Gratz* and *Grutter*," **Joint International Meeting of the Law and Society Association and the Canadian Law and Society Association**, Las Vegas, NV, June 2-5, 2005.

*Paper Presentation*, "Being and Nonbeing:  Race, Fear, Existential 'Death,' and the Affirmative Action Cases of *Gratz* and *Grutter*," 8th **Annual Meeting – The Association for the Study of Law, Culture, and Humanities Conference**, Hosted by the University of Texas, Austin, Texas, March 11-12, 2005.

*Moderator*, "Evaluation and Litigation/Arbitration of Legal Malpractice Claims," **Conference on the Liabilities of Lawyers in Crossborder Transactions and Disputes**, Sponsored by the Center for International Legal Studies, Kitzbühel, Austria, January 23-29, 2005.

*Paper Presentation*, "The Sacred Way of Tibetan CRT Kung Fu: Can Race Crits Teach the Shadow's Mystical Insight to Law Students and Help Them to 'Know' the Heart of the Law in the First-Year Curriculum?", *Constructing A New Discourse on Race/ism Panel*, **Second National People of Color Conference**, George Washington Law School, Washington, DC, November 2004.

*Small Group Leader*, **Yale Brown@50 Conference** (in conjunction with Howard Law School), Yale Law School, New Haven, Connecticut, April 1, 2004.

*Paper Presentation*, "Affirmative Action:  Grutter and Reconciling the Structuralist Tension in Justices O'Connor and Thomas' Opinions," **Affirmative Action Panel**, Southern Illinois University Law School, Carbondale, Illinois, November 2003.  Panel presentation available at 29 Southern Illinois University Law Journal 519, 524-25, 532-35 (2004).

11

*Paper Presentation*, "Human Agency, Negated Subjectivity, and White Structural Oppression: A Critical Analysis of Critical Race Practice/Praxis," **Critical Race Theory Workshop**, Hosted by American University School of Law, April 2003.

*Paper Presentation*, "Traditional Marriage and the Lost of Her Natural Sexual Rights: Critiquing Crimes of Passion and Separation Violence as Fear and Control in a Legal Institution," **Critical Legal Conference 2002**, Hosted by the University of North London, September 2002.

*Paper Presentation*, "Crimes of Passion and Separation Violence as a Human Rights Violence?", **International Society of Family Law 11th World Conference**, Held at the Universities of Copenhagen and of Oslo, Copenhagen, Denmark and Oslo, Norway, August 2002.

*Panelists, Section on Minority Groups*, **AALS Workshop for New Law Teachers**, AALS, Washington, DC, (Len Baynes (St. Johns) and H.G. Prince (Visiting Professor, Howard Law School), June 2002.

*Paper Presentation*, "The Death of the Critical Race Theorist:  Deconstructing CRT and the End of Race Consciousness," **Joint International Meeting of the Law and Society Association and the Canadian Law and Society Association**, Vancouver, British Columbia, May 29th-June 2, 2002.

*Paper Presentation*, "The Death of the Critical Race Theorist:  Deconstructing CRT and the End of Race Consciousness," **5th Annual Meeting – The Association for the Study of Law, Culture, and Humanities Conference**, Hosted by University of Pennsylvania Law School, Philadelphia, PA, March 2002.

*Paper Presentation*, "Traditional Marriage:  Breaking the Paradigm of a Fear- and Control-Based Legal Institution:  A New Age Critique of Nomos, Culture, and Consciousness," **Joint International Meeting of the Law and Society Association**, Budapest, Hungary, June-July 2001.

*Panelists, Section on Minority Groups*, **AALS Workshop for New Law Teachers**, AALS, Alexandria, VA, (Gilbert Holmes (Dean, Baltimore) and H.G. Prince (Associate Director, AALS), June 21, 2001.

*Small Group Leader*, "Teaching Critical Theory," **SALT Teaching Conference**, Hosted by NYU Law School, New York City, NY, October 2000.

*Presented Paper*: "The Death of the Critical Race Theorist: Deconstructing CRT and the End of Race Consciousness," on panel entitled: *Critical Legal Race Theory 2000: Consciousness, Emotions, and Reawakening*, at **East of Law:  Critical Legal Conference 2000**, University of Helsinki, Faculty of Law, Helsinki, Finland, September 15-17, 2000.

*Breakfast Panelists, Section on Minority Groups*, **AALS Workshop for New Law Teachers**, AALS, Washington, DC, (with Charles Calleros (Arizona), Frank Wu (Howard), Angela Burton (Syracuse), Linda Greene (Wisconsin)) July 2000.

*Panelist*, Panel IV: *Shifting the Traditional Historical Legal Paradigm:  Identifying and Developing a New 21st Century Paradigm*, **6th Annual Mid-Atlantic People of Color Legal Scholarship Conference**, *Requiem for a Century to Renaissance: A Legal-Historical Critique of the Traditional Paradigm*, hosted by Widener University School of Law, February 10-13, 2000.

*Work-in-Progress Presenter*: "The Death of Critical Race Theory:  Deconstructing CRT and the End of Race Consciousness," **6th Annual Mid-Atlantic People of Color Legal Scholarship Conference**, *Requiem for a Century to Renaissance: A Legal-Historical Critique of the Traditional Paradigm*, hosted by Widener University School of Law, February 10-13, 2000.

*Commentator/Invited Speaker*: "Race Consciousness: Can Thick, Legal Contextual Analysis Assist the Poor, Low-Status Minority in Overcoming the Hurdle to Liberation and Advancement?," on a paper presented by Professor Regina Austin, The John Marshall Law School, December 5, 1999.

*Paper Presentation:* "The Death of the Critical Race Theorist: Deconstructing CRT and the End of Race Consciousness," **Conference on Legal Theory at the End of the 20th Century**, University of London, Birkbeck College of Law, London, England, September 17, 1999.

*Paper Presentation:* **International Society of Family Law**, Albuquerque, New Mexico, hosted by the University of New Mexico and University of Utah, June 10-12, 1999.

*Panelist*, Scholarship and Publishing, One-Day Symposium – Opening the Doors of the Legal Academy: **A Recruitment Workshop for Minority Law Professor**, Oct. 29, 1998, Marriott Hotel, Washington, D.C.

*Paper Presentation & Panelist: The Theoretical Basis for Proactive Engagement,* "Dr. Martin Luther King, Jr.'s Life in Proactive Engagement: The Lawyer as Social Activist in the Community," **Southeast/Southwest Law Teacher of 1998 Conference**, May 7-9, 1998. Hosted by the University of Alabama Law School.

*Moderator*, Panel: *The Way We Talk About Race*, "The Salience of Race," **3rd Annual Northeast People of Color Conference**, March 27-29, 1998. Hosted by Touro Law School, Huntington, New York.

*Panelist*, Panel: *Beyond the Traditional Canon?*, "Law and Literature: Examining the Limited Legal Imagination in the Traditional Canon," **4th Annual Mid-Atlantic People of Color Legal Scholarship Conference**, February 12-15, 1998. Sponsored by Howard Law School, Rutgers-Camden Law School, and Mississippi College School of Law. Hosted by Rutgers-Camden School of Law, Camden, New Jersey.

*Paper Presentation, "Race Consciousness and Reparation: Disgorging 'Blackness' and 'Whiteness' – A Critical Essay,"* AALS Section on Remedies, **AALS Annual Meeting**, Jan. 1998 in San Francisco, CA.

*Panelist, National Community*, **1996 Southwestern & Southeastern People of Color Legal Scholarship Conference**, Southern Methodist University Law School, May 30-June 1, 1996.

*Moderator & Panelist, Split Personalities: Teaching and Scholarship in Non-Stereotypical Areas of the Law*, 1st **Annual Northeastern People of Color Legal Scholarship Conference**, sponsored by Western New England College of Law, Springfield, MA, March 28-31, 1996.

*Commentator*, Work in Progress, **Critical Race Workshop**, Dixon House, Philadelphia, PA, June 25-28, 1995. Sponsored by Temple University Law School.

*Panelist*, "The Distribution of Housing," **The Politics of Class & the Construction of Identity: A Crit Network Conference**, Mar. 11, 1995. Sponsored by American University Washington College of Law & Georgetown University Law Center.

*Panelist*, "Cultural Matrix and the Language of Nonverbal Advertising in Housing Segregation: Toward an Aggregate Theory of Liability," **State of the City: Capital Law Review Symposium**, Capital University Law School, Columbus, OH, Mar. 2-3, 1995.

*Panelist*, "The Impact of Race and Ethnicity on Immigration Law and Policy," **The Annual Race and the Law Symposium**, Brooklyn Law School, New York, NY, Apr. 13, 1994 (with Prof. Jan Ting (Temple), Thomas Fox, Esq., (ACLU), Robert Begleiter (U.S. Attorney), and Moderator Maryellen Fullerton (Brooklyn)).

*Panelist*, Work-in-Progress: "Race, Myth, and Narrative in the Social Construction of the Black Self: A Response to Farber and Sherry", **Mid-Western People of Color Legal Scholarship Conference**, Hosted by the University of Columbia-Missouri Law School, Columbia, Mo., Mar. 25-27, 1994.

*Panelist, Intersection of Race and Immigration*, **Association of American Law Schools**, Orlando, Florida, Jan. 9, 1994. Sponsoring sections are Immigration Law (Michael Olivas), International Law (Sherri Burr), and Minority Groups (Jerome Culp).

*Panelist & Moderator*, Jurisprudence Panel: *Law and the Possibility for Justice?*, Work-in-Progress: "The Power of Legal Myth," **Southwestern/Southeastern People of Color Legal Scholarship Conference**, Albuquerque, NM, Apr. 30, 1993.

*Panelist*, **Work-in-Progress**: "The Power of Legal Myth:  Regulatory Takings as Campbell's Ordeal, the Experience of Being Alive, and the Search of True Justice," **Western Law Teachers of Color Conference, Carmel**, CA, Mar. 27, 1993.

*Panelist*, "Methodological Analysis: What Distinguishes Critical Race from Traditional Civil Rights Scholarship?," **Methodology Revisited: Adoration and Denigration of Critical Race Scholarship**. Sponsored by the BLSA, AALSA, SALSA, HALSA, SBA, and the Boston University Law School, Feb. 18, 1993 (with Robin Barnes (Connecticut), Mary Coombs (Miami), and Dwight Greene (Hofstra), Randall Kennedy (Harvard), and Manuel Utset (Boston)).

*Panelist*, "What is Critical Race Theory?  How is it Similar and or Different from Traditional Scholarship?," **Methodology Revisited: Adoration and Denigration of Critical Race Scholarship**. Sponsored by the Black Law Student's Association and the University of Connecticut Law School, Feb. 17, 1993.

*Panelist*, Plenary Session, Entitled: "Working Together, Recognizing Difference:  Racial and Ethnic Diversity Among Legal "Outsiders." **The Southwestern People of Color Legal Scholarship Conference**, sponsored by AALS and University of Arizona.  Apr. 24-25, 1992.

*Participant* ("Judge Clarence Thomas"), *Mock EEOC Investigation Session*, **Hypothetical Unfair Employment Practice Charge Brought by "Professor Anita Hill"**, Class: Labor and Employment Law (Associate Professor Christopher D. Cameron), Southwestern University School of Law, Los Angeles, CA 90005, Oct. 1991.

*Panelist*, Panel III:  "The Recruitment and Hiring Process from the Viewpoint of Both Faculty Candidates and Faculties," **Considering a Career in Law Teaching?:  A Program for Minority Lawyers Interested in Law Teaching**, Association of American Law Schools, Southwestern University School of Law, Los Angeles, CA 90005, Sept. 6, 1991.

## Hobbies/Activities

Travel, Martial Arts, Yoga, Reading, Poetry, Dancing, Writing, Movies, Art, Museums

*Chief Instructor (Fall 2006-Fall 2007)*, **Aikido Club**, The University of Maryland Aikido Club (affiliated with **Aikido Shobukan International Dojo**, 421 Butternut Street, N.W., Washington, D.C.).

*Instructor (Nidan-Second Degree Black Belt)*, **Aikido Club**, The University of Maryland Aikido Club, Spring-Fall 2004, Fall 2005, Spring and Summer 2006 (affiliated with **Aikido Shobukan International Dojo**, 421 Butternut Street, N.W., Washington, D.C.).

*Regular Instructor (Sandan, Third Degree Black Belt)*, **Aikido Shobukan International Dojo**, 421 Butternut Street, N.W., Washington, D.C.

*Board Member*, Board of Directors, **Aikido Shobukan International Dojo**, 421 Butternut Street, N.W., Washington, D.C., July 2017 to Present.

## Institutional Development

*Founder & Executive Managing Director*, Aiki-Om-Do, LLC (founded 2018).

*Founder*, New Millennium Writers' Workshop (not-for-profit), 2003.

## References

*Available upon request*



# HOWARD UNIVERSITY

# FACULTY HANDBOOK

August 1993

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

(g)     Conviction under any criminal drug statute for a violation occurring in the workplace.

(h)     Conviction under any criminal drug statute under circumstances that adversely affect the university's reputation in the community.

(i)     Failure to notify the university of any conviction under any criminal drug statute for conduct occurring in the workplace within 5 days of the conviction.

(j)     Refusal to sign a statement acknowledging receipt of the university's Drug and Alcohol Abuse Policy.

## 2.2.4
### Academic Freedom Policy

Faculty members are entitled to freedom in research and in the publication of the results, subject to adequate performance of their other academic duties and to such restrictions as may be imposed by grantors funding the research and by the *University Research Manual*.

Faculty members are entitled to freedom in the classroom in discussing their subjects, but they should be careful not to introduce matter into their teaching that has no relation to their subjects. Students are entitled to an atmosphere conducive to learning and to even-handed treatment in all aspects of the teacher-student relationship. Therefore, in exercising their freedom in the classroom, faculty members are responsible for ensuring that their treatment of students is in no way inconsistent with the university's equal opportunity policy or the university's commitment to promoting the educational aspirations and achievements of all students.

Howard University faculty members are members of learned professions. When they speak or write as individuals, they should be free from institutional censorship or discipline, but their special obligation is to be accurate, to exercise appropriate restraint, and to show respect for the opinions of others. Faculty should remember that the public may judge their profession and the institution by their utterances and, therefore, should make every effort, when operating as individuals, to make clear that they are not university spokespersons.

Each faculty member has the right to criticize and seek alteration of institutional regulations and policies through existing means of shared responsibility.

## 2.2.5
## Additional Policies Relating to Faculty Research

## 2.2.5.1
### Patents and Intellectual Property

text of the university's policy and guidelines is set forth in Appendix C. All faculty members as well as staff and students are subject to this policy.

The university will address AIDS issues in a caring, compassionate, responsible manner and will strive to ensure the confidentiality and dignity of persons with AIDS, ARC, or a positive HIV antibody test. The primary response of the university to AIDS will be one of education. The most important goals for the university will be those of increasing awareness and providing education to prevent further spread of the disease.

The university will analyze and respond to each case of AIDS, ARC, or a positive HIV antibody test as required by its own particular facts in keeping with the university guidelines.

### 2.2.3
### Substance Abuse Policy

The term substance abuse, as used in this policy, refers to the use of illegal drugs or controlled substances and to the consumption of alcohol in quantities to the extent that an employee is unable to perform work in a safe and productive manner. It is the goal of Howard University to protect the public health and environment of all members of the university by promoting a drug-free environment in accordance with the Drug-Free Workplace Act of 1988. Howard University, therefore, prohibits the unlawful manufacture, distribution, dispensation, possession, or use of any controlled substance or illegal drug on its premises. Employees who engage in prohibited drug- or alcohol-related activities will be subject to disciplinary action up to and including dismissal. The entire text of the university's policy is set forth in Appendix D. All faculty members as well as staff and students are subject to this policy.

Howard University policy prohibits the following:

    (a)    Use, possession, manufacture, distribution, dispensation, or sale of illegal drugs or drug paraphernalia on university premises or in university-supplied vehicles.

    (b)    Use, possession, or any manufacture, distribution, dispensation, or sale of a controlled substance on university premises or in university-supplied vehicles.

    (c)    Storage of any illegal drug, drug paraphernalia, or controlled substance whose use is unauthorized in a locker, desk, or other repository on university premises.

    (d)    Being under the influence of an unauthorized controlled substance or illegal drug on university premises or in university-supplied vehicles.

    (e)    Use of alcohol that adversely affects the employee's work performance, safety at work or that of others, or the university's reputation in the community.

    (f)    Possession, use, manufacture, distribution, dispensation, or sale of illegal drugs off university premises that adversely affects the employee's work performance or safety, or safety of others, at work.

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

The mission of Howard University includes the provision of quality education for any student, but with emphasis upon the provision of educational opportunities for those students who may not otherwise have an opportunity to acquire an education of the type provided at Howard.

In fulfilling its mission, the university does not discriminate on the basis of race, color, national or ethnic origin, sex, marital status, religion, handicap, age, sexual preference, political affiliation, or any other basis prohibited by federal or District of Columbia law.  This policy covers administration of the university's educational policies, admissions policies, scholarship and loan programs, other university-administered programs, and employment.

### 2.2.1.2
### Sexual Harassment

It is the policy of Howard University to maintain the university community as a place of work and study for staff, faculty, and students free of sexual harassment and all forms of sexual intimidation and exploitation.  The entire text of the policy and procedures is set forth in Appendix B.  All faculty members as well as staff and students are subject to this policy.

Sexual harassment is defined as verbal or physical conduct of a sexual nature when submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, submission to or rejection of such conduct by an individual is used as the basis for an employment decision affecting such individual, or such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.  While a particular interaction must be offensive and unconsented to, to be defined as harassment, all persons in the university community should be sensitive to the questions about mutuality of consent that may be raised and to the conflicts of interest that are inherent in personal relationships where professional and educational relationships also are involved.

Anyone who is subjected to offensive sexual behavior is encouraged to pursue the matter through the informal or formal procedures described in Sexual Harassment Policy and Procedures, adopted by the Board of Trustees and incorporated here by reference.  (See Appendix B.)

Violation of university policy on sexual harassment will be the basis for disciplinary action.

### 2.2.2
### AIDS Policy

It is the policy of Howard University that no person shall be discriminated against based on acquired immune deficiency syndrome (AIDS), AIDS-related complex (ARC), or a positive human immunodeficiency virus (HIV) antibody test.  The entire

# SECTION 2

# TERMS AND CONDITIONS
# OF FACULTY EMPLOYMENT

**2.1**
**Contractual Force of Handbook**
Sections 2 and 3 of this handbook contain the approved policies and procedures of Howard University concerning the terms and conditions of the faculty of the university.   These sections are incorporated into the individual contract of employment of each faculty member, and they are subject to change by the Board of Trustees as conditions require.   When the terms and provisions of a faculty member's contract are inconsistent with the general policies contained herein, the provisions of the individual contract shall supersede.   It should be noted that Sections 1.0 and 4.0 through 7.0 inclusive of this handbook do not come under the grievance procedures of this handbook.

**2.2**
**Policies Related to Faculty Employment and Activities**

**2.2.1**
**Equal Opportunity Policies**

**2.2.1.1**
**General Equal Opportunity Policy**

meet a class, the department office must be notified and arrangements made for substitute instruction or for the class to be notified concerning cancellation.   Make-up classes shall be rescheduled at a time reasonably convenient for students.

(d)   To design and evaluate conscientiously all student work with impartiality; and to complete grading in a timely fashion according to the schedule of due dates announced by the Office of the Registrar. Moreover, students will be given an opportunity to receive an explanation of the grade assigned.

(e)   To provide each student with a written syllabus or course guide summarizing the objectives and requirements of their courses, the textbooks or other sources to be used, and the applicable attendance and grading rules.

(f)   To avoid unacceptable discriminatory conduct based on such factors as race, color, religion, national origin, sex, sexual orientation, disability or handicap, age, or political beliefs.  Accordingly, faculty members must be sensitive to the harmful consequences of professorial or student conduct or comments in classroom discussions or elsewhere that perpetuate stereotypes or prejudices involving such factors.

## 2.3.3
### Conference Hours

Faculty members shall be available to counsel students about academic matters throughout the academic year by means of regularly scheduled office hours or appointments.  In performing this function, the faculty member should make every reasonable effort to ensure that the information they transmit is timely and accurate.

Faculty members will be reasonably available to colleagues for purposes of discussing teaching methods, content of courses, possible topics of scholarship, scholarly work in progress, and related matters.

## 2.3.4
### Scholarly Activities

Since teaching responsibilities allow for a flexible scheduling of time and an opportunity to pursue intellectual interests relatively free from distraction, faculty members are obligated to make the best and fullest use of that freedom to fulfill their scholarly responsibilities.

Accordingly, the university requires all faculty members, including tenured and probationary, to continue their professional development through research, scholarly writing, advanced study, or original creative production as appropriate to their disciplines.  Such activities derive their importance both from the contributions they make to classroom performance and to the fact that one of the major roles of any

Deans should raise potential nepotism problems with the  appropriate academic vice president.

## 2.3
## Faculty Responsibility

Appointment to the faculty of Howard University carries with it responsibilities for excellence in teaching, the intellectual growth of students, high scholarship, and the improvement of society.  In addition, faculty members have a responsibility to participate in the life and operation of the university and particularly the department and school or college of their appointment.  Although the final authority for the conduct of university affairs is vested in the Board of Trustees, the academic judgments, recommendations, and policies of the faculty are central to the university's general educational policy and in determining the shape and character of the university as an educational institution.

The purpose of the following sections is to further survey some of the details comprising the minimum obligations of a faculty member toward the students, the university, and the public.  The purpose does not include a desire to impose a rigid, codified body of rules on the faculty.

## 2.3.1
## Professional Ethics

As members of a learned profession and as officers of an educational institution, the special position of faculty in this community imposes special ethical obligations.  These ethical standards are the repository of what experience has revealed as to how scholars can live together to the best advantage.

## 2.3.2
## Teaching

The faculty members' pursuit of teaching excellence is a life-long commitment and includes the following specific responsibilities:

(a)     To have a firm command of their subjects and to keep abreast of new developments.

(b)     To select teaching strategies that facilitate the learning process and to communicate their subjects effectively.

(c)     To instruct classes at the scheduled time and place, in a manner consistent with the course content and course credit approved by the appropriate faculty body.  When the faculty member is unable to

university is the discovery of new knowledge, the synthesis of ideas, and other creative activities.

### 2.3.5
### University and Community Service

Although many duties within the university are assumed by professional administrators, the faculty retains substantial collective responsibility and authority to provide institutional leadership. Thus individual faculty have a responsibility to assume a fair share of that leadership, including participation in departmental and school faculty meetings and service on departmental, school, and university committees. In discharging their academic, committee, and other assignments, faculty members are obligated to complete each in a professional, timely, and responsible manner. Faculty also are expected to serve the academic, professional, and civic communities with their expertise.

### 2.3.6
### Attendance at University Ceremonies

Attendance at Opening Convocation, Charter Day, and the Commencement Convocations is expected from the full-time faculty. Absence from these ceremonies should be arranged with the dean of the school. Faculty members should participate in other major departmental, school, college, and university activities.

### 2.4
### Academic Appointments

An outstanding faculty is the key ingredient in maintaining academic excellence. The faculty serves to help create a university environment that demands the best from all its participants. Additionally, a well-qualified and productive faculty helps to attract other well-qualified individuals--faculty and students--who show promise for future achievement.

Howard University's ability to maintain or exceed its present academic reputation depends on the recruitment of outstanding faculty who are willing to give their best efforts to

> (a)  Engage in effective teaching;
> (b)  Make scholarly contributions in research or creative works;
> (c)  Exhibit evidence of professional development; and
> (d)  Render service to the university, the profession, and the community.

Howard University's policies and procedures for the recruiting and appointing of its faculty are stated herein.

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

The candidate shall be a person having national or international recognition in the academic field or area of performance, a sustained record of achievement at the highest professional and scholarly level, and a record of service to the university or to the wider community that the university serves. The candidate shall have achieved distinction in scholarship, research, or professional performance as attested by such evidence as the following:

(a)     Outstanding publications or other public demonstrations of professional or academic excellence that provide significant new knowledge in the candidate's field of specialization, new and useful techniques for the constructive utilization of existing knowledge in that field, or a revision or reinterpretation of data in a given field that engenders new perspectives for thought and action.

(b)     Recognition by professional societies or recognized experts in the candidate's field or medium.  This recognition may take such forms as invitations to serve as advisor, consultant, or organizer for programs related to the field, to present professional papers, or to appear in the most selective auditoriums or galleries; special awards and honors including membership in highly selective academies and honorary societies; or inclusion in highly respected and exclusive exhibitions, performance series, or publications.

(c)     Recognition based on professional merit by groups other than professional societies, such as foundations, government bodies, and community groups.

(d)     A record of significant research funded by outside agencies as a result of recognition in the candidate's field of specialization.

The scholarship and professional achievement of the candidate shall be attested to by reputable professionals in the field outside the university.  Student evaluations also shall be taken into consideration.

## 2.4.2.2.1
## Appointment Procedure

Recommendations shall be initiated by the Committee on Appointments, Promotions, and Tenure of the Faculty Senate. Nominations for this rank may be received by this committee from any source within or without the university. Upon receipt of a nomination, the committee shall request the nominating person or body to provide a complete file documenting the qualifications outlined herein.  This file, together with the nomination, shall be forwarded to the APT Committee of the department most closely related to the candidate's field of specialization for evaluation and comment.  Following departmental review, the file shall be forwarded to the APT Committee of the appropriate school for its evaluation and comment. The judgments of the departmental and school committees shall be considered by the Senate Committee in reaching its decision.  Upon approval by the Senate Committee, the recommendation file shall be forwarded to the vice president of the division, the president, and the Board of Trustees for final action.

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

### 2.4.2.3
### University Professor

Persons holding this title will be individuals of unusual academic, scholarly, or professional distinction who have the competence to teach or perform other academic services in more than one school or college in the university. Appointment as university professor is a tenured appointment.

### 2.4.2.3.1
### Academic Preparation

The candidate shall hold an earned doctoral degree or its foreign equivalent. This requirement may be waived where the candidate has gained prominence through creative and productive activity in the field.

### 2.4.2.3.2
### Teaching Competence

The candidate shall have appropriate teaching experience at the college level or equivalent experience in the field. The candidate's teaching competence shall be judged by persons who teach in the candidate's field. Student evaluations also shall be taken into consideration.

### 2.4.2.3.3
### Research and Creative Productivity

The candidate shall give evidence of ability in research or creative activity through the publication of books, monographs, articles, or other creative work.

### 2.4.2.3.4
### Appointment Procedure

The same procedure for the appointment of a distinguished professor shall be followed (see 2.4.2.2.1), except that the file shall be forwarded for evaluation and comment to APT Committees in the two or more departments and schools/colleges in which the nominee will serve or has the qualifications for service. The Senate Committee will consider the comments of both units of the university in making its recommendation. The appointment will be a joint appointment between the appropriate units.

### 2.4.2.4
### Research Professor

Persons holding this title will be individuals of recognized research competence in a given field. Their principal function shall be the continuation of research activities. Appointment as a research professor is a tenured appointment.

### 2.4.2.4.1
### Teaching Competence

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

The candidate shall have appropriate teaching experience at the college level or equivalent experience in the professional field. The candidate's teaching competence shall be judged by persons who teach in the candidate's field. Student evaluations also shall be taken into consideration.

### 2.4.2.4.2
### Research Competence
The candidate shall give evidence of recognized research competence as judged by persons in the field who are competent to evaluate the candidate's books, monographs, articles, research projects, or other aspects of creative productivity. Evaluations of research competence shall be secured from at least two competent persons outside the university.

### 2.4.2.4.3
### Appointment Procedure
The procedure shall be the same as for the appointment of a distinguished professor (see above).

### 2.4.2.5
### Associate Professor
An appointment to this rank is made only to a person who has demonstrated the personal and intellectual qualities that with increased maturity are expected to lead to appointment to the rank of professor. An appointment as associate professor usually results from the promotion of an assistant professor with the award of tenure; however, promotion to associate professor can occur without the award of tenure. Associate professors may receive temporary appointments, probationary tenure track appointments, or tenured appointments.

### 2.4.2.6
### Assistant Professor
Appointment as assistant professor is accorded to a person who has completed the final earned degree or other professional certification relevant to the discipline and who has given evidence of superior potential for developing academic stature. Appointment in this rank provides a period during which an individual has an opportunity to confirm his/her own interest and motivation as being appropriate to the broad scope of university faculty responsibilities, and also one in which senior faculty may assess the promise and the competence of the faculty member's performance.

Assistant professors may receive temporary appointments or probationary tenure track appointments. Only in unusual, extraordinary situations is tenure awarded to faculty holding the rank of assistant professor.

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

early. After exhaustion of the above options, the tenured faculty member may be terminated.

A tenured faculty member who is terminated for reasons of financial exigency will be allowed to participate in the university group health insurance program for 18 calendar months following the date of termination, absent participation in another insurance plan. The faculty member is entitled to other rights and benefits of terminated employees as may be specified by the Board of Trustees.

The appropriate Faculty Senate Committee will monitor the efforts made by the university in finding suitable positions for displaced faculty members within the university.

### 2.7.8.4.6
### Other Rights Pertaining to All Faculty

Faculty members terminated for reasons of financial exigency will be provided counseling regarding employment opportunities outside the university.

If a program that has undergone sufficient reduction or elimination as a result of financial exigency is reinstated or strengthened by reinstated full-time employees within 3 years after termination of the state of financial exigency, tenured faculty terminated as a result of said reduction or termination will have the right to reinstatement.

A faculty member whose appointment is terminated for reasons of financial exigency has the right to appeal under established policies and procedures in cases where other faculty members in the same department are retained.

### 2.7.8.4.7
### Sunset Provisions

A declaration of financial exigency is valid for a period fixed by the Board of Trustees. In any case, after a period of 1 year from the date of declaration of a financial exigency, circumstances should be reviewed by the president and the advisory group and reported to the Board of Trustees for appropriate action.

## 2.8
## Grievance--Rights, Privileges, and Resolution of Disputes Governing Academic Freedom and Conduct of the Faculty

### 2.8.1

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

**Who is Eligible?**

The grievance procedures are available to all full-time tenured and probationary faculty members, and CAR staff members with career status.

The following are excluded:

    (a)    All administrative officers (president, deans, department chairs, directors, division chiefs, and so on). Faculty members holding such administrative positions, however, may invoke the procedures for grievance arising from their capacity as faculty members;

    (b)    Trainees (postdoctoral candidates, administrative associates, clinical interns, residents, and fellows). Faculty who share their areas of employment with other entities of the university (e.g., Howard University Hospital, Howard University Hotel, WHUR, or WHMM) will be able to direct their grievances to the appropriate body; and

    (c)    All temporary and part-time faculty.

## 2.8.2

**Grievance Matters**

A grievance is a complaint that action has been taken that involves the faculty member's personnel status or terms and conditions of employment, and that is a violation of academic freedom, arbitrary and capricious (i.e., an act that is unsupported by the record presented to support the action taken), or a violation of established rules and procedures.

Specific actions that may be considered under grievance procedures are the following:

    (a)    Departmental, school, or administrative recommendation of dismissal for cause;

    (b)    Demotion or suspension;

    (c)    Administrative recommendation of revocation of tenure and dismissal because of financial exigency, only in cases in which other tenured faculty members in the same department or program are retained;

    (d)    Departmental, school, or administrative recommendation of reduction in academic rank;

    (e)    Departmental, school, or administrative recommendation of reduction in individual salary;

    (f)    Denial of sabbatical leave; and

    (g)    Denial of tenure, promotion, or reappointment where such denial allegedly involves a violation of academic freedom.

## 2.8.3

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

# General Procedures for Resolution of a Faculty Grievance

### 2.8.3.1
### Faculty Grievance Commission

The FGC shall be elected at large by the Senate from the tenured university faculty. No administrative officer or department chair may serve on the commission. The FGC shall consist of seven faculty members. In addition, a Hearing List of 30 tenured faculty members representing all schools and colleges shall also be elected. Members of the Hearing List will be selected to serve on a Hearing Panel if formal procedures are invoked.

The members of the FGC shall be elected to 2-year terms. Members of the Hearing List shall also be elected for 3-year terms, and the appointments shall be arranged so that the terms of approximately one-third of the members shall expire each year.

The commission shall elect a chair from among the seven members and the chair shall serve as the presiding officer of grievance hearings.

There shall be an independent legal officer to assist the commission in its operations. The legal officer's professional responsibility shall be to the Senate and the terms and conditions of employment shall be determined by the Senate.

### 2.8.3.2
### Preliminary Procedures

A good faith attempt must be made to mediate any disputes between the faculty member and the administrative officer at the department or school/college level before filing a formal complaint. Failing to receive satisfaction, the faculty member may take steps to formalize the complaint by filing with the FGC.

### 2.8.3.3
### Formal Complaints

All petitions and complaints shall be made in writing by the faculty member to the chair of the FGC within 2 weeks after the faculty member has received written notice of action from the administration. A grievance may be based on prior as well as recent or continuing events. However, the grievance, where feasible, should be focused on recent and continuing events or conditions.

A.     The petition or complaint shall

    (a)     Detail the nature of the grievance and provide any factual or other pertinent data; and

    (b)     State against whom the grievance is directed (administrative officer).

B.     Upon receipt of the written petition or complaint and within 30 days, the FGC will decide whether or not the grievance merits detailed investigation:

**TERMS AND CONDITIONS OF FACULTY EMPLOYMENT**

(a)     The FGC may choose not to handle the grievance (i.e., dismissal of the complaint because it does not fit criteria).

(b)     If it accepts, the FGC must attempt to mediate and resolve the complaint informally.

(c)     If the FGC is unable to resolve the complaint informally, then it must proceed with a formal hearing.

## 2.8.3.4
## Formal Hearing

Within 3 weeks of the recommendation of the FGC regarding its inability to resolve the matter informally and the need for a formal hearing, the chair of the FGC will convene an ad hoc Hearing Panel of five faculty members selected from Hearing List to conduct formal hearings regarding the complaint.

A.      The grievant and administrator shall each select two candidates respectively from the elected Hearing List for the Hearing Panel. Members of the Hearing List deeming themselves disqualified because of personal bias or conflict of interest will remove themselves from consideration, either at the request of either party or on their own initiative. The final decision with respect to whether a member should hear the grievance rests with the remaining panel members. The four panel members shall select a fifth who shall act as chair. Members of the commission with current complaints against the university shall be disqualified automatically.

B.      The chair of the FGC shall serve as chair of the Hearing Panel. If the chair of the FGC should be a member of the department of the grievant or the respondent, or has a current grievance or formal complaint pending, the chair shall be excused. A replacement shall be selected from the remaining members of the commission as agreed on by the members of the FGC and both parties.

C.      The Hearing Panel shall conduct its hearings within 8 weeks (except in extraordinary circumstances as recognized by the chair of the Senate) and report its recommendations in writing to the FGC no later than 30 days after the conclusion of the hearings.

(a)     The chair of the Hearing Panel shall notify all parties in writing of the time and place of the hearing. The Hearing Panel, in consultation with both the grievant and the respondent, will exercise its judgment as to whether the hearings should be public or private. A transcript of the hearings will be taken and a copy will be made available upon request to both parties without cost.

(b)     The decision on the merits of a grievance will be made by the panel after hearings in which the grievant and the respondent have the opportunity to present their cases. The grievance hearing is not a

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

formal judicial proceeding. Its purpose is to provide a fair evaluation of the allegation that a right or privilege has been violated.

The Hearing Panel may receive any relevant evidence that is not privileged and may decline to consider evidence when its probative value is outweighed by considerations of unfair prejudice, confusion of the issues, undue delay, or needless presentation of cumulative evidence. Arguments, oral and documentary evidence, and witnesses may be presented by the grievant, the respondent, or the Hearing Panel. The university will make a reasonable effort to facilitate the appearances of witnesses.

The grievant may have the assistance of an academic advisor and counsel in the preparation and presentation of his/her case to the panel. Such a colleague should normally have academic qualifications in the grievant's field of study and therefore be able to provide expert assistance in the case.

(c)     The recommendation of the Hearing Panel shall be based solely on evidence and argument presented in the hearings. The written report shall state the committee's findings on all parts of the complaint and may include recommendations as to disposition of the case. The report shall be transmitted to the grievant, respondent, dean, appropriate vice president, and the FGC. If no appeal is filed, the recommendation is forwarded to the president for decision and action; if the president is a party to the action, the report shall go to the Board of Trustees. The president's decision shall be made and communicated in writing to the chair of the Faculty Grievance Commission, the grievant, and the respondent within 30 days from the date the transcript of the hearing is prepared. In the event the president declines to implement the recommendations, the written communication shall include detailed reasons, and it shall be sent to the chair of the Senate.

D.     The recommendations of the Hearing Panel may be appealed to the FGC by either party. The notice of appeal must filed with the chair of the commission within 15 days after receipt of the recommendation of the Hearing Panel.

The members of the FGC who were not members of the Hearing Panel and would meet the criteria regarding qualifications for the panel shall hear the appeal. Evidence not introduced in the hearing may not be considered in the appeal. The commission shall decide by majority vote and render a recommendation in writing--sustaining, modifying, or remanding the decision of the Hearing Panel. The commission's recommendation shall be forwarded to the president for decision and action. The President's decision shall be made and communicated in writing to the FGC chair, the grievant, and the respondent within 30 days. In the event the president declines to

implement the recommendations, the written communication shall include reasons, and it shall be sent to the chair of the Senate.

## 2.8.4
## Appeal of a Negative Decision Regarding Probationary Reappointment, Tenure, Career Status, and Promotion at the University Level

A.  If the dean's or school/college APT Committee's final decision is negative, the candidate or the department, or the candidate and the department in concert, may appeal the decision. The appeal must be filed in writing with the dean of the school/college and the Faculty Grievance Commission within 3 weeks of notification of the dean's decision and must state the specific reasons for the appeal.  The reasons must be based on one or more of the grounds listed below.  Failure to raise a particular reason may be treated as a waiver of such a claim in this or any subsequent procedure.

B.  The grounds for an appeal shall be limited to

   (a)  Violations of established procedures;
   (b)  Decisions unsupported by the record submitted by the candidate;
   (c)  Consideration of factors unrelated to performance in carrying out professional responsibilities; and
   (d)  Actions violative of academic freedom.

   If a grievance is sustained by the FGC, the file will be returned to the appropriate level of review for reconsideration.

C.  In its deliberations and findings, the Faculty Grievance Commission and Hearing Panel shall respect the following principles and restrictions:

   (a)  The Faculty Grievance Commission's review shall be limited to determining whether any one of the four possible grounds for appeal has been established.
   (b)  The Hearing Panel shall recognize the central role of peer judgment in tenure decisions.  Hence, the committee shall not substitute its assessment of the appellant's professional qualifications for those of the department and the experts outside the department who have been asked to submit evaluations. The committee's role in judging professional merit shall be limited to determining whether the recommendations of the department and the dean were arbitrary and capricious or based on improper considerations.
   (c)  Comparisons with other tenure review cases may be used by the Hearing Panel. However, the committee shall recognize the right and duty of the departments to improve their quality or take into account different departmental needs, so long as this is not done as a pretext.

# AGENCY, PARTNERSHIP, AND THE LLC: THE LAW OF UNINCORPORATED BUSINESS ENTERPRISES

## *CASES, MATERIALS, PROBLEMS*

### Ninth Edition

**J. DENNIS HYNES**
*Nicholas A. Rosenbaum Professor of Law Emeritus*
*University of Colorado*

**MARK J. LOEWENSTEIN**
*Monfort Professor of Commercial Law*
*University of Colorado*

 LexisNexis

# *Table of Contents*

| | | |
|---|---|---|
| **Introduction** | **THE LAW OF UNINCORPORATED BUSINESS ENTERPRISES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** |
| A. | THE CORPORATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| B. | THE DIFFERENT FORMS OF UNINCORPORATED BUSINESSES . . . . | 4 |
| 1. | The Sole Proprietorship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 |
| 2. | The Business Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |
| 3. | The Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| 4. | The Limited Liability Partnership (LLP) . . . . . . . . . . . . . . . . . . . | 7 |
| 5. | The Limited Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| 6. | The Limited Liability Limited Partnership (LLLP) . . . . . . . . . . . . . . | 8 |
| 7. | The Limited Liability Company (LLC) . . . . . . . . . . . . . . . . . . . . . | 8 |
| | | |
| **Chapter 1** | **THE AGENCY RELATIONSHIP; THE AMBIGUOUS PRINCIPAL PROBLEM; SUBAGENCY** . . . . . . . . . . . . . . | **9** |
| *Carrier v. McLlarky* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| *United States v. Bonds* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
| Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
| A. | AGENCY OR SALE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| | *Hunter Mining Laboratories, Inc. v. Management Assistance, Inc.* . . . . | 25 |
| | Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| | *United States v. General Electric Co.* . . . . . . . . . . . . . . . . . . . . . . | 29 |
| | Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| B. | AGENCY OR DEBTOR-CREDITOR RELATIONSHIP . . . . . . . . . . . . | 31 |
| | *A. Gay Jenson Farms Co. v. Cargill, Inc.* . . . . . . . . . . . . . . . . . . . . | 31 |
| | Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 |
| C. | AGENCY OR BAILMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 |
| | *Jones v. Taylor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 |
| | Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| D. | AGENCY AND THE LAW OF TRUSTS . . . . . . . . . . . . . . . . . . . . | 42 |
| | *Dierksen v. Albert* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 42 |
| | Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| E. | AGENT OR ESCROW HOLDER . . . . . . . . . . . . . . . . . . . . . . . . | 46 |
| | Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47 |
| | *King v. First National Bank* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47 |
| | Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 49 |
| F. | AGENCY DISTINGUISHED FROM OTHER RELATIONSHIPS . . . . . . | 51 |
| 1. | The Franchise Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51 |
| 2. | The Marriage Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 52 |
| 3. | Property Relationships . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 53 |

xi

## Table of Contents

| | | | |
|---|---|---|---|
| a. | Co-ownership | | 53 |
| b. | Landlord-Tenant | | 53 |
| 4. | Corporate Relationships | | 53 |
| a. | The Agency Status of Corporate Directors | | 53 |
| b. | The "Mere Instrumentality" or "Alter Ego" Doctrine Contrasted with Traditional Agency Liability | | 54 |
| G. | THE AMBIGUOUS PRINCIPAL PROBLEM | | 56 |
| | *Thayer v. Pacific Electric Railway* | | 56 |
| | Notes | | 58 |
| | *Kilbourn v. Henderson* | | 59 |
| | Note | | 60 |
| | *Norby v. Bankers Life Co.* | | 61 |
| | Notes | | 64 |
| H. | SUBAGENCY | | 65 |
| | Notes | | 66 |
| I. | THE HISTORY OF AGENCY AND OTHER MATTERS | | 67 |
| | Problems | | 68 |

| Chapter 2 | RIGHTS AND DUTIES BETWEEN PRINCIPAL AND AGENT | | 73 |
|---|---|---|---|
| A. | DUTIES OF PRINCIPAL TO AGENT | | 74 |
| 1. | Duty of Exoneration and Indemnification | | 74 |
| | *Admiral Oriental Line v. United States* | | 74 |
| | Notes | | 76 |
| 2. | Duty to Pay Compensation | | 78 |
| a. | Express Contract Between Principal and Agent | | 78 |
| | *Roberts Associates v. Blazer International Corp.* | | 78 |
| b. | Implied-in-Fact Contract | | 83 |
| | *McCollum v. Clothier* | | 83 |
| | Notes | | 85 |
| | *McKnight v. Peoples-Pittsburgh Trust Co.* | | 86 |
| | Note | | 88 |
| 3. | Duty of Care | | 88 |
| | Notes | | 89 |
| 4. | Social Legislation | | 90 |
| a. | Worker's Compensation Legislation | | 90 |
| b. | Other Social Legislation | | 91 |
| 5. | Duty to Deal Fairly and in Good Faith | | 92 |
| | *Taylor v. Cordis Corp.* | | 92 |
| | *Deonier & Associates v. Paul Revere Life Insurance Company* | | 94 |
| | Notes | | 100 |

xii

## Table of Contents

B.      DUTIES OF AGENT TO PRINCIPAL ........................ 101
1.      Duty of Good Conduct and to Obey ......................... 102
2.      Duty to Indemnify Principal for Loss Caused by Misconduct ....... 102
3.      Duty to Account ....................................... 104
4.      The Fiduciary Duties of Agents ........................... 104
   a.      Commencement of Fiduciary Relationship .................. 104
   b.      Duty of Care ..................................... 107
         *Carrier v. McLlarky* .............................. 107
         Notes ........................................ 109
   c.      Duty of Disclosure ................................ 110
         *Estate of Eller v. Bartron* .......................... 110
         Note ........................................ 114
   d.      Duty of Loyalty ................................... 115
     i.     Loyalty During the Relationship ....................... 115
         *Gelfand v. Horizon Corp.* .......................... 115
         Notes ........................................ 119
     ii.    Post-Termination Competition ........................ 124
         *Town & Country House & Home Service v. Newbery* ........ 125
         Notes ........................................ 128
         *Robbins v. Finlay* ............................... 130
         Notes ........................................ 133
     iii.   Dealing at Arm's Length ............................ 135
         *Pappas v. Tzolis* ................................ 135
         Note ........................................ 137
         Problems ..................................... 138

Chapter 3      **VICARIOUS TORT LIABILITY** ................... **141**

A.      THE MASTER-SERVANT RELATIONSHIP ................... 141
1.      The Concept ......................................... 141
         *Jones v. Hart* .................................... 141
         Notes ........................................ 142
   a.      The History of Respondeat Superior Liability ................. 145
     i.     The Holmes Thesis ................................ 145
     ii.    The Wigmore Rebuttal ............................. 147
   b.      Is an Employment Relationship Necessary to Respondeat Superior
        Liability? ....................................... 148
         *Heims v. Hanke* ................................. 148
         *Sandrock v. Taylor* ............................... 150
         Notes ........................................ 151
   c.      Rationale for Respondeat Superior ........................ 153
     i.     Arguments Questioning the Theory ..................... 153

## Table of Contents

| | | | |
|---|---|---|---|
| ii. | | Arguments in Favor of or Explanations for the Theory | 155 |
| d. | | Imputed Contributory Negligence | 156 |
| e. | | Limitation to Losses Caused by Tortious Behavior | 157 |
| f. | | Direct Tort Liability of an Employer | 157 |
| 2. | | The Independent Contractor Exception | 158 |
| a. | | The Concept | 158 |
| | | *Kane Furniture Corp. v. Miranda* | 158 |
| | | Note | 162 |
| | | *Lazo v. Mak's Trading Co.* | 163 |
| | | Notes | 165 |
| | | *Soderback v. Townsend* | 167 |
| | | *Hunter v. R.G. Watkins & Son, Inc.* | 168 |
| | | Notes | 170 |
| | | *Sandrock v. Taylor* | 174 |
| | | Note | 175 |
| b. | | Limitations to the Independent Contractor Exception | 176 |
| | | *Hixon v. Sherwin-Williams Co.* | 176 |
| | | Notes | 178 |
| | | *Kleeman v. Rheingold* | 179 |
| | | Notes | 182 |
| | | Problems | 185 |
| 3. | | Borrowed Servants | 186 |
| | | *Charles v. Barrett* | 187 |
| | | Notes | 187 |
| | | *ATS, Inc. v. Beddingfield* | 189 |
| | | *Sparger v. Worley Hospital, Inc.* | 193 |
| | | Note | 196 |
| | | Problems | 196 |
| 4. | | The Scope of Employment Limitation | 197 |
| a. | | Negligent Acts | 197 |
| | | *Joel v. Morison* | 197 |
| | | Notes | 199 |
| | | *Fiocco v. Carver* | 202 |
| | | Notes | 205 |
| | | *Clover v. Snowbird Ski Resort* | 207 |
| | | Note | 212 |
| | | *Spencer v. V.I.P., Inc.* | 213 |
| b. | | Intentional Torts | 217 |
| | | *Bremen State Bank v. Hartford Accident & Indemnity Co.* | 218 |
| | | Note | 219 |
| i. | | The Assault on § 228(1)(c) | 220 |

*Table of Contents*

|  |  |  |  |
|---|---|---|---|
|  |  | *Ira S. Bushey & Sons v. United States* | 220 |
|  |  | Notes | 223 |
|  |  | *Lisa M. v. Henry Mayo Newhall Memorial Hospital* | 225 |
|  |  | Notes | 233 |
|  | ii. | Restatement (Second) § 219(2)(d) | 236 |
|  |  | *Costos v. Coconut Island Corp.* | 236 |
|  |  | Notes | 239 |
|  | iii. | The Implied Contract Theory | 241 |
|  |  | *Nazareth v. Herndon Ambulance Service* | 241 |
|  |  | *Adams v. New York City Transit Authority* | 243 |
|  | iv. | Punitive Damages | 246 |
|  | v. | Non-Physical Torts | 249 |
| B. |  | THE PARTNERSHIP RELATIONSHIP | 249 |
| C. |  | THE UNINCORPORATED NONPROFIT ASSOCIATION RELATIONSHIP | 250 |
| 1. |  | Liability of the Members | 251 |
| 2. |  | Liability of the Association | 251 |
| a. |  | In General | 251 |
| b. |  | For the Actions of Its Affiliates and Chapters | 252 |
| c. |  | To Its Members | 252 |
| D. |  | THREE UNUSUAL EXAMPLES OF VICARIOUS TORT LIABILITY | 253 |
| 1. |  | Vicarious Liability by Estoppel | 253 |
| 2. |  | The "Family Car" Doctrine | 253 |
| 3. |  | Owner Consent and Other Legislation | 254 |
| E. |  | THE EFFECT ON VICARIOUS LIABILITY OF A RELATIONSHIP BETWEEN SERVANT AND INJURED PARTY | 255 |
|  |  | *Schubert v. August Schubert Wagon Co.* | 255 |
|  |  | Notes | 256 |
|  |  | *Klatt v. Commonwealth Edison Co.* | 257 |
|  |  | Problems | 259 |

| Chapter 4 |  | **CONTRACTUAL POWERS OF AGENTS** | **261** |
|---|---|---|---|
| A. |  | AUTHORITY | 261 |
| 1. |  | Express Authority | 261 |
|  |  | *King v. Bankerd* | 262 |
|  |  | *Lamb v. Scott* | 266 |
|  |  | Notes | 267 |
| 2. |  | Implied Authority | 268 |
| a. |  | Delegation of Authority | 269 |
|  |  | Notes | 270 |
| b. |  | Incidental Authority | 270 |

## *Table of Contents*

B.      APPARENT AUTHORITY ................................. 271
          *H. H. Taylor v. Ramsay-Gerding Construction Company* .......... 271
          *Smith v. Hansen, Hansen & Johnson, Inc.* .................... 275
          Notes ................................................ 278
          *Sauber v. Northland Insurance Co.* ......................... 281
          *Foley v. Allard* ....................................... 283
          Notes and Questions .................................. 286
          *Herbert Construction Co. v. Continental Insurance Co.* .......... 286
          *Continental Insurance Co. v. Gazaway* ..................... 292
          Notes ................................................ 294
C.      ESTOPPEL ........................................... 297
          *Estate of Cordero v. Christ Hospital* ....................... 297
          Notes ................................................ 302
D.      THE INHERENT AGENCY POWER CONCEPT ................ 303
          *Autoxchange.com, Inc. v. Dreyer and Reinbold, Inc.* ............ 304
          Note ................................................. 307
          Problems ............................................. 307

**Chapter 5          FRAUDULENT ACTS OF AGENTS ................ 311**

A.      THE UNSCRUPULOUS AGENT .......................... 312
          *Grease Monkey International, Inc. v. Montoya* ................ 312
          Notes ................................................ 316
          *Entente Mineral Co. v. Parker* ............................ 317
          *Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc.* . 322
          Notes ................................................ 324
          *Rothman v. Fillette* ................................... 327
          Note ................................................. 330
B.      LIMITS TO LIABILITY FOR FRAUD ...................... 330
          *Light v. Chandler Improvement Co.* ........................ 330
          Notes ................................................ 333
          *Leafgreen v. American Family Mutual Insurance Co.* ............ 334
          Notes ................................................ 340
          Problems ............................................. 341

**Chapter 6          THE UNDISCLOSED PRINCIPAL ................ 343**

A.      RIGHTS OF THE UNDISCLOSED PRINCIPAL ................ 343
  1.      Assertion of Rights by the Undisclosed Principal ................ 344
  2.      Parol Evidence Rule .................................... 345
  3.      Sealed Contracts ...................................... 346
  4.      Exceptions ............................................ 347
            *Kelly Asphalt Block Co. v. Barber Asphalt Paving Co.* .......... 348

## *Table of Contents*

|  |  |  |
|---|---|---|
| | *Finley v. Dalton* | 350 |
| | Notes | 352 |
| B. | LIABILITIES OF THE UNDISCLOSED PRINCIPAL | 354 |
| 1. | Authorized Transactions | 354 |
| a. | Remedies of the Third Party | 354 |
| b. | The Election Rule | 354 |
| 2. | Unauthorized Transactions | 357 |
| | *Watteau v. Fenwick* | 357 |
| | Note | 358 |
| | *Senor v. Bangor Mills* | 360 |
| | Notes | 363 |
| C. | PAYMENT AND SETOFF | 364 |
| 1. | Payment by the Third Party | 364 |
| 2. | Payment to the Third Party | 365 |
| 3. | Setoff | 366 |
| | *Oil Supply Company, Inc. v. Hires Parts Service, Inc.* | 367 |
| | Note | 369 |
| | Question | 370 |
| | Problems | 370 |

| Chapter 7 | **LIABILITY OF THE AGENT TO THIRD PERSONS** | 373 |
|---|---|---|
| A. | LIABILITY ON THE CONTRACT | 373 |
| 1. | Liability When the Principal Is Unintentionally Undisclosed | 373 |
| | *Jensen v. Alaska Valuation Service* | 373 |
| | Notes | 376 |
| 2. | Liability When the Principal Is Disclosed: Special Circumstances | 378 |
| | *Copp v. Breskin* | 379 |
| | Notes | 381 |
| 3. | Liability When the Principal Is Partially Disclosed or Unidentified | 384 |
| | *Van D. Costas, Inc. v. Rosenberg* | 384 |
| | Notes | 386 |
| B. | THE AGENT'S WARRANTY OF AUTHORITY | 388 |
| | *Husky Industries v. Craig Industries* | 388 |
| | Notes | 391 |
| C. | HARM TO THE ECONOMIC INTERESTS OF OTHERS | 392 |
| | *Coker v. Dollar* | 392 |
| | Note | 394 |
| D. | LIABILITY IN TORT | 394 |
| | Problems | 394 |

*Table of Contents*

| Chapter 8 | THE DOCTRINE OF RATIFICATION | 397 |
|---|---|---|
| A. | THE CONCEPT | 397 |
| | *Evans v. Ruth* | 397 |
| | *Dempsey v. Chambers* | 399 |
| 1. | Justification for the Concept | 401 |
| | Notes | 403 |
| 2. | Implied Ratification | 405 |
| | *Manning v. Twin Falls Clinic & Hospital, Inc.* | 405 |
| | Notes | 409 |
| B. | THE KNOWLEDGE REQUIREMENT | 409 |
| | *Lewis v. Cable* | 410 |
| | *Computel, Inc. v. Emery Air Freight Corp.* | 412 |
| | *Inn Foods, Inc. v. Equitable Cooperative Bank* | 415 |
| C. | CAN SILENCE CONSTITUTE AFFIRMANCE? | 418 |
| | *Bruton v. Automatic Welding & Supply Corp.* | 418 |
| | Notes | 422 |
| D. | THE NO PARTIAL RATIFICATION RULE | 425 |
| | *Rakestraw v. Rodrigues* | 425 |
| | Notes | 428 |
| E. | CHANGED CIRCUMSTANCES | 430 |
| | Notes | 430 |
| | Problems | 431 |
| Chapter 9 | NOTICE AND NOTIFICATION; IMPUTED KNOWLEDGE | 435 |
| A. | INTRODUCTION | 435 |
| B. | NOTIFICATION | 435 |
| | *Montana Reservoir & Irrigation Co. v. Utah Junk Co.* | 441 |
| | Note | 442 |
| C. | IMPUTED KNOWLEDGE | 442 |
| | *Constant v. University of Rochester* | 444 |
| | Notes | 446 |
| | *Bird v. Penn Central Co.* | 449 |
| | *Shapiro v. American Home Assurance Co.* | 452 |
| | *First American Title Insurance Co. v. Lawson* | 455 |
| | Questions | 461 |
| D. | THE ADVERSE INTEREST QUALIFICATION | 462 |
| | *Kirschner v. KPMG LLP* | 463 |
| | Notes | 467 |
| E. | THE SOLE ACTOR DOCTRINE | 468 |
| | *Munroe v. Harriman* | 470 |

*Table of Contents*

Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 472
Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473

| Chapter 10 | TERMINATION OF THE AGENCY RELATIONSHIP . . 477 |

A.   TERMINATION BETWEEN THE PARTIES TO AN AGENCY
     RELATIONSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 477
  1.   Termination by Will . . . . . . . . . . . . . . . . . . . . . . . . . . . . 477
    a.   Some Consequences of Termination of an Agency Relationship . . . . 478
         *Want v. Century Supply Co.* . . . . . . . . . . . . . . . . . . . . . . . 480
    b.   Irrevocable Powers Phrased in Agency Terms . . . . . . . . . . . . . . 481
  2.   Termination by Operation of Law . . . . . . . . . . . . . . . . . . . . . . 482
    a.   Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 482
         *Hunt v. Rousmanier's Administrators* . . . . . . . . . . . . . . . . . . . 482
         Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 485
    b.   Loss of Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 486
         *In re Berry's Estate* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 486
         *Campbell v. United States* . . . . . . . . . . . . . . . . . . . . . . . . . 488
         Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 491
    c.   Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 492
    d.   War . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 493
B.   NOTICE OF TERMINATION TO THIRD PARTIES . . . . . . . . . . . . . 493
  1.   Termination by Will . . . . . . . . . . . . . . . . . . . . . . . . . . . . 493
  2.   Termination by Operation of Law . . . . . . . . . . . . . . . . . . . . . . 494
         Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 496

| Chapter 11 | THE CREATION OF A PARTNERSHIP . . . . . . . . . . . 499 |

A.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 499
B.   THE LIMITED LIABILITY PARTNERSHIP (LLP) . . . . . . . . . . . . . . 500
C.   THE PARTNERSHIP RELATIONSHIP DEFINED AND
     DISTINGUISHED FROM OTHER RELATIONSHIPS . . . . . . . . . . . . . 502
  1.   Historical Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 502
  2.   An Early Test of Partnership . . . . . . . . . . . . . . . . . . . . . . . . . 502
         Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503
  3.   The Uniform Partnership Act (1914) and the Revised Uniform
       Partnership Act (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503
         Notes and Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 507
         *Martin v. Peyton* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 508
         Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 511
         *Byker v. Mannes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512
         Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516
         Note on Non-Equity Partners . . . . . . . . . . . . . . . . . . . . . . . 518

xix

**AFFIDAVIT**
**In Support of Plaintiff's Character**

**District of Columbia**    :

BEFORE ME, THE UNDERSIGNED AUTHORITY, personally appeared Faraz Siddiqui, who after being duly sworn and deposed, states the following:

1.  My name is Faraz Siddiqui. I am a resident of the District of Columbia, a member of the D.C. Bar, and more than 18 years old.

2.  I attended a four-month-long class entitled "Business Organizations" taught by Plaintiff Robinson at the Howard University School of Law (HUSL) on or about Spring of 2017 in Washington, D.C. This class met for at least 4 hours per week. At that time, I was enrolled as a full-time student at HUSL, in the class of 2017.

3.  Robinson allowed me to "audit" his class (attend without formally registering for the course) after the HUSL administration had approved me for the same. This introduced me to Robinson's openness to impart knowledge, no matter who the student is.

4.  I had conversations with him in class and one-on-one about his teaching methodology. Robinson is very deliberate with his teaching style. He takes care to study education methods and styles. He creates a class environment where students gain skills rather than just to learn legal facts.

5.  Robinson's style is thoroughly Socratic. Borrowing from the well-known proverb, Robinson strives to teach his students to fish rather than giving them the fish. This allowed this class to be one of the most interactive and dynamic classrooms that I have been in at HUSL. At the same time, some students that are used to didactic teaching, or are used to being "spoon-fed" in other classes or other less demanding schools felt discouraged and, at times, acrimonious, towards Robinson.

6.  More than once, I heard fellow classmates complain about Robinson's demands as a professor. None of these complaints were about Robinson's personality. More than once, I heard students being uncomfortable with his teaching style. None of these complaints were about their personal discomfort as people, but their intellectual discomfort for keeping up with his pace. Yet, in all these circumstances, these students felt comfortable sharing these thoughts with Robinson when class was in session. Robinson responded kindly. I saw that he was open to taking criticisms of his teaching style. He tweaked his teaching to fit the maximum number of students.

7.  Robinson never imposed his methods on any students. This allowed all kinds of students and learners to be comfortable in his class. Students were never forced to participate. He would ask for a volunteer several times before calling on a student. If he called on a student, the student was nevertheless allowed to "pass."

8.  Robinson talked about delicate issues very tactfully. I overheard his conversations with several of my classmates who took his other classes on laws related to children. I also had conversations with Robinson on raising children. Robinson is opinionated, as most lawyers are. But in his conversations with his students, he was incredibly kind, engaged, encouraging and mentoring. If one of these conversations spilled into an open classroom, he would present his views but never force any student to share their opinions on a matter. He always kept delicate conversations abstract and did not pick on anyone to illustrate a point.

Sign/Date :  _FMR___ 12/21/2017

Print Name:  ___FARAZ  SIDDIQUI___

Sworn to and subscribed before me this _21_ day of _____ 2017.

Sign: _____, Notary Public, District of Columbia
Name: _____   My Commission Expires _____

**AFFIDAVIT**
**In Support of Plaintiff's Character**

**District of Columbia**      :

BEFORE ME, THE UNDERSIGNED AUTHORITY, personally appeared _____Vernon Ross_____, who after being duly sworn and deposed, states the following:

1.  My name is _____Vernon Ross_____. I am a resident of the District of Columbia and more than eighteen years old.

2.  I was a student in Plaintiff Robinson's Agency class during the spring semester of 2016 and Business Corporations class spring of 2017 at the Howard University School of Law (HUSL) in Washington, D.C.

3.  Both of my experiences were memorable and rewarding. Although I was not in the class during the Fall of 2015, I can attest to Professor Robinson's teaching style as it was consistent in both classes, one year apart from each other.

4.  Robinson is very deliberate with his teaching style. I had conversations with him in class and one-on-one about his teaching methodology. He has taken care to study education methods and styles and create a class environment that will allow his students to gain skills rather than just to learn legal facts.

5.  Professor Robinson teaches directly from the casebook, assigning several cases for students to read before class. During class we exclusively follow the casebook and discuss the legal principles that each case introduces. For a law student, his class is very relaxed. There is no pressure of cold calling or being caught unprepared when asked a question. Professor Robinson exclusively takes volunteers. I do not remember him ever calling on someone who did not volunteer to speak. I also recall several students in both classes who never spoke the entire year. He does not count participation towards the final grade so there is no subtle pressure to participate. However, he does make clear that the best way to learn is to engage the material and to actively engage in the classroom discussion.

6.  There are two other important points that make Professor Robinson's class unique. First, he does not allow any electronics to be out during class time. This is not unheard of but still unique in 2017. I only had one other professor at HUSL make that rule in class. Second, Professor Robinson almost weekly drafts multiple choice questions as mini quizzes for students to grapple with the material and to have practice for the actual test. The quizzes mirror the questions on the final exam. After taking the quiz, we discuss the answers in class by debating the answer choices. Again, no one is ever forced to volunteer or to reveal anything personal about themselves or to ever answer at all.

Sign/Date : _____ 12-29-17

Print Name: Vernon Ross

Sworn to and subscribed before me this 29th day of December, 2017.

_____Name:

Notary Public                    Notary Public, District of Columbia

My Commission expires            Date:

**AFFIDAVIT**
**In Support of Plaintiff's Complaint**

**District of Columbia**       :

THIS IS AN AFFIDAVIT FOR REGINALD ROBINSON IN REGARDS TO THE EVENTS THAT TRANSPIRED
DURING MY FALL 2015 AGENCY LAW CLASS. TO THE BEST OF MY KNOWLEDGE, THE FACTS AS I RECALL
THEM, ARE THESE:

1.  My name is Sasha De Cruise. I am a resident of New York and twenty-six years old.
2.  I graduated from Howard University School of Law in May 2017. As a student, Robinson served as the
    professor for both Agency Law and Business Organizations. Additionally, Robinson served as my faculty
    advisor for my law journal comment.
3.  On the day in question, the class was reviewing one of our Knowledge Demonstration Assessments (an
    ungraded quiz).
4.  Per Robinson's usual practice, when the class moved to question five, he asked for a volunteer to answer.
5.  I do not recall which student volunteered, but I remember a student raising their hand and Robinson
    selecting them. The student responded that a person would not fall asleep during a wax.
6.  At that time, Robinson acknowledged the student's point and admitted to not being knowledgeable about the
    waxing process.
7.  After this discussion, Robinson asked for the answer to the question, notwithstanding the fact that a person
    would not fall asleep during a wax.
8.  I do not recall the answer or which student answered the question. However, I recall moving to question six.
9.  While taking and reviewing the quiz, I did not feel uncomfortable or that question five was inappropriate.
    Further, I did not think that the question required me to disclose personal information about myself in order
    to answer the question.
10. In both of the classes I have taken with Robinson, he was always very respectful to his students and open to
    our opinions.

Sign/Date : _DE C S_ 12/29/17

Print Name: _Sasha De Cruise_

Sworn to and subscribed before me this _29_ day of _December_, 2017.

Name: _Alejandrino Echevarria_

Notary Public

My Commission expires

_2/24/18_

Notary Public

Date: _12/29/17_

...lis County
...s F... 24 ...

AGENCY, PARTNERSHIP, AND OTHER BUSINESS ORGANIZATIONS
Howard Law School
Washington, DC
Professor Reginald Leamon Robinson
Fall 2015

**KNOWLEDGE DEMONSTRATION OPPORTUNITY (KDO) NO. 3**
Tuesday, September 8, 2015

15 QUESTIONS

## Question 1.

P invited A, P's long-time friend, to help P detail T's car.  T was P's client, and P owned and operated a car wash and detailing business.  A also had extensive experience detailing customers' cars because A worked for a car washing and detailing service across town.  P asked A to help P with detailing cars, and A agreed to do so on A's day off.  On that day, A arrived, bringing A's own tools and equipment, which A owned and on which A relied to detail cars.  Upon A's arrival, P told A that P had received not one but two cars, T and T2, which had just been dropped off.  P informed T2 that A would work on T2's car, informing T2 that A worked across town at another detailing business.  Although P closed P's business at 5pm, A worked on T2's car until 8pm, and during the detailing, A broke the fittings to T2's front passenger seat after A had removed it.  A did not inform P.  The following day, T2 returned to pick up T2's car.  Upon inspection, T2 was initially pleased with the job, paid P, and drove away.  Later, T2 contacted P, informing P that A had more than likely damaged the front passenger seat, for which T2 demanded either the cost of P repairing it or the price of T2 causing the seat to be repaired.  P refused to pay.  If T2 sued P for the damage caused by A to the seat, who will prevail?

(A)     T2, because P had hired A to detail T2's car.
(B)     P, because A was not P's servant.*
(C)     T2, because A had completely lent A's time and efforts to P regardless of whether A can completed any specific job.
(D)     P, because A had agreed to volunteer A's services to P.

Ans.:  (B) is the best choice.  Per *Heims v. Hanke*, TB at 140, under the principle of respondeat superior, P must answer for the intentional and negligent injuries caused by A while acting with in the scope of employment.  Generally, A is a servant who performs A's work at the direction of P or P's agent because P is entitled or has the right to control A's control, even if P failed to exercise such an entitlement or right.  An unpaid servant can still be subject to P's control, and as such, A, if A volunteered and if A caused an injuries or tort to a person or a person's thing, will still subject P to strict liability.  Hence, (D) is not the correct choice.  (A) is not the best choice because, although P hired A it does not follow that A is P's servant and can thus subject P to strict liability.  *See* TB, at 141.  (C) is not the best choice because P clearly asked A to detail T2's car, and only T2's car.  It would thus appear that A would only be compensated if A completed the detailing work on T2's car.  (B) is the best choice because A was more than likely an independent contractor, who had his or her own equipment, who had extensively experience, and who was not subject to P's control.   P cannot be held liable for A's conduct if A is an independent contractor, unless P negligently hired, unless the job is inherently hazardous, unless the job subjects P to a nondelegable duty, or P held out A as an agent, and T

reasonably believed that T was dealing with A as an authorized agent of P. *See* TB, at 144.

## Question 2.

P directed A to tighten the lug nuts on P's scaffolding, which P had just erected before A arrived for work. The scaffold provided the public with a pass through so that renovations on P's building could take place without any T getting injured. In response to P's direction, A agreed to tightened the nuts but after A returned from completing an errand for P. When A returned from the errand, A went to lunch, forgetting to tighten the lug nuts. Shortly after A left the renovation site, T passed under the scaffolding. The debris, which had been placed properly in the refuse containers atop the scaffolds, fell on T. Parts of the scaffold collapsed too. T got hurt badly. If T sued P and A and alleged negligence, will T prevail?

(A)    Yes, because P and A had a duty to act reasonably toward all foreseeable plaintiffs.
(B)    No, if A has a duty to following legal and appropriate directions of P.
(C)    Yes.
(D)    No, because T only has a cause of action for T's injury against P.*

Ans.: (D) is the correct choice. This question involves the personal liability of A for nonfeasance where A failed to perform a duty owed to P. A failed to tighten the lug nuts on the scaffold, which were contrary to the P's direction. Moreover, P's obligation to protect T from P's conduct or activity is a nondelegable duty, and so P still has the duty to act reasonably toward all foreseeable T remains with P. Per *Delaney*, "at common law, an A is personally responsible to third parties for doing something which A ought not to have done, but not for not doing something which A ought to have done." *See* TB, at 137. A is liable only to P. *Id.* "No man increases or diminishes his obligations to strangers by becoming an agent." *Id.* Accordingly, (A) is not the correct choice because P and A do not have a shared duty. (B) is not the correct choice because while A is obligated to follow P's directions, A does not owe a duty to T, and by not following P's direction, P's obligations remains, and if T is injured, P must answer to T. By following P's direction, A does not become legally obligated to T, and if A had followed P's direction and if T were injured, T can sue P and A. Yet, in this case, A failed to do something, and by so failing, (B) does not help determine if T can succeed against both P and A. (C) thus is clearly wrong.

## Question 3.

P was sitting in P's truck out in front of P's factory. A, who worked for P, asked P for a ride into town. During the ride into town, P and A would be on their uncompensated lunch hour. A told P that A would first eat lunch in town, and then after lunch, A would complete in town a task that P had assigned to A. P agreed. En route to town, P's and T's trucks struck each other at an intersection. T had apparently ran the stop sign. P, A, and T were badly injured. A sued P, alleging strict liability and negligence and seeking damages. Can A prevail against P under a course of employment theory?

(A)    Yes.
(B)    No, because T had faulty brakes and obviously negligent.
(C)    Yes, because as P's worker, A had intended to benefit P by completing P's task in town.
(D)    No, because it would be unfair for P to pay for A's injuries.*

Ans.: (D) is the correct choice. This fact situation test "merely benefiting" theory under *Sandrock v. Taylor*. *See* TB, at 142. It also attempts to test whether you appreciate the elements for a successful worker's compensation claim. *See* TB, at 210. What does "course of employment" mean? It means that A was actually working for, and conferring a benefit on, P at the time of the accident. Unfortunately, A was not technically working at the time of the accident. Both P and A were enjoying an unpaid lunch hour. Moreover, A would not actually be a worker until after A's lunch, when while in town A could then complete a task for P. Under *Sandrock*, I would argue that P was merely benefiting A, and although P and A are more closely related than Sandrock was to Meirose, it would be unfair to hold P liable for A's injuries under a worker's compensation theory because A does have a remedy against T personally on apparent negligence grounds and T may be properly insured. (A) for these reasons is not the best choice. (B) rests on unstated facts, and it is a weak choice. (C) is not the best choice in light of the foregoing reasoning, and it's not clear that A was intending to benefit P.

## Question 4.

P, a homeowner, needed to have P's gutters cleaned. P spoke to P's neighbor, seeking a referral, who recommended A, a handy person. P's neighbor said that A had a very poor reputation for trimming and cutting down trees. P hired A to clean P's gutters and to rakes leave on P's property. A raked P's leaves, and then A prepared to clean P's gutters. After removing the latter from A's truck, A lost control of the it. The extension ladder fell on T who was walking T's dog past P's property. T was badly injured. T sued P and A, alleging negligent hiring. Will T prevail?

(A)   Yes, because P knew that A had a bad reputation.
(B)   No.*
(C)   Yes, because P could foresee that A might injure any T.
(D)   No, because A was not actually on P's property when A's ladder injured T.

Ans.: (B) is the correct choice. Per Restatement 2d Agency § 220, A was an independent contractor. *See* TB, at 151. A had A's own business. A could start the job at P's property within a reasonable time. A did not take direction from P to complete the job. P was interested only in the final result. P paid A when A completed the job. A provided A's own equipment. P and A did not intend to enter into an agency relationship. *See Kane*, TB at 151-154. *See also* Restatement 3d § 7.07, comment f, TB at 154-155. Generally, P are not liable for the torts of A, if A is an IC. Under these facts, A is an IC. In response to T's suit, P will assert that A is an IC. However, the issue here is whether any exceptions to the IC liability rule would permit T to sue P directly. One of exceptions is negligent hiring (the others are: inherently hazardous or nondelegable duty). *See* TB at 170; *Hixon*, TB 168-170. Moreover, per Restatement 2d Torts § 411, P is liable to T for the tort of IC if P "knows the contractor's reputation is bad or knows of facts which should lead him to realize that the contractors is not competent." TB at 171. Did P negligently hire A after P learned that A had a poor reputation with trimming and cutting down trees? Arguably no because P hired A to clean P's gutters and to rake P's leaves. Given the liability shield from strict liability under master-servant liability, P did not know that A had a bad reputation for work related to cleaning gutters. Therefore (A) is not the correct choice. (C) is not the correct choice because even if P could foreseeable some risk to T, P was not obligated to take reasonable steps to ensure that T did not injured. Why? A's work was not inherently hazardous. Accordingly, A, an IC, had a

duty to T. (D) is not a good choice because it relies on unstated facts, and even if the facts were true and if A were on the public way when A's ladder struck and injured T, P would not be liable, unless one of the foregoing exceptions to IC defense were applicable.

## Question 5.

P hired A to relocate T's personal property. A owned the moving company. Under the contract between P and A, A was required to use a truck and uniform that bore A's brand and logo. Under the contract, A agreed to hold P harmless and to indemnify P for all damages arising out of or under the contract between P and A in moving T's property. A so complied. Nevertheless, after A picked up T's personal property, A gave to T a bill of lading, on which A had prominently handwritten P's name. A had also placed P's business card on the clipboard that held the bill of lading. During the move, A lost control of the moving truck, which jackknifed and rolled over, destroying all of T's personal property, including a vintage car. T sued, alleging that A was P's agent, and that P was liable. P asserted the affirmative defense of independent contractor, which A countered by arguing that P had cloaked A with apparent authority. Will T prevail?

(A)    Yes, because P is not liable for the negligent action of an independent contractor.
(B)    No, if P personally assured T that P always takes care of its customer.
(C)    Yes, because T cannot bind P based on A's apparent authority.*
(D)    No, because P held out A as P's agent and T's belief was reasonable.

Ans.: (C) is the correct choice.

## Question 6.

P hired A to drive P's delivery truck within the large city in which P's company was located. A's job required A to deliver packages on time, preferably earlier than P's promised time. Many of A's routes took A past A's house. Although A generally worked during the week, P asked A to work on Super Bowl Sunday. A, needing the money, agreed, and as a result A would miss A's own Super Bowl party. That Sunday after the football game started and after A's guests arrived, A would periodically stop by A's house to catch up on the game, staying no more than ten minutes each time. By work rules, A was not permitted to play the radio or other devices in the truck during work hours. T called P, and asked when P would deliver T's package. P texted A, and asked for A's location and delivery time to T. Upon receiving this text from P, A rushed back to P's truck and, while pulling away from the curb, inadvertently hit T2's parked car as T2 was getting in that car. T2 suffered severe injuries. Can T2 sue P?

(A)    Yes, because T2's injuries were really severe.
(B)    No, because A was negligent.
(C)    Yes, because A was attempting to delivery P's package to T.*
(D)    No, if A was listening to A's mobile phone's streaming of the football game.

Ans.: (C) is the best choice. Generally, P is not liable for A's negligence to T if A has abandoned P's business by engaging in a frolic or detour. *See* Restatement 2d Agency § 228(1) & (2), TB at 197-198. A was engaged in a frolic or detour because A decided to attend his own football party during work hours. Had A left the party for the sole purpose of parking P's truck behind P's house, so that the truck were not

visible from the street, and had struck T2's car and injured T2, then A more than likely would be liable for T2's injuries and damage to T2's car. However, per § 228(1)(c), it is possible to argue that A's conduct at the time of the accident was attenuated to serve P. *Id.* at 197. It is also possible to argue that A's dominant motive was to serve P, and so A had re-entered the scope of employment. *See Fiocco*, TB at 200-202; *see also Clover*, TB at 207 for *Birkner*'s 3d test. Even if A had mixed motives, A had some concurrent cause to serve P's interest, and based on the totality of the circumstances, it could be argued that A had re-entered the scope of employment, which makes (D) the incorrect choice. (B) is not the correct choice because even if A is negligent, T2 may still sue P under strict liability theory. (A) is not the correct choice because whether T2's injuries were minor or severe, this question attempts to test whether A had re-entered the scope of employment sufficiently, so that T2 can maintain a strict liability claim against P.

## Question 7.

A needed a tower crane to build a high-rise apartment complex. A contracted with P to lease P's tower crane and its operator to A. T, the crane operator, delivered the tower crane, constructed it, and operated it. From time to time, and without notice to A, P would send new crane operators to A's site. One day, while T operated the crane, T lost control of the load, which fell on T2 – a passerby who drove on the public road. On what theory would T2 be likely to succeed in seeking damages from P?

(A)     Dual liability.
(B)     Allegiance.*
(C)     On the spot control.
(D)     Inherently hazardous.

Ans.: (B) is the best choice. An employer is liable for the employee's negligence based solely on Respondeat superior. This liability is strict. To determine if a master-servant or employer-employee relationship exists, we must determine who has control of the servant or employee. A master or employer has the right to control its servant or employee. Under the borrowed or loaned-servant doctrine, an employee of one employer may become the servant of another and shift the liability for his or her negligent acts to the second employer. To determine control, we need to know if the employee is (1) acting in the business and (2) under the direction of the general or special employer. *See Charles* and *ATS, Inc.*, TB at 185 and 187, 189-90. Did T believe that T had allegiance to P or to A, and did T believe that T was employed in A's business and subject, even temporarily, to A's control? Under the facts, P is the general employer, who is in the business of renting heavy, special equipment and to providing operators for tower cranes. Moreover, even though A, a special employer, has leased P's crane and operator, A is not in that business, and P had the option, and did exercise the option, of determining which T reported to A's construction site and operated the crane. Accordingly, it would appear that T had allegiance to P, and T believed that T was employed and control by P. It would follow then that T was not a borrowed or loaned-servant, which would subject T to A's control and which would make A liable for T's negligent conduct toward T2. (A), (C), and (D) are inconsistent with the foregoing rules and reasoning, and are therefore incorrect choices.

## Question 8.

P hired A to deliver messages by motorcycle, which P provided to A. While A was delivering P's messages, A lost control of A's motorcycle and struck T, as T used the crosswalk to cross the street. A realized that T, severely injured, was A's spouse. T could not work, and A's salary alone would not permit A and T to maintain their home and lifestyle. T thus sued P, alleging strict liability and seeking damages. However, T expressly waived and released any claim against A. In response to T's complaint, P alleged that, at common law, the court must to nonsuit T's claim because by releasing A, T extinguished P's vicarious liability. Will P's motion for nonsuit prevail?

(A)    Yes, because states enforce the interspousal immunity doctrine.
(B)    No, if T's state requires P to contribute to T's damages under a joint and several doctrine.*
(C)    Yes, because A negligently harmed T.
(D)    No, because T has a separate claims against P for negligent maintenance of A's motorcycle.

Ans.: (B) is the correct choice. Under this doctrine, T can sue only P, or A, or both. By releasing A, T has not perforce released P. Per TB at 255, P remains liable to T. P has a remedy against A because A owed P an independent duty to act with due care and to not cause damages to P while A acted within the scope of A's duty.

## Question 9.

P, the president of Company X, hired A to sell insurance to T, senior citizens who had bought term life and health insurance from Company X. A reported directly to P. A, vice president of sales and marketing, told A's sales staff to use stories of horror to induce the corporation's clients to renew their policies. At A's instructions, they were to tell T if they didn't renew by the end of the call, Company X could either refuse to sell T new term policies or charge T considerably more if T bought a new term policy after T's current policy had expired. Unbeknownst to P, A knew that some of the sales staff were charging T a surcharge if T waited until T's current policies had expired. A's sales staff kept 60% of the surcharge; A got 40%. Eighty percent of T renewed T's policies before the sales calls ended or T's policies expired. A told P about A's renewal rate of T. P asked what motivational presentations were A's sales staff had used so successfully, and A responded: "Ask me no questions; I'll tell you no lies." P then said: "Nothing illegal I trust." A smiled, but did not answer. After this meeting, P increased A's salary and commission. During a sales call to T1, T1 suffered a mild stroke, after A2, a sale staffer, told T1 a horrible story about a policyholder who didn't renew a policy. T1 thereafter had limited mobility on T's left side and impaired vision in T's left eye. T sued P, A, and A2 seeking compensatory and punitive damages. Should the court award also T punitive damages?

(A)    Yes, because P ratified A's conduct.*
(B)    Yes, if P had negligently and improperly supervised A and A's sales staff.
(C)    No, because P did not actually know that A and A's sales staff had engaged in either unauthorized or very aggressive sales tactics.
(D)    No, because P was not complicit with A and A2 in causing the direct or proximate harm to T1.

Ans.: (A) is the best choice. Under the majority rule, courts will impose punitive damages on the employer only on the basis of culpability, such as authorizing or ratifying the tortuous behavior. *See* TB, at 245. The policy goal of punitive damages

is to impose awards over and above compensatory damages because P's employees have misbehaved, and because P and others who are similarly situated will be deterred from acting likewise. *See* TB, at 245. And so, courts award such damages where an employer's, through an employee's "intentional misconduct, has authorized, participated in, consented to, or ratified conduct giving rise to such damages, or deliberately retained the unfit servant, or the wrong was in pursuance of a recognized business system of the entity." *See* TB, at 245-46. Under our facts, P hired A, and P awarded A for A's apparently aggressive sales presentations because P's company was directly benefiting. Moreover, P by acquiescence ratified A's conduct and that of A's sales staff like A2 by refusing to act on inquiry notice that perhaps A was engaged in unauthorized behaviors in marketing P's insurance products. If so, a court could conclude that P either authorized, participated in, consented to, or ratified A's conduct which caused suffering and damage to T1. Accordingly, (A) is the best choice. (B) is not the best choice because even if P negligently and improperly supervised P's staff, P might be subject to compensatory damages under respondeat superior or vicarious liability. However, the question is should P be subject to punitive damages. By failing to supervise, it does not follow that P authorized or ratified A's conduct or A's sales staff's aggressive sales presentation. (C) is not the correct choice because by implication this statement is not equitably true. P could have known what A was doing, if P had acted on P's inquiry notice. However, P preferred to remain deliberately ignorant, thus suggesting that P was prepared to accept the likely risk that attended to A's unauthorized conduct or aggressive sales tactics. (D) is not the best choice because P by inference was complicit in A's conduct, when P impliedly authorized and clearly benefited by A's aggressive sales presentations.

## Question 10.

P hired A to serve as P's personal driver. P used this driver whenever P needed to attend business meetings within 2 hours of P's location or when P had to fly for business purposes. One day, P told A that P had been unavoidably detained in a meeting, and that P needed to get to the airport quickly. P's flight would depart within 1.5 hours. A, a new driver, who had not taken P to the airport before, asked P for the best way to get to the airport quickly. P gave A explicit directions, which A followed. At that point, P said nothing but read the newspaper. As they neared the airport, A entered an intersection while the traffic light was yellow. Hoping to pass through the intersection before the light turned red, A failed. T, entering the intersection, had anticipated a green light. A and T accelerated, entered the intersection illegally, and crashed into each other. T and P were severely injured. P sued T for P's severe injuries. T likewise sued P. In response to P's suit, T asserted that P, at common law, was barred from suing T under the imputed contributory negligence doctrine. Will P be permitted to sue T?

(A)     No, because P instructed A on how to get to the airport.
(B)     No, because a master would be barred from recovery against a third person who negligently caused a loss to the master if the servant were also negligent in the accident that caused P's loss.
(C)     Yes, P had not instructed A on how to get to the airport.
(D)     Yes, because the theory is illogical and unfair.*

Ans.: (D) is the correct choice. At common law, the both way doctrine would prevent P from recovering damages after T if A, P's agent, were negligent too. Under our facts, A and T were both negligent, and as a result, P and T were severely harmed. Because A was P's agent and because P had direct A's conduct, A while in

the scope of employment. A's negligence would ordinarily be imputed to P. Yet, courts have rejected the both way doctrine because it is illogical and unfair. P should not be barred from recovering at T simply because A, P's agent, was negligent. Accordingly, P can still recover from T, even though A worked for P, especially P did not tell A to enter the intersection and to negligently cause damage to P and to T. P therefore should have the right to sue and to recover from T, despite A's negligence. *See* TB, at 148-149.

## Question 11.

P hired A to fix the brick chimney on P's home. P thought P's mortis of the bricks had deteriorated. P's house was very close to P's property line, and if the chimney were to fall, P feared that it could damage P's neighbor's house, which was also built very close their adjoining property line. A arrived and inspected the chimney. A told P that the chimney was not in danger of falling. A did point out that some of the chimney's brickwork needed repairing and appointing. Based on A's report, P hired A to do that work. P left the house because A worked outside. After erected the scaffolding around the bricks and anchored the scaffolding to the house for stability, A began repairing the brickwork. Unfortunately, the brickwork was in danger of collapsing. That's exactly what happened. T, P's neighbor, was home when the chimney and the scaffolding fell, causing at least $30,000 in damage to T's house. T sued P and A, alleging that both of them were responsible for T's losses. P responded by alleging that A was an independent contractor. Which of the following choices will the court not consider in determining P's responsive pleadings?

(A)    The method of payment, whether by time or by job.
(B)    Whether the principal is or is not in the business.
(C)    Whether P required A's workers to arrive on the job promptly, sober, and bringing the required tools.*
(D)    The skill required in the particular occupation.

Ans.:  (C) is the best choice. *See* TB, at 150-154. Or *Kane Furniture*.

## Question 12.

P needed additional supplies, and so P asked A, who worked for P, to run an errand for the company over the weekend. A agreed, and when A asked about compensation, which was time and one-half after regular work hours and on weekends, P said that P would find a way to compensate A for taking on this personal task for P and on A's own time. A agreed. P told A that A could either use P's truck or A's personal car. On Saturday, A took A's personal car and had to drive a total of 300 miles to pick up and to deliver the goods that P required. On the return leg, A inadvertently crossed the center double yellow lines to avoid killing a possum and her litter. A's efforts to save the animal and her babies caused A to kill T, when A's car sideswiped T's car. T's estate sued P, alleging that A was P's servant or employee. In response, P pleaded that P did not have any control over A's conduct, that A was not on company time, that A chose A's own route, and that A chose to use A's personal car. Is P liable for T's death?

(A)    Yes, because a gratuitous agent, if under the direction of P, can still impose strict liability on P.
(B)    No, P was not compensating A.
(C)    Yes, if P and A agreed that A was acting within the scope of employment.*

(D)     No, because P did not have the actual right to control the details of A's activities.

Ans.:   (C) is the best answer. *See* TB, at 161-162. Applicable rule is on TB, at 162.

## Question 13.

P, a private corporation, hired a chauffeured bus from the local county bus company, A, to take P's employees on a weekend retreat. By statute, A was a common carrier when A provided public bus service to county riders under a contract with the county. In the contract between P and A, A would provide a late model bus, which was part of its fleet that served the local citizens, and an experienced driver. A's drivers carried certified chauffeur's license, and A hired an outsider investigation firm to vet its drivers, even if the drivers only drove county buses in service to the residents. As the contract between P and A required, A's bus arrived and P's employees got onboard. As A2, the bus driver, drove the bus to P's retreat site some 260 miles away from P's corporate site, P's employees began to celebrate. They drank wine, ate, and enjoyed each other's company. One of P's employees, T, planned to prank the driver, A2, at the first rest stop. After the first rest stop, T, unbeknownst to A2, had placed a whoopee cushion under A2's seat cover. When A2 sat down, a loud farting sound emanated from A2's seat. A2 leaped up, was embarrassed, and was angry. A2 quickly discovered that T had engineered the prank. While the bus was still parked, A2 got up, rushed over to T, and punched T unconscious. Later, while T was recovering from a mild concussion, T sued A and A2, alleging that A, as a common carrier, must answer for A2's assault which caused T's injuries. Can T prevail against A on the implied contract theory?

(A)     No.*
(B)     No, because an employer cannot be held liable for the tortious or criminal acts of an employee.
(C)     Yes, because an intentional tort is foreseeable, for purposes of respondeat superior, only if in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss from it among the costs of the employer's business.
(D)     Yes, if imposing liability on the employer furthers the three identified policy goals of respondeat superior.

Ans.:   (A) is the correct choice. Generally, "sexual assaults and batteries by employees are held to be outside the scope of employee's employment and, therefore, insufficient to impose vicarious liability on the employer." *Nazareth*, at 239. Second, "an employer cannot be held liable for the tortious or criminal acts of an employee, unless they were committed during the course of employment and to further a purpose or interest, however excessive or misguided, of the employer." *Id.* However, an exception exists to the general rule. "Where the employer is a common carrier for hire to the public, and the tort or attack is by an employee upon a passenger while the contract for transport is being accomplished," then the employer can be liable. *Id.* Although A is a common carrier for purposes of providing public transportation services to county riders, P hired A to provide private chauffeuring services to P's employees. Under the contract between P and A, A is not a common carrier. Accordingly, the common law common carrier rule does not apply. Given that the common carrier rules does not apply, then we must consider §§ 228(1)(c) and 229 to determine whether or not A2 conduct was actuated in part to further A's interest. Under our facts, T pranked A2, and A2 left A2's driver's seat and beat T until T was unconscious. We'll assume that nothing in A2's contract A requires A2

to use force to further A's purpose or interest. Furthermore, we cannot easily say that A2, however excessive or misguided, engaged in violence as a way of furthering A's interest, thus keeping A2 within the scope of employment. For example, if T were actually destroying the interior of the bus, and if A2 directed T to cease and desist, and if T became belligerent toward other of P's employees or toward A2, then it would be reasonable to some degree for A2 to use appropriate violence to protect A2 or to protect an employee of P who was attacked by T. None of these situations applies, and so we can properly concluded that A cannot be held liable for A2 beating of T, even if T initially pranked A2. (B) is incorrect because this statement of the rule does not as stated allow for exceptions. (C), although a correct statement of the enterprise liability rule, is not correct because no apparent policy goal would be served by imposing enterprise liability on A as the ordinary cost of doing business, especially because A took great care to hired excellent employees and highly qualified and skilled bus drivers. *See* TB, at 226-227. (D) is not the best choice because given all of the steps that A took to hire superior employees with excellent skill, and given that A2's violence was triggered by T's prank, however malicious it might have been, it would appear that the three policy justifications for respondeat superior liability of (1) preventing future injuries, (2) assuring compensation to victims, and (3) spreading the losses caused by the enterprise equitably. *See* TB, at 228.

## Question 14.

A, who was P's general manager at Pinnacle Luxury Hotels, observed T and T's friends entering the hotel lobby at 9pm. That night, an event for dignitaries was taking place in one of the hotel's salons. T and T's friends were properly and smartly dressed in after 6 wear or formal evening attire. T approached A, and asked if A could give T and T's friends a spare electronic key to their room, which they shared. A asked T on what floor was T's room. T said the 15th floor. T also told T's name to A, at which point A checked to hotel registration, and A could not find either T's name or T's friends' names. A then asked T for T's legal identification, at which point T produced T's driver's license. T then said: "Oh my god, I completely forgot that my best friend had made these reservations and paid for the room. When we checked in early, we didn't have to give our credit cards for incidentals because my friend has a membership with your chain of hotels." T then asked A to look for T's friend's name who'd originally reserved and paid for the room. A looked at T and T's friends suspiciously. A said to T: "You should know that we don't permit prostitutes, male or female, near our guests, and tonight we have dignitaries at our fine establishment." T and T's friends were shocked. After showing T and T's friends a hotel detective badge, and after telling T that A was also responsible for hotel security, A then told T and T's friends that A would have to take them to a secured location in the hotel's security suite and search them thoroughly to ensure that they're not at the hotel under false pretenses. Reluctantly, T and T's friends felt compelled to comply with A's instructions for the physical search and inspection of their clutches. A required T and T's friends to submit to physical search that allowed A to touch T and T's friends' genitals, including requiring them to bend forward and to spread their buttocks. A also searched through all of their personal possessions. T and T's friends were angry and humiliated. The next day, having regained access to their hotel room, T and T's friends decided to check out of the hotel. Having gathered their luggage, T and T's friends went to the concierge's desk to report A's actions. The concierge said that A was not the general manager, and A had nothing to do with security. The concierge also said that A was part of the evening and night janitorial staff. After T described how A was dressed, the concierge told T and T's friends that A should not have been dressed in the night

manager's uniform. After arriving back home, T and T's friends sued P, Pinnacle Luxury Hotels, alleging that they suffered a tort, due to the false imprisonment, impermissible touching, humiliating body searches, and touching of their personal belongings. In responsive pleadings, P resisted T and T's friends' action, arguing that A's conduct was not within the scope of employment because it was not actuated, at least in part, by a purpose to serve the master. In response, T and T's friends amended their complaint, alleging that A had apparent authority. Who will prevail?

(A)   T, because A purportedly acted on behalf of P.*
(B)   P, because, as a janitor, A's conduct was not authorized and was outside of the scope of employment.
(C)   T, if T could show that P had security camera in the lobby by which P could have exercise control of A, even though P failed to assert such control.
(D)   P, if P could show that T and T's friends could not have been convinced that A was a night manager who also enforced security, due to A having only received a 8th grade education.

Ans.: (A) is the best choice. *See* RESTATEMENT (3d) § 7.08, at 92 (statute book). This case also implicates *Costos* at TB, 234.

## Question 15.

P ran a skip-trace business, known as "Peaceful Snatcher." P's agents had never used life-taking violence. P hired A as a skip tracer, who located and identified defendants who were under a bail bond obligation, and who'd failed to appear in court. P had to locate T, who'd failed to appear. P knew from T's records that T was violent and aggressive. P told A where T lived, and told A that if A entered T's apartment at 5am, then A cuff T while I slept without a struggle or the risk of violence. P specifically instructed A not to use violence. P also told A not to take a gun. On the morning before A was to enter T's apartment at 5am, A got drunk, had been trolling, and overslept. P knew that P's employees and agents were well known for their loose behavior, hard drinking, and violent tendencies. By oversleeping, A arrived at T's apartment at 7am. Entering through an unlocked rear window, A entered T's ground-floor apartment. T, awaken and startled, confronted A, believing that A was a home invader. Although A had announced that A worked for P and was there to take T before a judge, T's shouts and screams muffled A's notice and notification. T was shouting: "Get out! I have a gun!" T had a shotgun. Regardless, A, having no weapon, jumped on T and grabbed the shotgun before T could level it and shoot A. As A and T wrestled for control of the shotgun, the gun inadvertently fired. Unfortunately, the shotgun's .22 gauge pellets went through the adjoining wall and killed T's neighbor, T2, an elderly person. T2's personal representative sued P, alleging that A was within the scope of employment and thus P was vicariously liable for T2's death. In response, P stated that A was not within the scope because A did not follow P's instructions and A was directly, negligently, and solely liable for T2's death. If the court found in favor to T2, which of the following statements would best explain that result?

(A)   A's conduct was not so unforeseeable as to make it unfair to charge P with responsibility.*
(B)   A's arrival at T's apartment was at P's instructions, and therefore P is vicariously liable for A's actions.
(C)   By arriving at T's apartment at 7am, which posed a risk that T might be alert, aggressive, and violent, A thus became liable for the natural consequences of entering T's apartment through the rear window.

(D)     P knew that A was likely to oversleep, and by not properly ensuring that A arrived at T's apartment at 5am, P assumed the risk that T would be awake, aggressive, and violent, and the risk that T might harm A or others.

Ans.:   (A) is the best choice.  See TB, at 218-222.

AGENCY, PARTNERSHIP, AND OTHER BUSINESS ORGANIZATIONS
Howard Law School
Washington, DC
Professor Reginald Leamon Robinson
Fall 2015

**Knowledge Demonstration Opportunity** (KDO) No. 5
Chapter 5
September 17, 2015

## REGGIE'S COPY

7 QUESTIONS

### Question 1.

P asked A, P's agent, to visit T. T had been P's long-term client. T trusted P and so T had confidence in A. A arrived at T's business, and while providing services to T, A saw padlock keypad number T used to access T's safe. A easily remembered T's safe access code, which was coincidentally the same as one of A's friends. Five weeks later, A gathered with A's long-time friends. A, while intoxicated, A blurted out that A knew the access code to T's safe. T's brand was popular. Local residents like A's friends knew where T's store was located. None of A's friend knew that A worked for P. A's outburst was compounded by A's inadvertency, and so A's said: "It's so simply; it's one of your motorcycle's chain locks." When asked, A told A's friend that A didn't know the contents of T's safe. Before A passed out, A's friend said in chorus: "Tell us! Tell us!" A said nothing. Due to work demands, A didn't see or talk to A's friends for more than three months. Two weeks after A had been hanging out with A's friends, T's safe was burglarized. The police investigation uncovered that A had discovered T's safe access code. Police questioning revealed that A, while drunk, had accidentally hinted at T's code because one of A's friends had that exact access code. Unfortunately, A's friend knew each other's motorbike access codes. They shared each other's bikes. The investigation completed, the detectives told T what they'd learned. The detectives didn't arrest A, and after reading the detectives' report, the district attorney refused to charge, indict, or prosecute A. T, having lost substantial assets, later sued P, alleging that P was liable for A's breach of fiduciary duty. Can T sue P on these grounds?

(A)   Yes, because A owed a fiduciary to P and T.
(B)   No, because P had thoroughly vetted A before hiring A.
(C)   Yes, because based on the course of dealings and performance between P and T, T could reasonably repose trust in A, and A breached that trust by sharing confidential information about T to A's friends.
(D)   No, because A, while operating within the scope of A's actual authority, was primarily motivated to serve P's interest.*

Ans.: (D) is the best choice because as unlike *Leafgreen*, A in this case did not have ambiguous motives in serving P. Moreover, A did not participate in any actions with A's friends, who more than likely burglarized T's business and safe, or who caused T's safe to be burglarized. And by reading §§ 261 and 231 together, P should not be required to suffer damages under enterprise liability theory. TB, at 328-329. Per § 261, P would be liable . . . .   Under § 231, P would not be liable if . . .

### Question 2.

I

T sued P after T bought P's stocks from A. Before T sued P, T contacted P in writing, alleging that A had grossly exaggerated claims of investment returns on P's stocks. T, while having some knowledge of penny stocks, stated that T had never invested in sophisticated stock transactions. T then told P what A had told T before T bought P's stock. T then asked P if A's statement had been authorized. In a written response to T's letter, P admitted that A worked for P, telling T that A was a valued member of P's investment sales division. Second, P told T that P had never heard such allegations against A before receiving T's letter. Third, P then told T that if T's allegations were true, A's statements were unauthorized. After T read P's written reply, T again wrote to P. In T's second letter, T sent to P a copy of P's investment prospectus that A had altered. In this second letter, T also demanded that P return T's capital investment. P refused, stating that P was innocent and had been harmed by A. P also told T that T's request for the capital would violate T's contract with P, which A had not altered. Can T successfully sue P?

(A)  Yes, because P must have negligently hired A.
(B)  No, if P did not know that A made misrepresentations to T before T invested in P.
(C)  Yes, because P had ratified A's conduct.*
(D)  No, because P had changed P's position in good faith before T contacted P about A's conduct.

Ans.: (C) is the best choice because after T realized A had misled T, T had two courses of action. First, T could ratify A's conduct by keeping T's investment in P. And T could sue A. Second, T could "go to P and, stating the fraud, offer to rescind. If P, after due notice of the fraud and offer of rescission, insists upon holding T to T's bargain, P will be deemed to ratified the alleged representations of the agent and T may pursue as against such P any remedy which T would have had, had the false representation been made by P in person." TB, at 324. [incomplete]

## Question 3.

Assume the facts in **Question 2**, except that T decided to remain invested in P after T discovered that A had made unauthorized representations to T. Which remedy, if any, would T have?

(A)  T has no remedy.
(B)  T must wait until one year has expired and then sue P and A.
(C)  T can sell T's stock in P through a broker to another investor.
(D)  T can sue A for damages due to A's representations to T.*

Ans.: (D) is the best choice. See TB, at 324.

## Question 4.

T sued P, alleging that T was misled to invest in P by A's fraud, deceit, and misrepresentations. A was P's vice president who was responsible for P's capital campaigns. P had required A to seek P's approval if any T would invest more than $400,000.00 in P. After A had contacted T, T invested $300,000.00 in P. A had promised T that within one year, T's investment of $5.00 per share would grow to $35.00 per share, a 700% increase over T's initial investment in P. T, a sophisticated investor, exclaimed: "Wow! That's crazy incredible!" Three years later, T's stock in P was valued at $7.00 per share. If P, in response to T's complaint, moved for

summary judgment, alleging that P did not know that A had made such representations to T and, even if T's allegations were true, T could not have justifiably relied on A's statements, it would have which of the following effects?

(A)    It would require T to seek leave from the court so that T could amend T's complaint and allege that P authorized A's statements.
(B)    It would not be relevant.
(C)    It bars recovery by T.*
(D)    It would require T to allege that P had negligently hired A.

Ans.: (C) is the best choice because § 261 of Restatement (2d), T must satisfy the 5 test on TB, at 303. Second, T must show that P is liable for A's statements because "a principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." TB, at 305. Unfortunately, T is a sophisticated investor, who could not have believed A when A promised an unheard of return of 700% within one year. At the very least, T was on inquiry notice to act reasonably, and T could have been induced to justifiably rely on A's representations when T knew better. (A) is irrelevant because this choice assumes that P's liability will be on Respondeat Superior or § 228 of Restatement (2d). That's not true. *See* TB, at 305. (B) is a bad choice because P's motion for summary judgment based on P's allegations are relevant under these facts. (D) is a bad choice because T's new allegation relies on actual and apparent authority.

## Question 5.

P owned and member managed "Day Spa & Massage Therapy Company, LLC." P catered to men and women. Among other services, P offered Brazilian and bikini waxes – sometimes called "Sphynx," bare waxing, or Hollywood waxing. To provide these services, P hired A, an Aesthetician, who had been fully certified and licensed by the school at which A had studied and by the state in which P was located. One day, T visited P's company. T had never sought such services, but T's friends had raved about P's waxes. A met T at the service desk. T asked for a Brazilian wax. "A full or modified Brazilian?" A asked. T looked confused, and so A explained that a Full Brazilian ("FB") would render T hairless from belly button to buttocks, and a FB required T would be naked from the waist down. A FB required A to touch T's body and to adjust T's body so that A could access every follicle of pubic hair. Next, A explained a Modified Brazilians ("MB"). A MB left a thin strip of hair at the top of T's genitalia, *viz.*, a "landing strip." T opted for FB. A again told T that A would have to touch T's genitals to complete the waxing. T agreed, and T signed the service contract and initialed the space for acknowledging A's information. T got undressed in a private salon, where T also drank hot herbal tea. At A's behest, T, w who was waist down naked, got on the waxing table. Once on the table, with instrumental tones wafting, T drifted into light sleep; A completed the FB. Upon awaking, T felt physically uncomfortable, asking A if A had touched T improperly. A, saying no, and feeling offended, walked out. Two weeks later, P received a letter from T's attorney, in which T alleged that A had improperly touched T, causing T to seeking counseling and drugs for post-traumatic stress disorder. Having worked with A for 10 years, P responded that A was a certified, licensed Aesthetician, who'd never had any such allegations filed by clients. T sued P, and in deposing A, P and T's attorney learned that A had properly touched T during the FB. Nevertheless, T still felt that A's touching was improper. In the suit, T alleged that A, cloaked with the apparent authority, had induced T by false representations to rely reasonably on A, so that A, while within the scope of employment, could cause harm to T. If P

demurred, in effect saying "Yeah, so what!" to T's pleadings, will the court find in favor of T?

(A)   Yes, because T had established that A was a servant who was placed into A's position as an Aesthetician, which enabled A to harm to T.
(B)   No, because T expressly and impliedly consented to A touching T in any manner that was reasonable for A to provide the FB service that T requested.
(C)   Yes, because P benefited from the revenue paid by T to P for services performed by A.
(D)   No.*

Ans.: (D) is the best choice. Per § 261 of Restatement (2d) Agency, "a principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his or her apparent authority, to commit a fraud upon third persons is subject to liability to such third persons for fraud."   TB, at 305.   This principle applies to masters and servants.   Under respondeat superior, "the agent's intent in committing the tortious act must be to further the employer's business.   If an employee commits an intentional tort solely for reasons that do not further his or her employer's business or cannot be considered a natural incident of employment, the employer cannot be vicariously liable."   Id.   Based on respondeat superior liability, T cannot prevail because T must show that A's alleged conduct was either further P's business or was a natural incident of the employment.   While it may be a natural incident of the employment, T has alleged that A engaged in fraud based on A's misrepresentations.   Assuming that A did engage in misrepresentations, T has the burden of showing that § 261 tort fall doesn't fall within the scope and principles of respondent superior.   Based on § 261, T must show that A's position enabled A to perpetuate the fraud, and A acted for A's own purposes.   It is also immaterial that A was acting for A's own purposes.   To make out a § 261 claim, (1) T must establish that A or other agent was put in a position which enabled A to commit fraud, (2) A acted within A's apparent authority, and (3) A committed fraud.

## Question 6.

A made representations to T.   T sued P, alleging that A's representations were false and deceitful.   T had told A that T wanted returns greater than 3%.   According to T, A told T that A could cause T to improve T's financial investment if T would write the investment check of $50,000.00, not to P but to A.   A told T that A owned a private equity fund, and through it, A could increase T's return not by 3%, which P had offered, but by 18% which A was offering.   A showed T two sets of documents. The first was P's written prospectus.   The second was A's research, financial statements, and prospectus.   A told T that P's prospectus was too conservative. However, A told T that A's documents were based on actual financial returns to A's clients.   A also stated that P knew that A offered high risk investment but greater return opportunities to prospective.   Over several days, T reviewed P and A's documents.   Later, T wrote the investment check for $50,000.00 to A.   Later, T returned to P's office, but on a day when A did not work.   On those days, P staffed the office.   T gave the check to P, and told P that T was just repaying a personal debt to A.   When A returned to work, P gave T's check to A, and P asked A if A were still gambling.   A said no, and informed P that A was attending Addictions Anonymous meetings.   Two days, when T's check cleared, T learned that A had deposited T's check into A's personal bank account.   After T's check cleared, A quit working for P. T contacted P, but P refused to return of the $50,000.00, saying that T was not P's client and that P hadn't received T's funds.   T sued P, alleging that A had engaged § 261 misrepresentations, for which P must be held accountable.   P, in response, stated

that P had been injured too. Which of the following will a court not consider in determining if P must answer for A's conduct?

(A)     Did P ratified A's conduct*
(B)     Did P know that A had a gambling addiction problem.
(C)     Did P cloak A with apparent authority by placing A in a position to defraud T.
(D)     Did P authorize A to offer T high or low risk investment options.

Ans.: (A) is the correct choice. See TB, at 316.

## Question 7.

P hired A as a stockbroker's assistant, for which A had no power to buy or sell stock for P's clients. A, however, wanted badly to prove A's acumen with stocks, bonds, and other financial trades. Before working for P, A had earned an M.B.A., from a very prestigious university's business school. Moreover, A had grown up around stocks and bonds because A's parents had been key players in the rise of Preys, Onna, & Nube, PC. But P told A that everyone at P started at the bottom, learned the business, and worked his or her way up. Unbeknownst to P, A later bought a new nametag, which read: "A, Senior Stock Broker & Supervisor." On the day A worn the new nametag, wondering if anyone would notice, T, a prospective client, entered P and approached A. T told A that T was aware that the commodities and short markets were very volatile, but T was hoping for a bit of better luck at a new brokerage house. After a brief conversation, in which T was completely impressed and amazed by A's breath of knowledge, T gave A a check for $100,000.00, which was made out to P. A opened an account in T's name, and A began to trade. Initially, A had a perfect, intuitive feel for price fluctuations, and A would move T's funds with confidence and with very positive returns for T. Later, T returned to P, and told A that T wanted to sell commodity shares that were risky. But A convinced T to retain the stocks. Two days later, A's keen insight had betrayed T, causing T to lose value in T's portfolio, viz., $75,000.00. T called P, and asked why A had caused T such losses. Although P initially faulted the volatile commodities market, P told T that P was unaware that T was a client and that A was managing T's stock portfolio. P explained that P hired A as a stockbroker's assistant. Still angry, T sued P, alleging that P was responsible for T's losses. In response, P alleged that the market's volatility would have affected T even if P had advised T, and P argued that A had not been within A's scope of employment, thus relieving P of liability. T then modified T's complaint, alleging that on advice of A, T retained stocks that T had initially wanted sell, and during to A's fraud, T was induced by A to rely on A and to retain worthless stock. Will T prevail?

(A)     P, because A's conduct was so startling and outrageous.
(B)     P, because P did not put A into a position which would have permitted A to induce T to invest funds in worthless stocks.
(C)     T.*
(D)     T, if T could not have foreseen that the stock market's volatility would have resulted in the very losses that T had by selling the origin stocks and by buying new shares.

Ans.: (C) is the correct choice. See § 261.



*EX. 10*

June 16, 2017

President Wayne A.I. Frederick, M.D., MBA
Howard University
2400 Sixth Street NW
Washington, D.C. 20059

*Sent via U.S. Mail and Electronic Mail (HUPresident@howard.edu)*

Dear President Frederick:

The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

FIRE is deeply concerned about the state of freedom of expression and academic freedom at Howard University following the university's finding that School of Law professor Reginald Robinson violated Howard's Title IX policy by including on a test a hypothetical scenario involving an individual undergoing a Brazilian wax. This finding is at odds with the plain language of several written university policies and could chill professors' teaching of basic legal principles. As a result, it puts at risk both faculty rights and the sufficiency of law students' education.

### I.    FACTS

The following is our understanding of the facts; please inform us if you believe we are in error.

On September 17, 2015, Robinson gave his class on agency law a Knowledge Demonstration Opportunity (KDO), a type of test Robinson employs throughout the semester to assess students' progress and discuss their analyses of relevant issues by reviewing the questions in class. September 17's KDO included the following question:

#### Question 5.

P owned and member managed "Day Spa & Massage Therapy Company, LLC." P catered to men and women. Among other services, P offered Brazilian and bikini waxes – sometimes called "Sphynx," bare waxing, or Hollywood waxing. To provide these services, P hired A, an Aesthetician, who had been fully certified

and licensed by the school at which A had studied and by the state in which P was located. One day, T visited P's company. T had never sought such services, but T's friends had raved about P's waxes. A met T at the service desk. T asked for a Brazilian wax. "A full or modified Brazilian?" A asked. T looked confused, and so A explained that a Full Brazilian ("FB") would render T hairless from belly button to buttocks, and a FB required T would be naked from the waist down. A FB required A to touch T's body and to adjust T's body so that A could access every follicle of pubic hair. Next, A explained a Modified Brazilians ("MB"). A MB left a thin strip of hair at the top of T's genitalia, viz., a "landing strip." T opted for FB. A again told T that A would have to touch T's genitals to complete the waxing. T agreed, and T signed the service contract and initialed the space for acknowledging A's information. T got undressed in a private salon, where T also drank hot herbal tea. At A's behest, T, w [sic] who was waist down naked, got on the waxing table. Once on the table, with instrumental tones wafting, T drifted into light sleep; A completed the FB. Upon awaking, T felt physically uncomfortable, asking A if A had touched T improperly. A, saying no, and feeling offended, walked out. Two weeks later, P received a letter from T's attorney, in which T alleged that A had improperly touched T, causing T to seeking counseling and drugs for post-traumatic stress disorder. Having worked with A for 10 years, P responded that A was a certified, licensed Aesthetician, who'd never had any such allegations filed by clients. T sued P, and in deposing A, P and T's attorney learned that A had properly touched T during the FB. Nevertheless, T still felt that A's touching was improper. In the suit, T alleged that A, cloaked with the apparent authority, had induced T by false representations to rely reasonably on A, so that A, while within the scope of employment, could cause harm to T. If P demurred, in effect saying "Yeah, so what!" to T's pleadings, will the court find in favor of T?

(A) Yes, because T had established that A was a servant who was placed into A's position as an Aesthetician, which enabled A to harm to T.
(B) No, because T expressly and impliedly consented to A touching T in any manner that was reasonable for A to provide the FB service that T requested.
(C) Yes, because P benefited from the revenue paid by T to P for services performed by A.
(D) No.

The correct answer to Question 5 was (D). After the test, Robinson solicited volunteers to discuss their answers to the test questions. When discussing Question 5, one volunteer opined that "T would not sleep" through the waxing process. After briefly explaining that his knowledge of Brazilian waxes was limited to the research he did for this particular test question, Robinson switched focus and asked the student about her answer choice. When she declined to explain her answer choice, Robinson moved on to another volunteer.

On December 17, 2015, Howard's Deputy Title IX Coordinator Candi N. Smiley notified
Robinson via letter that two students had filed a complaint against him alleging sexual
harassment and gender-based harassment. On January 13, 2016, Robinson was informed
that this complaint was filed as a result of Question 5 on September 17's KDO. According to
the December 2015 letter, the sexual harassment allegation was to be assessed by the
following standard[1]:

> With respect to academic programs and activities, the term "sexual
> harassment" shall mean unwelcomed sexual advances, requests for sexual
> favors, and other verbal or physical conduct of a sexual nature when:
>
> (1) Submission to such conduct is made either explicitly or implicitly a
>     basis for any decision affecting the terms or conductions [sic] of
>     participation in any such program or activity or status in an academic
>     course; or
> (2) Such conduct has the purpose or effect of unreasonably interfering
>     with a student's educational right, privilege, advantage, or
>     opportunity; or
> (3) Such conduct is so pervasive or severe that it creates an intimidating,
>     hostile, or offensive environment for learning and has no reasonable
>     relationship to the subject matter of the relevant course of
>     instruction.

On May 4, 2017, Robinson met with Provost Anthony K. Wutoh and Title IX Coordinator
Veronica Love to discuss the findings. During that meeting, Wutoh gave Robinson a notice
of findings, which stated that there was "sufficient evidence to sustain a finding of Sexual
Harassment in violation of the Title IX policy" but "insufficient evidence to sustain a
finding of Gender-Based Discrimination." During the meeting, Robinson was told that
Smiley relied on four factors in coming to the conclusion that he had committed sexual
harassment.

The first factor Smiley relied on was that Robinson used the word "genital" in Question 5.
Second, the complainants felt that the hypothetical scenario was crafted in order to prompt
them to reveal personal details about themselves. Third, the complainants believed their
revelations had a negative impact on them. Fourth, Smiley believed posing the scenario
described in Question 5 was not necessary to teach the subject at hand.

Because of the finding of responsibility, Robinson was subjected to several sanctions,
including "a detailed reprimand placed in his file," sensitivity training, mandatory

---

[1] This standard substantively matches the standard articulated in Howard's Title IX Policy, 400-005.IV.N.,
attached to Smiley's letter, though the two versions have different typographical errors. Provisions quoted in
the Analysis section below will be copied from whichever version is correct, but because they convey the same
standards, all analysis applies equally both to Howard's publicly published policy and to the standard
articulated by Smiley in her letter.

submission of KDO questions for prior review by the dean's office two weeks in advance, and "institut[ing] a procedure to allow . . . students to remove the KDOs, exams and questions from the classroom." Robinson attended sensitivity training with Love on May 10, 2017. Additionally, Robinson was informed that if he is found responsible for any further violations under the university's Title IX policy, he may be terminated or otherwise disciplined.

## II.  ANALYSIS

Question 5 of Robinson's September 17, 2015 KDO plainly does not constitute sexual harassment under Howard's Title IX policy. Howard's punishment of Robinson for this question, therefore, is unacceptable under the university's speech-protective academic freedom policy. Moreover, were Howard to apply its Title IX policy consistently in the manner as it has done in this case, professors would be unable to teach about many areas of the law, and their students would be deprived of the rigorous intellectual training necessary to become skilled, competent attorneys.

### i.  Robinson's use of the hypothetical question at issue does not constitute "sexual harassment" under Howard's own policy.

There are three types of "sexual harassment" defined in the Title IX policy purportedly applied to Robinson's case; each entails "unwelcome . . . conduct of a sexual nature" in addition to other conditions being met. Robinson's use of Question 5 in his test does not satisfy any of the three sets of conditions described in Howard's sexual harassment policy.

The first type of sexual harassment occurs when "submission to [unwelcome sexual conduct by a faculty or staff member] is made either explicitly or implicitly a basis for any decision affecting the terms or conditions of participation in any such program or activity or status in an academic course." Question 5 asked students to apply their knowledge of agency law to a hypothetical situation. Robinson did not solicit personal information about his students in any manner, much less condition students' grades on their sharing of private information. In fact, he did not require any students to publicly comment on this question at all—he took volunteers for the discussion of all his test questions. Further, it would be unworkable to characterize the use of the word "genitals" as "conduct" to which students had to submit—by completing the KDO—as a condition of receiving high grades. Such an interpretation would render any class assignment or test that even tangentially relates to sex a potential basis for a finding of harassment if one especially sensitive student is made uncomfortable. Therefore, his decision to include the Question 5 in the KDO cannot constitute the first type of sexual harassment in Howard's Title IX policy.

The second type of sexual harassment is that which "has the purpose or effect of unreasonably interfering with a student's educational right, privilege, advantage, or opportunity." Even if the complainants subjectively felt uncomfortable reading or discussing Question 5, the question cannot be said to *unreasonably* interfere with any student's educational opportunities. Mere discomfort with the mention of certain body

4

parts or sex does not transform pedagogy into sexual harassment—if it did, professors could not teach topics like human sexuality, biology, or a broad range of classic literature without the risk of being found guilty of harassment because of one particularly sensitive student's complaint.

More specifically to Robinson's class: All law students in the United States can expect to encounter descriptions of scenarios that involve sexual touching, even if they learn only the subjects tested on bar examinations in all jurisdictions, which include rape and other criminal infractions. The simple fact that a test question involves touching of a hypothetical individual's genitals and the word "genitals" would not, therefore, unreasonably interfere with any law student's education.

Any student with even the most basic understanding of the first-year topics taught almost uniformly nationwide would expect such hypothetical questions, and any law student who graduates without having encountered such a question is likely a step behind in learning the knowledge necessary to become a licensed attorney. Moreover, nothing suggests that Robinson created the question with the *purpose* of interfering with his students' education. Quite to the contrary, he explained his rationale for including the question in the KDO in a 32-page letter to Provost Wutoh that was forwarded to you on May 25.

The third type of sexual harassment defined by Howard's Title IX policy is conduct that is "so pervasive or severe that it creates an intimidating, hostile, or offensive environment for learning and has no reasonable relationship to the subject matter of the relevant course of instruction." A single question involving a hypothetical individual's genitals, among dozens of other questions throughout the semester that do not, is neither "severe" nor "pervasive." The Department of Education's Office for Civil Rights explicitly stated in a July 28, 2003, "Dear Colleague" letter, sent to the presidents of public and private universities nationwide, that "in addressing harassment allegations . . . the offensiveness of a particular expression, standing alone, is not a legally sufficient basis to establish a hostile environment under the statutes enforced by OCR." The letter elaborated:

> Some colleges and universities have interpreted OCR's prohibition of "harassment" as encompassing all offensive speech regarding sex, disability, race or other classifications. Harassment, however, to be prohibited by the statutes within OCR's jurisdiction, must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive.

Howard's finding that Robinson's inclusion of Question 5 in his KDO constitutes sexual harassment rests solely on two students' judgment that this was offensive, and is therefore not within the bounds of sexual harassment prohibited by Title IX.

Additionally, Question 5 clearly has a reasonable relationship to the subject matter Robinson was teaching: agency law. As Robinson noted in his May 25 letter to Wutoh, cases like *Bowman v. Home Life Ins. Co.*, 243 F.2d 331 (3d Cir. 1957), and *Nazareth v. Herndon*

5

*Ambulance Serv.*, 467 So. 2d 1076 (Fla. Dist. Ct. App. 1985), deal with questions of agency and vicarious liability in situations involving an "intimate examination" of individuals' bodies (in *Bowman*) and an alleged sexual assault (in *Nazareth*). These are real-life cases that are substantially similar to Question 5, and students who go on to practice agency law will be well-served by learning how to analyze similar circumstances. Whether this particular question is absolutely *necessary* to teach agency law is not relevant to the question of whether Robinson violated Howard's Title IX policy.

Because Robinson's use of Question 5 in his KDO does not satisfy the conditions required for any of the three types of "sexual harassment" described in Howard's Title IX policy, the finding against him is erroneous and must be reversed.

### ii.   Howard's punishment of Robinson does not comport with the university's promises of free speech and academic freedom.

The finding against Robinson and his subsequent punishment are flatly incompatible with Howard's express, written promises of free speech and academic freedom. Howard is a private institution, and thus not legally bound by the First Amendment. However, it is morally and legally obligated to abide by the promises it makes to its faculty. Howard has not done so in this instance.

Howard's "Academic Freedom Policy," set forth in the Faculty Handbook, states, in relevant part:

> Faculty members are entitled to freedom in the classroom in discussing their subjects, but they should be careful not to introduce matter into their teaching that has no relation to their subjects. Students are entitled to an atmosphere conducive to learning and to even-handed treatment in all aspects of the teacher-student relationship. Therefore, in exercising their freedom in the classroom, faculty members are responsible for ensuring that their treatment of students is in no way inconsistent with the university's equal opportunity policy or the university's commitment to promoting the educational aspirations and achievements of all students.

Robinson's teaching during the class in question was even-handed and consistent with university policy, as explained above. Question 5 contained only gender-neutral terminology, and the university's findings concluded that a gender-based discrimination claim could not be sustained. Accordingly, Robinson was entitled to freedom in the classroom in discussing his subject, agency law. This freedom means very little if it does not include the ability to craft questions that Robinson believes will best convey the nuances of agency law to his students. Academic freedom cannot include a requirement that professors utilize only the most anodyne or commonly employed illustrations of each principle they are teaching.

Howard's actions against Robinson are particularly untenable in light of your recent statement on freedom of speech, posted to the university website on February 28, 2017.[2] In this statement, you repeatedly emphasized that "Howard University is committed to the principle[] of free speech" and that the administration has "defend[ed] the right of community members who express a wide range of often conflicting points of view." On September 17, 2015, Robinson did not even seek to express a controversial viewpoint—he sought only to illustrate a principle of agency law using a scenario that was different from most other questions he had posed to his students. It is critically important that law students learn to apply legal principles to different scenarios, and crafting a range of hypothetical scenarios plainly falls within the scope of what a professor can expect to do when promised academic freedom.

### iii.    Howard's application of its Title IX policy effectively prohibits the teaching of wide swaths of the law.

Howard punished Robinson for presenting to his law students a hypothetical scenario in which one individual consented to another individual touching his or her genitals. In doing so, as noted above, he used gender-neutral and formal terminology. Myriad situations involving genitals implicate different torts and criminal laws—in fact, some laws can be illustrated and taught *only* with reference to someone's genitals. To punish a law professor for including this terminology in one question among dozens is to effectively prohibit the teaching of broad swaths of the law. Howard's students would be ill-equipped to pass the bar exam, advise clients, or seek employment without this knowledge.

Were Howard's reasoning in Robinson's case applied evenly to all law faculty, professors would be unable to teach about rape and sexual assault laws at all if one student subjectively felt uncomfortable during those discussions. As a result of the sanctions imposed on him, Robinson will feel unable to teach cases related to these topics. He may even feel unable to adequately answer questions posed by his students if the students bring up related topics on their own. Students, as a result, are likely to feel uncomfortable asking about certain areas of the law, unsatisfied with their educational experiences at the law school, and potentially unable to advise their clients.

Classroom discussion, so long as it is germane to the curriculum, should not be limited to what Howard's most sensitive students would choose to study. Exposure to a wide range of potential circumstances and nuanced fact patterns is an essential part of training students for the legal profession. Howard's decision to sanction Robinson under the guise that Question 5 constitutes sexual harassment cannot be sustained if Howard wishes its students to have a meaningful legal education.

### III.    CONCLUSION

---

[2] Letter from Wayne A.I. Frederick, M.D., MBA, President, Howard Univ., to Howard Univ. Community (Feb. 28, 2017), *available at* https://www2.howard.edu/about/president/statements/freedom-of-speech-02282017.

Howard's punishment of Reginald Robinson does not comport with its own definition of sexual harassment or its promises of academic freedom. It poses a severe threat not only to professors' rights but also to students' ability to learn all areas of the law, including learning how to analyze situations that may make some students uncomfortable. For lawyers in many fields, having the ability to do so is imperative. Howard must immediately remove the finding of responsibility from Robinson's file and rescind its sanctions against him.

FIRE is committed to using all of the resources at its disposal to see this matter through to a just conclusion. We request a response to this letter by June 30, 2017.

Sincerely,

Susan Kruth
Senior Program Officer, Legal and Public Advocacy

cc:
Stacey J. Mobley, Chairman, Howard University Board of Trustees
Candi N. Smiley, Title IX Coordinator
Veronica Love, Title IX Coordinator
Anthony K. Wutoh, Provost & Chief Academic Officer
Florence Prioleau, General Counsel
Danielle Holley-Walker, Dean, Howard University School of Law

FIRE therefore renews our demand that Howard immediately remove the finding of responsibility from Robinson's file and rescind its sanctions against him. FIRE is committed to using all of the resources at our disposal to see this matter through to a just conclusion. We request a response to this letter by January 5, 2018.

Sincerely,

Susan Kruth
Staff Attorney, Stand Up For Speech Litigation Project

cc:
Stacey J. Mobley, Chairman, Howard University Board of Trustees
Candi N. Smiley, Title IX Coordinator
Vanessa C. Love, Title IX Investigator
Anthony K. Wutoh, Provost & Chief Academic Officer
Florence Prioleau, General Counsel
Danielle Holley-Walker, Dean, Howard University School of Law

## GENERAL INFORMATION

**GENERAL OVERVIEW.** "Agency, Partnerships, and Business Organizations", a fundamental and foundational course in the study of Corporate and Business Law, depends heavily on state and federal statutes. Despite a federal regulatory presence, state statutory law and common law rulings govern this study. In this course, you will learn agency law, the indispensable substantive law on which all businesses, regardless of how they are organized and structured, depend. Once we've have understood this conceptual framework, we will carry that understanding over to partnership and limited liability companies. Although corporate entities, joint ventures, trusts, s-corporations, and c-corporations will be present in the substantive materials, we will exclusively devote our focused learning to agency law, partnerships, and LLCs. The syllabus reflects your obligations in the course. You are directly responsible for all cases and materials set forth in the syllabus, even if we do not cover or discuss specific parts of the assigned readings in class. From time to time, I will distribute additional readings that cover either business organizational materials or corporate social responsibility and related issues. You are responsible for such readings.

**REQUIRED TEXTBOOK.** J. DENNIS HYNES & MARK J. LOEWENSTEIN, AGENCY, PARTNERSHIP, AND THE LLC: THE LAWS OF UNINCORPORATED BUSINESS ENTERPRISES: CASES, MATERIALS, PROBLEMS (8th ed. 2011).

**REQUIRED STATUTORY MATERIAL.** J. DENNIS HYNES & MARK J. LOEWENSTEIN, AGENCY, PARTNERSHIP, AND THE LLC: SELECTED STATUTES AND FORM AGREEMENTS (2008 ed. or later).

**RECOMMENDED MATERIALS.** DANIEL S. KLEINBERGER, AGENCY, PARTNERSHIPS, AND LLCs: EXAMPLES & EXPLANATIONS (3d. ed. 2011).

**CLASSROOM LOCATION AND MEETING SCHEDULE.** Mondays, Tuesdays, and Thursday, Holy Cross G101. All meeting times are at 2:45 p.m. to 3:45 p.m.

**OFFICE HOURS.** Houston Hall, Room 313 from 10:00 p.m. to 12:00 p.m. on Mondays, Tuesdays, and Thursdays. Other times by appointment. Office number is 806-8059. Email addresses: rrobinson@law.howard.edu; heru.hermes@gmail.com.

**OPEN-DOOR POLICY.** I have an open-door policy. When my office door is open, you may come in and talk to me about course-related matters. However, if my door is closed even during posted office hours, then I will not be seeing students at that time. Nevertheless, if you wish to see me, please call or email me at your earliest convenience. Thanks.

**ATTENDANCE POLICY.** The Law School's attendance policy will be strictly enforced. This policy is part of the Student Handbook, and the Law School imputes knowledge of the Attendance Policy to each student. If you've not received a Student Handbook, you're now on notice of both the Handbook's and the Attendance Policy's existence. If you have any questions, please consult Associate Dean Reginald McGahee.

**ADA.** Howard University is committed to providing an educational environment that is accessible to all students. In accordance with this policy, students in need of accommodations due to a disability should contact Dean Reginald McGahee (rmcgahee@law.howard.edu) or the Office of the Dean for Special Student Services ((202)283-2420) for verification and determination of reasonable accommodations as soon as possible after admission to the University, or at the beginning of each semester.

**FINAL EXAMINATION.** The final will have 100 multiple-choice questions, and the exam will be 3 hours. Please Note: the Grade Normalization Policy will govern your final grades. Please consult the Student Handbook.

**KNOWLEDGE DEMONSTRATION OPPORTUNITIES (KDOS).** This course will give you proper and timely feedback on your understanding of the materials on which the course depend. Ideally, at the end of every chapter, I will give you an in-class, MBE-type questions, which I call Knowledge Demonstration Opportunities or KDOs. You must take all KDOs, which will take approximately 16 to 30 minutes to take depending on the number of questions. No student will receive any credit or extra credit for taking the KDOs; however, any student who fails to take a KDO will lose two points off his or her final, course grade per missed KDO. KDOs are closed book practice exams. While taking the KDOs, you MUST NOT have any devices, electronic or otherwise, on your desk. You'll only need a pencil. You'll be required to sign for the KDO and out it out. You must place your name at the top of the KDO.

If you miss any of the KDOs, you CANNOT make it up.

The KDOs and Review KDO are subject to the Student Honor Code. However, the Review KDO is optional.

**KDOS AND STUDENT HONOR CODE: Your KDOs are subject to and governed by the Student Honor Code. Moreover, you cannot cause any information contained in the KDO to leave the classroom. Cause includes acts of commission or omission, or negligence, or misfeasance. You cannot copy or cause to be copied any information contained in the KDOs. Copy or copied means any duplication of the KDO's content by human or non-human means, whether mechanical or electronic means. Any student who violates this provision of the syllabus shall receive an automatic failing grade for the course. Such a student will also face Student Honor Code charges, and such student will risk expulsion from Law School and a permanent notation on such student's academic record.**

**NO USE OF COMPUTERS OR ANY OTHER ELECTRONIC DEVICES.** Unless otherwise instructed, you cannot use your laptops, notebooks, cellphones, smartphones, or other such electronic or mechanical devices, whether wired, wireless or tethered, during class.

**RESERVATION.** With proper notice, I reserve the right to change the syllabus. By proper notice, I mean that I'll give you either written notice on TWEN or in-class notice at least one week before I intend to make the change effective.

2

https://www2.howard.edu/about/president/statements/statement-freedom-speech

# STATEMENT ON FREEDOM OF SPEECH

**Tuesday, February 28, 2017**

Dear Howard University Community,

Howard University is committed to the principles of free speech, public protest, and inclusivity, even though these ideals may sometimes conflict with one another. However, our commitment to the safety, well-being, and support of the Howard University community remains our highest priority.

Freedom of expression is embedded in our founding principles. As a campus administration, we have honored this principle by defending the right of community members who express a wide range of often conflicting points of view. Howard University has long been a safe haven for such discourse, welcoming opposing views and providing a platform for stimulating dialogue among students, faculty, staff and alumni alike. Moreover, we are choosing to defend the right to free expression at a historic moment for our nation, when this right is once again of insurmountable importance.

While I respect freedom of expression, I strongly oppose vandalism as a form of free expression. I am aware of the recent vandalism that has occurred on this campus and these actions will not be tolerated. This administration will take any and all actions necessary to bring misguided uses of expression to a halt. The key to our progress is respectful dialogue, not bullying behaviors. As we learn to communicate with those who have opposing views, we must be sure that our tone and tenor is not rude or abusive. I encourage us all to avoid the use of condemning speech in the face of adversity and to be mindful that our opinions and words can elicit strong actions that diminish the University's commitment to providing an excellent educational experience for all students.

In the true spirit of Howard University, being solution driven, I am asking members of the community to join me in conversation over the next several weeks to discuss campus relations that impact us all. This series of dialogues will begin later this week when I meet with student leaders from across campus. It is critical that we include as many voices as possible in the conversation as we work to advance this institution and plan our progress forward. Any student, faculty, or staff member who is interested in joining these dialogues should contact Mr. Calvin Hadley, Senior Advisor for Strategic Initiatives and Student Ombudsman via email: **hustudentadvocate@howard.edu**. Howard University is a place that I call home; a place that I love; a place that nurtured me. Every member of our community calls her home, so we should all have respect for her. Every member of our diverse community must engage responsibly and ensure that our actions are infused with goodwill, kindness, and respect. Our common ground must be Truth and Service.

As always, my team and I remain supportive of our students and will engage in educated discourse with anyone who is invested in advancing the Capstone.

*Excellence in Truth and Service,*
**Wayne A. I. Frederick**, M.D., MBA
President



**HOWARD**
**UNIVERSITY**

OFFICE OF THE PROVOST

May 4, 2017

**CONFIDENTIAL**

Professor Reginald Robinson

RE: **Letter of Reprimand- Title IX Violation**

Dear Professor Reginald Robinson:

This letter of reprimand is in response to conduct that, violated the Howard University Title IX (Student) POLICY ON PROHIBITED SEXUAL HARASSMENT AND GENDER-BASED DISCRIMINATION IN EDUCATION PROGRAMS AND ACTIVITIES ("Title IX policy"). Specifically, you were found responsible for engaging in acts of sexual harassment toward one or more Howard University students.

Therefore, the following sanctions were imposed against you:

- Professor Reginald Robinson shall receive sensitivity training regarding what is appropriate and what is not appropriate in the KDOs, exams and questions within a week after the notice of findings meeting.
- Professor Reginald Robinson's KDOs, exams and questions will be submitted to, reviewed and approved by the office of the Dean two weeks before any KDO's, exams and questions are submitted to students. Upon approval from the Dean, Professor Robinson will inform the Title IX office. Professor Robinson will also institute a procedure to allow the students to remove the KDOs, exams and questions from the classroom.
- Professor Reginald Robinson's class should be sporadically observed for a period of no longer than one semester by a member of the Administration to determine the nature of the discussions taking place in his classroom.
- Professor Reginald Robinson shall have a detailed reprimand placed in his file. This reprimand shall outline the procedures of the office of the Dean to review Professor Robinson's academic material for sexually suggestive and or offensive material. It shall also detail the procedures that will allow students to remove such material from Professor Robinson's class, and it shall indicate the consequences of another Title IX violation. Specifically, the reprimand shall state that if Professor Reginald Robinson is found responsible for any further Title IX violations he will be subject to further disciplinary measures up to, and including termination.



Failure to strictly adhere to the forgoing sanctions will lead to further disciplinary action up to and including separation from the University.

Sincerely,

Anthony K. Wutoh, Ph.D., R.Ph.
Provost & Chief Academic Officer
Title IX Decisional Authority

Cc: Human Resources Personnel File
    Provost Office Faculty Personnel File

# HOWARD UNIVERSITY POLICY

| | |
|---|---|
| **Policy Number:** | 400-005 Governance, Risk and Compliance |
| **Policy Title:** | TITLE IX (STUDENT) POLICY ON PROHIBITED SEXUAL HARASSMENT AND GENDER-BASED DISCRIMINATION IN EDUCATION PROGRAMS AND ACTIVITIES |
| **Responsible Officers:** | Provost and Chief Academic Officer<br>Title IX Coordinator and Deputy Title IX Coordinator |
| **Responsible Offices:** | Office of the Provost and Chief Academic Officer<br>Title IX Office |
| **Effective Date:** | May 31, 2015<br>March 12, 2015 Interim Policy<br>August 11, 2011 (Updated)<br>June 5, 1999 (Original) |

## I.   POLICY STATEMENT

Howard University (the "University) is committed to ensuring compliance with Title IX of the *Education Amendments of 1972*, as amended, and the *Violence Against Women Act*. To that end, the University reaffirms its commitment to providing students with educational opportunities free from sexual harassment and discrimination based upon gender, gender expression, gender identity, sexual orientation, or marital status. In furtherance of this commitment, the University strives to maintain an environment in which all members of the University community are: (a) judged and rewarded solely on the basis of ability, experience, effort, and performance; and (b) provided conditions for educational pursuits that are free from gender-based coercion, intimidation, or exploitation.

Sexual harassment (hereinafter referred to as "harassment") and gender-based discrimination (hereinafter referred to as "discrimination") are violations of both federal and local law. They can result in physical and psychological harm to victims, while corrupting the positive work and academic environment the University strives to maintain. Therefore, harassment or discrimination on the part of any member of the Howard University community shall not be tolerated under any circumstance and is strictly prohibited under both Title IX (applicable to students) and Title VII (applicable to faculty and staff).

The University considers harassment and discrimination to be extremely serious matters. In accordance with federal law, the University has a legal obligation to investigate all allegations of harassment and discrimination. This obligation arises when the University knows with certainty or has reason to believe that sexual harassment or discrimination may have taken place. Upon learning of any such allegations, the University must use its best efforts to investigate all matters brought to the attention of a Title IX Officer or a Responsible Employee. Therefore, upon learning of potential prohibited activity, the University may take action to investigate an allegation even if the alleged victim does not file a formal written complaint.

Under this policy, every complaint submitted to the University, by or against a student, will be reviewed and investigated to the fullest possible extent. However, the submission of false,

spurious, or frivolous claims will result in the immediate consideration of disciplinary action, up to and including suspension or expulsion. Additionally, submission of a complaint alleging harassment or discrimination is considered to be a protected activity. As such, retaliation against a Complainant, Dean, Title IX Officer, administrator, faculty member, witness or individual involved in any aspect of the investigative process under this policy is strictly prohibited and will be sanctioned accordingly.

Further, this policy is not designed to limit the academic freedom of University Faculty. The University prides itself on affording faculty with a fair opportunity to teach, conduct research, and provide services to the community in a setting that allows the academic freedom necessary to cultivate a wide expanse of ideas and teaching methods. The University encourages the expression of such ideas or the use of such methods, provided that they are expressed or used in a manner that is consistent with this policy and the legitimate rights of students.

It is important to note three considerations that inform the application of this policy:

### (1) University Prohibition on Consensual Relationships
Sexual relationships, including dating, between students and faculty, staff, or any other type of University employee are strictly prohibited under this policy regardless of whether such a relationship may violate the law. Therefore, violations of this prohibition by a faculty member, staff member, or any other type of University employee and a student may lead to disciplinary action against one or both parties.

### (2) University Policy on Indemnification
In any legal action or proceeding precipitated by a violation of this policy, in which the University and a member of the University community are named as "co-defendants", the University may refuse to defend and/or indemnify any co-defendant who is responsible for that violation. If a complaint is filed in court and a legal action is thereby commenced against the University and/or such employee, the University may decline to represent the employee and may also decline to provide that employee any indemnification for damages awarded against him or her. Additionally, the University will not defend or indemnify any member of the University community in any legal proceeding or other similar action alleging sexual harassment if the Office of General Counsel determines that such member violated this policy and may have acted either (1) in bad faith; or (2) in a manner adverse to the best interests of the University.

The decision regarding defense and indemnification will be based solely on the General Counsel's determination as to whether the co-defendant acted in good faith and not in a manner adverse to the best interests of the University. In addition to its refusal to defend and indemnify, in appropriate cases, the University may also file a legal action against a member of the University community to reimburse the University for any loss it may incur as a result of that person's violation of this policy or any applicable provision of law.

### (3) University Amnesty Statement
The University recognizes that an individual who has been drinking or using drugs at the time of the incident may be hesitant to file a complaint or provide a report because

drinking and drug use may be a violation of the Student of Code of Conduct and District of Columbia law. In order to encourage reporting and remove barriers to doing so, any individual who reports sexual harassment, sexual misconduct, sexual assault or sexual violence, either as a Complainant or as a third party witness, will not be subject to disciplinary action by the University for his/her/their own personal consumption of alcohol or drugs at or near the time of the incident, provided that any such violations did not and do not place the health, safety or well-being of any other person at risk. The University may, however, advise a student to engage in an educational discussion regarding the dangers of alcohol consumption or drug use or to pursue other educational and counseling activities regarding such use.

The Title IX Coordinator and Deputy Title IX Coordinator are primarily responsible for implementing this policy and ensuring that all students and Responsible Employees are adequately trained or otherwise made aware of their rights and responsibilities under this policy. The provisions of this policy extend to all undergraduate, graduate, transfer, international and/or domestic exchange students as well as all residents and individuals receiving education and/or training at the University. Additionally, each and every faculty and staff member is expected to comply with all terms set forth in this policy. In the event that a faculty or staff member experiences harassment or discrimination, he or she is encouraged to contact the University's EEO Officer for guidance and further action under the University's Title VII policy.

The Chief Operating Officer shall ensure that appropriate notice of this policy and its contents are distributed to all University vendors and those seeking to do business with the University; these individuals are also required to comply with all of the University's prohibitions against harassment and discrimination, as set forth within this policy.

## II. RATIONALE

Title IX of the Education Amendments of 1972, as amended ("Title IX"), and its implementing regulations (34 CFR Part 106) prohibit any individual from being excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity on the basis of gender. In compliance with this federal regulation, it is the policy of the University not to discriminate on the basis of gender in the education programs and activities that it operates. This prohibition against discrimination also extends to employment in education programs and activities and to admission to such programs and activities.

Further, this policy is designed to protect all University students from illegal and improper forms of harassment and discrimination. It provides students with an opportunity to seek redress against any individual in violation of the policy and allows the University to reaffirm its commitment to providing educational opportunities free from the negative effects of sexual harassment and discrimination.

## III. ENTITIES AFFECTED BY THIS POLICY

This policy applies to all students of the University community. More specifically, in any instance where a student is named as either the Complainant or the Respondent in a matter

alleging harassment and/or discrimination, this policy will be applied. However, it is important to note that all faculty and staff members are expected to know and comply with the terms of this policy. Moreover, the prohibitions of harassment and discrimination contained in this policy extend to third parties, including those serving as contractors and vendors doing business at and/or with the University.

While it is the responsibility of the University to disseminate this policy, it is the responsibility of each member of the University community to read the policy and become familiar with its provisions. Moreover, failure to follow the procedures set forth in this policy may inhibit or prevent the University from properly investigating an instance of alleged harassment, or from taking appropriate remedial action.

Finally, it is important to note that the actions proscribed by this policy are also applicable to all individuals who are on University premises or on any other property where the University conducts its business. If such an individual commits an act in violation of this policy, the University will take appropriate measures, under the circumstances, to sanction the offender, to mitigate against the potential for recurrence, and to discipline any member of the University community who may have participated in such conduct, or may have failed to stop such conduct when he or she had the authority to do so.

## IV.   DEFINITIONS

A. **Complainant** - The party reporting the alleged Title IX violation. The Complainant can be the person who experienced the alleged action, a third party who witnessed the alleged action or a person who knows or has reason to know of the alleged action.

B. **Confidential Employee** - Licensed counselors and pastoral counselors whose official responsibilities include providing mental health counseling to members of the school community are not required by Title IX to report any information regarding an incident of alleged sexual violence to the Title IX coordinator or other appropriate school designee. However, licensed counselors and pastoral counselors not acting in the capacity of a licensed counselor or pastoral counselor at the time of the disclosure **ARE NOT** considered confidential employees. **NOTE:** Interpersonal Violence Prevention Program advocates are Confidential Employees.

C. **Consent** - When a person clearly and decisively gives voluntary permission to engage in a specific sexual act without fear of reprisal or as a result of threats. A person can withdraw consent at any time during a sexual activity. A person cannot give consent to engage in a sexual activity if she or he is:
   (1) Under the age of consent.
   (2) Mentally or physically incapacitated.
   (3) Sleeping.
   (4) Being threatened or coerced.
   (5) Intoxicated by alcohol or drugs.

D. **Dating and Domestic Violence** - A pattern of controlling behaviors used by one partner to control the other partner. There are many forms of dating and domestic violence:

(1) <u>Physical Abuse</u> – Dating and domestic violence that includes, but is not limited to, hitting, shoving, slapping, pushing, punching, burning, and stabbing. It can also include withholding someone from receiving needed medical care or medication.

(2) <u>Sexual Abuse</u> - Dating and domestic violence that includes, but is not limited to, forced sex, and forcing someone to have sex without protection, with an object, or with another person.

(3) <u>Psychological and Emotional Abuse</u> - Dating and domestic violence that includes, but is not limited to, controlling someone's behavior or actions, isolating a person from friends and family; making threats against a person, his/her family, friends and pets; using social media to make threats; and verbal abuse.

(4) <u>Economic Abuse</u> - Dating and domestic violence that includes, but is not limited to, taking a partner's money, and not allowing a person or disrupting a person's ability to work or go to school.

E. **Gender** - The sex of an individual, male or female, based on reproductive anatomy.

F. **Gender-Based Discrimination** - Any intentional or unintentional act that results in an individual being excluded from participation in, denied the benefits of, or subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity based upon the individual's gender.

**Examples of Gender-Based Harassment** - Specifically, under this policy, in providing any aid, benefit, or service to a student, the University shall not:

(1) treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;

(2) provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;

(3) deny any person any aid, benefit, or service;

(4) subject any person to separate or different rules of behavior, sanctions, or other treatment;

(5) apply any rule concerning the domicile or residence of a student or applicant, including eligibility for fees and tuition;

(6) aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of gender in providing any aid, benefit or service to students; or

5

  (7) otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

G. **Gender Expression** - The physical manifestation of one's gender identity, usually expressed through clothing, grooming, mannerisms, chosen names, and social interactions that associate with the social definitions of masculinity and femininity, rather than birth sex.

H. **Gender Identity** - A person's self-conception of being a man or woman or boy or girl.

I. **Marital Status** - The legal status of being married or unmarried.

J. **Preponderance of Evidence Standard**- The standard upon which all complaints will be reviewed and decided. Under this standard, if the evidence suggests that it is more likely than not that the alleged incident occurred (51% likely), there will be a finding that a Title IX violation has occurred.

K. **Respondent** - The party accused of committing a Title IX policy violation

L. **Responsible Employee** - Every individual employed by Howard University and Howard University Hospital. **ALL** Responsible Employees have a duty, an obligation and a responsibility to report any known or suspected violation of this policy to a Title IX Officer as soon as he or she learns of it, no matter how he or she learns of this information.

M. **Sexual Assault** - Rape, attempted rape, forced sexual intercourse including forcible sodomy, sexual assault with an object and/or sexual battery; any unwanted sexual contact or threats; and any non-consensual sexual contact, including unwanted touching or forcible fondling.

N. **Sexual Harassment**- Unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

  (1) submission to such conduct is made either explicitly or implicitly a basis for any decision affecting the terms or conditions of participation in any such program or activity or status in an academic course; or

  (2) such conduct has the purpose or affect of unreasonably interfering with a student's educational right, privilege, advantage, or opportunity; or

  (3) such conduct is so pervasive or severe that it creates an intimidating, hostile, or offensive environment for learning and has no reasonable relationship to the subject matter of the relevant course of instruction.

**Examples of Sexual Harassment** - The **following examples** are illustrative of conduct that, if proven, may be considered by the University to establish sexual harassment in an academic setting:

(1) unsolicited, unwelcomed flirtations, advances, and/or propositions of a sexual nature;

(2) insults, jokes, or anecdotes that belittle or demean an individual or a group's sexuality or gender;

(3) unwelcomed sexually-oriented gestures, verbal expressions, or comments of a sexual nature about an individual's body, clothing, or sexual experience;

(4) inappropriate displays of sexually suggestive objects or pictures;

(5) unnecessary and inappropriate touching, such as hugging, or brushing against an individual's body; patting, pinching,

(6) sexual assault (includes all incidents of "criminal sexual conduct" as defined by the District of Columbia Code or the applicable law where the sexual assault takes place); or

(7) suggestions that submission to or rejection of sexual advances will affect decisions regarding such matters as an individual's employment, work assignments, status, salary, academic standing, grades, receipt of financial aid, or letters of recommendation.

O. **Sexual Misconduct** - Sexual assault, sexual harassment, sexual exploitation and sexual intimidation.

P. **Sexual Orientation** - An individual's natural preference when developing emotional and/or sexual relationships with people of the same sex (homosexual relationships), opposite sex (heterosexual relationships) or either sex (bisexual relationships).

Q. **Sexual Violence** - Physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's intellectual or other disability and/or use of drugs or alcohol. Acts of sexual violence include rape, sexual assault, sexual battery, and sexual coercion. Sexual violence is a form of sexual harassment prohibited by federal and local law.

R. **Stalking** - A course of conduct that is unwanted, unwelcome and unreciprocated directed at a specific person that would cause a reasonable person to feel fear. Examples of stalking behaviors include, but are not limited to:

(1) Waiting outside a person's class or residence.
(2) Sending unwanted letters, phone calls, emails, texts, posts to a person.
(3) Following the person.
(4) Sending gifts.
(5) Sending information to others about the person.
(6) Threatening the person.
(7) Vandalizing the person's property
(8) Tracking the person's computer and internet use.
(9) Posting improper messages on social media about the person.

S. **Title IX Officers** - Individuals tasked with the responsibility of investigating all complaints alleging harassment or discrimination under this policy and training the

University community about Title IX and this policy. Title IX Officers include the Title IX Coordinator, the Deputy Title IX Coordinator and any other investigators working under the leadership and direction of the Title IX Coordinator.

T.  **University Community** - All members of the Howard University community including, but not limited to, members of the Howard University Board of Trustees, students, faculty, administrative personnel, staff and those who are conducting any type of business on any of the University premises, i.e., independent contractors and individuals engaged and/or participating in educational or other activities hosted by the University.

## V.   POLICY PROCEDURES

In determining whether alleged conduct constitutes harassment or discrimination under this policy, the University will look at the entire record as a whole and consider the totality of the circumstances. This inquiry will examine information such as the nature of the sexual advances and the context in which the alleged incidents occurred. All determinations of the appropriateness of a particular action will be based upon a thorough and comprehensive review the facts, and made on a case-by-case basis utilizing the preponderance of the evidence standard.

### A.  Rights of the Complainant

Any student member of the University community who believes that he or she has been subjected to harassment or discrimination, in violation of this policy, is urged to promptly pursue the matter and to file a complaint, as advised below. Additionally, any person who knows or has reason to know that a student has been subjected to harassment or discrimination is also urged to promptly report this information to a Responsible Employee or to file a complaint with a Title IX Officer.  The complaining party will not be reprimanded, retaliated against, or discriminated against in any way for initiating an inquiry or complaint in good faith.

> **The Title IX Coordinator is Carol McKinnon. She is located in:**
> **Carnegie Hall**
> **2395 6th Street, N.W., Suite 200**
> **Washington, D.C. 20059**
> **Phone: (202) 806-4343        Email: cmckinnon@howard.edu**
>
> **The Deputy Title IX Coordinator is Candi Smiley. She is located in:**
> **The Administration Building**
> **2400 6th Street, N. W., Suite 306**
> **Washington, D.C. 20059**
> **Phone: (202) 806-2561        Email: candi.smiley@howard.edu**

All Complainants have a right to have an advocate of his or her choosing present during any meeting or proceeding related to this investigation.  However, when present, advocates are not permitted to speak or otherwise provide advice or counsel during any meeting or proceeding conducted in accordance with this policy.

**B. Rights of the Respondent**

A person against whom a complaint is lodged shall be presumed innocent of that charge unless and until a thorough and comprehensive investigation has been conducted and there is a final administrative finding of culpability or a stipulated admission to the charge by that person.

Respondents have a right to have an advocate of his or her choosing present during any meeting or proceeding related to this investigation. However, when present, advocates are not permitted to speak or otherwise provide advice or counsel during any meeting or proceeding conducted in accordance with this policy.

**C. Procedures for Investigating and Resolving Sexual Harassment and Gender-Based Discrimination Complaints in Educational Programs or Activities**

(1) Immediate Assistance For Victims of Sexual Misconduct and Sexual Violence

## Medical Services

If a student has been the victim of sexual misconduct or sexual violence, he or she may need to receive medical treatment. Medical services are available at:

Howard University Hospital
2041 Georgia Avenue, N.W.
Washington, D.C. 20060
Phone: (202) 865-1131

Students can also receive medical services at:
Howard University Student Health Center
2139 Georgia Avenue, N.W.
Washington, D.C. 20059
Phone: (202) 806-7540

NOTE: **Rape Kits and SANE Exams are ONLY** available at:

**WASHINGTON HOSPITAL CENTER**
**110 Irving St. N.W.**
**Washington, D.C. 20010**
**Phone: (202) 877-7000**

## Support Services

Support Services are available through:

> The Howard University Interpersonal Violence Prevention Program
> 2225 Georgia Avenue N.W. Suite 508
> Washington, D.C. 20059
> Phone: (202) 238-2382

> -and-

> University Counseling Services
> CB Powell/School of Communications Building
> 6th and Bryant Streets, N.W.
> Washington, D.C.
> Phone: (202) 806-6870

## Law Enforcement Assistance

Victims of sexual misconduct and sexual violence are strongly encouraged to immediately contact the Howard University Department of Public Safety (DPS) and/or the Metropolitan Police Department in order to report such incidences to law enforcement.

The Howard University Department of Public Safety may be reached at:

> **Department of Public Safety**
> **2244 10th Street, N.W., Suite 270**
> **Washington, D.C. 20059**
> **Phone: (202) 806-1100**

The District of Columbia Metropolitan Police Department may be reached at:

> **Metropolitan Police Department**
> **1620 V Street, N.W.**
> **Washington, D.C. 20009**
> **Third District Main Phone: (202) 673-6815; or**
> **The Detectives Office Phone: (202) 673-6918**

(2) Filing a Complaint

Any and all potential violations of this policy, including known and/or suspected harassment or discrimination by or against a student should immediately be brought to the attention of a Title IX Officer or a Responsible Employee. This includes acts of discrimination, harassment and retaliation that are committed by other students, faculty or staff members, administrative personnel at the University and at Howard University Hospital, individuals doing business on University property, those engaged in educational or extracurricular activities on University property and visitors. When reporting such incidences, the Complainant should do his or her best to provide as much information as possible, including, but not limited to, the name of each person involved, the date and time of the incident, the location where the incident occurred, a specific description of what occurred and any other information on which the complaint is based.

Immediately upon learning of a potential violation of this policy, the Responsible Employee must contact either the Title IX Coordinator or the Deputy Title IX Coordinator to report any and all known information related to the incident.
All complaints that are brought to the attention of a Responsible Employee must be submitted to a Title IX Officer.

Students are encouraged to consult with the Title IX Coordinator or the Deputy Title IX Coordinator if they have any questions regarding this policy, including, but not limited to, the appropriateness of filing a complaint.

Once the Complainant files a complaint, the Title IX Officer will commence an investigation in accordance with this policy.

**NOTE:** If the performance of a duty or responsibility, under this policy, creates an actual or apparent conflict of interest or is a violation of another University policy, the General Counsel may reassign duties and/or responsibilities of such employees on a case-by-case basis to avoid such conflict or violation. The General Counsel will make all conflict of interest determinations.

Moreover, in addition to or instead of the persons described in the preceding paragraphs, a student may file a complaint of sexual harassment, gender-based discrimination, or discrimination based on race, color, or national origin with the United States Department of Education, Office for Civil Rights ("OCR"). The address and telephone number of the appropriate OCR District are as follows:

U. S. Department of Education
Office for Civil Rights
District of Columbia Office
400 Maryland Avenue, S.W.
Washington, D.C. 20202-1475
Telephone: (202) 453-6020
FAX: (202) 453-6021
TDD (877) 521-2172

### (3) Time of Filing

Students are encouraged to file a complaint within 120 calendar days following the date of the alleged harassment or discrimination. However, the University will investigate each and every complaint filed regardless of when the incident is reported. While the University is firmly committed to protecting all students from harassment or discrimination in educational programs or activities, failure to timely file a complaint with a Title IX Officer or a Responsible Employee may adversely affect the ability of the University to take any remedial action under this policy.

### (4) Notice to the Respondent

The Respondent shall be informed, in writing, of the complaint and the allegations made against him or her. The Title IX Officer will notify the Respondent of the allegations within 10 calendar days of receiving the complaint and speaking with the Complainant to learn more information, and/or the person who experienced the action if the complaint was submitted by a third party, when necessary. Upon receipt, the Respondent will then have an opportunity to submit a written response to the charges. This response must be submitted to the Title IX Officer within 7 calendar days of receiving notice of the complaint.

Please be advised that any allegations of sexual harassment, sexual misconduct or sexual violence may also be criminal violations. As such, any information obtained during the course of an investigation may be subject to review and action by law enforcement.

### (5) Confidentiality

To the fullest extent practicable, complaints of harassment or discrimination will be processed confidentially and consistently with the University's need to investigate and take corrective action against such behavior. While the vast majority of investigations involve disclosure of the Complainant's identity to the Respondent, there may be situations where state and/or federal law prohibits disclosure or where the Complainant requests for his or her identity to remain confidential during the course of the investigative proceedings. Therefore, unwillingness to be identified should not prevent a person from reporting and filing a complaint.

In the event a Complainant requests to keep his or her identity anonymous, the Title IX Officer will inform the Complainant that the confidentiality request may limit the University's ability to respond to the allegations and address the University's provisions against retaliation.

If the Complainant continues his or her request for confidentiality, the University will take all reasonable steps necessary to investigate the allegations contained in the Complaint. However, the University cannot guarantee complete confidentiality, especially if the Title IX Officer, after consultation with the Office of the General Counsel, determines that resolution of the complaint requires disclosure to conduct an effective investigation or that confidentiality concerns are outweighed by the University's interest in protecting the safety,

12

welfare, and well-being of others. Additionally, once a Title IX Officer knows or has reason to know of a potential violation of this policy, the Title IX Officer must use reasonable efforts to determine the threat to the University and investigate the allegations based upon the information provided/supplied by the Complainant.

The University is committed to maintaining the confidentiality of all Title IX matters as well as the confidentiality of any and every individual participating in or aware of an investigation.   Any willful and/or deliberate breach of this confidentiality is strictly prohibited and may result in disciplinary action, up to and including suspension, expulsion or termination.

(6) Interim Remedial Measures

Promptly upon learning of potential harassment or discrimination, the Title IX Officer will consult with the Complainant to determine whether interim remedial measures should be taken to alleviate problems or conflicts that currently exist or that may arise while the investigation is pending. Such measures may involve either the Complainant or the Respondent and may include, but are not limited to, academic & residential accommodation, as well as no-contact orders for students; work reassignments for faculty or staff members, administrative leave, or excusable absences from class and/or work assignments as well as no-contact orders. Such measures, however, shall not be considered disciplinary action against any person and may only be taken with the concurrence of the Provost and/or an appropriate Cabinet-level administrator, after consultation with the Office of General Counsel.

(7) Investigation

The Title IX Officer will have 60 calendar days to conduct an impartial, thorough and timely investigation of all complaints alleging harassment or discrimination under this policy. In the event, additional time is needed, the Title IX Officer will notify the Complainant, in writing, that additional time is needed for completion of the investigation.

Please note, at any time, the University may decide that it is in the best interest of the University to have an outside law firm or consultant conduct a Title IX investigation. In these instances, the Title IX Officer, with the concurrence of the General Counsel, may delegate an investigation to one of these entities. Any law firm or consultant used shall be selected and retained solely by the General Counsel. In the event an outside law firm or consultant is used to conduct an investigation under this policy, the resulting Report of Investigation may be disclosed only to the extent authorized by the General Counsel.

(8) Methods of Investigation

Investigations **must** include an interview of the Complainant and **may** include one or more of the following fact-finding methods:
   a.  Review of all relevant documents including, but not limited to, academic  and judicial records, emails, social media posts and communications, pictures, phone

records, text and voicemail messages, handwritten notes, and law enforcement reports;

b. Personal interviews of Faculty, students, administrators, staff and other persons who may have knowledge or information relevant to the allegations in the complaint; or

c. Letters of inquiry by the Title Officer to those person's described in (b) above.

(9) <u>Resolution</u>

Once the investigation has been completed, a Report of Investigation shall be prepared by the Title IX Officer (or the designated outside law firm or consultant). In most circumstances, this Report will be submitted to the Provost. However, in the event the Alternative Procedures are invoked, the Report of Investigation will be submitted in accordance with that provision. Alternative Procedures are set forth below in Section (11).

The Report shall contain a description of the complaint, a statement of the methodology used to investigate the complaint, findings of material fact, and a recommendation from the Title IX Officer as to whether the allegations are sustained by the facts. If the Title IX Officer determines that the University's Title IX policy has been violated, the Report shall also contain a recommendation stipulating what sanctions, if any, are appropriate under the circumstances. This Report must be completed within the 60-calendar day investigation period. Please note, this Report is for internal purposes only and will not be shared with any party.

The Title IX Officer will then forward the Report of Investigation to the Provost. Upon receipt, the Provost will then have 10 business days to review the report and determine if he or she: 1) agrees with the findings and the recommended disciplinary action; 2) agrees with the findings but disagrees with the recommended disciplinary action; or 3) disagrees with the findings. In the event the Provost disagrees, in whole or in part, with the recommendations of the Title IX Officer, the Provost will make the appropriate changes and his or her changes will constitute the final decision on the matter.

(10) <u>Outcome Notification</u>

Once the Provost has rendered a decision, both the Complainant and the Respondent will be contacted to schedule an individual Findings Meeting. Initial contact to schedule the meeting will be made within 10 calendar days of the date the Provost renders his or her final decision. During this meeting, each party will be notified of the results of the investigation. In the event the allegations are sustained, both parties will be apprised of the sanctions rendered by the Provost. Once the Provost has rendered his or her decision, that decision is final and may not be appealed to any other authority.

In the event that the allegations are sustained against a Faculty or staff member, within 10 calendar days of the last Findings Meeting, the Title IX Officer will forward the recommended sanctions to the appropriate University Officer as follows:

| | |
|---|---|
| Faculty: | Provost and Chief Academic Officer |
| Staff: | Director or Department Head |
| Hospital Staff: | Associate Vice President for Administration and Operations |

Recommended sanctions for Faculty or Staff may include, but are not limited to: administrative leave without pay; restitution; suspension; requirement to receive counseling through the Employee Assistance Program; Title IX training, a no contact order, a campus-wide barring order, a requirement to cease doing business with the University or termination

In the event that the allegations are sustained against a student, within 10 calendar days of the last Findings Meeting, the Title IX Officer will forward the imposed sanctions to the Office of Judicial Affairs for implementation and execution.

Recommended sanctions for students may include, but are not limited to: academic and/or social probation; disciplinary probation; community service, restitution; limited-term suspension; indefinite suspension; expulsion; a campus-wide barring order; a no contact order; a written apology; a requirement to receive counseling through the University Counseling Service; and/or Title IX training.

Upon receipt, the appropriate University Officer will be responsible for implementing the imposed sanctions.

Even if no harassment or discrimination has been found, the Provost may determine that one or both parties should receive training on Title IX, alcohol consumption, drug use or any other subject matter relevant to the information contained within the Report of Investigation. Training is neither designed to be nor considered to be a punishment and will not be characterized as such; however, if training is recommended, completion is mandatory.

(11) <u>Alternative Procedures</u>

If the Provost, Vice President (or person of similar rank) is the subject of a complaint of harassment or discrimination, the Title IX Officer will forward the Report of Investigation to the President, who will make the final determination regarding appropriate sanctions. If the President, in his individual capacity, is the subject of such a complaint, the Title IX Officer shall immediately notify the General Counsel who, in turn, will recommend a special investigative protocol to the Chairman of the Audit and Legal Committee of the Board of Trustees. Thereafter, the complaint shall be investigated as directed by said Committee.

## VI.   SANCTIONS

Engaging in any act that is found to be a violation of this policy, or failing to carry out the responsibilities established by this policy, will give rise to disciplinary action, up to and including separation from the University.

In all cases, the appropriate University Officer is responsible for imposing all sanctions. Additionally, after consultation with the Title IX Coordinator, the appropriate University Officer is responsible for taking any recommended remedial action necessary to promptly and effectively eliminate the harassment or discrimination, prevent its recurrence, and protect the Complainant from future incidents.

## VII.   HYPERLINKS

www.howard.edu/policy

Emergencies & Alerts

Related Policies:

> 600-001 Student Code of Conduct
> 400-011 Response to Domestic Violence, Dating Violence, Sexual Assault and Stalking Policy
> 600-002 Student's Privacy Rights Policy (FERPA)

Resources:

> Title IX: U.S. Department of Education



# HOWARD
## UNIVERSITY

Office of the Provost and
Chief Academic Officer

May 24, 2017

Professor Reginald Robinson
Howard University School of Law
2900 Van Ness Street, NW
Washington, DC  20008

Re:  Notice of Findings, Howard University Title IX Policy

Dear Professor Robinson,

I am in receipt of your correspondence and supporting documentation dated May 15, 2017, in which you disagree with the findings of your Title IX investigation, and request reconsideration or an appeal.  You were found responsible for violating the Howard University Title IX (Student) Policy on Prohibited Sexual Harassment and Gender-Based Discrimination In Education Programs and Activities. As a result, you are subject to the disciplinary actions listed in your Notice of Findings letter, dated May 4, 2017.

In accordance with the Howard University Title IX Policy, I serve as the Howard University Provost and Chief Academic Officer and, therefore, the Title IX Decisional Authority. As with all cases, I carefully reviewed the recommendation from the Title IX Office before rendering a decision in this matter.  The decision reached in your Title IX matter is final, and is not subject to reconsideration or appeal.

In closing, the University's findings, determinations, and the sanctions imposed related to the Title IX investigation in which you were found to have violated the University's Title IX Policy stand.

In Truth and Service,

Anthony K. Wutoh, Ph.D, R.Ph.
Provost and Chief Academic Officer



**Reginald Robinson**

Re: Email

May 18, 2017 at 11:41 PM

Wutoh, Anthony K.

**Reginald Robinson**, **Reginald Robinson**

Dear Dr. Wutoh:

I'm just seeing this email.

I couldn't get to commencement due to getting my son ready for an overnight playdate.

Nevertheless, thanks for replying to me.

I trust you and yours are well.

Sincerely,

Reggie

Reginald Robinson
http://humangodsandsocialrealities.blogspot.com/
http://ssrn.com/author=937283
heru.hermes@gmail.com

CONFIDENTIALITY: This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Thank you.

On May 15, 2017, at 9:48 AM, Wutoh, Anthony K. <awutoh@Howard.edu> wrote:

Professor Robinson,

Good morning. I am in receipt of your email, and anticipated speaking with you during the Commencement programs. While that did not occur, I will follow up shortly. Thank you.

AKW

"Excellence in Truth and Service"

Anthony K. Wutoh, Ph.D., R.Ph.
Provost and Chief Academic Officer
Howard University
2400 Sixth Street, NW
Washington, DC 20059
202-806-2550
202-806-4971 (fax)
awutoh@howard.edu

202)-806-2350
(202) 806-4971 (fax)
awutoh@howard.edu

<Letter of Response - Reginald Robinson - 515 1-.pdf>

**Reginald Robinson**
Re: Response to Inquiry
May 25, 2017 at 12:27 PM
Wutoh, Anthony K.
**Reginald Robinson**, **Smiley, Candi N**

Dear Provost Wutoh:

I write to tell you that I received your early morning letter to me in which you rejected my appeal of the findings against me.

Today, I have filed academic freedom violations against Howard University with the AAUP.

In the next three weeks, I'll find a formal grievance with the Faculty Grievance Commission.

Sincerely,

/s/

Reggie L. Robinson
Professor of Law

Reginald Robinson
http://humangodsandsocialrealities.blogspot.com/
http://ssrn.com/author=937283
heru.hermes@gmail.com

CONFIDENTIALITY: This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Thank you.

On May 25, 2017, at 11:10 AM, Wutoh, Anthony K. <awutoh@Howard.edu> wrote:

Professor Robinson,

Good morning. Please find attached a response to your inquiry regarding the Title IX investigation. Thank you.

AKW

"Excellence in Truth and Service"

Antony K. Wutoh, Ph.D., R.Ph.
Provost and Chief Academic Officer
Howard University

From: **Reginald Robinson** hera hermes @gmail c
Subject: I Need Your Help and Reasonable Judgment
Date: May 25, 2017 at 3:52 AM
To: stacy.mobley @gmail.com
Cc: Reginald Robinson hera hermes@gmail.com

Dear Chairman Mobley:

You may recall that I along with 14 law professors wrote to you in support of President Frederick and Provost Wutoh when the Faculty Senate had taken a no-confidence vote against them.

To be sure, I still support them both.

Yet, I find myself in need of your help because the board of directors at Howard is bound by good faith, due care, and decisions in the best interest of Howard University.

In fall 2015, I used the word "genitals" in a hypothetical in an effort to help my students learn when an agent has used fraud or deceit to tortiously touch a client's body. In the hypothetical, the client agreed to get a brazilain wax, which required touching to complete the service. The issue was whether the touching was induced by fraud. It was not, and so the answer was no.

What's ironic is that hypothetical involves nothing related to sex, sexual activity, or words or conduct of a sexual nature. Nothing! The point of the hypothetical is that the client didn't suffer any sex-based crimes or tort.

Unfortunately, two law students reacted to my use of the word "genitals" which does not mean sex, sexual activity, unwelcome sexual advances, requests for sexual favors, and verbal, nonverbal, or physical conduct of a sexual nature. Nor is the word severe or pervasive such that it creates a hostile, offensive, or intimidating classroom environment. Because the word was used in connection with teaching Agency Law, it also falls under Howard's academic freedom contractual rights.

On 04 May 2017, I met with Provost Wutoh who read the findings against me for quid pro quo sexual harassment and hostile environment sexual harassment. I was shocked to say the least. Then he said something equally shocking to me: "It's not like you were caught chasing a student around your office." By those words, he unwittingly acknowledged that no sexual activity, the legal predicate for a finding of sexual harassment, took place. Without these such sex (actual intercourse or seeking sexual intercourse from a student) or sexual conduct, no legal predicate exists for a findings of sexual harassment.

In response, I wrote to him a 32-page letter/memo, which I've attached, that sets forth the legal standards by the United States Supreme Court, federal courts, and OCR 1997 Sexual Harassment Guidance.

But he stands behind Ms. Smiley's factually unsupported findings.

I'm a Bison through and through, having completed my undergraduate degree at Howard in 1981.

I joined the law school faculty in 1994, and I've always been an employee in excellent standing.

Now, my personal and professional reputation has been sullied because two Howard adult law students reacted, even though they were not harassed, to the word "genitals."

I appeal to you because the board of directors has a fiduciary duty to the University, and you are chargeable with fulfilling that duty. Given that Provost Wutoh's decision should have been made in good faith, with due care, and in the best interest of Howard, he cannot have acted in good faith and due care if not factual or legal basis existence to sustain these allegations against me.

I am quite confident that if your outside legal counsel were to read my letter/memo, which is not perfect, he/she would agree with me that "genitals" standing alone cannot meet the legal standard for Title IX violations.

I appealed to Provost Wutoh privately because I was certain, but clearly wrong it appears, that if he knew the correct legal standard, he would vacate the unfounded allegations against me. By doing so privately, I was certain that Provost Wutoh would act in good faith and with due care. (As you know, the corporate standard when an agent takes an action while he or she is within the scope of his or her employment is whether the agent's actions are grossly negligent. Given that I teach corporate law, I can't imagine now Provost Wutoh's unwillingness to apply the correct legal standards satisfies the good faith and due care standard to Howard and to faculty like me.)

I also appeal to you because even though he did not explain the factual or legal basis for his affirming the investigator erroneous findings, I cannot appeal the findings to Provost Wutoh again.

Thanks in advance for taking your attention from your busy schedule giving it to this matter.

Sincerely,

/s/

Reginald Leamon Robinson,
Professor of Law



Reply Letter to Provost
Wutoh - Le...th 2017.pdf

Notice of Findings -
Provost.pdf

Reginald Robinson
http://humangodsandsocialrealities.blogspot.com/
http://ssrn.com/author=937283
heru.hermes@gmail.com

CONFIDENTIALITY: This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Thank you.



HOWARD
UNIVERSITY

School of Law

CONFIDENTIAL

15 May 2017

Anthony K. Wutoh, Ph.D., R.Ph.,
Provost & Title IX Decisional Authority
Office of the Provost
Howard University
2400 Sixth Street, N.W.
Washington, DC 20059

RE:   *Notice of Findings of Sexual Harassment*

Dear Mr. Provost:

## I. INTRODUCTION

In response to the *Notice of Findings* that I received on 04 May 2017 from Dr. Anthony K. Wutoh, Provost ("Provost") and Ms. Veronica Love ("Ms. Love"), I write because I DISAGREE with the findings of sexual harassment against me, and to present you with the correct legal standards under which the allegations against me for sexual harassment must be evaluated.   Based on § IV. N. (2) or (3),[1] Ms. Smiley found that sufficient evidence existed to sustain the complainants' allegation of sexual harassment, i.e., *quid pro quo* sexual harassment, and hostile environment sexual harassment.[2]   By relying on those sections of Howard University's Title IX Policy ("Howard 2015 Policy"),[3] and by finding that I had engaged in *quid pro quo* sexual harassment and hostile environment sexual harassment, Ms. Smiley must have conclusively presumed that the students' subjective feelings, however unreasonable, determined and sustained the allegations against me.   By accepting Ms. Smiley's unsupported findings, the Provost has acted arbitrarily and capriciously and has violated the terms and conditions of my employment

---

[1]       During my Mandatory Sensitivity Training with Ms. Love on 10 May 2017, she told me that statutory basis on which Ms. Smiley had relied to find that my words or physical conduct were sexual harassment, which was sufficient evidence to sustain the complainants' allegations against me for sexual harassment.

[2]       *See Sexual Harassment Guidance:  Harassment of Students' by School Employees, Other Students, or Third Parties*, OFFICE OF CIVIL RIGHTS, DEPT. OF EDU., at *2, 62 FR 12034 (1997) (hereinafter cited as *Sexual Harassment Guidance 1997*), *available at* https//www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html. [page designation track printed out doc file – attached].

[3]       HOWARD UNIVERSITY TITLE IX (STUDENT) POLICY ON PROHIBITED SEXUAL HARASSMENT AND GENDER-BASED DISCRIMINATION IN EDUCATION PROGRAMS AND ACTIVITIES § IV. N., at 14, (Effective Date: 31 May 2015) (hereinafter cited as HOWARD 2015 POLICY).



contract with Howard University, particularly my contractual right of academic freedom.[4]

Under the United States Supreme Court ruling in *Oncale v. Sundowner Offshore Services, Inc.*,[5] and federal court rulings like *Crandell v. New York College of Osteopathic Medicine*,[6] *every* sexual harassment allegation, despite the complainants' subjective feelings, must be evaluated under the reasonable person's perspective.[7] Unfortunately, Ms. Smiley, and thus the Provost, either didn't know of *Oncale*'s requirements, or knew of the requirements and refused to apply them in investigating the allegations against me.

By not applying *Oncale* requirements, the Provost has been led wrongly to adopt Ms. Smiley factually unsupported findings. Had Ms. Smiley applied *Oncale*'s requirements, had she viewed "genital" in the social context of law school education and a class on Agency Law, and had she not overreacted by conclusively presuming that the complainants' subjective feelings, however unreasonable, were determinative of any finding of sexual harassment,[8] she would have found that "genitals", standing alone, did not necessarily mean vagina, and that on 17 September 2015, I did not engage in unwelcome sexual advances, did not request sexual favors, and did not use other words or physical conduct of a sexual nature. And she would have found that, in this social context, "genitals" was not sexual conduct that, when viewed from the perspective of the reasonable student, was objectively severe or pervasive. Without any factual evidence of objective severity that tangibly denied educational benefits to which the complaining students were entitled, or without any words or physical conduct of a sexual nature that was sufficiently severe, persistent, or pervasive, which created a hostile classroom environment, Ms. Smiley could only find improperly and wrongly that sufficient evidence sustained the allegations. And, because § 261 of RESTATEMENT (2D) AGENCY deals with the agent stealing money for third parties[9] and with the agent engaged in tortious conduct to the third parties' bodies,[10] Question 15's use of "genital" was reasonably related to the subject matter of Agency Law.

---

[4]     *See* HOWARD UNIVERSITY FACULTY HANDBOOK § 2.8.2, at 2-61 (1993).

[5]     523 U.S. 75 (1998).

[6]     87 F.Supp. 304 (2000).

[7]     *See* Oncale v. Sundowner Offshore Service Inc., 523 U.S. 75, 81 (1998) ("We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"). *See also* Crandell v. New York College of Osteopathic Medicine, 87 F.Supp.2d 304, 314 (S.D. N.Y. 2000) (in adopting *Oncale*'s Title VII jurisprudence, the court found that in order to state a claim of hostile environment sexual harassment under Title IX, the consequences as alleged by plaintiff under this classification had to "analyzed from the perspective of a reasonable person.").

[8]     *See, e.g.*, Willow Springs Condominium Owner's Ass'n, Inc. v. The Ranches, L.C., 2015 WL 12731319 (Utah Dist. Ct., Oct. 27, 2015) (Conclusive presumption "is a substantive rule of law directing the proof of certain facts conclusively provides an additional fact that cannot be rebutted. Most often presumptions operate to give an opening advantage as to the burden of proof, an advantage that can be lost by a showing of contrary facts by the opposing side, but in the case of a conclusive presumption there is no opportunity for rebuttal. The position to make a presumption conclusive rests upon ground of expediency or policies so compelling in character as to override the generally fundamental requirement that questions of fact must be resolved according to the proof.").

[9]     *See, e.g.*, Grease Monkey International, Inc. v. Montoya, 904 P.2d 468 (1995) (en banc) (corporation's CEO and Chairman of the Board, while acting with apparent authority, from 1983 to 1991, received payment for personal use from plaintiffs, even though they thought that were investing in corporate securities).

[10]     *See, e.g.*, Bowman v. Home Life Insurance Company of America, 243 F.2d 331 (3d Cir. 1957) (defendant insurance field underwriter, who was not a doctor, and who posed as a doctor, induced female applicants for insurance to give consent while believing that he was an insurance company doctor, so that

Given the specific context of the reasonable law students in law school, who were learning about § 261 of Agency Law, and given the totality of the circumstances, it was unreasonable for Ms. Smiley to *presume conclusively* that the complainants' subjective feelings, however unreasonable, about the word "genitals" as vagina, not only constituted a word or physical conduct of a sexual nature, but also met the legal requirements of hostile environment sexual harassment.   Moreover, by adopting the complainants' feelings as determinative of whether I had engaged in sexual harassment, Ms. Smiley could not have conducted the required, thorough investigation as set forth under Howard 2015 Policy.   Had she undertaken such an investigation, applying not her personal beliefs about the complainants' determinative feelings, but rationally applying the federal court jurisprudence and OCR guidance, Ms. Smiley would have realized that nothing about "genitals," standing alone, in the specific context of a law school class on Agency Law, met the legal requirements under federal law and OCR Guidance for sexual activity that was sufficiently and objectively severe, persistent, and pervasive.

In addition, by not applying *Oncale*, the Provost has no legal or statutory basis under Howard 2015 Policy as viewed through federal court jurisprudence and OCR Guidance, and in complete derogation of my contractual right of academic freedom, to rule that I didn't have to use Question 5 to teach about the unscrupulous agent's deceit and misrepresentation who, with apparent authority, would induce the plaintiff's consent so that the agent could engage in tortious touching to the plaintiff's body.

In conclusion, Mr. Provost, I would ask that, as the Title IX Decisional Authority, you reject Ms. Smiley's findings.   Her findings have no material facts to sustain her conclusion under § IV. N. (2) or (3).   She also has no factual or legal basis to say that "genitals" means vagina, and even if hypothetically "genitals" could mean vagina, it's still appropriate for the proper training of future attorneys. Under federal jurisprudence and OCR Guidance, "genitals" does not mean words or physical conduct of sexual activity. Accordingly, based on the reasonable person perspective,[11] especially the reasonable law

---

the unscrupulous agent could tortiously touch the plaintiff intimately while pretending to examine them for a hernia.).

[11]    *See, e.g.,* Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998) ("We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."); Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1354 (4th Cir. 1995) (relying "on an objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign."); Ellison v. Brady, 924 F.2d 872, 879 (9th Cir. 1991) (adopting the reasonable woman perspective where defendant's conduct is sufficiently severe or pervasive to alter the conditions of employee and creates an abusive working environment); Lipsett v. University of Puerto Rico, 864 F.2d 881 (1st Cir. 1988) (relying on the reasonable trier of fact standard to determining that the employer's supervisors were aware that an anti-female atmosphere had been created that was pervasive and hostile to plaintiff); Crandell v. New York College of Osteopathic Medicine, 87 F.Supp.2d 304, 315 (S.D. NY. 2000 ("The consequences of the harassment are analyzed from the perspective of a reasonable person."); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 753 (E.D. Va. 1995) (the sexual based conduct must be viewed by a reasonable person to find that objective hostility or abusiveness exists in an environment); Patricia H. v. Berkeley Unified School Dist., 830 F.Supp. 1288, 1296 (N.D. Ca. 1993) ("Similarly, the OCR has recommended that when considering whether an actionable hostile environment has been created in an educational setting, the determining body should consider "the age of the victim(s); the frequency, duration, repetition, location, severity, and scope of the acts of harassment; [and] the nature of context of the incidents," in essence using a "reasonable student" standard.").

3

student's perspective, social context, and the totality of the circumstances as announced in *Oncale*, on 17 September 2015, no factual predicates existed to support such a finding. Under Howard 2015 Policy, you are not required to accept Ms. Smiley's unwarranted findings. By rejecting Ms. Smiley's unreasonable findings, your office can ensure that Howard University has reached a fair, legal, and proper resolution to the allegations against me.

## II. FACTUAL BACKGROUND: QUESTION 5 AND MY LEGAL PROBLEM-SOLVING PROCESS

### A.   *Overview.*

On 17 September 2015, I gave my students KDO 5, on which Question 5 appeared. After they completed KDO 5, we discussed and analyzed Questions 1 through 4, 6 and 7. Those questions focused on an agent's deceitful and fraudulent misrepresentation that induced plaintiffs, believing the agent had apparent authority, to give their capital to the unscrupulous agent, or to suffer a financial loss due to the agent's deceitful conduct. Unlike the other questions, Question 5 dealt with the agent's deceitful and fraudulent misrepresentation that would induce the plaintiff to give consent to the agent for tortious touching by the unscrupulous agent. In this tortious context, the plaintiff would believe that the agent had apparent authority, which means that the employer, corporation, or principal had held the agent out in a position of authority, or that the agent's conduct were benefiting the employer. With such authority or trust, the plaintiff will follow the agent's directions or instructions, not suspecting that the agent intends to harm the plaintiff tortiously.

### B.   *Question 5's Fact Situation.*

In Question 5, P, the principal or employer, owned a spa, which catered to men and women. A, the agent, was a licensed and certificated Aesthetician. T, the third party and plaintiff, entered P's establishment and approached A. T asked about a Brazilian wax because T's friend had raved about P's Brazilian and bikini waxes.[12]

---

[12]     In Google, I typed the following search term: "do men get bikini wax." In response, I got 81,300,000 results. *See, e.g.,* Jennifer Pesce, *Male Brazilian Wax & Men's Bikini Wax: What To Expect* (Updated 10 August 2016), http://hairremoval.about.com/od/bikiniwaxing/a/mens-bikini.htm. Prior to 17 September 2015, I knew that men got waxing. Yet, I didn't know the difference types of Brazilian waxing. Moreover, according to Ms. Love, the complainant(s) reacted not to waxing but to the word "genitals."

Hence, it would be unreasonable for the complainants to feel that "genitals" meant vagina, and it would be equally unreasonable for Ms. Smiley to believe that the complainants' subjective feelings, however unreasonable, controlled the meaning of "genitals" in the context of Question 5 in a Law School context, in which they were studying § 261 of RESTATEMENT (2D) AGENCY. When I met with Ms. Smiley on 13 January 2016, she repeatedly told me, even though it was not the standard as announced and applied in *Oncale* and *Crandell*, that my intent didn't matter, and the law school classroom context of learning § 261 didn't matter. Rather, Ms. Smiley told me emphatically and repeated that the complainants' feelings, even though highly subjective, determined how she would assign meaning to the word "genitals." Ms. Smiley's conclusive presumption that the complainants' feelings determined meaning under § IV. N. (2) or (3) not only ignored United States Supreme Court jurisprudence, federal rulings, and OCR Guidance, but also was clearly erroneous.

When I met with Ms. Love on 10 May 2017 for my Mandatory Sensitivity Training on Sexual Harassment under Howard 2017 Policy, she again announced the incorrect standard for evaluating sexual harassment under § IV. N. (2) or (3), telling me that the respondent's intent is completely irrelevant, and that the subjective feelings of the complainant would control the meaning that Howard University would

Given that T knew nothing about waxing, A fully informed T of the difference between a full and medium Brazilian wax. After A described the differences, T elected a full Brazilian. A then explained that A would have to touch T's body, including T's genitals or genitalia, to ensure that A removed all of T's pubic hair. T agreed. A then offered T as service contract, which T signed, and on which T initialed that A had fully informed T. Hence, A had garnered T's consent through a full and proper disclosure.

Thereafter, T got undressed in a private salon, naked from the waist down. T then got on the waxing table. To make T comfortable, A offered T hot, herbal tea, which T drank. In the salon, T listened to instrumental music. While on the waxing table, T drifted into a light sleep. Nevertheless, A completed T's waxing service.

Upon awakening, T declared that T felt funny. T then asked A if A had touched T inappropriately. Offended, A said no, and walked out.

Two weeks later, P received a letter from T's attorney, in which T alleged that A had improperly touched T. T's attorney told P that T had sought counseling, and had taken drugs for post-traumatic stress disorder ("PTSD"). In response, P, who had worked with A for 10 years, told T's attorney that P had never received such complaints about A by P's clients.

Regardless, T sued P. During pre-trial discovery, T deposed A, and as a result, P's and T's attorneys learned that despite T's feeling, A had touched T properly during the full Brazilian waxing. Despite what both attorneys knew, T nevertheless still felt that A's touching was improper.

In court, T alleged that A, cloaked with apparent authority, had induced T by false representations to rely reasonably on A and to give consent to A, so that A, while within the scope of employment, could cause tortious harm to T.[13]

Question 5's material facts are indisputable: A, while cloaked with apparent authority, did not engage in deceitful or fraudulent misrepresentations, had not falsely induced T's consent, and did not tortiously harm T. Now that these facts were established, the students must focus on the call of the question: "If P demurred, in effect saying 'Yeah, so what!' to T's pleadings, will the court find in favor of T?" The correct choice is (D), or no.[14]

C.    *Legal Problem-Solving Process.*

---

assign to allegations of sexual harassment. That's incomplete. Based on *Oncale*, the student's subjective feelings must be evaluated by a reasonable person in the student's position.

[13]    Per RESTATEMENT (2D) AGENCY § 261, "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his [or her] authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."
    Per RESTATEMENT (3D) AGENCY § 7.08, "A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission."   Section 7.08 has broadened the liability under § 261. But my students learned about how courts apply § 261 through *Grease Monkey International, Inc. v. Montoya*, 904 P.2d 468 (1995), and so I did not test them on § 7.08.

[14]    *See KDO 5, Chapter 5*, 17 September 2015 (attachment).

As I've consistently done since 2009, I asked for volunteers to tell us which of the 4 choices they had made, and to explain the analytical or cognitive process on which they relied to make that choice. By taking this approach, my students must listen and learn from each other, and if students picked (D) or the correct choice, they must still explain their process – material facts and elements of and the courts' analyses of § 261. In teaching the analytical process of legal problem-solving, I require my students to think about the material facts and substantive rules, and then to explain *why*, especially considering the case analyses that they've read, they had deduced that answer choice. Some students get the correct choice, but they can't explain *why*. That's bad. Some don't know the rules well enough, and so they can't distinguish between, say, (B) and (D). That's also bad. But as a result of our discussions and analyses of each KDO question, I help my students understand not only the required elements of the substantive rules, but also which facts apply to which elements. Ultimately, what's good about this process is that whether students have chosen the correct choice or not, they in the end will understand what they know and don't know. That's good!

What's also good about this process is that it helps my students not only with learning material facts and substantive rules, but also with readiness for the final exam and bar preparation and success.[15]

On 17 September 2015, I used this analytical process for legal problem-solving with every student who volunteered to participate. I don't "cold call" on my students, and so if they wish to explain analytically what choices they've made, they must raise their hands or verbally jump in.

On 17 September 2015, I asked for volunteers to analyze Question 5. Among those who did, I apparently chose one of the complainants.[16] But her response was factually and legally irrelevant. For subjective reasons, and rather than answering the question before her – what was your answer choice, she simply wished to tell me that: "T would not sleep." I said, "No?" She stated, "No." Again, in response, I told the entire class that I was clueless about the types of Brazilian waxes, and had to research the service. Nevertheless, I still wanted to know what choice she had made. If my memory serves me, complainant did not choose (D), or the correct choice. Accordingly, as per usual, I asked her to explain why she had made the wrong choice. She could not tell her peers or me. She then turned to the female student next to her. As in the past, this student

---

[15] On August 15, 2016, at 7:55pm, Ms. Arpine Sardaryan wrote me a "Thank You" note. In fall 2015, she'd taken my Agency, Partnership, and LLC course. In that email, she wrote:
Professor Robinson,
Although I may have given you a hard time about how difficult your class was last year, I wanted to take the time to thank you. Studying for Agency and Partnership for the bar was so much easier because of how much I learned in your class. I didn't have to learn the information anew, but rather refreshing what I had previously learned.
Thank you again, and I hope you are doing well.
Arpine Sardaryan
Howard University School of Law | J.D. | Class of 2016
University of Southern California | B.A. Philosophy | Class of 2012
arpine169@ml.com | 818.585.8848

[16] Based on my conversations with the Provost, Ms. Love, and Ms. Smiley, especially because they told me that one of the complainants felt that she had to disclose something about her personal life, I realized that the only female student to challenged Question 5 on factual grounds had to be one of the complainants. However, at no time, did the Provost, Ms. Love, or Ms. Smiley ever disclose any of the complainants' identities. Neither of them has ever confirmed my sense of who one of the complainants had to be.

usually could not assist her.   So in the interest of time and others who wished to volunteer – males and females, I moved on.

### III. Sexual Harassment and its Required Legal Elements/Tests under Howard 2015 Policy

A.     *Howard 2015 Policy: Defining Sexual Harassment.*

Under Howard 2015 Policy, § IV. N., " Sexual Harassment is defined as unwelcomed sexual advances, requests for sexual favors, *and* other verbal or physical conduct of a **sexual nature** *when*:

> "(1) Submission to such conduct is made either explicitly or implicitly a basis for any action affecting the terms or conditions of participation in any such program or activity or status in an academic course;[17] or

> "(2) Such conduct has the purpose or effect of unreasonably interfering with a student's education right, privilege, advantage or opportunity; or

> "(3) Such conduct is so pervasive or severe that is [sic] creates an intimidating, hostile, or offensive environment for learning *and* has no reasonable relationship to the subject matter of the relevant course of instruction."[18]

Fundamentally, Title IX, and thus Howard 2015 Policy, prohibits sexual harassment. However, this federal law and Policy do "not extend to legitimate nonsexual touching or other nonsexual conduct."[19]   In this regard, OCR advised that schools "not overreact to behavior that does not rise to the level of sexual harassment."[20]   That admonition implies that when complainant alleges that a kiss on the cheek by a first grader is sexual harassment, the school guided by the reasonable person's perspective should find that such behavior does not constitute sexual harassment.[21]   Basically, then, in investigating sexual harassment allegations, OCR advises teachers and administrators to use "good judgment and common sense."[22]   However, under Howard 2015 Policy, especially considering federal court rulings and OCR Guidance, certain words or physical conduct

---

[17]      On 10 May 2017, I met with Ms. Love for Mandatory Sensitivity Training on Sexual Harassment, at which time we discussed Howard's 2017 Policy.  At that time, Ms. Love informed me that Ms. Smiley had based her finding against me on § IV. N. (2) and (3).  Accordingly, I will focus my analyses on these disjunctive prongs of sexual harassment under Howard 2105 Policy.  Because Ms. Smiley had based on her findings on § IV. N. (2) *and* (3), I'll ignore the disjunctive "or" and focus on the conjunctive "and."  In either case, Ms. Smiley lacked any evidentiary bases and factual predicates to support her conclusion that, notwithstanding Title IX, Howard 2015 Policy, federal court rulings, and OCR Guidance, on 17 September 2015, I had sexual harassed complainants based on unreasonably interfering with and was adverse to the complainants' educational program *and* "hostile environment sexual harassment."

[18]      *See Notice of Findings*, Office of the Provost, dated 04 May 2017, at 1 (bold and italics added).

[19]      *Sexual Harassment Guidance 1997, supra* note 2, at *2.

[20]      *Revised Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties – Title IX,*, Office of Civil Rights, Dept. of Edu., at *3 (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html   [hereafter cited as Revised Sexual Harassment Guidance 2001].

[21]      *Id. See, e.g.,* Maryclaire Dale, Judge Overturns Expulsion for Kindergartner Touching Teacher, http://www.pottsmerc.com/article/MP/20110614/NEWS01/306149910 (holding that the school had abused its discretion for expelling a six-year child, after he touched the upper thigh, near her crotch area of an adult teacher who was sitting, and ruling that touching was developmentally normal touching).

[22]      *Revised Sexual Harassment Guidance 2001, supra* note 20, at *3.

of a sexual nature could constitute sexual harassment. Because Ms. Smiley had adopted the conclusive presumption that the complainants' subjective feelings, however unreasonable, were facts alone that were sufficient to sustain their allegations against me, and because she found therefore that I had violated § IV. N. (2) *and* (3) of Howard 2015 Policy, I'll limit my analyses to *quid pro quo* sexual harassment and hostile environment sexual harassment.

As the *Oncale* and *Crandell* courts ruled, Ms. Smiley, and thus the Provost, Title IX, and thus Howard 2015 Policy, prohibits *quid pro quo* sexual harassment and hostile environment sexual harassment. First, under *quid pro quo*, an employee or supervisor must explicitly or implicitly conditions a student's participation in an educational program or activity on whether the student will submit to "unwelcomed sexual advances, requests for sexual favors, or other verbal, nonverbal, or physical conduct of a sexual nature."[23] Under agency principles, an employee like a teacher, who had been delegated authority to give students final grades or to evaluate them for other educational purposes, becomes an agent or supervisor of Howard University.[24] Under § IV. N., *quid pro quo* sexual harassment, i.e., requesting sexual favors, when considering the totality of the circumstances,[25] would constitute sexual harassment, and under OCR's read of Title IX, one act of *quid pro quo* request for sexual favors would constitute sexual harassment by a supervisor would expose a recipient like Howard University to liability, even if it didn't have actual knowledge of the incident, and even if the student actually didn't accede to the employee's request for sexual favors.

Second, under hostile environment sexual harassment, an employee or supervisor's use of words, nonverbal, or physical conduct of a *sexual* nature would *sexually* harass other employees or students. Such words, nonverbal, or physical conduct of a sexual nature can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Such words, nonverbal, or physical conduct of a sexual nature must be "sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment."[26]

Based on federal court rulings, sexual harassment based on *quid pro quo* or hostile environment sexual harassment requires minimally involve sex or sexual activities – unwelcome sexual advances, request for sexual favors, *and* verbal or other physical conduct of a sexual nature. By unwelcome sexual advances, federal courts have meant for example having a sexually explicit talk with a student about her sexual experiences with her boyfriend, asking her if she would consider having sexual intercourse with an older man, forcibly kissing her on the mouth in the school parking lot, calling her at home and asking her to join him socially, having her excused from class and taking "her to a private office where "he subjected her to coercive intercourse."[27]

According to the Department of Education's Office of Civil Rights (OCR), sexual harassment is conduct (a) of a *sexual nature*, (b) that is *unwelcome*, and (c) that *denies* or

---

[23]   *Sexual Harassment Guidance 1997, supra* note 2, at *1.

[24]   *See id.* at 1, n. 4.

[25]   *See Crandell*, 87 F.Supp.2d at 319 ("courts have adopted a 'totality of the circumstances' approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment.").

[26]   *Id.* at *1.

[27]   Franklin v. Gwinnett County School Public Schools, 503 U.S. 60, 63 (1992).

*limits* a student's ability to participate in or benefit from a school's education program.[28] Generally, for sexual harassment, the conduct involves "explicit or implicit proposals of sexual activity."[29] Or, such conduct can be "sex-specific and derogatory terms."[30] Of critical importance, Howard University, a recipient of federal funds, would be liable if "genitals" constituted a *quid pro quo* request for assigning good or bad grades, and under agency principles, if the employee or supervisor had authority to assign grades and to use that authority to force students to submit to sexual demands, then Howard University would be liable because it had delegated its grade assigning to the employee.[31]

Given that sexual harassment refers to words or actions of a *sexual* nature, then that term – "sexual nature" – is vital for evaluating whether such words or conduct, by social context and the totality of the circumstances, when viewed from the perspective of a reasonable person (or reasonable law student's) comes within the ambit of Howard's Policy or OCR Guidance. According to *Advocates for Human Rights*, "sexual nature" means "actions, language or visual materials which specifically refer to, portray or involve sexual activity or language."[32] Importantly, "[c]onduct of a sexual nature may include

---

[28]     *See* U.S. DEP'T OF EDUCATION, OFFICE OF CIVIL RIGHTS, SEXUAL HARASSMENT: IT'S NOT ACADEMIC 3 (Wash., DC, rev., 2008) (italics added).

[29]     *Oncale*, 523 U.S. at 80.

[30]     *Id.*

[31]     *See Sexual Harassment Guidance 1997, supra* note 2, at *1, n. 6. Based on federal court rulings and OCR Guidance under Title IX, OCR would rely on agency law principles like apparent authority and the knew or should have reason to know standards to impute knowledge to a recipient, and thus would conclude that under such agency principles, a recipient like Howard University would be liable under Title IX. In this instance, OCR would be looking at what words or physical conduct qualified as sexual nature under *quid pro quo* and hostile environment sexual harassment. Here are examples of sexual nature: a professor/teacher agreeing to reexamine a student if the student permitted the professor to spank the student if the student didn't attain a better grade; professor/teacher kissed a student; professor/teacher had sexual intercourse with a student; professor/teacher had used vulgar and obscene language, posted pictures of nude women on office wall and desks; professor/teacher had engaged in unwelcome touching; professor/teacher had made sexually offensive jokes; professor/teacher had bribed student to perform sexual acts; professor/teacher had indecently exposed herself/himself to student; and professor/teacher had engaged in a year-long campaign of derogatory, sexually explicit graffiti, and had directed impermissible remarks at one student. *See, e.g.*, Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992); Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367 (1993); Lipsett v. University of Puerto Rico, 864 F.2d 881, 903-4 (1st Cir. 1988); *Kadiki*, 892 F.Supp. at 751; Denver School Dist. #1, OCR Case No. 08-92-1007 (vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure).
        Based on federal court rulings and OCR Guidance, these examples would be defined as words or physical conduct of a sexual nature. On 04 May 2017, the Provost gave another reason why Ms. Smiley believed, which he had adopted, that I didn't have to use Question 5 to teach § 261 of RESTATEMENT (2D) AGENCY. Keep in mind that the central point of Question 5 is that no deceitful or fraudulently induced consent happened and thus no tortious touching occurred. Yet, OCR used agency law to illustrate not only *quid pro quo* sexual activity, but also hostile environment sexual harassment. It is clear to me that agency law directly bears on these issues of sexual harassment. Agency law also has bearing on the risk to commercial enterprises who are providing services to the public. Anyway, OCR used agency principles to illustrate when a recipient would be liable for the actions of a professor, teacher, supervisors, or employee who induced a student's consent for sexual intercourse. The student's consent induced in this manner would not constitute legal consent at all, thus giving rise not only to a Title IX violation for *quid pro quo* and hostile environment sexual harassment, but also for a tort claim against the recipient and the professor, teacher, employee, or employee for sexual battery. *See* RESTATEMENT (2D) AGENCY, § 219(2)(d). By using "genitals," could the complaining students properly and successfully filed a cause of action against Howard University or me? Under the foregoing standards for what constitutes verbal, nonverbal, or physical conduct of a sexual nature, the answer is no.

[32]     *Sexual Harassment Is Conduct Based on Sex or of a Sexual Nature*, ADVOCATES FOR HUMAN RIGHTS, http://www.stopvaw.org/sexual_harassment_is_conduct_based_on_sex_or_of_a_sexual_nature.

overt sexual solicitations, inappropriate touching, sexual jokes and inquiries about a person's sex life."[33]

In addition, to establish sexual harassment in an educational setting, Howard's Policy offers illustrative examples. Upon a thorough investigation and a *proper* finding, Howard University may consider the following conduct, in relevant part, as sexual harassment: [1] unsolicited, unwelcome flirtations, advances, and/or propositions of a sexual nature; and [2] unwelcome sexually-oriented gestures, verbal expressions, or comments of a sexual nature about an individual's body, clothing, or sexual experience.[34]

Under Howard's 2015 Policy, in testing for sexual harassment, *viz.*, requesting sexual favors and other verbal or physical conduct of a sexual nature, the employee's or supervisor's words or conduct must be sexual and unwelcome, and the employee's or supervisor's words or conduct *must affect* a student's participation or status in academic courses, or *must unreasonably interfere* with a student's education opportunities, or *must be so pervasive or severe* that it creates an intimidating, hostile, or offensive classroom environment **and** *must have no reasonable relationship* to the study of Agency Law.[35] Even if the employee's or supervisor's words or conduct is nonsexual, it may nevertheless constitute sexual harassment. However, such nonsexual conduct must be unwelcome, must based on sex or sexual stereotypes, and effectively interferes "with a students ability to participate in or benefit from a school program" based on sex-based discrimination.[36]

## IV.  INSUFFICIENT FACTUAL EVIDENCE TO SUSTAIN A FINDING OF QUID PRO QUO SEXUAL HARASSMENT AND HOSTILE ENVIRONMENT SEXUAL HARASSMENT: AN ANALYSIS

### A.  *General.*

To sustain a claim under Title IX and § IV. N. (2) of Howard 2015 Policy, the students must allege, and Ms. Smiley has the burden of finding, that I engaged in *quid pro quo* sexual harassment by denying them access to tangible educational benefits when they refused to submit to my sexual demands.[37] The students must already be eligible for these real, tangible benefits. That is, my words or other physical conduct of a sexual nature unreasonably interfered with or deprived them of an educational benefit.[38] The students must allege that I made unwelcomed sexual advances,[39] and that I directed those advances to them individually or to them as a group of students.

---

[33]    *Id.*

[34]    *See Definitions*, HOWARD'S 2015 POLICY, § IV. N., *supra* note 3, at 14.

[35]    Under *Definition*, HOWARD UNIVERSITY TITLE IX POLICY, § N.(3), at 6-7 (June 5, 1999) (revised policy, Jan. 18, 2017), sexual harassment means unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: . . . (3) such conduct is so pervasive or severe that it creates an intimidating, hostile, or offensive environment for learning. According, Howard's 2017 Policy has deleted the language that followed the conjunction, *viz.*, "has no reasonable relationship to the subject matter of the relevant course of instruction."

[36]    *Sexual        Harassment      and      Title      IX*,      NCAA      GENDER      EQUITY, https://www.ncaa.org/sites/default/files/S%2BHarassment%2BBrochure.pdf.

[37]    *Kadiki*, 892 F.Supp. at 740; Crandell, 87 F.Supp. at 318.

[38]    *Kadiki*, 892 F.Supp. at 740.

[39]    *See, e.g.*, Davis v. Coastal Intern Sec., Inc., 275 F.3d 1119, 1122-23 (CA DC 2002) ("To make a prima facie Title VII hostile environment claim, the plaintiff employee must show: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome[ ] sexual harassment ...; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of

In *Kadiki v. Virginia Commonwealth University*, a Title IX case, to set forth a cognizable claim under *quid pro quo* sexual harassment, the complainants must allege, and Ms. Smiley must establish, the following elements:[40]   "[1] the students were subject to unwelcome sexual harassment; [2] the harassment about which they complained was based upon sex [or sexual activity]; [3] the sexual harassment unreasonably interfered with, or denied them a tangible benefit of, an educational program for which they were qualified, unless they acceded to employee or teacher's demand for sexual intercourse or other sexual activities."[41] To create liability, the employee or teacher must expressly or impliedly condition such benefit, e.g., good or bad grades, on either submitting to or rejecting such sexual demands.[42]   In *Crandell v. New York College of Osteopathic Medicine* court stated: "this standard applies equally to Title IX and Title VII cases."[43]

Moreover, the *Crandell* court, citing *Oncale v Sundowner Offshore Services, Inc.*, stated that in addition to the students alleging that an employee or supervisor made "unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature," which altered or unreasonably interfered with the condition of the complainants' education benefits, the school must investigate the students' allegations from the reasonable person's perspective.[44]   Under § IV. N. (2), the school must investigate the students' claimed consequences, and the school should not prejudge the students' allegations. Rather, the school administrators should use common sense and good judgment, while having "an appropriate sensitivity to social context."[45]

Despite the students' allegations, the mere utterance of an word like "genitals", even a charged one, which lacks a sexual nature, caused students to feel offended or emotionally stirred, and which does not unreasonably interfere with the conditions of the educational environment, will not implicate Title IX.[46]   Equally important, conduct is also beyond Title IX, when it is not severe or pervasive enough to create an objectively hostile or abusive educational environment, and when viewed from the perspective of a reasonable person,.[47]   Yet, if *reasonable* law students subjectively believes that employee's or teacher's words, nonverbal, or physical conduct of a *sexual* nature was severe or pervasive, then the words, nonverbal, or physical conduct of a *sexual* nature has altered the educational environment.   In the social context of legal education, even if "genitals" is a word of personal and social repugnance, it however is not a word of a *sexual* nature.   In *Oncale*, the Supreme Court noted that Title VII, and thus Title IX, is not a general civility code.[48]

---

unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment ...; and (5) the existence of respondeat superior liability.").

[40]     I eliminated one of Kadiki's elements, which was "the employees belong to a protected group." *See id.*

[41]     *Kadiki*, 892 F.Supp. at 751.

[42]     *Crandell*, 87 F.Supp. at 318 (adding "[professor's]" after "supervisor's").

[43]     *Id.*

[44]     *Id.* at 314-315, citing *Oncale*, 523 U.S. at 81.

[45]     *Oncale*, 523 U.S. at 82.

[46]     *See* Harris v. Forklift System, Inc., 510 U.S. 17, 21 (1993) (citing *Meritor v. Vinson*, saying that "mere utterance of an . . . epithet which engenders offensive feelings in a [sic] employee does not sufficiently affect the conditions of employment to implicate Title VII.").

[47]     *See id.* ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment − an environment that a reasonable person would find hostile or abusive − is beyond Title VII's purview.").

[48]     *Oncale*, 523 U.S. at 80.

In *Oncale*, the United States Supreme Court emphasized that courts should evaluate claims of sexual harassment from the perspective of the reasonable person, who considers "all the circumstances."[49] Likewise, in a *quid pro quo* sexual harassment case, the *Oncale* Court noted that the reasonable person's investigation of the objective severity of the sexual harassment "requires careful consideration of the social context in which the particular behavior occurs and is experienced by its target."[50] As basic elements, then, the unwelcome sexual advances, requests for sexual favors, and other word, nonverbal, or physical conduct of a sexual nature must be objectively severe. They must occur in a social context where they don't belong. And in investigating the students' claim, the school must consider the social context in which the students experienced the words or other physical conduct of a sexual nature.

Moreover, the *Oncale* Court illustrated how social context impacts claims of sexual harassment when they are investigated by a reasonable person. For example, this Court considered the social context of professional football. Writing for the *Oncale* Court, Associate Justice Scalia said that a "professional football player's working environment is not severely or pervasively abusive . . . if the coach smacks him on the buttocks as he heads onto the field."[51] Yet, back in the office, if the coach smacks the secretary, male or female, on the buttocks, the secretary would reasonably experience the coach's physical conduct as abusive.[52] Hence, what impacts a social environment depends on a "constellation of surrounding circumstances, expectations, and relationships which are not captured by a simple recitation of the words used or the physical acts performed."[53] Under the social context element, the reasonable person who investigates allegations of sexual harassment must use common sense, and must have an "appropriate sensitivity to social context," which will enable the courts to tell the difference between words of simple teasing and conduct or nonsexual conduct that a reasonable person in the students' position would find "severely hostile or abusive."[54]

According to *Crandell*, which cited *Oncale*'s standards, words or physical conduct of a sexual nature must be severe or pervasive, and the consequences must unreasonably interfere with or "limit[] a student's ability to participate in or benefit from the education program."[55] Such words or physical conduct must deny a student a tangible benefit for which a student is qualified because the student refused to accede to an employee's or supervisor's sexual demands.[56] If students complain about words or physical conduct of a sexual nature that is "isolated or genuinely trivial," such words or conduct are not severe or pervasive, and they will not give rise to a Title IX claim.[57]

In what follows, I analyze the material facts and legal standards for *quid pro quo* sexual harassment and hostile environment sexual harassment, and assert that Ms. Smiley, who had wrongly adopted the belief that the complaining students' subjective feelings, however unreasonable, conclusively presumed that sexual harassment had occurred,

---

[49] *Oncale*, 523 U.S. at 81.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.* at 82.
[54] *Id.*
[55] *Sexual Harassment Guidance 1997, supra* note 2, at *7.
[56] *See Crandell*, 87 F.Supp. at 318 ("In order to state claim for *quid pro quo* harassment, plaintiff must allege that 'a tangible employment [or education] action resulted from a refusal to submit to a supervisor's sexual demands.'").
[57] *Kadiki*, 892 F.Supp. at 753.

could not have met her burden of proof by the preponderance of the evidence for three reasons. First, under § IV. N. (2), Ms. Smiley had to apply the *Oncale*'s reasonable person's perspective, even if the students felt subjectively, and unreasonably, that "genitals" could only mean vagina.[58]  Second, she had to evaluate of social context of law school class environment where my students were learning Agency Law. Third, in addition to viewing the alleged consequences for *quid pro quo* sexual harassment through the reasonable person's perspective, Ms. Smiley had to consider the totality of circumstances, where she would also use common sense and good judgment.

Following section on quid pro quo sexual harassment, I analyze hostile environment sexual harassment.

On 04 May 2017, according to the Provost and Ms. Love, viewing the allegations through the complainants' subjective feelings, which conclusively presumed that sexual harassment must exist, Ms. Smiley relied on four (4) critical facts or factors to sustain the allegations of sexual harassment under § IV. N. (2). These facts or factors were: [1] my hypothetical, or Question 5, contained the word "genital"; [2] Complainants who sought to correct my hypothetical and others *felt*, whether reasonably or unreasonably, and without regard to my pedagogical intent, that Question 5 required them to reveal something personal about themselves, and they felt that legal problem-solving process demanded that they reveal more personal information; [3] Complainants, by voluntarily to respond at all, *felt* that they had been impacted negatively and thus sexually harassed; and [4] Ms. Smiley, and thus the Provost, the Title IX Decisional Authority, believed that I didn't have to use Question 5 to teach about agent's deceitful or fraudulent misrepresentations, falsely induced consent, and tortious touching to the third party or plaintiff.

B.   *Section IV. N. (2) of Howard 2015 Policy and Insufficient Factual Evidence to Support a Finding of* Quid Pro Quo *Sexual Harassment.*

On 17 September 2015, after my students completed taking the Knowledge Demonstration Opportunity (KDO) test on Chapter 5, which dealt with the agent's deceitful or fraudulent misrepresentation, we discussed and analyzed each question. KDO 5 had 7 questions, and although each question required the students to know § 261 and other substantive law as they had learned it, Question 5 asked the students to assess whether the agent had engaged in deceit or fraud to induce the third party's consent, so that the unscrupulous agent could provide a waxing service, while the third party believed that the agent had apparent authority, and could cause tortious harm to the third party's body.

To make these determinations, the students needed language within the hypothetical that allowed them to see that the agent had identified the different Brazilian waxes. Because we were dealing language of deceitfulness or fraudulence, my students had to see the agent explain the services. Likewise, they had to see that the third party believed or justifiably relied what the agent had said, and they had to see the third party signed the service agreement and initialized the parts, indicating the third party had been properly informed by the agent.[59]

---

[58]    *Crandell*, 87 F.Supp.2d at 315.

[59]    Two of the five required elements of tortious fraud are: [1] "intention of defendant to induce the plaintiff to act (or refrain from action) in reliance upon the misrepresentation"; and [2] "justifiable

In this hypothetical, I made it quite clear that the owner or principal served men and women.  Moreover, I used P for owner or principal of the spa.  I used A for the agent or employee.  I also used T for third party or plaintiff.  Based on these designations, the hypothetical was sex and gender neutral.

To get the correct choice to Question 5, the students had to know § 261.  They had to assess whether the A's disclosure was deceitful or fraudulent.  They had to decide whether T's consent for the service had been fraudulently induced.  Lastly, they had to determine whether A had committed a tortious act on T's body.  In the fact pattern, I established conclusively that despite T's feelings, A had not induced consent by fraud, and A had not tortiously touched T.  The call of the question asked the students to decide whether T would prevail if T sued P, the deductive answer was (D) or No.

In Question 5, I used words like "genitals," "genitalia," and "pubic."  However, according to *Merriam-Webster's Dictionary*, "genital" means "of, or relating to, the human, or being a sexual organ."[60]  This word refers also animal sexual organs, thus having a biological, reproductive, or clinical context.  I also used "genitalia," a plural noun, that refer to male and female external, reproductive organs.[61]  I also used "pubic," to modify "hair," which means "of, relating to, or situated in or near the region of the pubes or the pubis."[62]  Most importantly, "genital," "genitalia," or "pubic" do *not* mean words or conduct of a *sexual nature*, i.e., sexual activity.

But according to Ms. Smiley, Ms. Love, and the Provost who adopted Ms. Smiley's findings, my intent to teach § 261 and other agency law concepts cannot control what "genitals" means.  Rather, the students' subjective feelings, even if unreasonable, would establish the conclusive presumption on whether I had engaged in *quid pro quo* sexual harassment.  By necessity, the Provost, and through Ms. Smiley, told me that I could not explain away the students' subjective feelings.  Even though federal courts rely on objective and subjective test for sexual harassment, especially hostile environment sexual harassment, Ms. Smiley, and 04 May 2017 the Provost, posited that from the very beginning, it wasn't Ms. Smiley's thorough investigation that would determine her findings.  It would be the students' subjective feelings, even if unreasonable, that conclusively presumed that I had engaged in sexual harassment.

As such, from the very beginning, Ms. Smiley, and thus the Provost, never presumed my innocence, as required under Howard 2015 Policy.  Even more troubling, from the very beginning, Ms. Smiley didn't have to investigate the students' allegations because so long as they *felt* subjectively that Question 5's use of "genitals" meant vagina, and so long as they *felt* subjectively that by asking them to discuss Question 5 analytically I really wanted them to reveal information about their personal life, then Ms. Smiley could find, however wrong, that I had engaged in *quid pro quo* sexual harassment because I had engaged in unwelcome sexual advances.  Far more troubling, Ms. Smiley, who has a law degree, would not need to determine if Question 5's use of "genitals" constituted objective severity[63] because the students' subjective *feelings* conclusively presumed that I

reliance by the plaintiff upon the representation."  *See* W. PAGE KEETON, PROSSER AND KEETON ON TORTS 728 (5th ed. 1984).

[60]     MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 521 (11th ed. 2003).

[61]     *Id.*

[62]     *Id.* at 1005.

[63]     *See Oncale*, 523 U.S. at 81.

14

have violated Title IX and § IV. N. (2) of Howard 2015 Policy. Yet, under *Oncale*, in the social context of a law school class on Agency Law, how does Question 5's use of "genitals" constitute, when all circumstances are considered by a reasonable person, "severely hostile or abusive"?[64]

After a 504-day investigation by the Provost, even though the Howard 2015 Policy requires a finding not later than 60 days,[65] where is the factual evidence of unwelcome sexual advances, requests for sexual favors, and words or other physical conduct of a sexual nature that could arguably meet the severely hostile or abusive test? On 17 September 2015, in full view of the students, and in analyzing Question 5, I asked for volunteers. As usual, some students were eager to participate and others were reluctant. From the raised hands, I picked a female student, perhaps one of the complainants, who offered a legally irrelevant response: "T would not sleep." In response, I said: "No?" She said, "No." Given the irrelevancy of her correction, I asked her about her answer to Question 5, and I believe she didn't have the right answer. So, I asked her to explain her choice. She couldn't. She turned to the female student next to her, and as in the past, the student offered her little to no help. In the interest of time and to get other students to participate, I moved on.

On 17 September 2015, I perhaps spent no more than 2 minutes talking to that student about her answer choice. In toto, I might have spent 5 minutes on Question 5. Of the 153 KDO questions that I drafted and/or edited in fall 2015, Question 5 was the only hypothetical that dealt with the substantive issues of fraudulently induced consent and an agent's tortious touching of the third party.

Nothing in Question 5 qualified as an unwelcomed sexual advance. In *Franklin v. Gwinnett County School System*,[66] a Title IX case, the United States Supreme Court gave us very clear examples of unwelcomed sexual advances. In *Franklin*, a teacher had sexually oriented talks with plaintiff, asking her about her sex life with her boyfriend. He asked her if "she would consider having sexual intercourse with an older man." He "forcibly kissed her on the mouth." Once he got her into a private office, he had coercive sexual intercourse with her. He would call her at home and ask her to join him socially.[67] Before graduating from high school, plaintiffs sued the school, seeking monetary damages.[68]

The *Crandell* court, a Title IX case, also illustrates unwelcome sexual advances, where plaintiff alleged *quid pro quo* sexual harassment and hostile environment sexual harassment. Plaintiff, Ms. Colleen Crandell, a student at the New York College of Osteopathic Medicine ("NYCOM"), faced unwelcome sexual advances for approximately 4 years, and after graduating, she held a post-graduate internship from 1998 to 1999. In 1994, plaintiff's anatomy professor asked her out on a date, but she declined.[69] Despite her rejection, this same professor asked her out "several more time" over the semester, and at least on one occasion, he told her that: "she was pretty." Although this professor never explicitly asked her for sex, plaintiff assumed from his

---

[64]    *Id.* at 82.
[65]    *See* HOWARD 2015 POLICY, *supra* note 3, at 13.
[66]    503 U.S. 60 (1992).
[67]    *Franklin*, 503 U.S. at 63-64.
[68]    *Id.* at 63.
[69]    *Crandell*, 87 F.Supp.2d at 307.

comments and the frequency requests, he wanted her for sex.[70] Moreover, this professor arrived at plaintiff's apartment with another professor who had dated plaintiff's roommate, and after entering her apartment, he entered plaintiff's bedroom uninvited and kissed her against her will. "Plaintiff pushed him away and told him to leave the room."[71] Over the course of 5 years, plaintiff was beset by approximately 7 faculty or residents who made unwelcome sexual advances,[72] including the Lutheran Hospital Resident who put his arms around her, made numerous sexual comments to her, referred to her breast size, and after inviting her to lunch many times told her that if she declined his lunch invitation, he would fail her for the rotation.[73] In determining whether this Resident has engaged unwelcome sexual advances, the court looked at the "totality of his frequent and highly inappropriate alleged behavior toward plaintiff" to conclude that the Resident's behavior could reasonably be interpreted as unwelcome sexual advances.[74]

Based on the factual examples in *Franklin* and *Crandell*, the Provost cannot reasonably conclude that Question 5's use of "genitals" and my effort to elicit a legally and substantively relevant analysis of Question 5 constituted unwelcomed sexual advances. In this context, and social context matters, including the totality of the circumstances, "genitals" cannot mean sex, sexual activity, sexual touching, or a comment of a sexual nature. And this word doesn't imply such ideas, especially because Question 5 dealt with consensual touching so that A could provide waxing service to T. Put emphatically, Question 5 specific legal context dealt with nonsexual conduct, nonsexual activity, and consensual touching. Even if the complaining students thought hypothetically that I offended female students, and that I should have known that the complaining students would feel that "genitals" meant vagina, that word alone would be insufficient to alter the condition of their educational experience in violation of Title IX and § IV. N. (2), and accordingly, the word "genitals," standing alone, should not warrant a disciplinary action by Howard University.[75] Moreover, while in full view of the entire class, I did not engage in nonverbal conduct of a sexual nature like winking at the students, so as to alert them that something sexual was afoot. Based on my reading of Supreme Court and federal court jurisprudence, Question 5's use of "genitals" and my effort to elicit responsive analysis to that hypothetical, which I had done throughout the entire semester, do not fall within those cases or under Title IX.

In addition, nothing in Question 5's use of "genitals" and my effort to elicit analytical responses from my students could reasonably constitute a request for sexual favors. *Crandell* again, *Meritor Sav. Banks FSB v. Vinson*,[76] and *Faragher v. City of Boca Raton*[77] are instructive. In *Crandell*, plaintiff visited a cardiologist because she was suffering heart palpitations. The cardiologist was faculty at NYCOM, where she was a medical student. Upon arriving at the doctor's office, she dressed in an examination gown, and waited for the doctor in the examining room. Upon entering the room, the cardiologist asked the nurse to leave, and while examining plaintiff, he "pressed his erect penis

---

[70]     *Id.*
[71]     *Id.*
[72]     *Id.* at 308-314.
[73]     *Id.* at 318.
[74]     *Id.*
[75]     *See, e.g.,* Rogers v. EEOC, 454 F.2d 234, 238 (CA 5th Cir.), *cert. denied*, 406 U.S. 957 (1972) ("'[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII").
[76]     477 U.S. 57 (1986).
[77]     574 U.S. 775 (1998).

against plaintiff's hand, which was gripping the side of the table."[78]  She moved her hand, and "he followed and continued to press his himself against her."[79]  Although she twice returned to his office, she didn't on those occasion see him, and "plaintiff felt humiliated, violated, and fearful that there could be a negative effect on her medical career."[80]  So she didn't report this request for sexual favors.[81]

In *Meritor*, a Title VII case, Mechelle Vinson worked at Meritor as a bank teller-trainee, and during her probationary period, the branch's vice president, Sidney Taylor, initially treated her kindly as if a doting father.  During the initial phase of their work relationship, he requested no sexual favors.  Within a short time, he invited her to dinner, where he proposed, until she accepted, that they get a hotel room and have sex.  Initially, she refused, but then she agreed, fearing that if she continued to say no, she would lose her job. Thereafter, Taylor repeated demanded sexual favors, usually at work, during and after work hours.  She estimated that they had sex 40 or 50 times.  Apart from these occasions, Taylor would follow into the bathroom, if she were alone, expose himself to her, and "even forcibly raped her . . . several" times.  In 1977, after she began dating her boyfriend, Taylor and Vinson stopped having sex.[82]

In *Faragher*, a Title VII case, plaintiff, Mary Beth Faragher, who worked as a lifeguard for nearly 5 years while attending college, was sexually harassment by her supervisors, which was so pervasive, that the discriminatory behavior altered the terms of her employment.[83]  Given that the harassers were Faragher's supervisors, the United States Supreme Court ruled that the City of Boca Ration, the employer, was vicariously liable under the principles of agency law.[84]  During plaintiff's time as a lifeguard, one of her supervisors told her that she can either date him or be assigned to clean toilets for a year.[85]  On one occasion, a supervisor "pantomimed an act of oral sex" at her.  A supervisor would put his arm around her, and place his hand on her buttocks.[86]  In addition, the supervisors made it clear to a woman who interviewed as lifeguard that female lifeguards slept with their male counterparts, and asked her if she would do the same,[87] thus making a request for sexual favors appear to be an expression condition of employment or, if hired, of not getting fired.

In light of *Franklin*, *Crandell*, *Meritor Sav. Bank FSB*, and *Faragher*, Question 5's use of "genitals," even if objectively rude, offensive, discourteous, or insensitive,[88] cannot reasonably be a requests for sexual favors.  Likewise, my efforts to elicit legally relevant answers to Question 5, standing alone, and without any requests for sexual favors, cannot be reasonably viewed as an explicit or implicit condition to my students, thus denying them access to a tangible benefits for which they are already qualified, or as

---

[78]    *Crandell*, 87 F.Supp.2d at 308.
[79]    *Id.*
[80]    *Id.*
[81]    *Id.*
[82]    *Meritor Sav. Bank FSB*, 477 U.S. at 60.
[83]    *Faragher*, 574 U.S. at 780-784.
[84]    *Id.* at 794-799.
[85]    *Id.* at 780.
[86]    *Id.* at 782.
[87]    *Id.*
[88]    *Cf. id.* at 787, citing 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 349, nn. 36-37 (3d ed. 1996) ("citing cases instructing that 'discourtesy or rudeness should not be confused with racial harassment' and that 'lack of racial sensitivity does not, alone, amount to actionable harassment.'").

unreasonably interfering with their participation in the educational program. Specifically, "genitals," standing alone, cannot reasonably mean sex, an unwelcome sexual advance, or a request for sexual favors. And "genitals," standing alone, cannot also be reasonably understood to mean verbal, nonverbal, or other physical conduct of a sexual nature. Nevertheless, the sexual acts in *Crandell*, *Meritor*, and *Faragher* help us understand that "genitals," standing alone, cannot rise to the level of a request for sexual favors.

In sum, given the foregoing analyses, Ms. Smiley did not have material facts to sustain the students' allegations of *quid pro quo* sexual harassment against me.

C.    *Section IV. N. (3) of Howard 2015 Policy and Insufficient Factual Evidence to Support Hostile Environment Sexual Harassment.*

Under *Crandell*, and § IV. N. (3) of the Howard 2015 Policy, to state a claim for hostile environment sexual harassment, the students must allege, and Ms. Smiley must prove by the preponderance of the evidence, that they were subject to unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, and that this sexual behavior was sufficiently severe or pervasive that it created an intimidating, hostile, or oppressive classroom environment, *and* the sexual behavior had no reasonable relationship to the subject matter of Agency Law.[89]   This legal standard suggests that the complaining students must have alleged specifically that the employee or supervisor engaged in sexual behavior that limited "a student's ability to participate in or benefit form an education program or activity, or to create a hostile or abusive educational environment."[90]    Again, in determining whether a hostile environment sexual harassment exists, the Provost must view the complaining students' allegations from the reasonable person's perspective, taking into account the social context such as the law school educational program, using good judgment and common sense, and viewing the totality of the circumstances out of which the allegations arose.[91]

In this section, given that I have already shown analytically that on 17 September 2015, Question 5's use of "genitals" could not reasonably constitute, standing alone, an unwelcome sexual advances, requests for sexual favors, and verbal, nonverbal, or other physical conduct of a sexual nature. Yet, the question remains: can "genitals," a word, when viewed from the perspective of a reasonable person, be understood to constitute *sexual* behavior that is sufficiently severe or pervasive?    Second, when view by a reasonable person, can "genitals," standing alone, created an intimidating, hostile, or oppressive law school classroom environment?

FIRST, does "genitals," standing alone, when viewed by a reasonable person, constitute sexual behavior that is sufficiently severe or pervasive?   To this question, I answer no. As set forth in *Kinman v. Omaha Public School Dist.*,[92] the complaining students must allege, and Ms. Smiley must find factually by the preponderance of the evidence, that they were "subject to unwelcomed harassment."[93]  On 04 May 2017, when I met with the Provost and Ms. Love for my Notice of Findings, the Provost stated emphatically that the allegations against me had nothing to do with me acting inappropriately toward

---

89    *See Crandell*, 87 F.Supp.2d, at 314-315; HOWARD 2015 POLICY, *supra* note 3, at 14.
90    *Sexual Harassment Guidance 1997*, *supra* note 2, at *1.
91    *See Oncale*, 523 U.S. at 81.
92    *Kinman*, 94 F.3d 463 (1996).
93    *Id.* at 468.

students. In fact, he said that I had not chased a student around my office. By that, I presumed the Provost intimated two reasonable conclusions. First, the students' allegations against me had nothing to do with unwelcome sexual advances, requests for sexual favors, and verbal, nonverbal, or other physical conduct of a sexual nature, the very factual predicate on which a finding of sexual harassment under § IV. N. (2) and/or (3) must rest. Second, in reaching her findings, Ms. Smiley had not found legally sufficient facts to sustain the students' allegations against me for sexual harassment, e.g., verbal, nonverbal, or other physical conduct of a sexual nature.

By stating that physical conduct of a sexual nature had nothing to do with Ms. Smiley's findings, the Provost was repeating Ms. Smiley's earliest, incorrect legal standard that the complaining students' *subjective feelings*, however unreasonable, conclusively presumed that I had engaged in *quid pro quo* sexual harassment or hostile environment sexual harassment. By stating as the Provost did that the Ms. Smiley's finding against me rested on my use of "genitals" in Question 5, he had factually acknowledged that, despite the students' allegations based on their subjective feelings, I by using the word "genitals," had not engaged in unwelcome sexual advances, made requests for sexual favors, and used verbal, nonverbal, or other physical conduct of a sexual nature toward the complaining students. At that point, the Provost had explicitly acknowledged that two of the required elements of hostile environment sexual harassment in an educational context had not been satisfied,[94] and therefore by implication, Ms. Smiley had failed to find sufficient factual support for sustaining the students' allegations against me.

In *Kinman*, a lesbian teacher took a sexual interest in her student, after the student realized that the teacher was gay, and after the student wrote a letter to her, in which she told the teacher that she liked her. After receiving the letter, the teacher began staring at the student, which made plaintiff uncomfortable. But the student didn't report the incident. Later, the student became uncomfortable because she thought the teacher wanted her to be gay. Initially, the student did not welcome the teacher's sexual advances. But during one summer, after the student's junior year, the teacher and student went on a "friend date." While on this date, they went to the teacher's home, where the teacher caressed and kissed her, and where she had sex with the student. They spent the night together. After this sexual encounter, they entered into a sexual relationship.[95] Given the procedural posture of the case, which was the defendant's motion for summary judgment, one of the questions was whether the teacher's sexual advances unwelcomed.[96]

In evaluating the complaining students' allegation of hostile environment sexual harassment, the court in *Crandell* stated that the courts have adopted a "totality of the circumstances" approach. Under this approach, courts reject disaggregation of the factual allegations and "require[] only that the alleged incidents cumulatively have result in the creation of a hostile environment."[97] In *Crandell*, plaintiff suffered a group of related incidents that were sufficient standing alone to state a claim of hostile

---

[94]     *See id.* at 467-468 ("To establish a prima facie case of hostile environment [sexual] harassment in the educational context, Kinman must show: 1) that she belongs to the protected group; 2) that she was subject to unwelcome sexual harassment; 3) that the harassment was based on sex; 4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment; and 5) that some basis for institutional liability has been established.").

[95]     *Id.* at 465.

[96]     *Id.* at 468.

[97]     *Crandell*, 87 F.Supp. at 319.

environment sexual harassment.[98]   Let's consider those incidences.   Upon entering NYCOM, plaintiff was approached by one of her anatomy professors who asked her out on a date.  Over the course of the semester, he frequently asked her out.  He even told her that he would breakup with his fiancé so that he could date her. Although he never explicitly asked plaintiff for sex, plaintiff presumed that he wanted to have sex with her.[99]   During her first year, one of plaintiff's professors made several comments with sexual overtones, which were directed at a large lecture class or her small laboratory section of 6 students.[100]   In her third year, plaintiff went on a six-week rotation at Lutheran Hospital as an OB/GYN resident, and the Resident subjected plaintiff to sexual comments, routinely referred to her as his girlfriend in front of patients and staff, remarked about her breast size, and invited her to lunch, which she declined many times, until he threatened to fail her on the rotation.  She acceded to lunch once, and even though she asked him to cease calling her his girlfriend, "he did not care and continued the behavior."[101]  In the end, the resident gave her a poor grade.[102]  In this way, plaintiff's experiences of unwelcome sexual advances were pervasive because they continued for 5 years, and they were objectively severe when, as an example, the cardiologist, a faculty member at NYCOM, pressed his erect penis against her hand while he was examining her for heart palpitations.   As a result of that specific experience, plaintiff felt "humiliated, violated, and fearful."[103]  Given the totality of the circumstances, plaintiff's experiences with unwelcome sexual advances, when evaluated from a reasonable person's perspective, were objectively severe and pervasive, and satisfied an essential element in making a *prima facie* case of hostile environment sexual harassment.[104]

*Oncale*,[105] a Title VII case, in which same-sex harassment was alleged by plaintiff, also acutely illustrates hostile environment sexual harassment.  August to November 1991, Joseph Oncale worked on an offshore rig. After quitting, Oncale filed allegations of *quid pro quo* sexual harassment and hostile environment sexual harassment against his former co-workers and supervisors.  He specifically alleged that Pippen and Johnson, both co-workers, restrained him while Lyons, the supervisor, "placed his penis on Oncale's neck" and on his arm.[106]   At another time, Lyons and Pippen threatened plaintiff with homosexual rape.  On another occasion, while plaintiff showered at Sundowner's site, Pippen restrained plaintiff, while Lyon used "force . . . to push a bar of soap into [plaintiff's] anus."[107]  Thereafter, plaintiff quit, and filed sexual harassment claims.[108]  To say the least, plaintiff's unwelcome sexual advances were objectively and sufficiently severe or hostile, and even though he worked for defendant for four months, when evaluated by a reasonable person, in light of the totality of the circumstance, it's likely that plaintiff's experiences were pervasive, too.

---

[98]     *Id.*
[99]     *Id.* at 307.
[100]    *Id.* at 308.
[101]    *Id.* at 309.
[102]    *Id.*
[103]    *Id.* at 308.
[104]    *Id.* at 319 ("In evaluating hostile environment claims, courts have adopted a 'totality of the circumstances' approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment.").
[105]    *See* Oncale v. Sundowners Offshore Services, Inc., 82 F.3d 118 (5th Cir. 1996).
[106]    *Id.* at 118.
[107]    *Id.* at 118-119.
[108]    *Id.* at 119.

On the issue of objectively hostile or abusive, or severe or pervasive, when evaluated by a reasonable person, within the totality of the circumstances, it is clear that in light of *Kinman*, *Crandell*, and *Oncale*, "genitals" in the context of a law school exam about tortious harm to the third party's body cannot be an unwelcome sexual advance. Title IX, and Howard 2015 Policy, prohibits sexual conduct that's so "objectively offensive as to alter the conditions" of the students' educational program. Stated slightly differently, Title IX "bars conduct that would seriously affect a reasonable person's psychological well-being."[109] Where the sexual conduct "is not severe or pervasive enough to create an objectively hostile or abusive" educational experience that "a reasonable person would find hostile or abusive," a Title IX action will not lie.[110]  As the *Kadiki* court noted, complainants' allegations of "hostile educational environment will not lie where the acts complained of are 'isolated or genuinely trivial.'"[111]

Taken together, *Kinman*, *Crandell*, *Oncale*, and *Kadiki* clearly illustrate that the complaining students' allegations that "genitals" created a hostile environment sexual harassment cannot be sustained. Only a very strained reading of "genitals" can yield sexual conduct as a meaning. Such a reading would reject or ignore the factual and legal standards for assessing sexual conduct. Moreover, when these students' alleged that my efforts to elicit a legally responsive to Question 5 created a hostile environment sexual harassment were unwelcome sexual advances, requests for sexual favors, and verbal, nonverbal or other physical conduct of a sexual nature, their claims cannot be sustained because material facts simply do not exist. On 17 September 2015, Question 5's use of "genitals," in the higher educational context of law school, was not objectively and reasonably an exhibition of "discriminatory intimidation, ridicule, and insult" to male or female students.  Question 5 tested whether my students knew § 261, and whether in the face of irrebuttable facts, they could deduce the correct choice.

In a law school setting, and in an upper level course that teaches the fundamental legal concepts in business law, my students must have already been exposed to tort claims and criminal assault prosecution cases, in which children are sexually molested and in which women are brutally raped.   Yet, these students ventured through the first-years curriculum without filing a Title IX claims against their professors who required them to read of, and to talk about, such molestations and rapes. For legal training purposes, "genitals" by comparison would be trivial, and given that my students were only exposed to Question 5 on 17 September 2015, it is a nonsexual act that's isolated.  Accordingly, based on the totality of the circumstances, when viewed by a reasonable person, Question 5, "genitals," and my effort to elicit analytically relevant responses cannot reasonably constitute legally required facts on which Ms. Smiley can properly rely to find that sufficient evidence exists to sustain the complaining students' allegations of hostile environment sexual harassment in an education environment like law school.

SECOND, when view by a reasonable person, can "genitals," standing alone, created an intimidating, hostile, or oppressive classroom environment?  I answer no.  Given the material facts in *Kinman*, *Crandell*, *Oncale*, and *Kadiki*, Question 5's use of "genitals" and my effect to elicit analytically relevant response from my students were not only not sexual conduct, but also not sufficiently severe or pervasive that they created an intimidating, hostile, or oppressive classroom environment.  If I ridicule or comment on

---

[109]     *See Harris*, 510 U.S. at 22 ("Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being.").
[110]     *Oncale*, 523 U.S. at 81.
[111]     *Kadiki*, 892 F.Supp. at 753.

a student's appearance as the professor did in *Crandell*, I can create an abusive atmosphere. If I were to ogle a student's body as the teacher did in *Kinman*, I could create an oppressive classroom atmosphere. If I tell a student that she will never be as good as male surgeons but I would protect her from the male chief residents if she accedes to my request for sexual favors and the supervisors are aware of my behavior as in *Lipsett v. University of Puerto Rico*,[112] I can create a hostile educational environment.[113] Consider *Kadiki*, in which at professor spanked a student because she didn't get the proper grade in Biology. After the spanking, the professor told plaintiff that if she got a poor score after retaking his biology test, he might spank her again. After the first spanking, she didn't want to see the professor again. She withdrew from his course. Thereafter, she was "reluctant to enter the life sciences building, avoid[ed] classes taught by male professors and refrain[ed] from identifying herself in class."[114] In *Kadiki*, after the professor spanking or unwelcome touching, plaintiff experienced the education environment as intimidating, hostile, or oppressive because, when viewed by a reasonable person, she had suffered an objectively severe harm.[115]

Yet, despite the students' allegations of sexual harassment, when viewed from a reasonable person's perspective, on 17 September 2015, Question 5's use of "genitals" did not create an intimidating, hostile, or oppressive classroom environment. Basically, Question 5 contained no verbal, nonverbal, or other physical conduct of a sexual nature that could reasonably create objective hostility or abusiveness. As the *Kadiki* stated, "the environment must be more than *subjectively* hostile or abusive."[116] Rather, a reasonable person must find the classroom environment objectively hostile or abusive.[117] Unlike the plaintiff in *Kadiki*, who dropped her biology class, hesitated to enter the life sciences building, didn't register for any class taught by male professors, and refrained for identifying herself in class, my students, including the complaining students, attended class regularly. For example, after KDO 5, my students, including the complaining students, still attended classes regularly:

| Dates | No. of Students | % of Attend. | KDO Tests |
|---|---|---|---|
| Sept. 22, 2015 | 33 | 97% | KDO 6 |
| Sept. 28, 2015 | 33 | 97% | KDO 7 |
| Sept. 29, 2015 | 32 | 94% | KDO 8 |
| Oct. 1, 2015 | 24 | 70% | no |
| Oct. 6, 2015 | 34 | 100% | KDO 9 |
| Oct. 8, 2015 | 28 | 82% | No |
| Oct. 13, 2015 | 34 | 100% | KDO 10 |
| Oct. 19, 2015 | 30 | 88% | KDO 11 |
| Oct. 20, 2015 | 27 | 79% | No |
| Oct. 22, 2015 | 25 | 74% | No |
| Nov. 5, 2015 | 27 | 79% | No |
| Nov. 9, 2015 | 33 | 97% | KDO 12 |
| Nov. 10, 2015 | 27 | 79% | no |

[112]   864 F.2d 881 (1st Cir. 1988).
[113]   *See, e.g., Lipsett*, 864 F.2d at 905 (holding that although verbal attacks were not explicitly sexual, they were "nevertheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment.").
[114]   *Kadiki*, 892 F.Supp. at 752-753.
[115]   *See Lipsett*, 864 F.2d at 898.
[116]   *Kadiki*, 892 F.Supp. at 746 (italics added).
[117]   *Id.*

| Nov. 12, 2015 | 34 | 100% | KDO 13 |
|---|---|---|---|
| Nov. 19, 2015 | 32 | 94% | KDO 14 |
| Nov. 30, 2015 | Incomplete data | | KDO 15 |
| Dec. 1, 2015 | 33 | 97% | Pre-Test Final |
| Total Avg | | 89% | |

Given the legal standards and material facts in *Kinman*, *Crandell*, *Oncale*, and *Kadiki*, Question 5's use of "genitals" and my effect to elicit analytically responsive answers to Question 5 falls far short of what Title IX and the federal courts minimally require for hostile environment sexual harassment.

In the context of a law school classroom where adult law students are learning about the agent's deceit or fraud, induced consent of the third party, and tortious, harmful touching of the third party's body, Question 5's use of "genitals" can be reasonably viewed as "genuinely trivial"[118] or effectively necessary to prepare students for the harsh, legal reality of commercial civil litigation practice. In addition, unlike *Lipsett*, I did not use words or nonverbal or other physical conduct of a sexual nature to create an anti-female animus in my classroom, where 22 of the 34 law students were females. Fundamentally, as the Provost acknowledged when I met with him and Ms. Love on 04 May 2017, Ms. Smiley did not find *any* sexual behavior like unwelcome sexual harassment and harassment based on sex or sexual activity,[119] and at the very least without these two required elements, Ms. Smiley, and thus the Provost, did not have material factual evidence to sustain the students' allegations against me. Finally, as *Oncale* established, Title IX is not a "general civility code;" thus, "genuine but innocuous differences" in the educational environment will not give rise to an actionable claim[120] and subject an employee or supervisor to disciplinary action. And as *Kadiki* would state, to violate § IV. N. (2) and/or (3), my classroom environment on 17 September 2015 "must be more than subjectively hostile or abusive."[121] It must be objective hostile, when viewed from the perspective of a reasonable person.[122] On 17 September 2015, the complaining students were not reasonable persons, thus wrongly viewing my nonsexual conduct as objectively hostile or abusive.

In sum, given the foregoing analyses, Ms. Smiley did not have material facts to sustain the students' allegations of hostile environment sexual harassment against me.

D. *Ms. Smiley Failed to Analyze the Social Context of Law School Environment Where Law Students Were Learning Agency Law.*

In 13 January 2016, when I first met with Ms. Smiley, she appeared convinced that I had violated § IV. N. (2) and/or (3) of Howard 2015 Policy. During the interview, she told me that how the complaining students' subjectively felt was the single, most important element of their allegations. When I stated that my intent was to teach them § 261 of

---

[118]   *Kadiki*, 892 F.Supp. at 753.
[119]   *See Kinman*, 94 F.3d 467-468 (plaintiff must show to make a prima facie case at the very least that "she was subject to unwelcome sexual harassment" *and* "the harassment was based on sex.").
[120]   *Oncale*, 523 U.S. at 81.
[121]   *Kadiki*, 892 F.Supp. at 750.
[122]   *Oncale*, 523 U.S. at 81. ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's [, Title IX's] purview.").

the RESTATEMENT (2D) AGENCY, she emphatically and immediately told me that my intentions were irrelevant. Moreover, Ms. Smiley didn't say that she would evaluate the students' allegations from the perspective of the reasonable person. After all, a student can allege sexual harassment. However, the students must be reasonable, and the allegations must be properly and disinterestedly evaluated by a reasonable person.

Yet, Ms. Smiley failed entirely to consider the social context of a legal education in a nationally ranked law school. Had Ms. Smiley taken the perspective of the reasonable person when evaluating the complaining students' subjective feelings, she would have focused on the *social context* as required by the United States Supreme Court in *Oncale*. For example, in the social context of a legal education, where law students are learning about employer's vicarious liability when an employee or supervisor like an employee or supervisor engages in sexual conduct, can I assign them the *Crandell* case, and can I create a hypothetical, in which one of the facts is that the employee or supervisor, while dressed, rubbed his erect penis against the plaintiff's hand? Can I also ask if that tortious touching creates vicarious liability for the employer?

In *Oncale*, the United States Supreme Court emphasized that "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"[123] To evaluate if the alleged harassment met the objective severity test, Ms. Smiley, a disinterested and reasonable evaluator, must carefully consider "the social context in which particular [sexual] behavior occurs and is experienced by its target."[124] In this instance, the social context is legal education in a nationally ranked law school. The particular behavior was not sexual. The behavior was not an unwelcome sexual advance, for as the Provost correctly on 04 May 2017 stated I was not chasing a student around my office. Rather, the particular behavior was a test on Chapter 5. Specifically, the particular behavior was "genitals" – a word. And that word was part of a fact situation, which required the law students to demonstrate that they understood the material facts and substantive issues of § 261, and they knew that A had engaged in nonsexual and consensual touching of T. Moreover, Question 5 did not target any student because I didn't comment, for example, on a student's sexuality, clothing, or potential for future success. Nor did I use verbal, nonverbal or other physical conduct of a sexual nature when I held my class on 17 September 2015. Instead, I asked the entire class to read Question 5, which contained one word – "genitals." That word begs this question: was "genitals" so objectively offensive that it altered the conditions of the reasonable law student's education environment?[125]

The answer to this question is somewhat in doubt because the Provost has wrongly relied on Ms. Smiley's conclusive presumption approach. Yet, Associate Justice Scalia gave us an excellent example. If a professional football coach slaps a professional player on the buttock as he heads onto the field, that slap is not severely or pervasively abusive. However, if the same coach slaps his secretary on the buttock, the secretary would reasonably experience the coach's conduct as abusive.[126]

---

[123]     *Oncale*, 523 U.S. at 81.
[124]     *Id.*
[125]     *Id.* ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's [, Title IX's] purview.").
[126]     *Id.*

24

Justice Scalia's excellent example is an analog for legal education. Consider what I required my students to read before they took KDO 5 test. They read *Costos v. Coconut Island Corp.*,[127] which bears directly on whether in the legal education context a word like rape can constitute verbal conduct of a sexual nature that is severe or pervasive. In *Costos*, the night manager, Charles Bonney, raped a hotel guest in the early morning hours while she slept. Upon awaking, she found Bonney raping her. She punched, kicked, and threw him out of her bed. Before fleeing her room, Bonney stood over her laughing. To say the least, Bonney had utter contempt for his victim or for women generally. She sued the corporation alleging apparent authority. By apparent authority, Costos meant that Bonney's behavior served the employer, and Costos had no reason to belief that Bonney's behavior could not be trusted. Accordingly, Bonney had a right to know in which room she stayed, and to have master keys to guest rooms. Costos also believed that Bonney could be trusted to do his job because the corporation held out Bonney as its trustworthy night manager. In her suit, Costos alleged that per § 219(2)(d), the corporation had aided Bonney in raping her. Without master keys, Bonney could not have raped her. Of course, the corporation resisted the suit by arguing that Bonney's conduct was outside of his scope of employment, and so it should not be liable. The trial court agreed with the corporate defendant. The reviewing court disagreed, and reversed the lower court.

To be sure, *Costos* has charged, disturbing facts. Yet, in the sound, learned judgment of Hynes and Loewenstein, the textbook authors, *Costos* or cases about rape and unconsented, harmful touching were reasonably related to the study of Agency Law. Accordingly, this case would not constitute sexual conduct that was so pervasive or severe that it would create an intimidating, hostile, or offensive classroom environment. Moreover, in the sound, learned judgment Hynes and Loewenstein, *Costos* has a reasonable relationship to the subject matter of Agency Law. Unlike Question 5, and my effort to elicit a legal and substantive response from my students, the *Costos* court used words like "rape," "intercourse," "punched," and "kicked." And when the court used the word "intercourse" to describe Bonney's tortious conduct toward Costos, I emphatically told my students that Bonney's conduct was not intercourse, which connotes consent, but rape, which means against her will.

On 17 September 2015, Question 5 unlike *Costos* did not contain any invasions of or crimes against T's body. Unlike *Costos*, Question 5 did not use words like "rape" or "intercourse." Rape is a violent sex crime. Yet, my textbook, which contains such cases, aids our study of Agency Law, and my textbook has not led students' to allege sexual conduct that was so pervasive or severe that it created an intimidating, hostile, or offensive classroom environment. Rather, given the substantive expertise and the learned judgment of Hynes and Loewenstein, it is clear that in an Agency Law course, the study of violent, tortious conduct by the agent against innocent, non-consenting third parties does not give rise to conduct (of a sexual nature) that would be so pervasive or severe that it would create an intimidating, hostile, or offensive classroom environment. Given the authors' expertise, it is also clear that Question 5, which tested the study of violent, tortious behavior by the unscrupulous agents against innocent, non-consenting third parties, which can lead to strict liability for employers, has always been reasonably related to the subject matter of Agency Law.[128]

---

[127]   137 F.3d 46 (1st Cir. 1998).

[128]   *See, e.g.*, Bowman v. Home Life Insurance Company of America, 243 F.2d 331 (3d Cir. 1957) (defendant insurance field underwriter, who was not a doctor, and who posed as a doctor, induced female applicants for insurance to give consent while believing that he was an insurance company doctor, so that

In addition, we read and discussed *Lisa M.*,[129] in which a radiologist sexually assaulted a pregnant woman who had fallen, after asking her if she wished to know the sex of her unborn child.  *Lisa M.* is an emotionally difficult case because the court appeared to be concerned less about the plaintiff's sexual assault and more about whether the defendant hospital ought to be vicariously liable for the radiologist's sexual tort.  This court ultimately concluded the radiologist's sexual tort was not an outgrowth of, inherent in, typical of, or broadly incidental to the employer's enterprise.  Given that the court applied enterprise liability theory to hold the defendant hospital harmless, the students often have trouble with this case, and despite very difficult factual analysis, I focus my students on the tension between negligence foreseeability and enterprise liability foreseeability.  Eventually, they settled down and focus on the legal standard on which the court relied, which has a strong public policy implication that narrows the employer's liability when agents and employees, who act outside of the scope of their employment, harm third parties in sexual tort.  And despite these difficult, emotional facts, our factual discussions of *Lisa M.*'s sexual battery, and our study of sexual battery or tort and of the legal standard for enterprise liability have not led my students to allege that *Lisa M.* was so pervasive or severe that it created an intimidating, hostile, and offensive classroom environment.

On the heels of *Lisa M.*, we visited *Costos*' rape facts and an analysis of § 219(2)(d), and *Costos* was followed by *Nazareth*,[130] in which an ambulance attendant sexually assaulted a patient in transit to the hospital, and in which the court applied the common carrier theory, thus making the innocent employer strictly liable for the attendant's sexual attack.  Although *Costos* and *Nazareth* offered the students an emotional respite because the employers were found liable, *Lisa M.*, *Costos*, and *Nazareth* all involved sexual battery.  Despite these potentially strong facts, we engaged in factual and legal analyses, none of which has ever given rise to allegations of sexual conduct that was so pervasive or severe, when view from the perspective of the reasonable person, that it created an intimidating, hostile, or offensive classroom environment.  Fundamentally, *Lisa M.*, *Costos*, and *Nazareth* were directly and reasonably related to the study of Agency Law.

The foregoing begs the question: how did Question 5 on 17 September 2015 differ from *Lisa M.*, *Costos*, and *Nazareth*?  Those cases dealt directly and factually with either rape or sexual battery, and I consciously assigned those cases to my students so that they could learn the substantive law and so that they would be prepared for the harsh, legal reality of commercial civil litigation practice.  Moreover, I also deliberately assigned 985 pages of reading because Agency Law plays a vital legal role in commercial and non-commercial contexts.  Unlike *Lisa M.*, *Costos*, and *Nazareth*, Question 5 has no charged, emotional facts related to rape, sexual battery, sexual assault, or sexual tort.  Unlike those rape or sexual battery cases, Question 5, which was sex and gender neutral, has no victims at all, even though T subjectively felt funny after A completed the waxing services.  In light of the legal standards of Title IX, should T's subjectively feeling, standing alone, create a conclusive presumption that P must be strictly liable for A's nonsexual, non-tortious conduct in providing the waxing serve to T?  As in the context of Title IX, without more, the answer is no.

---

the unscrupulous agent could tortiously touch the plaintiff intimately while pretending to examine them for a hernia.).

[129]       907 P.2d 358 (Ca. 1995).
[130]       467 So.2d 1076 (Dist. Ct. App. 5th Dist. 1985).

The foregoing begs another questions about how Ms. Smiley evaluated Question 5 in the social context of legal education. Based on *Oncale*, whether Question 5's use of "genitals" constitutes sexual conduct that's so objectively offensive that it alters the condition of the law school's classroom environment depends on a "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."[131] On 17 September 2015, the surrounding circumstances were teaching law students about whether under § 261 the agent lied, induced consent by fraud, and tortiously harmed the third party. Under these circumstances, the agent must touch the third party physically. My expectations were that my students would read the facts carefully, identify the issue, and deduce the correct choice, and after they completed KDO 5, it was my expectations, of which they knew quite well, that we'd use the KDOs to help them know what they knew, what they didn't know, and why. I was so my expectations, of which they likewise knew, that they must choose to participate, and when they do, I would expect them to engage the facts and the law analytically. In this relationship, I am their professor, and while in my class, they are my students. And as part of this relationship, they know that I require their very best, and to help them perform, I have created a classroom learning environment, in which I use humor, storytelling, and self-effacing behavior to "keep it light, so that they can learn." Given that they must read in excess of 985 pages, not including statutory materials, they already have sufficient stress. In this way, my relationship with my students is one of professor-student, which is based on earned, practiced trust.

Given this constellation, especially within the social context of legal education, why does a word like "genitals," standing alone, become actionable under Title IX? Yet, *Oncale* points out that simple teasing is not actionable. Likewise, roughhousing is not actionable. If I were supervising students in a legal clinic, if the law students were preparing for a hearing on our client's vicarious liability when it knew of an assault on staff and did nothing, and if I required them to read the entire record in *Crandell*, can female law students properly alleged that by requiring them read about the NYCOM cardiologist who rubbed his erect penis against the plaintiff's hand, they subjectively *felt* that I was violating and humiliating them? Likewise, if I had required my students to read the Court of Appeals case of *Oncale*, which described how co-workers and a supervisor sodomized the plaintiff with a bar of soap, could a gay male law student properly filed a complain alleging that I had by requiring him to read the case and to discuss the facts and legal standard in class, I had engaged in verbal, nonverbal, or other physical conduct of a sexual nature that was severe or pervasive enough that it created a hostile education environment? Yes, he should file the complaint with the Provost's Office. But the filing would be improper because, as the student's professor, I can require such reading as part of his legal education.

Yet, if the gay student tells Ms. Smiley that he felt subjectively violated because I required the entire class to read this case and to discuss the case in class, should she conclusively presume that the student's subjective feelings will determine a finding of sexual harassment? If this male student were suing me in court, would I be able to offer any affirmative defense? Would I be able say to the court that from the perspective of the reasonable person, the offensive case is a not verbal, nonverbal, or other physical conduct of a sexual nature. Would I be able to say that from the perspective of the reasonable person who looks at the context of legal education, the offensive case does not standing alone constitute an unwelcome sexual advance *and* a request for sexual

---

[131]   *Oncale*, 523 U.S. at 82.

favors? Would I be able say to the court that when evaluated from the perspective of the reasonable person, the legal case is neither offensive nor an act of sex. Rather, I would be able to adduce facts that the case bears directly and substantively on the student learning of law of sexual harassment, and whether the innocent employer should be vicariously liable. Accordingly, like Question 5, the legal case would not objectively offensive, when viewed by a reasonable person, even if the case were to stir my students' emotions. If I adduce such evidence, which would be material and relevant to legal education, would I have asserted an affirmative defense, thus placing the student's allegations, however subjectively felt, beyond Title IX's purview? As the *Oncale* court stated, Title IX prohibits sexual conduct that "a reasonable person in the plaintiff's position would find severely hostile or abusive."[132] In light of the court's totality of the circumstances test, which includes social context, Question 5 – even though nonsexual conduct – was not severely hostile or abusive.

E.    *Ms. Smiley's Investigation: Complainants' Subjective Feeling Conclusively Presumed and Determined Unsubstantiated Findings of Sexual Harassment.*

On 13 January 2016, Ms. Smiley interviewed me. During that interview, I realized that Ms. Smiley had a view of the reasonable person that would be prejudicial to me, and to anyone in my shoes. Moreover, she openly assumed that bikini meant female. After she made this observation, she retreated from it, but it was too late. She appeared to be influenced by the complaining students' subjective feelings that "genitals" meant vagina.

Yet, in my hope of getting an objective, neutral disinterested investigator, I wrote an email to Ms. Smiley on 18 January 2016, and raised the difference between the reasonable person that she appeared to have in mind and the reasonable person in the same or similar circumstances of the law student.[133] In *Oncale*, the Court emphasized that "the objective severity of harassment should be judged from the perspective of a reasonable person in the [law students'] position."[134] That email read, in part:

> In effect, I'm training not the reasonable person broadly and generally conceived. Rather, I'm training *the reasonable person under the same or similar circumstances of the law student*. During the interview of Wednesday, January 13, 2016, I pointed out that I was intending to test the § 261. Your immediate response to me was: "It's not your intent. It's the reasonable person." I responded by saying: "But it's not the super sensitive person." Accordingly, you appeared to be assessing Question 5 and my responses during the interview not based on how reasonable person is used or applied in the context of sexual harassment but based on an everyday person's sense of what reasonable person might mean. Fortunately, given that Howard Title IX policy must comport itself with the minimum threshold requirements of Title IX, then your office would be required to apply "*the reasonable person under the same or similar circumstances of the law student*" standard.

---

[132]    *Id.*

[133]    Patricia H. v. Berkeley Unified School Dist., 830 F.Supp. 1288, 1296 (N.D. Ca. 1993) ("Similarly, the OCR has recommended that when considering whether an actionable hostile environment has been created in an educational setting, the determining body should consider "the age of the victim(s); the frequency, duration, repetition, location, severity, and scope of the acts of harassment; [and] the nature of context of the incidents," in essence using a "reasonable student" standard.").

[134]    *Oncale*, 523 U.S. at 81.

Given her findings, Ms. Smiley not only ignored the reasonable perspective requirement as announced by *Oncale*, but also confessed that she has always strongly identified with the complaining students.  By applying *Oncale*'s standard, Ms. Smiley could not have found any verbal, nonverbal or physical conduct of a sexual nature. Under this standard, she wouldn't find any unwelcome sexual advances.  Under this standard, she would find no sexual behavior that was objectively offensive.  Likewise, under this standard, she would have found no objectively hostile classroom environment.    Why? On 17 September 2015, none of them had happened.

But if Ms. Smiley had long decided to confer some sense of justice on the complaining students, where it might happen all too infrequently, even at the expense of my professional standing and career, she would have had to treat the complaining students' subjective feelings, however unreasonable, as if they conclusively presumed and determined the allegations against me.  Once a court conclusively presumes a fact, neither party can disturb its by adducing a new, competing fact.  As the court stated in *Willow Springs Condominium,*

> Conclusive presumption "is a substantive rule of law directing the proof of certain facts conclusively provides an additional fact that cannot be rebutted. . . . In the case of a conclusive presumption there is no opportunity for rebuttal.  The position to make a presumption conclusive rests upon ground of expediency or policies so compelling in character as to override the generally fundamental requirement that questions of fact must be resolved according to the proof."[135]

Once Ms. Smiley could not find any conduct of a sexual nature that would trigger Title IX and § IV. N. (2) or (3), she would conclusively presume that the students' emotional reactions were based in a fact, even if under her burden she couldn't find it.  As a conclusive presumption reveals, Ms. Smiley would have taken an expedient road to helping the complaining students feel better and thus to sustaining their allegations against me.  Why then was her need to help the complaining students so much more compelling than remaining a reasonable, disinterested, and independent investigator? Why would she purchase their apparent sense of safety at my expense?  Neither of us can afford to pay this bill.  Such a bill always comes due.  But by adopting Ms. Smiley's unsupported finding, Mr. Provost, you're asking Howard University to pay that bill.

More important, under Howard 2015 Policy, Ms. Smiley is not required to reveal the analytical bases for her findings.  However, we, at Howard University, are counting on you, Mr. Provost, to act in good faith and with due care, so that Ms. Smiley's prejudices, and we all have them, don't run roughshod over accused but otherwise innocent faculty.  Any faculty can be accused, but cooler, reasonable heads prevent any ensuing injustice.  Given that the Provost is the Title IX Decisional Authority, you can prevent Ms. Smiley from arrogantly achieving this sorted notion of justice by disregarding the legal standards for a proper finding of sexual harassment.  Mr. Provost, you prevent such an injustice by not adopting her findings.

Given that I'm now quite familiar with Title IX, OCR, and federal court rulings, I can tell you that without verbal, nonverbal, or other physical conduct of a sexual nature, which is also objectively and sufficient severe or pervasive, it's not legally possible to find

---

[135]    *See, e.g.*, Willow Springs Condominium Owner's Ass'n, Inc. v. The Ranches, L.C., 2015 WL 12731319 (Utah Dist. Ct., Oct. 27, 2015).

that sufficient evidence exists to sustain a finding of sexual harassment. By ruling that sufficient evidence exists, Ms. Smiley has either found it. (And I'd like to see it!) Or, she was counting on you not to review her file. As you stated to me on 04 May 2017, this case doesn't turn on someone catching me chasing a student around my office, or saying something unprofessional and salacious to one of my students. Based on the legal standard for sexual harassment, your observation confessed that no sexual conduct was present in my case. Without sexual conduct that is unwelcome, especially if the nonsexual conduct is isolated or genuinely trivial or necessarily incidental to legal training, no court will find sexual harassment. That means that on 17 September 2015, I didn't violate § IV. N. (2) and (3) of Howard 2015 Policy.

Fortunately, Mr. Provost, I have given you the legal standards, and given you examples of how courts might evaluate the allegations that were raised against me. I trust that you will review this document with an open mind, and if so, you'll understand that on 17 September 2015, Question 5 and my effect to elicit analytically responsive answers to Question 5 cannot constitute, standing alone, any sexual conduct. Again, without such conduct that's unwelcome, no action will lie under Title IX.

## V. CONCLUSION

On 17 September 2015, I did not engage in any conduct of a sexual nature. At the very least, sexual nature means unwelcome sexual advances, requesting sexual favors, and verbal, nonverbal or other physical conduct of a sexual nature. First, in the *quid pro quo* context, I would have had to offer my students a benefit or harm, whether I carry out the harm or not, if they accede to my demand for sexual intercourse or other sexual activities. Second, in the hostile environment sexual harassment context, sexual nature means actual sexual intercourse, sexting, writing unwelcome love letters, sex-orienting touching, requesting dates, comments on a male's or female's body, demeaning a person's sexuality, etc. In this latter context, such sexual conduct alters the experience of the educational environment, when the sexual conduct becomes objectively or sufficiently severe, thus creating a hostile environment.

On what factual basis did Ms. Smiley make her findings about the word – "genitals"? First, "genitals," which doesn't mean sexual activity at all, is not sexual conduct. Second, "genitals" cannot make sexual advances. Third, "genitals" cannot request sexual favors. Fourth, "genitals" cannot be, or use, words or other physical conduct of sexual nature. Fifth, "genitals" as a descriptive word for basically biological reproduction, and cast clinically, is not sufficiently severe or pervasive of anything, especially in a law school classroom of adults. Sixth, "genitals" cannot, standing alone, alter an educational environment, thus denying students some benefit to which they were entitled. And even if the complaining students' alleged that "genitals" has done that and more to them and their classroom, these alleged discriminatory consequences that might flow from "genitals" must be "analyzed from the perspective of a reasonable person."

Again, I ask, on what factual basis did Ms. Smiley make her findings about my effort to elicit analytically responsive answers? First, I asked for volunteers, but that's not making for unwelcome sexual advance. Second, I selected from those who raised their hands or who jumped in vocally, but that's not requesting sexual favors. Third, I bantered with a student who told me that T would not sleep, but that's not a verbal, nonverbal, or other physical conduct of a sexual nature. Fourth, I told my students that I had to research different Brazilian bikini waxing services, but that's not unwelcome touching of a sexual

nature. Fifth, I asked this same student for an analytical response to the correct choice to Question 5, but that's not passing a love note or blowing kisses to the student. Sixth, I allowed her to get help from her neighbor, but that's not ogling a student, which might be objectively severe or pervasive to alter a benefit of the classroom environment. Finally, I moved on so that other students could participate, thus just doing my job, thus placing me well within the scope of my employment. Regardless, even if the complaining students' subjective feelings, however unreasonable, that my aforementioned professorial behavior triggered Title IX because they were emotionally stirred, and that my conduct was sexual in nature that severely altered the classroom experience, these alleged discriminatory consequences, including their read on my professional behavior, must be "analyzed from the perspective of a reasonable person."

Under this *Oncale* requirement, what factual evidence caused Ms. Smiley to finding that, even when viewed from the perspective of a reasonable person, who by the way is a law student, "genitals" and my behavior were of a sexual nature? In truth, I don't believe that Ms. Smiley, if she were put before a jury, could adduce one scintilla of factual evidence of conduct of a sexual nature. If so, then on what other basis could Ms. Smiley have found factually that I engaged in *quid pro quo* sexual harassment and/or hostile environment sexual harassment?

Without sex, sexual intercourse, unwelcome sexual advances, and other verbal, nonverbal, or physical conduct of a sexual nature, no court will sustain an allegation of sexual harassment. How did Ms. Smiley? As I've already argued, Ms. Smiley took the students' side. In so doing, she had to presume conclusively that, subjective feeling, however unreasonable, they were right; I was wrong. Ms. Smiley must have believed that "genitals" meant vagina because the complaining students said so. She believed that bikini meant female. On 04 May 2017, Ms. Love told me that, despite the legal standards for sexual harassment, if students had to even respond to Question 5, they were injured and harassed. Ms. Smiley must believe that too because she told the Provost and Ms. Love exactly that because they repeated it to me. But objectively, Title IX's legal standard is not such a life-stopping sinkhole. Title IX requires far more than that! Hence, OCR warned schools and teachers that they must not overreact. Likewise, *Kadiki* clearly stated, "the environment must be more than subjectively hostile or abusive." But I don't think that Ms. Smiley cares about the unreasonableness of subjective feelings of hostility or abusiveness.

Yet, Mr. Provost, I hope you do.

In this conclusion, my factual and legal points are unmistakable. Ms. Smiley had conclusively presumed that once the students subjectively felt bad or emotional, they were harassed. On 13 January 2016, Ms. Smiley asked me if I could have tested tortious touching without using Brazilian waxing, yes I could. She suggested a doctor's office. Ms. Smiley said that my students would not have reacted. By using the word "reacted," Ms. Smiley unknowingly implied that the complaining students were emotionally stirred. Emotionally stirred doesn't mean sexually harassed. But the unscrupulous agent would still have to tortiously touch the unsuspecting third party. For example, would Ms. Smiley have found differently if I had used the facts from *Crandell*, where the cardiologist who taught at NYCOM rubbed his erect penis on the plaintiff's hand? Although not a § 261 issue but perhaps a 219(2)(d) claim, I would still have to ask the students if the innocent employer should be liable for the doctor's tortious violation? *Crandell* is a real world legal issue, but I doubt sincerely that Ms. Smiley would approve.

But given my contractual right of academic freedom, and given the totality of the circumstances of preparing future attorneys for the harsh, legal reality of commercial civil litigation practice, I don't really need her approval. But that's not how she thinks.

Mr. Provost, I hope you know differently.

In the end, Mr. Provost, I hope you will see that I am counting on your sense of fairness. Howard University, as a recipient of federal funds, must comply with Title IX. Yet, your office need not do so unfairly, and in a way that professionally ruins my standing within the profession, simply because, without any objective, factual basis, Ms. Smiley had made an unwarranted and prejudicial finding against me. As the ultimate decision authority, Ms. Smiley's error can, but need not, become your error. So, in light of this document, I'm asking you to revisit her files, her investigation, and reach your own independent, disinterested, and good faith judgment on whether I ought to known or labeled as a sexual harasser.

If you have questions, please get in touch with me at your earliest convenience.

Sincerely,

/s/

Reginald Leamon Robinson
Professor of Law

cc:    File

32

# HOWARD UNIVERSITY

OFFICE OF THE FACULTY SENATE

June 14th, 2017

Reginald L. Robinson, J.D.
Professor of Law
School of Law
Howard University
Washington, DC 20059                                        **RE: FGC-33-SOL-2017**

Dear Professor Robinson:

The Faculty Grievance Commission [FGC] is in receipt of your official complaint that was filed on June 6th, 2017.  In accordance with the Procedure for Resolution of a Faculty Grievance outlined in the 1993 Faculty Handbook [Handbook], Section 2.8.3.3, the FGC met on June 12th, 2017 to discuss your complaint.  After reviewing the documents you provided, it is the decision of the FGC that under Section 2.8.3.3 B., your formal complaint merits further investigation and that under § 2.8.3.3.B.(2), the FGC will pursue the required Informal Mediation of your grievance, which will be based on the following grounds under § 2.8.2:

> *(1) (Action taken that involves the faculty member's personnel status or terms and conditions of employment;*
> *(2) Action taken that violates academic freedom;*
> *(3) Actions taken that are arbitrary and capricious (i.e., an action that is unsupported by the record presented to support the action taken);*
> *(4) Actions taken that violate established procedure and due process.*

This decision is based on the following.  The procedure used to investigate a formal allegation of *quid pro quo* sexual harassment and hostile environment sexual harassment against you did not follow Howard University's 2015 Title IX Policy with respect to the following points:

> • the investigative procedure followed by the Office of the Provost violated your due process rights, and failed to follow rules and regulations.  The grievant was denied proper notice and a hearing before an impartial investigator.  Moreover the investigative process continued for 504 days, in violation of the 60 days that is required for resolution;



• the findings of *quid pro quo* sexual harassment and hostile environment sexual harassment were arbitrary and capricious.  As presented, the behavior of the grievant does not appear to reflect sexual harassment  which is defined in Howard University's Title IX Policy, Section IV N,  as  " ... unwelcomed sexual  advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:
(1) submission to such conduct is made either explicitly or implicitly a basis for any decision affecting the terms or conditions of participation in any such program or activity or status in an academic course; or (2) such conduct has the purpose or effect of unreasonably interfering with a student's educational right, privilege, advantage, or opportunity; or (3) such conduct is so pervasive or severe that it creates an intimidating, hostile, or offensive environment for learning";

• the letter of reprimand issued by the Provost altered the personnel status of the grievant and infringed on his academic freedom in the classroom in that his curricular materials must be pre-cleared by the Dean of the Law School or the Dean's designate, and Knowledge Demonstration Opportunities, exams and questions be released to the students.

The FGC will request information from the Office of the Provost and from the University's Title IX Coordinator.  At present we do not require any additional information from you.  If you have any questions regarding this matter, please do not hesitate to contact me. Please reference your case file number [FGC-33-SOL-2017] in the subject line of e-mails and any future correspondence regarding this case.  Thank you.

Sincerely,

*Sonya K. Sobrian*

Sonya K. Sobrian, Ph.D.
Immediate Past Chair
Faculty Grievance Commission
Howard University
(202) 806-7901

Cc: Faculty Grievance Commission

From: **Reginald Robinson** hero hermes @ gmail.com
Subject: Re: * Confidential *
Date: January 19, 2016 at 12:56 AM
To: Smiley, Candi N candi smiley@ Howard edu
Cc: Reginald Robinson hero hermes @gmail.com

Dear Ms. Smiley:

Hey!! In prior emails, I've addressed the following:  (1) men wear bikini underwear, and so the word "bikini" in and of itself should not cause a student to think that T was a female, and (2) T can feel uncomfortable about T's Full Brazilian waxing if T had never had such waxing in the past because, as you read in the link that I sent, a person who had never had such a waxing felt at the very least uncomfortable after she became aroused.

In this email, I provide you with further context that perhaps raises cogent questions about the allegations against me based in Title IX violations.  Roundly put, two law students alleged that Question 5 of KDO 5 (or 1 out of 184 KDO questions), in which T who did not have a sex or gender designation received a Brazilian waxing, caused them and other students to feel that Question 5's facts were sufficiently severe, persistent, or pervasive that they adversely affected their education or created a hostile or abusive educational environment.  And further, these facts from Question 5 gave raise to gender-based discrimination, even though P served men and women, even though P, A, and T were sex and gender neutral, and even though, apart of biases projected onto these facts, nothing in the facts described T's genitalia or other anatomical parts that could have suggested or implied T's sex or gender.  In short, no bases exist to support the allegations that Question 5's facts gave raise to a legally cognizable claim of either sexual harassment or gender-based discrimination under Title IX.

Based on the legal materials in the Chapter 5, I intended to use this hypothetical for sound pedagogical reasons:  to test whether A was used deceit or misrepresentation to pursue not P's business but A's private or personal purpose, to wit, touching T inappropriately while also providing the waxing service.  And given that I'm training not geography students but law students, which makes the facts in Question 5 appropriate to testing Restatement (2d) § 261, they must be able to engage facts without becoming distracted by their personal, experiential, and emotional contexts.

In effect, I'm training not the reasonable person broadly and generally conceived.  Rather, I'm training **the reasonable person under the same or similar circumstances of the law student**.  During the interview of Wednesday, January 13, 2016, I pointed out that I was intending to test the § 261.  Your immediate response to me was:  "It's not your intent.  It's the reasonable person.  It's how they experienced it."  I responded by saying:  "But it's not the super sensitive person."  During the interview, you appeared already convinced that Question 5 was an appropriate basis to support these two law students' allegations.  I hope that since the e interview, you have look closely and objectively not only at Question 5's sex and gender neutrality, but also at the links and emails that I've since that interview sent to you.  During the interview, you appeared to be assessing Question 5 and my responses during the interview not based on how reasonable person is used or applied in the context of sexual harassment but based on an everyday person's sense of what reasonable person might mean.  Fortunately, given that Howard Title IX policy must comport itself with the minimum threshold requirements of Title IX and its case law, then your office would be required to apply "**the reasonable person under the same or similar circumstances of the law student**" standard.

Accordingly, given that my students had already learned Criminal Law and Torts, they've been exposed to and focused on facts and legal issues that involved rape, incest, assaults, murders, etc.  I can't imagine that they would allege that, after covering this material in first  year, such charged facts and legal issues were sufficiently severe, persistent, or pervasive, which adversely affected their education or would create a hostile or abusive educational environment.

As such, words like "bikini," "genitalia," "touching," and "discomfort" ought to be simply a part of a law student's excellent legal training, even if the relevant and material facts are emotionally charged.  To be sure, words like rape, incest, molest, assault, murder, or felony murder, and the accompanying facts trample words like "bikini," "genitalia," "touching," and "discomfort," and yet I can't imagine that law students who are struggling through the learning challenges of the first year of law school would alleged that learning about

~~why didn't they raise concerns about having to read about women who suffered these harms.~~

Yet, these law students were not offended or made to feel that these cases, either in full text or in note form, were sufficiently severe, persistent, or pervasive that they would adversely affect their education or would create a hostile or abusive educational environment.

Keep in mind that based on your interview questions, neither of these students alleged that I used Question 5 to engage in a near pornographic teaching of the facts in this hypo. Rather, for reasons that are not quite clear to me, these two law students alleged that the clearly sex and gender neutral facts of Question 5, which differed in tone and tenor from Lisa M. or Costos, for example, were sufficiently severe, persistent, or pervasive that they would adversely affect their education or would create a hostile or abusive educational environment.

In my effort to help my students learn agency law, especially in the context of § 261, how am I any different from these textbook authors?

Given that these two students **did not allege** that Lisa M (i.e., a pregnant female sexually assaulted by radiologist), Alma (i.e., elementary children raped by a janitor), Doe (i.e., a women manipulated into sexual intercourse), and Costos (i.e., a female guest raped in her sleep by hotel's night manager) were sufficiently severe, persistent, or pervasive that they would adversely affect their education or would create a hostile or abusive educational environment, then you and your office must ask - why?

Since you notified me that such allegations have been raised against me, I've revisited literally every contact that I've had with my students — in class or out of class. In so doing, I realized that my students could have raised such allegations based on Question 5. Still, I have wondered why? I cannot fathom how the reasonable law students who has already learned about rape, sexual assault, molestation, or domestic violence, could view my sex- and gender-neutral hypo as violative of Title IX.

I conjecture that had Question 5 been part of this published textbook, neither of these two students would have raised such an allegation against me. Based on the allegations, these two students, who are required to be reasonable persons under the same or similar circumstances as law students, were not impacted negatively within the meaning of Title IX by these textbook cases. Question 5's facts were not emotionally charged, were sex and gender neutral, and were devoid of any description of T's genitals or of how A may have touched T to provide these services. Yet these very same reasonable persons under the same or similar circumstances of law students found Question 5's facts so disturbing or unsettling or disruptive, such that they alleged that they were sufficiently severe, persistent, or pervasive and that they would adversely affect their education or would create a hostile or abusive educational environment.

For pedagogical purposes, § 261 positions law students between master-servant liability, which is strict, and enterprise liability theory, which asks whether the principal (P) should be liable for the deceit of an agent (A) if A's deceit were made possible because A was purporting acting within the ordinary scope of A's employment, so that the third part (T, or victim, or plaintiff) had no notice that A was acting for A's own private purpose. Given that master-servant liability is broad and strict, and given that enterprise liability theory is narrowed and limited to the risk attended to a given industry, Question 5 served my pedagogical goals by requiring the reasonable law student to assess whether by P holding A as P's agent, A could engage in deceitful practices, such that T would not be put on notice that A served a private purpose, and such that A could harm T.

In the end, Question 5, which is 1 question out of 184 KDO questions in fall 2015, which is sex and gender neutral, and which asks reasonable law students to assess whether T had brought a bona fide claim under § 261, cannot in and of itself cause sexual harassment or gender-based discrimination either under Howard's Title IX policy or federal Title IX.

For your consideration, I've attached Restatement (Second) Agency § 261, so that you can see that sexual assault, rape, homosexual advances, and sexual harassment are part and parcel of the courts' § 261 analyses, and so that you can understand the court's struggle with how and when a principal (P) ought to be required to answer legally and fairly for the agent's (A) tortious conduct borne out of A's deceit that causes harm, suffering, pain, and injury to the third party plaintiff (T).

rape or incest or molestation, for example, adversely affect their education or created a hostile or abusive educational environmental in violation of Title IX.

Given your current position at Howard, you are clearly positioned to test my foregoing proposition.

By using Question 5, I could test whether A had engaged in any deceit or misrepresentation while operating within the scope of A's authority and duties, so that A could touch T inappropriately. As you can see from my analysis of the hypo, I don't transform P, A, and/or T into a sexed or gendered person. Second, I focused on what T must allege and prove in order to make out a § 261 claim. I concluded my analysis by focusing on the 3 tests that T must raise and prove. That's it. Question 5 facts and my analysis don't relate to a sexed or gendered person, and my students don't get to see my analysis. I have in the right context read to them what I'd written, so that my law students can see how I've approached the problem. In the end, Question 5 is decidedly unlike the cases that follow.

Before we read and discussed the materials in Chapter 5, we read, discussed, and analyzed the facts and legal issues that were raised in Chapter 3. Moreover, our textbook, which they were required to read deals with sexual violations like rape, but it would appear that neither student who complained to you was anxious about these emotionally charged facts. It thus makes me wonderful why they brought the complaint to your attention at all. I also wonder who and what caused them to raise these allegations against me.

For example, in the fall 2015 semester, we read and discussed enterprise liability theory in the context of sexual assault. In Lisa M. v. Henry Mayo Newhall Memorial Hospital, 907 P.2d 358 (1995), a radiologist used a wand below the pubic hair line of a pregnant who had fallen under the pretext of determining the sex of her baby. In Lisa M, the court used words like "inappropriately," "molesting," "misconduct," etc., to describe what Tripoli, the radiologist, had done to sexually assault Lisa M.

Following the Lisa M. case, we had a note case that dealt with a janitor sexually assaulting children in an elementary school during working hours. See Alma W. v. Oakland Unified School Dist., 176 Ca. Rptr. 287 (Cal. App. 1981).

Moreover, in note form, my students read about a pastoral counselor who engaged in sexual misconduct with an unnamed plaintiff, who'd suffered emotional harm. See Doe v. Samaritan Counseling Center, 791 P.2d 344 (Alaska 1990).

In the foregoing cases, viz., Lisa M., Alma, and Doe, these law students had to read about invasive assaults and inappropriate sexual conduct by defendants or defendants' employers, and in their complaint to you, these two students did not argue or suggest that by requiring them to read such cases I had create a hostile or abusive educational environment. And in these cases, we were testing the tension between remedial frameworks: respondeat superior liability (i.e., strict liability) and enterprise liability theory (i.e., not negligence foreseeability but risk of harm in the particular industry or enterprise, making it not unfair to require defendant to assume this lost).

In addition to these cases about sexual battery, assaults, and misconduct, my students had to read about a hotel night manager who used his master key, after getting two hotel guests to their room, to enter that room while only one of the guests slept and raped her. Having given him no consent, the plaintiff "awoke to find Bonney in the bed, having intercourse with her. She threw Bonney out of the bed, punching and kicking him. Bonney stood over her, laughing and then left the room." Although the court used the word "intercourse," I emphatically told my students that Costos had been raped. See Costos v. Coconut Island Corp., 137 F.3d 46 (1998). Given that at any time a law school classroom could be attended by a student who had suffered a rape or other grievous sexual crimes, neither of the two law students who complained to you alleged that by requiring them to read this case, I'd caused or create an experience that adversely affected their education or a hostile or abusive educational environment.

I believe you must ask: how are these cases dramatically different from the facts in Question 5? In the foregoing cases, viz., Lisa M., Doe, and Costos, the plaintiffs were women who had suffered sexual assaults, battery, or misconduct. To the extent that the two law students who made these allegations were females, why didn't they raise concerns about having to read about women who suffered these harms?

If you have questions, please get in touch with me at your earliest convenience.

Sincerely,

Reggie

**Reginald Robinson**
http://humangodsandsocialrealities.blogspot.com/
http://ssrn.com/author=937203
heru.hermes@gmail.com

Restatement §
261Agents ...Deceive.pdf

On Jan 15, 2016, at 9 36 AM, Smiley, Candi N <candi.smiley@Howard.edu> wrote

Received

Thank you,
Candi N. Smiley, Esq.
Deputy Title IX Coordinator
Howard University, Office of the Provost
2400 6th Street, NW
Suite 306
Washington, DC 20059
(o) 202-806-2550

**From:** Reginald Robinson <heru.hermes@gmail.com>
**Date:** Friday, January 15, 2016 at 9:22 AM
**To:** Candi N Smiley <candi.smiley@howard.edu>
**Cc:** Reginald Robinson <heru.hermes@gmail.com>
**Subject:** Re: * Confidential *

Dear Ms. Smiley,

Good morning! In my Question 5 of KDOS, the hypothetical states that P owned and member managed an LLC. It also stated that P provided services to men and women. In this hypothetical, C, who had never had any waxing, visited P's spa, where C met A who explained P's services.

At this point, my students have no reason to assume that C was a female. In my last email to you, I sent you a link to a website that sold men's bikini underwear, and apart from personal experiences, nothing in Question 5 pointed to C's sex or gender.

In Question 5, C selected the Full Brazilian, and A again explained that in order to perform this service, A would have to touch C's genitalia and adjust C's body, so that A could gain access to C's hair follicles. C agreed. C signed the service agreement, in which C also acknowledged that A had explained the process to C. At this point, P who worked through A had fully informed C about the Full Brazilian waxing, and what C might