UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

REGINALD LEAMON ROBINSON, PRO SE

                      Plaintiff,

  -- against ---

HOWARD UNIVERSITY, INC., ET AL.;

                   Defendants.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

*Leave to file GRANTED*

TREVOR N. MCFADDEN
United States District Judge   7/26/18

No. 1:18-cv-00518-TNM

**JURY IS DEMANDED**

## FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND JURY DEMAND

**COMES NOW** Plaintiff Reginald Leamon Robinson (hereinafter "Plaintiff"), by and through himself, in the above-caption action states to this Honorable Court, files this Amended Complaint pursuant to Fed. R. Civ. Pro. Rules 15(a), 4(d), and 12(a)(1)(A), and alleges as follows:

### I. PRELIMINARY STATEMENT

> **"There is a widespread crisis surrounding sexual harassment, dating and domestic violence, gender-based discrimination and, most alarming, sexual assault. Unfortunately, Howard University is not immune."**
>
> **Candi N. Smiley, Title IX Coordinator, Howard University, https://www2.howard.edu/title-ix/coordinator-statement (last visited: Dec. 29, 2017)**

1.     This case arises out of Defendant Howard University, Inc.'s, ("Howard" or "University"), a recipient of federal funding, knowingly fraudulent and deliberately deceptive conversion of two female students' false, spurious, and frivolous complaints against Professor Reginald Leamon Robinson ("Plaintiff"). During the investigation of

RECEIVED
Mail Room

JUL 2 0 2018

1

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

these complaints, Howard violated the rules, regulations, and procedures of its Title IX Policy ("Policy").  These violations led to erroneous outcomes, and followed from the deliberate indifference of Howard's leadership after Plaintiff put them on actual and inquiry notice that Plaintiff was suffering sex discrimination, which they had the institutional authority to correct.

2.      Howard issued an unsupported Notice of Findings ("Notice") of sexual harassment against Plaintiff.  But the Report of Investigation ("Report"), on which the Notice substantively depended and from which the Notice legally gains its institutional force, was completely devoid of the required findings of material facts and conclusions. Howard had the burdens of production and persuasion under the preponderance of the evidence standard, which it failed to meet.   Nevertheless, Howard sanctioned and disciplined Plaintiff, and placed the Notice of Findings and Sanctions/Disciplinary Action in his personnel file permanently.

3.      After Howard issued the Notice, Plaintiff made institutional attempts to correct the erroneous outcome and sex discrimination.  He appealed to the Provost.  He sent the record to a disinterested nonprofit, nonpartisan third-party organization, hoping to end the sex discrimination, and he told the Provost that he had sought such disinterested help.  Plaintiff also sent the appeal memo to the President and Board of Trustees of Howard.  In retaliation for seeking help from a disinterested organization, the Provost summarily rejected his appeal, which has frustrated Plaintiff's effort to overturn the erroneous outcome and sex discrimination because under the Policy, Plaintiff cannot appeal the Provost's Findings to any other University's official.  Howard's leadership failed to respond to the actual notice it received from Plaintiff, even though it had the

institutional authority to take corrective action.  Plaintiff also filed a timely grievance with the Faculty Grievance Commission ("FGC"), and he sent such grievance to the entire Howard leadership.  The FGC found that Howard's Notice was arbitrary and capricious and warranted a detailed investigation.  That preliminary finding required mandatory mediation, which was not covered by confidentiality and privilege, and at which Howard acknowledged that Plaintiff had not violated its Policy.

4.       Plaintiff's nearly 25-year relationship with Howard was governed by and understood through an employment contract, the *1993 Faculty Handbook*, and its implied duty of good faith and fair dealings.  Howard has a duty to Plaintiff to abide its rules and regulations and the implied duty of good faith and fair dealing.  Howard thus cannot make personnel decisions, whether positive or negative, without complying with the *1993 Faculty Handbook*, even if the Policy constitutes a stand-alone set of rules and regulations.  Howard breached its duty to Plaintiff under the *1993 Faculty Handbook* when it failed to comply with the Policy and OCR guidance, and in issuing the Notice, Howard breached Plaintiff's reasonable contractual expectations to be free of arbitrary and capricious personnel decision, his contractual entitlement of academic freedom, and his contractual right to free expression.  After these breaches, Howard labeled Plaintiff a sexual harasser, and without legal sufficiency, Howard notified the two complaining students that he was a sexual harasser and that he had been disciplined and sanctioned.

5.       On September 17, 2015, during a quiz, no sexual harassment took place. On December 4, 2015, Complainants 1 and 2 ("C1 and C2") filed complaints against Plaintiff.  In those complaints, C1 and C2 never alleged sexual harassment.  More than 504 days later, Howard made no material findings on the legal and factual predicates of

the threshold analyses of sexual harassment. Those predicates are whether Plaintiff made unwelcomed sexual advances, requested sexual favors, and engaged in verbal or physical conduct of a sexual nature. In this absence of legal and factual sufficiency in the complaints, and with no material findings on these predicates, Howard wrongfully sustained the fraudulently transmuted allegations and found that Plaintiff had committed sexual misconduct, needed sexual harassment sensitivity training, no longer had the contractual entitlement of academic freedom, and could be fired from Howard if he violated the Policy again.

6.      Howard's unsupported Notice was informed by erroneous outcome. Howard relied on an unknown, unpublished evaluation standard, i.e., the subjective experience of the female to determine conclusively if Plaintiff violated the Policy. Candi N. Smiley ("Smiley"), the investigator, was not fair, objective, neutral, and impartial, and believed the students' highly subjective allegations as holy writ. Smiley rejected Plaintiff's exculpatory and/or explanatory statements, which were based on his years of teaching Agency Law. The Report adopted the claims of and reliefs sought by the two students, which were driven by their deep hostility to Plaintiff's right to free speech, his professional personality, and his academic freedom to test them through various hypotheticals. Moreover, the Report was grounded on speculative beliefs and hearsay statements, none of which was supported by legal sufficiency and documented records/evidence. Within the Report, Smiley's (and thus Howard's) Rationale relied on inadmissible character evidence or character traits to assert that based on Plaintiff's purported past action, he more than likely drafted a depilatory hypo to test § 261 of a sexual nature. The Rationale's reliance of inadmissible character evidence or character

traits is a prop that hopes to stand in for sufficiently reliable and probative findings of material facts. Such evidence simply confessed the Rationale lack of legal and factual sufficiency. In the absence of such sufficiency, the Report flowed inexorably from Smiley's (and Love's) believe the victim stance, or her anti-male bias.

7. Howard engaged in negligent and intentional infliction of emotional distress. Based on the ongoing training of personnel in the Title IX Office, Howard knew or had reason to know that two students had not made allegations of sexual harassment against Plaintiff. Howard then converted their allegations, bringing them under the Policy's jurisdiction. In spring 2017, Howard suffered student protests, twitter storms, negative press coverage, and angry community outburst, accusing Howard of not punishing accused male employees and students. The unrest was triggered by 5 unresolved or slow to resolve complaints of sexual assault filed by five female students against Howard's male employees and students. After such protests, and as set forth in *Jane Doe 5 v. Howard*, Howard was under pressure for not punishing male employees and students who were accused of sexual misconduct. Howard feared that such infamy would trigger an OCR investigation. In the immediate days prior to the filing of *Jane Doe 5 v. Howard* on May 10, 2017, Howard issued its unsupported Notice against Plaintiff on May 4, 2017 on a timing that served a deep institutional conflict of interest, even though Howard had no legal sufficiency to find that Plaintiff had engaged in sexual misconduct.

8. Such Notice and the Disciplinary Action, which were permanently placed in Plaintiff's personnel file and other related employment files, altered the terms and condition of his employment and violated his reasonable expectations of contractual

entitlement of academic freedom because Howard can punish and discipline him, including terminating his employment, if his pedagogical approach, his professional personality, or his published articles from which he might choose to teach might contain what a University administrator considers "sexually offensive and/or indecent language," which arbitrarily and capriciously now falls under the Policy against sexual harassment.

9.      Today, Howard knows or has reason to know that males who are accused of sexual misconduct like sexual harassment become social and institutional pariah. Upon information and belief, Howard may be counting on accused males, even if wrongly found to have violated the Policy due to erroneous outcomes, keeping silent, lest they risk more than institutional sanctions.  In academia, Plaintiff has become a pariah, and he will suffer what will amount to professional solitary confinement. Due to rapidly shifting sexual norms and values, Howard's arbitrary and capricious labeling of Plaintiff as a sexual harasser was extreme and outrageous, especially because Howard had no factual or legal basis to assert Title IX jurisdiction over the specious allegations of Complainants 1 and 2, and because Howard knew or in the exercise of due care should have known that Smiley's Rationale lack the very legal sufficiency on which the Notice's legal and moral standing would rest.  What makes Defendants' arbitrary and capricious conduct so extreme and outrageous is that they knew or had reason to know that Plaintiff had not violated the Policy when on May 4, 2017 Wutoh stated that Plaintiff had not been chasing a student around his office, and when on July 12, 2017, during a mandatory mediation meeting, which was not governed by confidentiality and privilege, Wutoh also acknowledged in the presence of Plaintiff's then-legal counsel that Plaintiff had not violated Howard's Policy.  As a result, Plaintiff, even though he is an elected member of

the American Law Institute, will suffer the loss of new academic and administrative opportunities, including but not limited to lateral positions, visiting positions, distinguished visitorships, and decanal appointments, for which he has interviewed and been considered.

10.     As a direct and proximate cause of Howard's knowingly negligent and intentional conduct, which under the circumstances was extreme and outrageous, Plaintiff suffered emotionally, physically, and psychologically, resulting in for example panic attacks, anxiety, sleeplessness, suicidal ideations, etc., and Howard had every conceivable reason to know or to believe that if Plaintiff were found to have violated the Policy, especially falsely, he would suffer emotionally, physically, and psychologically.  Despite the reasonableness of such knowing and belief, Howard, even at the filing of this amended complaint, still hold to the assertion, despite what their own Report reveals, that Plaintiff's non-Title IX conduct on September 17, 2015 fell within the jurisdiction of the Title IX Office.

## II. PARTIES

11.     Plaintiff Reginald Leamon Robinson ("Plaintiff") is a natural person who resides in Silver Spring, Maryland.  Plaintiff has been a full-time faculty at Howard University since 1994 and tenured faculty since 1996.  Plaintiff is not an at-will employee.  His employment contract with Howard University has been governed by and understood through the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

12.     Defendant Howard University, Inc., ("Howard" or "University") is a private, enterprise, coeducational research university incorporated by an act of the United

States Congress in 1867. Howard, a culpable person, operates its university at 2400 Sixth Street, N.W., Washington, D.C. 20059. At all times relevant hereto, Howard University was and is a recipient of federal financial assistance within the meaning of 20 U.S.C. § 1681(a).

13.     Defendant Anthony K. Wutoh ("Wutoh"), appointed on June 15, 2015, was the Provost, Chief Academic Officer, and Title IX Decisional Authority at Howard University at all relevant times. Defendant Anthony K. Wutoh during all relevant times was the second highest-ranking agent and a culpable person at Howard University.

14.     Defendant Candi Smiley, Esq., ("Smiley") worked in the Office of the Provost and was listed as the then Deputy Title IX Coordinator, and a culpable person, at all relevant times and personally and/or with the ~~aide~~ assistance of other employees in the Office of the Provost's Title IX Office oversaw Howard's Title IX compliance, and investigated and responded to the allegations of sexual harassment against respondents.

15.     Defendant Vanessa Love ("Love") worked in the Office of the Provost, and on December 17, 2015 was listed as the Title IX Coordinator, and a culpable person, at all relevant times. "The Title IX Coordinator is tasked with overseeing the investigative process. It is the responsibility of the Title IX Coordinator to ensure that the Deputy Title IX Coordinator investigates the factual allegations of the complaint under the procedures of the Policy."[1]

16.     At all times material hereto, Howard acted by and through its agents, servants, employees, and representatives who were acting in the ordinary ~~course and~~ scope of their respective agency or employment and/or in the promotion of Howard's

---

[1]     See MEMORANDUM TO MR. REGINALD ROBINSON, PROFESSOR, SCHOOL OF LAW, NOTICE OF COMPLAINT MADE PURSUANT TO THE HOWARD UNIVERSITY TITLE IX (STUDENT) POLICY ON PROHIBITED SEXUAL HARASSMENT AND GENDER-BASED DISCRIMINATION IN EDUCATION PROGRAMS AND ACTIVITIES, dated Dec. 17, 2015, at 2, attached hereto as Ex. 12a & 12b [hereinafter after cited as "Complaint" or "Policy"].
[2]     As Dean Danielle Holley-Walker stated during her interview, "Professor Robinson is probably, he

business, mission, and/or affairs.   Where such agents, servants, employees, and representatives breached their authority or scope of their employment while attempting to promote Howard's business, mission, and/or affairs, Howard's leadership has either ratified or acquiesced in such breaches once they were placed at the very least on inquiry notice, and/or once they could have known fully of the extent of such breaches if it had undertaken ~~the~~ either the slightest or reasonable due diligence, and/or once they believed such conduct was done to serve the best, legal interest of the University.

### III.   JURISDICTION

17.   Diversity and supplemental jurisdiction of this Court against all defendants is invoked pursuant to 28 U.S.C. §§ 1331, 1332 (diversity), 1367, to 42 U.S.C. § 1988, and to 18 U.S.C. § 1964 because:  (a) Plaintiff and Howard are citizens of different states and/or federal district and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (b) the state law claims arise out of the same nucleus of facts as to be closely related to the federal claims and as to form the same case or controversy under Article III of the U.S. Constitution; and (c) Plaintiff suffered additional harm while seeking to remedy the sex-based discrimination against him.

18.   This Court has personal jurisdiction over Howard as Howard conducts business within the District of Columbia.

19.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Judicial District.  Howard University resides in the District of Columbia.

### IV.   COMMON FACTUAL BACKGROUND GIVING RISE TO RELIEF

**A.    Plaintiff's Employment Contract, Entitlement of Academic Freedom, and Freedom From Arbitrary and Capricious Action under § 2.8.2 of**

the *1993 Faculty Handbook*

### 1.    Plaintiff's Employment Contract

20.    In fall 1994, Plaintiff joined the law faculty in Howard.  In fall 1996, Plaintiff became tenured faculty.  Plaintiff is not an at-will employee.  Through Plaintiff's legal scholarship and academic publications, he has distinguished himself and brought notoriety to himself, the Law School, and Howard University.[2]  (Reginald Leamon Robinson's Curriculum Vitae, dated June 24th 2018, attached hereto as Amended Complaint, Ex. 1).

21.    Since 1994, Plaintiff has had an employment contract with Howard.  Per the *1993 Faculty Handbook*, that contract incorporates §§ 2 and 3 of the *1993 Faculty Handbook*.  (1993 Faculty Handbook, § 2.1, at 2-19, Original Complaint, Ex. 18).  The employment contract's terms and conditions have been understood through and governed by the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings. (*Allworth v. Howard Univ.*, 890 A.2d 194, 201 (DC CA 2006)).

22.    Within the District of Columbia, Plaintiff's employment contract, the *1993 Faculty Handbook*, and its implied duty of good faith and fair dealings together fully determine the duties, rights, privileges, obligations, and procedures between Howard and its faculty.  (*McConnell v. Howard Univ.*, 818 F.2d 58, 62-63 (CA DC Cir. 1987)) Howard's actions to enforce its rules and regulations, e.g., Title IX Policy, must comply with and promote the decency, fairness, and/or reasonableness of Plaintiff's contractual expectations.  (*Allworth v. Howard Univ.*, 890 A.2d 194, 201 (DC CA 2006)).

---

[2]    As Dean Danielle Holley-Walker stated during her interview, "Professor Robinson is probably, he may be the most prominent person on our faculty, in terms of scholarship.  In terms of his writing, how well he is known nationwide in terms of scholarship." (Report of Investigation, Interview Report, Dean Holley-Walker, at 12, ECF No. 11, Exhibit 1).

23.     Howard's Policy is appended to the *1993 Faculty Handbook* at Appendix B. (1993 Faculty Handbook, Ex. 2, at B103-B-111), and even if Howard posits that the Policy constitutes a stand-alone set of rules and regulations, Howard's Policy cannot unilaterally amend the faculty's reasonable contractual expectations and entitlement of academic freedom arising out of and under Plaintiff's employment contract and the *1993 Faculty Handbook*. (1993 Faculty Handbook, Ex. 2, § 2.9, at 2-68 to 2-70 (setting forth the process by which the *1993 Faculty Handbook* can be amended))

24.     Under the *1993 Faculty Handbook*, the Policy stated, "Disciplinary actions against individuals who do not belong to collective bargaining units will be in accordance with the applicable University handbook." (1993 Faculty Handbook, Ex. 2, § X., at B-111)

25.     Since July 1994, Plaintiff has not been part of a collective bargaining unit, and any disciplinary action under the Policy against Plaintiff must comport with Plaintiff's reasonable contractual expectation arising out of and under the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

26.     Since 1994, per the *1993 Faculty Handbook*, Plaintiff has had a reasonable contractual entitlement of academic freedom and reasonable expectation to be free of arbitrary and capricious actions by Howard. Those entitlement and expectation must be enforced and understood through the *1993 Faculty Handbook* and its implied duty of good faith and fair dealing. (1993 Faculty Handbook, Ex. 2, § 2.8.2, at 2-62)

### 2.     Plaintiff's Contractual Entitlement of Academic Freedom and Free Speech

27.     In setting forth Howard's Academic Freedom Policy, the *1993 Faculty Handbook* provides, in relevant, part:

> Faculty members are *entitled* to freedom in the classroom in discussing
> their subjects, but they should be careful not to introduce matter into their
> teaching that has no relation to their subjects.  Students are entitled to an
> atmosphere conducive to learning and to even-handed treatment in all
> aspects of their teacher-student relationship.  Therefore, in exercising their
> freedom in the classroom, faculty members are responsible for ensuring
> that their treatment of students is in no way inconsistent with the
> university's equal opportunity policy or the university's commitment to
> promoting the education aspirations and achievements of all students.

(1993 Faculty Handbook, Ex. 2, § 2.2.4, at 2-22) (italics added).

28.    On February 28, 2017, President Wayne A.I. Frederick committed
Howard to the principles of free speech and noted that the University has defended the
right of faculty to "express a wide range of often conflicting points of view"[3]  He declared
that Howard has been a "safe haven for such discourse."  He stated that Howard
welcomed "opposing views."  He stated that Howard would provide "a platform for
stimulating dialogue among students, faculty, staff and alumni alike."  He stated that
Howard's progress rested on "respectful dialogue, not bullying behaviors."  He also
stated that the Howard community must "learn to communicate with those who have
opposing views."  He encouraged the Howard community to "avoid the use of
condemning speech."  (President Wayne A.I. Frederick, Statement on Freedom of
Speech, Tuesday, Feb. 28, 2017)

29.    Together, § 2.2.4's entitlement of academic freedom and President
Frederick's commitment to free speech dedicated and acknowledged Howard as a
community of different professional personalities, pedagogical approaches and teach
styles, ideas and thoughts, scholarly approaches, and respectful dialogues.  As a
corollary, § 2.2.4's entitlement and the President's commitment rejected rude or abusive

---

[3]     *See generally* Letter from Wayne A.I. Frederick, M.D., M.B.A., President, Howard Univ., to
Howard       Univ.      Community      (Feb.     28,     2017,     *available     at*
https://www2.howard.edu/about/president/statements/freedom-of-speech-0228017.

ways of opposing differing views.

30.     Under § 2.2.4, Plaintiff has a reasonable contractual entitlement of academic freedom to choose his textbook, to develop pedagogical approaches to teaching bedrock legal principles of law, to ground students in the logic of deductive and inductive reasoning, to fashion logical black-box hypotheticals of varying complexities to reinforce such bedrock legal principles, to provide reasonable feedback through the learning module of quizzes at the end of very textbook chapter, and finally to write final examinations that provide an in-depth coverage of the fundamental legal principles within the textbook and of the verbally or otherwise delivered materials to the students.

31.     In fall 2015, Plaintiff taught Agency, Partnerships, and Other Unincorporated Business Associations ("Agency Law"). Plaintiff chose an excellent, widely adopted textbook.  That textbook required Plaintiff to revisit traditional and fundamental legal concepts of the first-year curriculum, e.g., torts, criminal law, and contracts.  (J. DENNIS HYNES & MARK J. LOEWENSTEIN, AGENCY, PARTNERSHIP, AND THE LLC: THE LAW OF UNINCORPORATED BUSINESS ENTERPRISES xi-xxvii (9th ed., 2015) (Table of Content), attached hereto as Ex. 3).

32.     Consistent with § 2.2.4 and President Frederick's commitment, Plaintiff drafted learning, evaluative, and testing modules called Knowledge Demonstration Opportunities ("KDO").

33.     KDOs are multiple-choice quizzes.  KDOs are sex and gender neutral. Once students have taken KDOs, they receive immediate feedback.  Students must volunteer to participate.  Non-participants suffer no final grade penalty.  Meaningful participation requires students to reveal their choices and to defend those choices based

on the legal principles and relevant/material facts.  KDOs contain geometric givens and algebraic probabilities, on which students' analyses depend.  KDOs offer Plaintiffs' students opportunities to analyze substantive rules and to train in deductive and inferential reasoning. ((Agency Law, Fall 2015 Syllabus, attached hereto as Ex. 4; Faraz Siddiqui's Affidavit, dated Dec. 21, 2017, attached hereto as Ex. 5; Vernon Ross's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 6).

34.     KDOs constitute logical black boxes (a traditional mainstay of near classic law school pedagogy), beyond which students need not venture factually and substantively to answer quiz questions. (De Cruise's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 7).

35.     Consistent with § 2.2.4, in fall 2015, Plaintiff required his students to read emotionally charged cases related to *Vicarious Tort Liability* (Chapter 3), dealing *inter alia* with assault, sexual assault, sexual misconduct, rape, criminal molestation, pedophilia, etc. (*See* Textbook Table of Content, Ex. 3).

36.     On September 8, 2015, Plaintiff gave his students a KDO on the substantive law of vicarious tort liability (chapter 3).  (KDO3, dated Sept. 8, 2015, attached hereto as Ex. 8).

37.     In fall 2015, Plaintiff sought to test § 261 of RESTATEMENT (SECOND) AGENCY (1958) using tortious touching and fraud in the hypothetical context of depilatory personal services.  Section 261 states that "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his [or her] authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."

38.     In fall 2015, Plaintiff researched the annotated materials of § 261, and learned that § 261 applies to tortious touching by an agent, *viz.*, tortious touching and deceit;[4] sexual harassment and constructive discharge;[5] sexual harassment and negligent hiring/retention;[6] employee's homosexual advances toward a student;[7] and rape and sexual assault.[8]

39.     On September 17, 2015, Plaintiff gave his students a KDO (chapter 5— *Fraudulent Acts of Agents*). Of the seven questions, Question 5 asked: if a customer, T, sought a depilatory service (Brazilian wax) from an owner, P, if T had never had such a service, if P's employee or agent, A, explained the services (full or partial) to T, if A described the touching that was required, if T signed the personal services contract believing what A had said to T, if T upon awaking from a light sleep felt funny and accused A of tortious touching, and if T sued P citing vicarious liability for A's alleged tortious touching, would T prevail?

40.     Question 5 offered geometric givens and algebraic probabilities to the students. First, at a later deposition, the attorneys for P and T understood that A had not touched T tortiously. Second, by implication, this understanding connotes that A did not make fraudulent misrepresentations to T, and third that A had not induced T to T's legal detriment. Fourth, despite this understanding, T insisted on suing P. Fifth, in responsive

---

[4]     *See Bowman v. Home Life Ins. Co.*, 243 F.2d 331 (3d Cir. 1957) (an insurance agent masquerades as medical doctor and tortiously gave mother and daughter a physical exam).

[5]     *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) (employer liable for employee's refused sexual harassment and constructive discharge).

[6]     *See Jansen v. Packaging Corp. of America*, 123 F.3d 490 (7th Cir. 1997) (employer liable for negligent hiring and retention for employee's sexual harassment).

[7]     *See Bozarth v. Harper Creek Board of Educ.*, 288 N.W.2d 424, 426 (Mich. App. 1979) (school district not liable due to immunity and per § 228 employee's conduct was not actuated to serve employer's interest).

[8]     *See Primeaux v. United States*, 181 F.3d 876, 880 (8th Cir. 1999) (native female who was raped and sexual assaulted by tribal reservation officer cannot hold United States liable under theory of apparent authority and Federal Tort Claims Act); *Doe v. Forrest*, 853 A.2d 48, 63 (Vt. 2004) (holding that material facts existed as to whether deputy was aided in accomplishing assault due to agency relationship under §§ 219(2)(d) and 261).

pleadings, P demurred.   With those geometric givens and algebraic probabilities (implications), will T prevail?  The students must choose from among four choices.  For students who had carefully read and who knew the elements of § 261, the Answer was (D) No. (KDO5, Question 5, Fall 2015, attached hereto as Ex. 9).

41.     On September 17, 2015, Question 5 was a proper test of Agency Law because a student's correct, complete analysis would have included the following:

(a)     P had held A out as an agent, servant, and/or employee;

(b)     A, while A was within the scope of A's employment, made representations to T about the Brazilian waxing services, which T had never received before;

(c)     T, as a result of A's representations about the services and the required touching to provide this service, agreed to the service, which suggests that A might have been induced by T to sign the service contract;

(d)     T, believing that A had been properly held out by P as P's agent, servant, and/or employee, would have had no notice if A's representations about the waxing service were offered to serve P's economic interest or A's fraudulent intentions;

(e)     T, at the completion of the waxing service, and after awaking from a light sleep, felt funny and accused A of touching T tortiously;

(f)     T later sued P alleging that P, an innocent employer, was liable for A's allegedly tortious conduct toward T;

(g)     T, assuming that A had touched T tortiously, need not show that P didn't benefit from the alleged tortious touching during the services rendered by

A;

       (h)     in the alternative, T's claim for tortious touching, if true, would not be defeated by P showing that A's tortious touching wasn't actuated at least in part to benefit P (*see* § 228 of RESTATEMENT (SECOND) AGENCY);

       (i)     later, during the deposition, attorneys for P and T realized that A did not touch T tortiously, but T nevertheless insisted on suing P; and

       (j)     to the call of the question: "If P demurred, in effect saying 'Yeah, so what!' to T's pleadings, will the court find in favor of T?"

42.    Given ¶ 41, in analyzing Question 5, no student, who knew the elements of § 261, would have had to introduce the factual irrelevancy of her/his personal grooming habits, or would have had to discuss the legal irrelevancy of whether T could actually and/or in reality fall asleep even lightly during a depilatory service, when Question 5 provided students with geometric givens (and algebraic probabilities) on which they should rely to deduce logically the correct answer choice—(D) No. (De Cruise's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 7).

43.    Per § 2.2.4's contractual entitlement and President Frederick's commitment to the principles of free speech, Plaintiff drafted a proper depilatory service hypo that mirrors real world legal issues faced by innocent (and negligent) employers. (https://www.washingtonpost.com/    amphtml/local/public-safety/massage-therapist-arrested-after-alleged-sexual-assaultin-dc/2017/09/18/5ca87780-9ca5-11e7-84fb-b4831436e807_ story.html; http://amp.tmz.com/2017/09/27/massage-envy-sued-woman-claims-therapist-sexually-assaulted.)

44.    Per § 2.2.4's contractual entitlement, Plaintiff treated all students even-

handedly, especially when a volunteering female student observed, "T would not sleep!" To which Plaintiff said, "No?"  She said, "No!"  At that point, Plaintiff immediately halted the feedback.  (De Cruise's Affidavit, dated Dec. 29, 2017, attached hereto as Ex. 7).  He issued the following caveat: do not challenge the hypo based on what you know or what you might believe or know.  That caveat prevented any (male or female) student from offering personal grooming habits.  No student challenged whether T could fall into a light sleep.  No student did offer personal grooming habits.  Plaintiff treated all students equally by limiting their volunteered answers and analyses to the elements and factors set forth in ¶ 41.

45.     Per § 2.2.4's contractual entitlement, Plaintiff must craft questions that he believes will best convey the nuances of Agency Law to his students.  Such contractual freedom cannot be only properly exercised if Plaintiff used only the "most anodyne or commonly employed illustrations of each principle [he is] teaching." (Susan Kruth, FIRE's Letter to President Wayne A.I. Frederick, Howard University, on Behalf of Professor Reginald Leamon Robinson, dated June 16, 2017, at 6, attached hereto as Original Complaint, Ex. 10; Susan Kruth, FIRE's Letter to President Wayne A.I. Frederick, Howard University, on Behalf of Professor Reginald Leamon Robinson, dated Dec. 19, 2017, attached as Ex. 11).

46.     Per § 2.2.4's contractual entitlement, Plaintiff illustrated a principle of Agency Law, § 261, that differed factually from the overwhelming majority of his hypotheticals in fall 2015 that did not include allegations of tortious touching.

    **3. Plaintiff's Reasonable Contractual Expectation to be Free of Arbitrary and Capricious Personnel Action Under § 2.8.2 of the *1993 Faculty Handbook*.**

47.     Plaintiff has been employed at Howard for nearly 25 years.  Plaintiff has

an employment contract with Howard.  That contract has been governed by the *1993*

*Faculty Handbook* and its implied duty of good faith and fair dealing.

48.     In 1994, Plaintiff was hired at Howard based on the *1994 Faculty*

*Handbook*'s section for appointing tenure-track faculty.

49.     Since 1996, Plaintiff was tenured under the *1993 Faculty Handbook*, Law

School bylaws, and other rules and regulations that were promulgated by Howard and

that were consistent with the *1993 Faculty Handbook*.

50.     Since 1994, Plaintiff has received three sabbatical leaves and one unpaid

leave to serve as a Distinguished University Visitor in Law and Social Theory at the

Southern Illinois University-Carbondale, all considered within and granted under the

sections of the *1993 Faculty Handbook*.

51.     Based on ¶¶ 48-51, Plaintiff has a reasonable expectation that any

personnel decision, whether positive or negative, by the University that would affect his

standing as tenured faculty would strictly comply with the *1993 Faculty Handbook*.

52.     Based on this reasonable expectation, where Howard's personnel

decisions failed to comply strictly with known and published rules and procedures,

including the *1993 Faculty Handbook* and the Policy, Plaintiff as an eligible faculty could

file a complaint, alleging that:

> action has been taken that involves the faculty member's personnel status
> or terms and condition of employment, and that is a violation of academic

---

[9]     Hypothetically, if Howard were to have denied Plaintiff's application for tenured and/or
promotion, Howard would have had to comply with the requirements of the *1993 Faculty Handbook*, and if
Plaintiff were to have appealed or challenged any such denials, he would have had to do so as prescribed by
and understood through the *1993 Faculty Handbook*, and any other set of rules and procedures that was
consistent with the reasonable contractual expectations of the *1993 Faculty Handbook. See, e.g., Allworth
v. Howard Univ.*, 890 A.2d 194, 201 (DC CA 2006); *McConnell v. Howard Univ.*, 818 F.2d 58, 62-63 (CA
DC Cir. 1987).

freedom, arbitrary and capricious (i.e., act action that is unsupported by the record presented to support the action taken), or a violation of established rules and procedures.

(1993 Faculty Handbook, Ex. 2, at 2-62)

53.     In the District of Columbia, Plaintiff's employment contract and the *1993 Faculty Handbook* are valid and enforceable contracts. (*McConnell v. Howard Univ.*, 818 F.2d 58, 62-63 (CA DC Cir. 1987))

54.     Under the *1993 Faculty Handbook*, "Sexual Harassment" has been defined as

verbal or physical conduct of a *sexual* nature when submission to such conduct is made either explicitly or implicitly a term or condition of [a student's educational opportunities or activities], submission to or rejection of such conduct by an individual is used as the basis of an [educational opportunity or activity] affecting such [student], or such conduct has the purpose or effect of unreasonably interfering with [a student's] opportunities or activities or creating an intimidating, hostile, or offensive [educational] environment.

(1993 Faculty Handbook, Ex. 2, § 2.2.1.2, at 2-20) (italics added).

55.     Under the Policy, "Sexual Harassment" is defined, in relevant part, as "Unwelcomed *sexual* advances, requests for *sexual* favors, and other verbal or physical conduct of a *sexual* nature when:

"(1)     Submission to such conduct is made either explicitly or implicitly a basis for any decision affecting the terms or condition of participation in any such program or activity or status in an academic course; or

"(2)     Such conduct has the purpose or effect of unreasonably interfering with a student's educational right, privilege, advantage, or opportunity; or

"(3)     Such conduct is so pervasive or severe that it creates an intimating, hostile, or offensive environment for learning and has no reasonable relationship to the

subject matter of the relevant course of instruction." (Policy, Ex. 12b, § IV. N.(1)-(3), at 6 (italics and bold added).

56.     Pursuant to the *1993 Faculty Handbook* and Howard's Policy, "sexual harassment" requires at the very least that on September 17, 2015, Plaintiff's Question 5 and his words and conduct be *sexual* or of a *sexual* nature. (Id., Ex. 2)

57.     Per the Policy, Howard's proper investigation required Smiley, the investigator, to draft a Report of Investigation ("Report"). That Report also contained a Report of Interviews ("Interviews") prepared by Love.

58.     Per the Policy and OCR Guidance, it is through the Report, even if the Report was an internal document, that Howard must show that the Complainants 1 and 2's ("C1" and "C2") allegations were legally sufficient to establish proper allegations of sexual harassment. Based on this sufficiency, the Title IX Office can assert proper jurisdiction over C1 and C2's allegations of December 4, 2015.

59.     Per the Policy and OCR Guidance, it is through the Report that Howard must show that it has met its burdens of production and persuasion under the preponderance of the evidence standard.

60.     Per the Policy, and ¶¶ 58-59, the Report must be the factual and legal bases for supported, *material* findings that allegations of sexual harassment against Plaintiff have been properly sustained.

61.     Per the Policy, the Report's factual and legal bases must have a stated methodology *and* findings of *material* facts and conclusions.

62.     Per the Policy, the Report failed to make findings of *material* facts and conclusions. The material facts would be significant and essential to determine whether

on September 17, 2015 Plaintiff's Question 5 and his words and conduct were unwelcomed *sexual* advances, requested *sexual* favors, and were verbal or physical conduct of a *sexual* nature.  Without the legal sufficiency of these indispensable predicates of sexual harassment, the Report cannot make findings of material fact that would sustain a legal, sound conclusion that on September 17, 2015 Plaintiff violated the Policy.

63.     The Report's Rationale made immaterial findings against Plaintiff.  Those findings were not material to central query of whether sexual harassment occurred on September 17, 2015.  Those findings lacked legal sufficiency on the indispensable predicates of sexual harassment.  The Rationale and its immaterial findings concluded illogically that Plaintiff engaged in sexual harassment.  Without material findings, the Rationale's conclusions were arbitrary and capricious.

64.     Per the Policy, the Report must make recommendations of sanctions and disciplinary actions.  The Report's rationale failed to make findings of a material fact to sustain a conclusion that Plaintiff violated the Policy.   Smiley's disciplinary recommendations must follow from appropriate findings of material facts.   Lacking material facts, Smiley's recommendations, which were adopted by Wutoh, were arbitrary and capricious.

65.     On May 4, 2017, Howard issued its Notice against Plaintiff.  The finding against Plaintiff was conclusory, i.e., sufficient evidence existed to sustain the allegations of sexual harassment against Plaintiff.

66.     On May 4, 2017, Plaintiff met with Wutoh and Love for the reading of the Notice.  At this meeting, Wutoh said, in response to Plaintiff seeking help to understand

the finding against him, "it's not like you were chasing a student around your office." Wutoh's statement offered *prima facie* evidence that Plaintiff had not violated the Policy.

67.    That Notice contained no findings of material facts. The Notice presented no legal sufficiency on the central question on which the Policy's jurisdiction could be properly asserted. That central question was:  did Plaintiff's Question 5 and his words and conduct constituted unwelcomed *sexual* advances, requested *sexual* favors, and were verbal or physical conduct of a *sexual* nature?  This central question goes to the legal sufficiency of the indispensable predicates of any sexual harassment claim.

68.    The Notice draws its substance and force from the Report. The Report was arbitrary and capricious.   The Notice was unsupported and conclusory; its finding was consistent with Smiley's Report and its Rationale.

69.    Due to several reasons, especially the absence of findings of material facts, the Notice evidenced that Howard had failed to meet its burdens of production and persuasion under the preponderance of the evidence standard as set forth by OCR Guidance.

70.    The Notice and Disciplinary Action of May 15, 2017 were personnel action.  Howard's personnel decisions, whether positive or negative, must comply with his employment contract and the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.   Howard's personnel decision did not comply with known and published rules, regulations, and procedures.

71.    Per § 2.8.2, Plaintiff filed an appeal memorandum with Wutoh on or about May 14, 2017. In the appeal memo, Plaintiff analytically showed Wutoh that the Notice made no findings of material facts. Without such material findings, no objective basis or

23

legal sufficiency existed to support the findings against Plaintiff. Without such legal sufficiency, the Notice was arbitrary and capricious. The Notice thus violated Plaintiff's reasonable contractual expectations to be free of arbitrary and capricious actions by the University as set forth in the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

72.     Plaintiff's appeal memo was sent to Wutoh, the Provost, the second highest-ranking agent/Officer at Howard, and the Title IX Decisional Authority. Per the Policy, Plaintiff could not appeal Wutoh's final decision to any other University official. Wutoh, who had received Plaintiff's appeal memo, was the proper and only person to whom Plaintiff could appeal. (See Professor Robinson's Appeal Memo to Dr. Wutoh, Provost & Title IX Decisional Authority, dated 15 May 2017, attached hereto as Ex. 25) Under the Policy, Wutoh was initially required to read the Report and the Rationale, to review its Recommendations, and to adopt the Report and its Recommendations as he saw fit. Under this due diligence burden, Wutoh had institutional authority to take corrective action. Without addressing any of Plaintiff's cogent claims, Wutoh on May 25, 2017 summarily, arbitrarily, and capriciously rejected Plaintiff's appeal. (Provost Wutoh's Email Rejecting Plaintiff's Appeal, dated May 24, 2017, received on May 25, 2017 at 1:49am, attached hereto as Ex. 13)

73.     In Wutoh's rejection, he did not state that he had revisited the Report, reviewed the rationale, and reconsidered the recommendations. (Wutoh's Email to Reggie, dated May 24, 2017, at 1:49am, attached hereto as Ex. 13). Wutoh stated that he had relied on the personnel in the Title IX Office. Per the Policy, Wutoh had a duty of due diligence, which he cannot negligently delegate, if at all, to any other University

personnel. (Policy, Ex. 12b, § V. C. (9), at 14); Smiley's Emails to Reggie, Acknowledging Receipt of Plaintiff's Appeal Memo, dated May 17, 2017, attached hereto as Ex. 26)

74.      After filing his appeal memo on or about May 14, 2017, Plaintiff told Wutoh that he was sending his documents to a FIRE, a nonprofit, nonpartisan, disinterested third-party organization. Plaintiff believed that FIRE, if it agreed with him, could help him to reverse the Notice, to rescind the Disciplinary Action, and to end the sex discrimination he faced. (Reggie's Email to Wutoh, dated May 18, 2017, at 11:41pm, attached hereto as Ex. 14);[10] Reggie's Email to Susan Kruth, FIRE, dated May 22, 2017, at 6:11pm, attached hereto as Ex. 22); Reggie's Email to Wutoh, May 23, 2017, at 8:26am, attached hereto as Ex. 23).

75.      Upon receiving Wutoh's summary rejection, Plaintiff notified him that he would appeal to the Faculty Grievance Commission ("FGC") as set forth under § 2.8.2. of the *1993 Faculty Handbook*. (Reggie's Email to Provost Wutoh, dated May 25, 2017, attached hereto as Ex. 15).

76.      Per the *1993 Faculty Handbook*, Plaintiff had to undertake good faith mediation to resolve the dispute between Plaintiff, Wutoh, Smiley, and thus Howard. Plaintiff satisfied that statutory requirement when he filed his appeal memo with Wutoh. (*See* 1993 Faculty Handbook, Ex. 2, § 2.8.3.2, at 2-62)

77.      On May 25, 2017, Plaintiff sent a copy of the appeal memorandum to President Frederick and Chair of the Board of Trustees, Mr. Stacey Mobley. (See Prof.

---

[10]      Prior to Plaintiff notifying Wutoh that he would send the record to FIRE, Wutoh had expressed some interest in talking to Plaintiff the University or Law School graduation ceremonies. *See* Wutoh's Email to Reggie, dated May 15, 2017, at 9:49am, attached hereto as Ex. 14a. After Plaintiff notified Wutoh of FIRE's external review of the record, Plaintiff did not hear from Wutoh until Plaintiff received his summary rejection of his appeal memo.

Robinson's Email with Attachments to Mr. Stacey Mobley, Chair, Board of Trustees, Howard University, dated May 25, 2017, attached hereto as Ex. 29)  Plaintiff used email addresses to which he had sent notes previously and from which he had received responsive replies.  Neither the President nor Mr. Mobley responded to Plaintiff's effort to seek relief, even though they had the institutional authority to make corrective action. (Reggie's Email and Attachments to President Frederick, dated May 25, 2017, attached hereto as Ex. 16).

> **4.    Wutoh and Mr. Teeling Acknowledged that Plaintiff Did Not Violate the Policy at the July 12, 2017 Mandatory Mediation Between Grievant and Respondents, & Notice Is Thus Arbitrary and Capricious**

78.    On June 6, 2017, Plaintiff filed a timely grievance with FGC under § 2.8.2. (1993 Faculty Handbook, Ex. 2, § 2.8.3.3, at 2-63).  Plaintiff also sent a copy of the grievance to Mr. Mobley, President Frederick, Dean Holley-Walker, Dr. Taft Broome, Chair, Faculty Senate, and the FGC Commissioners. *Professor Robinson Grievance against Provost Wutoh and Candi N. Smiley, Esq.*, dated June 6, 2017, attached hereto as General Allegations, and Legal Analyses, Ex. 17).

79.    On or about June 10, 2017, Plaintiff met with the FGC and presented his grievance to the Commissioners who attended the meeting.

80.    On June 14, 2017, the FGC preliminarily found that Plaintiff's grievance "merited detailed investigation." The FGC notified Wutoh and Smiley of its preliminary finding. The FGC based its preliminary finding on the following:  (a) Wutoh and Smiley had violated the implied duty of good faith and fair dealings; (b) the Notice was arbitrary and capricious; (c) the Notice violated rules and regulations; and (d) the Notice and

Disciplinary Action altered the terms and conditions of Plaintiff's employment contract. (FGC's Disposition Letter to Reginald Leamon Robinson, dated June 14, 2017, attached hereto as Ex. 18).

81.     Per the *1993 Faculty Handbook*, the FGC's preliminary finding triggered mandatory mediation.  Such mediation fell under § 2.8.3.3, which removed the "good faith" requirement.  Section 2.8.3.3 is not governed by any confidentiality and/or privilege communication rule. (*See* 1993 Faculty Handbook, Ex. 2, § 2.8.3.3, at 2-63)

82.     In advance of the mediation of July 12, 2017, none of the parties, in writing or otherwise, asked for confidentiality and/or privilege communication rule.

83.     No confidential or privilege information was disclosed.

84.     Upon information and belief, Wutoh and Mr. William Teeling, Office of the General Counsel ("Teeling"), were recording the mediation meeting.

85.     On July 12, 2017, the mediation meeting between Plaintiff, his then-legal counsel, Mr. GT Hunt, Wutoh, Smiley, and Teeling was not governed by the District of Columbia's Uniform Mediation Act as no mediator or a person who provided services as a mediator was present and/or acting within such a role at the meeting.  The mediation meeting was not mandated by a federal or local rule, or an administrative agency.

86.     On July 12, 2017, the parties in ¶ 86 met for mediation.  Per the *1993 Faculty Handbook*, § 2.8.3.3, this mediation was not covered by confidentiality and privilege.  At this mediation, Wutoh acknowledged that Plaintiff had not violated the Policy.

**B.     Complainants 1 and 2's Allegations, Smiley's Anti-Male Bias/the Subjective Experience Test, and Howard's Failure to Follow its Published Rules and Procedures**

1. **Complainants 1 and 2's Allegations Attack Plaintiff's Academic Freedom and Free Speech on December 4, 2015**

87.     On December 4, 2015, Complainants 1 ("C1") and ("C2") 2 did not file sexual harassment complaint against Plaintiff with the Title IX Office.

88.     C1 and C2 never alleged that Plaintiff had made unwelcomed *sexual* advances, requested *sexual* favors, and engaged in words or other physical conduct of a *sexual* nature. (See Smiley's Report of Investigation & Findings of Complaint Against Professor Reginald L. Robinson, Defendant's Motion to Dismiss and/or Motion for Summary Judgment, ECF. No. 11, June 6, 2018, citing Ex. 1, at 2 to 26 of 274).

89.     C1 and C2 never alleged that apart from facilitating KDO5, Plaintiff engaged in an independent series of actionable conduct under Title IX.

90.     After nearly three months of talking to each other (and to other students and faculty), sharing ideas, formulating objections, and developing strong odious feelings against Plaintiff, C1 and C2 filed formal allegations against Plaintiff.

91.     C1 directly and C2 implicitly sought institutional corrective action against Plaintiff's beliefs, ideas, thoughts, and arguments, against his casual communication style, against his pedagogical tools and models, and against his presence at Howard Law School, including at the very least punishment and at best termination.

92.     C1 and C2 principally filed their complaint after seeking to make sense of Question 5 on September 17, 2015 and finding that sense in Plaintiff's two peer-reviewed articles.

93.     C1 and C2 both perceived Plaintiff's casual communication style as intimate, unprofessional, "overly familiar," "overly comfortable," and too relaxed an

interaction for the Agency Law class and for Howard law students generally. C1 stated that Plaintiff's communication style like using his first name ("Reggie") in class and in emails was a negative, too intimate, and uncomfortable experience for her. C2 too stated that by using Plaintiff's first name in emails, he was "overly comfortable."

94.    C1 and C2 objected to Plaintiff's academic freedom and free speech, stating that he believed that black women (and mothers) abused their children. C1 and C2 stated that Plaintiff's published beliefs advocated for or justified misogyny and violence against black women. C1 stated that she did not "understand how in an academic and intellectual environment I'm supposed to look at the things that my professor has published and feel okay, being in his class." (Id. at 4)

95.    C2 stated that she did not have multiple issues with Plaintiff. C2 had heard stories about Plaintiff from other students. Based on these stories, C2 did not attend Plaintiff's office hours. C2, based on these stories, wrongly reported that Plaintiff had used an "explicitly sexual fact pattern" in prior semesters. C2 stated as incorrect hearsay that, referring to a past KDO's "explicitly sexual fact pattern," Plaintiff gave all students the same grades except for failing one. C2 stated that she did not like the tone of the conversation on Question 5, and C2 left the classroom during the discussion.

96.    C1 and C2 talked about Plaintiff's published ideas. C1, sharing how C2 felt, said: "'You should see the crazy stuff that he has actually published' looking at it, and knowing that there is someone who represents the Howard name at all that has put this kind of black woman hate um out into the public is disturbing to me." (Id. at 5)

97.    In ¶ 95, C2 stated that Plaintiff's published ideas should be punished by students who could use an institutional means to say that his intellectual ideas and

thoughts were incompatible with Howard's brand or mission. C2 stated explicitly that Plaintiff must be punished for offending black women or for writing inappropriate things about black women, to wit:

> I really feel like there should be at least some kind of action that students or [sic] able to take to say this is inappropriate. Ah we're not comfortable with this. I'm not comfortable reading this as a black woman. I'm not comfortable having to sit in this man's class and know that these are the kinds of things that he writes in his personal time.

(*Id.* at 5).

98.     C1 stated that Plaintiff was "being so difficult." C1 did not give examples of such difficulties. C1 did not like Plaintiff's casual professionalism and use of his first name in class. C1 did not like that Plaintiff used storytelling of potential child abuse in a class in which she was not enrolled. (In fall 2015, Plaintiff taught a Jurisprudence seminar.) Then, at some time after September 17, 2015, C1 stated that she came across Plaintiff's peer-reviewed articles. C1 stated (apparently in response to a question from Smiley) that she took meaning from them about Plaintiff's place at Howard, stating: "I don't know, I, the only way that I can make the point is to say that if I had found out my white professor was a Klansmen, I would feel exactly the same way." (*Id.* at 4)

99.     Smiley asked C1 for specific examples of conversations or things Plaintiff had said in class that made her feel uncomfortable about going to Plaintiff's office hours. C1 responded by stating: (a) Plaintiff's pedagogical choice to use storytelling in the child welfare seminar; (b) Plaintiff's salutations ("Dear loving students") and sign offs ("Peace, love, and namaste. Reggie")[11] in emails; (c) Plaintiff's use of his first name was "overly familiar"; and (d) Plaintiff's beliefs in his peer-review articles.

---

[11]     On January 13, 2016, Plaintiff told Smiley that his spiritual practice is East and West, i.e., Christian/New Age Philosophy and Buddhism.

100.    Based on ¶¶ 89-98, C1 and C2 proffered not one jot of actionable words or conduct by Plaintiff. C1 and C2 gained some insight into Question 5 from reading Plaintiff's peer-reviewed articles after September 17, 2015. C1 and C2 stated that Plaintiff's beliefs hurt Howard's brand and like black hating white Klansmen, Plaintiff ought to be punished or terminated. Based on hearsay, C1 and C2 did not attend Plaintiff's office hours. C1 and C2 reported factually incorrect hearsay about a prior KDO question that led to flat grading and one failing grade.

101.    Based on ¶¶ 89-98, C1 and C2's complaint on December 4, 2015 constituted nothing more than an attack on Plaintiff's contractual entitlement of academic freedom and free speech.

102.    Neither C1 nor C2 stated that Plaintiff made unwelcomed sexual advances, that he requested sexual favors, and that he engaged in verbal or other physical conduct of a sexual nature. C1 and C2 likewise did not state that Plaintiff engaged in independent words or conduct of a sexual nature while he facilitated KDO5.

103.    C1 and C2 never stated that Plaintiff conditioned their participation in the Agency Law course or their matriculation at Howard or submitting to non-sexual words or conduct.

104.    C1 and C2 never stated that Plaintiff's non-sex-based words or conduct had the purpose or effect of unreasonably interfering with their right to continue in the Agency Law course or to matriculate at Howard.

105.    C1 and C2 never stated that Plaintiff's Question 5, pedagogical style, and testing modalities were so pervasive or severe that he created an intimidating, hostile, or offensive environment for learning *and* his Question 5 and his pedagogical queries had no

reasonable relationship to Agency Law.

106.    Based on the interviews of December 4, 2015, C1 and C2 did not allege

that Plaintiff engaged in sexual misconduct, i.e., sexual harassment.  C1 and C2's

statements did not sound directly or implicitly in a legally sufficient claim of sexual

harassment.  C1 and C2's complaint cannot properly fall within the jurisdiction of the

Policy.

### 2.    Smiley's Subjective Experiences of the Female Complainants & the Rationale's Failed Burden of Proof

107.    On December 4, 2015, based on the interviews, Smiley knew or had

reason to know that C1 and C2's allegations fell outside of the Policy's purview.

108.    Under the Policy, the December 4, 2015 interviews permitted Smiley or

the Title IX Office to vet C1 and C2's allegations.  C1 and C2's allegations must make

out a *prima facie* on actionable conduct under the Policy.  C1 and C2's allegations must

contain relevant and material facts.  Such facts must be either actionable words or

conduct sounding in sexual harassment or "inappropriate behavior."  Complaint, Ex. 10a,

at 2)

109.    Under the Complaint, an accused person may be sanctioned for engaging

in inappropriate behavior.  The Complaint does not define "inappropriate behavior."

(Complaint, Ex. 12a).  In the Policy, "inappropriate behavior" is not defined.  (Policy, Ex.

12b, at 1-16).

110.    On the issue of "inappropriate behavior," the Complaint and Policy stand

in conflict.  With such a conflict, the Complaint cannot override the Policy.  The Policy

has no working definition or elements of "inappropriate behavior."  The Notice sustained

the false allegations of sexual harassment against Plaintiff.  Howard cannot now apply the

undefined "inappropriate behavior" standard.

### a. Subjective Experience Test

111.    On January 13, 2016, Smiley informed Plaintiff for the very first time that the Title IX Office, and thus Howard, would apply the subjective experience of the female victim to determine conclusively whether Plaintiff violated the Policy.

112.    On May 4, 2017, at the reading of the Notice, Love told Plaintiff: "You have to understand that by requiring them to answer the question, they were harmed," or words to that effect. (Plaintiff's Complaint, Docket No. 1, filed Feb. 24, 2018, at ¶ 324).

113.    Smiley (and Love) is not objective, impartial, and fair. She did not operate on a case-by-case basis. She did not consider the totality of circumstances.

114.    C1 and C2 are third-year law students. C1 and C2 have a preexisting duty to attend class and to be prepared substantively for that class. Despite C1 and C2's duty, Love made this statement in Wutoh's presence. (Wutoh did not correct Love's use of the subjective experience test.)  Love's statement established preliminarily that Howard knowingly adopted and applied an unknown and unpublished evaluative standard. Under this standard, Plaintiff cannot easily defend himself against such allegations. So long as C1 and C2 alleged that they were uncomfortable and felt that they had to participate, then the Title IX Office can assert wrongly that Plaintiff harmed C1 and C2.

115.    On May 10, 2017, during his mandatory sexual harassment sensitivity training, Love presented Plaintiff with a computer slide show, one slide of which was labeled "subjective experience."  Love told Plaintiff that all allegations of sexual harassment are evaluated from the subjective experience of the complaining (female) party. That test has not been published in the Policy.

116.   On December 4, 2015, Smiley applied this subjective experience test to C1 and C2's allegations against Plaintiff.

117.   Under the Policy, Smiley must keep an open mind.  She must consider any and all information that ensures that Howard reaches a "sound conclusion."  Smiley must seek information that is relevant.  Relevancy "would tend to establish either the truth or falsity of the allegations."  Any person who has such information should be name, so that Smiley can contact him or her.  (Complaint, Ex. 12a, at 4)

118.   Upon information and belief, based on C1 and C2's statement, Smiley did not vet the legal sufficiency of their allegations.   Smiley never asked C1 to describe "interact."

(a)   She never asked C1 and C2 how were Plaintiff's published ideas and beliefs material prohibited by the University.

(b)   She never asked C1 and C2 if Plaintiff used vulgar and explicit language during the Agency Law class.

(c)   She never asked C1 and C2 if Plaintiff required them to read his two peer-reviewed articles.

(d)   She never asked C1 and C2 if Plaintiff were entitled to think as he believed.

(e)   She never asked C1 and C2 if Plaintiff said something directly to them that kept them from attending his office hours.

(f)   She never asked C1 and C2 if Plaintiff asked them to rely on their personal grooming habits to analyze Question 5.

(g)   She never asked C1 and C2 if in Question 5 T drinking tea or T

falling into a light sleep red herrings.

(h)    She never asked C1 if analogizing Plaintiff to (presumably white) Klansmen was appropriate simply because they disagreed with his free speech that black mothers abuse their children.

(i)    She never asked C1 and C2 if they had asked Plaintiff not to address them with his salutations, i.e., "Dear loving students."

(j)    She never asked C1 and C2 whether they were offering character evidence that Plaintiff should be punished or terminated from Howard.

(k)    She never asked C2 if Plaintiff treated her differently or negatively throughout the balance of the semester.

(l)    Smiley never asked C1 and C2 why they appeared to use similar phrases, i.e., "overly familiar," and "overly comfortable."

119.    Upon information and belief, Smiley more than likely did not ask such relevant question as she relied on the subjective experience text, i.e., believe the victim. Believe the victim prefers to support females.  Believe the victim has an anti-male bias.

120.    Even if Smiley's subjective experience might be otherwise acceptable, the Notice and the Rationale proffered no other objective and/or independent basis that satisfies the legal sufficiency requirements for sustaining allegations of sexual harassment against Plaintiff.  On December 4, 2015, C1 and C2 never alleged that Plaintiff had sexually harassed them.

### b.    The Rationale Failed to Meet Howard's Burden of Proof

#### i.    Overview

121.    In determining whether Plaintiff's Question 5 and his pedagogical queries

constitute sexual harassment, Howard must look at the entire record as a whole. Howard must consider the totality of the circumstances. Howard must undertake a thorough and comprehensive review of relevant facts on a case-by-case basis.

122.    Howard's inquiry must consider the nature of the *sexual* advances, the sought-after sexual favors, *and sexual* nature of the words or physical conduct.

123.    Howard must examine the context in which such *sexual* advances occurred. Howard must determine the appropriateness of Plaintiff's actions.

124.    Per OCR Guidance, Howard must use the preponderance of the evidence standard. (Policy, Ex. 12b, at 8)

125.    By the preponderance of the evidence, Howard has the burden to show based on relevant evidence that the existence of a fact (i.e., sexual harassment) is more probable than its nonexistence before Howard, the party who has the burden to persuade, can conclude that factual evidence exists of sexual harassment against Plaintiff.

126.    Howard, adopting the highly subjective experiences of C1 and C2, the only students interviewed by Smiley, did not examine the record as a whole. Smiley gave evidentiary weight only C1 and C2's hearsay, speculations, subjective experiences, and rejection of Plaintiff's published ideas. Smiley dismissed Plaintiff's contractual entitlement to academic freedom and his freedom of expression.

127.    Smiley, having adopted only C1 and C2's subjective experiences, cited Plaintiff's exculpatory and explanatory materials, as further evidentiary of Plaintiff's character evidence or character trait to prove that he engaged in sexual harassment. Character or character trait evidence is more prejudicial than probative. In civil matters or litigation, such evidence is inadmissible.

128.    Smiley failed to consider the totality of the circumstances. Plaintiff required C1, C2, and other registered students in the Agency Law class to read cases on rape, sexual misconduct, pedophilia, etc. Plaintiff was teaching bedrock legal doctrine through which agents, employees, and/or servants expose innocent (and negligent) employers to vicarious liability, i.e., Respondeat Superior. As the annotated materials of § 261 illustrated, and Plaintiff sent this document to Smiley, a held-out agent can use fraud to induce third parties to their personal and legal detriment and cause them to suffer tortious touching. Question 5, one logical black box question out of seven, tested whether Plaintiff's students knew not about depilatory personal service, but about the element of § 261 in a hypothetical context where the customer alleged tortious touching. (*See* Reggie's Email to Smiley, dated Jan. 19, 2016 with annotated materials for § 261, attached hereto as Ex. 19).

129.    Under the totality of the circumstances text, Smiley cannot pick out one factors, i.e., how C1 and C2 subjective felt or experienced Question 5, and draw inferences of liability against Plaintiff.

130.    Smiley's Rationale never established that Plaintiff, Question 5, or his pedagogical queries were unwelcome sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature.

131.    Smiley's Rationale was disorganized, conclusory, and devoid of the required legal standards and analytical assessments of facts and elements. The Rationale lacked systematic analyses that logically drove Smiley objectively to either a valid deduction or a strong inference. Rather, the Rationale was replete with speculations that always concluded that Smiley felt, having adopted the subjective experiences of C1 and

C2, that Plaintiff had the propensity based on character evidence and character traits over the arc of his nearly entire employment history at Howard to engage in sexual harassment.

132.    Smiley's Rationale never discuss the lack of credibility of C1 and C2 who filed a complaint against Plaintiff after they chose to read his published ideas and beliefs, and after they were contaminated by the biases and emotions of others, including students and perhaps faculty. Smiley treated C1 and C2's subjective experiences as conclusive presumptions that Plaintiff violated the Policy.

133.    In the Rationale, Smiley referred to Plaintiff's exculpatory and explanatory statements as "allegations", as mere protestations of innocence, as lacking evidence, and as avoid of creditability.

134.    Smiley's Rationale proffered no specifically reliable and probative raw evidence that Plaintiff, Question 5, and his pedagogical queries caused C1 and C2, or any other student in the Agency Law class, to suffer with the requisite degree of certainty sexual harassment in violation of the Policy.

135.    Smiley, adopting the believe the victim stance, took up C1 and C2's emotional cause against Plaintiff.

136.    Smiley gave weight to one half of the record, not the whole record. Smiley's Rationale failed to satisfy the preponderance of the evidence standard.

ii.    **Howard's Adoption and Application of the Subjective Experience Test Shifts Burden of Proof Impermissibly to Accused Males like Plaintiff**

137.    Howard and its Title IX Office have adopted and applied the subjective experience of the complaining (female) student test to determine conclusively whether

Plaintiff violated the Policy.

138.   On January 13, 2016, Smiley announced that the interview that Howard had abandoned the required reasonable person standard, which is objective, and would apply the unknown and unpublished evaluative standard called the subjective experience of the (female) victim test.

139.   On May 10, 2017, during a mandatory sensitivity training session on sexual harassment, Love showed Plaintiff a computer slide, the frame of which was labeled "Subjective Experience."

140.   Based on the interview of December 4, 2017, when C1 and C2 deliver their allegations to Smiley and Howard, Smiley accepted C1 and C2's statements as if they were true, correction, and legally sufficient on which to bring their allegations within the jurisdiction of the Policy.

141.   From the narrative of Smiley's interview of Plaintiff, and from Smiley's statement in the Rationale, Howard did not credit any exculpatory and/or explanatory statements by Plaintiff.

142.   The foregoing permits the valid deduction that Smiley had shifted its burden of legal sufficiency by the preponderance of the evidence to Plaintiff.  Under this impermissible institutional burden shifting, Plaintiff had to unring the proverbial rung bell, thus requiring Plaintiff to prove that C1 and C2 did not subjective experience Plaintiff, Question 5, and his pedagogical queries as verbal or physical conduct of a sexual nature.

143.   Under that burden shifting standard, Howard has destroyed Plaintiff's presumed innocence until he either admits responsibility or Howard adduced findings of

material facts of sexual harassment that satisfy the requirements of legal sufficiency.

144.   Given that most accused respondents under the Policy are males, then Howard's impermissible burden shifting, which violates Title IX regulations and/or guidance by OCR, means that Plaintiff was subject to sex discrimination at the very beginning of Smiley's investigation.

145.   Upon information and belief, given that allegations against a male of sexual harassment is tantamount to a declaration of responsibility, it would follow that Smiley need not engage in a thorough investigation, considering the social context and the case as a whole, and the totality of the circumstances on a case-by-case basis.

146.   Upon information and belief, Smiley simply needs to stonewall Plaintiff's effort to get actual notice of the relevant facts of C1 and C2's allegations, as she in fact did, which exposes Plaintiff to the unfair likelihood of a finding of responsibility because Plaintiff simply cannot defend himself as spurious complaint that Smiley converts into allegations of sexual harassment.

### iii.   Smiley's Believe the Victim Interview of December 4, 2015 of C1 and C2

147.   On January 13, 2016, Smiley first informed Plaintiff that she would rely on an unpublished and unknown subjective experience of the complaining students' test to determine conclusively whether Plaintiff violated the Policy.

148.   Upon information and belief, Smiley believed the alleged victims because for example she never asked C1 to give very specific examples of what she meant by "interacts," and required her to relate Plaintiff's "interactions" generally and/or specifically to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

149.    Upon information and belief, Smiley believed the alleged victims because for example she never asked C1 why Plaintiff's articles and his analyses of gangsta rap artists' vulgar lyrics, which she and C2 had brought with them to the interview, were generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

150.    Upon information and belief, Smiley believed the alleged victims because for example she never asked C1 why Plaintiff's professional personality, which made him disturbing and personally offensive (e.g., he's a black hating white racist Klansmen) was generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

151.    Upon information and belief, Smiley believed the victims because for example she never asked C1 why Plaintiff's regarding black mothers as abusers to their children gave offensive meaning to the way Plaintiff interacted with the Agency Law class and to the unspecified "all the things he's done," and she never asked C1 to relate Plaintiff's intellectual views to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

152.    Upon information and belief, Smiley believed the victims because for example she never asked C1 if Plaintiff had asked her to defend her answer choice to Question 5 by using her intimate knowledge of Brazilian waxing, or if she could have answered Question 5 by simply applying the elements of § 261.

153.    Upon information and belief, Smiley never asked C1 for very concrete examples of why Question 5 was "inappropriate," but rather Smiley identified with her assessment when Smiley said:  "I was wondering," which led to C1 saying: "Yes! I think

that's inappropriate on its face."

154.    Upon information and belief, Smiley never asked C1 why Plaintiff's KDO policy was related specifically to her complaint about Plaintiff's informality and casualness with his Agency Law class and with students generally.

155.    Upon information and belief, Smiley never asked C1 and C2 how Plaintiff's email salutations and sign offs and the use of his first name, which she described as overly familiar, were generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

156.    Upon information and belief, Smiley never asked C1 and C2 why Plaintiff's academic writings and publications didn't belong in an intellectual environment of Howard Law School, and why Plaintiff's published thoughts and analyses were generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

157.    Upon information and belief, Smiley never asked C2 to describe Plaintiff's tone about Question 5, so that she could objectively assess how such tone was generally and/or specifically related to unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

158.    Upon information and belief, Smiley never asked C2 to explain when during the feedback and analyses of Question 5 did she get and leave the class, and during her absence from the class, how could she assess cogently the conversation around Question 5.

159.    Upon information and belief, given that C1 and C2's allegations against Plaintiff were generally and/or specifically unrelated to unwelcomed sexual advances,

sexual favors, and words or other conduct of a sexual nature, Smiley never asked C2 if she were using the Title IX Office to punish Plaintiff because she was uncomfortable reading what she purported that he had said about black women.

160.   Upon information and belief, Smiley never asked C1 and C2 whether they had biased each other because they can talk to each other, because they both used similar phrases like "overly familiar" and "over comfortable", because they both didn't like that Plaintiff used his first name, and because they both raised similar complaints about Plaintiff's peer-review articles.

        **iv.**    **Plaintiff, Question 5, and Pedagogical Queries Did Not Make Unwelcomed Sexual Advances, Request Sexual Favors, and Engage Verbal or Physical Conduct of a Sexual Nature**

161.   In the Report's Rationale, Smiley declared, "Per the Title IX Policy, KDO5 does in fact, meet the requirements for Sexual Harassment." (Smiley's Report of Investigation, ECF No. 11, Ex. 1, ¶ 2, at 6 of 274).   The Smiley did not state facts to support this conclusion.   She did not tie any relevant facts to required elements of the standard against sexual harassment.   Smiley offered only a conclusion.

162.   Per the Policy, Howard has the burden to show that sufficiently reliable and probative facts existed on the threshold legal predicates for sexual harassment:   (a) "unwelcomed sexual advances", (b) "requests for sexual favors", *and* (c) "other verbal or physical conduct of a sexual nature."

163.   Once Smiley has made findings of material facts on these threshold elements, then she must make material findings on the disjunctive tests on: (a) whether Plaintiff asked C1, C2, or any other student on September 17, 2015, to submit to conduct

that falls under the legal predicate explicitly or implicitly if they wanted to succeed in the Agency Law course or at Howard Law School generally; or (b) on whether Plaintiff's conduct which fell under the legal predicate had either the purpose or effect of unreasonably interfering with C1, C2, or any other student's educational rights, privilege, advantage or opportunity on September 17, 2015; or (c) on whether Plaintiff's conduct which fell under the legal predicate was so pervasive or severe that it created an intimidating, hostile, or offensive environment for learning *and* had no reasonable relationship to the subject matter of Agency Law.

164.    Smiley's Rationale made no findings of material facts on the threshold elements of the required legal predicate and then on the disjunctive tests for actual harm suffered by C1 and C2, or any other student registered in the Agency Law class.  Upon information and belief, Smiley never asked C1 and C2 whether they believed that Plaintiff, Question 5, and his pedagogical queries during the feedback were sexual or an act of sex, and/or sexual activities.

165.    Under federal jurisprudence, in this social context of teaching law to upper-level law students, Smiley's findings of material facts must be show that on September 17, 2015 Plaintiff, Question 5, and his pedagogical queries were laced or tainted with an objective sexual interest or activity.  Such interest or activity would be independent actionable consider under Title IX.  Smiley, having adopted the subjective experiences of C1 and C2 as a conclusively presumption, must adduce factual evidence that rise above C1 and C2's mere subjective belief that Question 5 was inappropriate, i.e., words or physical conduct of a sexual nature.

166.    Smiley's conclusive presumption in the Rationale cannot be permitted to

stand.  By adopting the subjective experience of C1 and C2, Smiley would be in an inquisitorial position or a star chamber jurist by which she can indict every law professor who teaches rape, sexual misconduct, sexual battery, and even domestic violence or child abuse cases.   Such faculty would risk having any student who feels subjectively uncomfortable filing allegations of sexual harassment, or having Smiley contort such uncomfortable feelings into claims of sexual harassment.  Even without objective words or conduct, the law professor would risk facing naked, highly subjective allegations. Thus a faculty's pedagogical material would thus become words or physical conduct of a sexual nature.[12]  Under Smiley's obviously adopted subjective experience of C1 and C2 evaluative test, no faculty's exculpatory material or explanatory statements would not spare the faculty from a finding of sexual harassment, borne exclusively out of and flowing inexorably from an erroneous outcome.

167.   Under federal jurisprudence, Smiley's must make findings of material facts that Plaintiff, Question 5, and his pedagogical queries were not only sexual but also targeted C1 and C2, and any other student registered in the class, because of their sex.

168.   On December 4, 2015, C1 and C2, the only students interviewed by Smiley, never made any allegations or filed any complaint that Plaintiff had made

---

[12]     *Cf. Graham v. Blissworld*, LLC, 2009 WL 2729841 (NY Sup. 2009) (a plaintiff, Graham, received a Brazilian wax and then later claimed an injury to her genitals or vagina, seeking thus to hold the principal, Blissworld, vicariously liable for the negligent conduct of the employee/agent, Normatov, who performed the waxing. The court used "genitals," "genitalia," and "vagina"); *Werts v. Grand Spa, Ltd*, 2008 WL 6983344 (2008) ("A 24-year-old female event planner alleged that she suffered a vaginal skin tear of the labia minor when she received a Brazilian bikini wax at the defendant spa where the plaintiff was a customer. The plaintiff contended that the defendant failed to properly train and supervise its employees, [and] negligently allowed a non-licensed beautician to perform the waxing, and that it was liable under the doctrine of respondeat superior. The defendant admitted liability.").

In Question 5, Plaintiff did not use such language due to the sex and gender neutrality of the hypothetical. In the above cases, the courts' language, which described the correct anatomical part of the female plaintiffs' body, was not sexually suggestive or offensive language as noted in the Letter of Reprimand.  However, based on the Report, once Smiley applied the evaluation framework of subjective experience of the female complainants, which would be determine whether an accused male like Plaintiff violated Howard's Policy, she would have declared the anatomical language in *Graham* and *Werts* to be "sexually suggestive and or offensive language."  Equally important, Smiley would have declared that the cases bore no reasonable relationship to the substantive issues of Agency Law.

unwelcome sexual advances, requested sexual favors, and engaged in verbal or physical conduct of a sexual nature.

169.    Rather, Smiley, in the absence of objective facts or for unexplained reasons, converted C1 and C2's complaint into allegations of sexual harassment.

170.    In the Report's Rationale, Smiley misstated facts of Plaintiff's pedagogy and its legal implication.  She wrongly declared that Plaintiff obligated the students to discuss their personal intimate knowledge or experiences of bikini waxes.  Smiley's declaration is not a finding of material facts that is sufficiently reliable and probative.

171.    She observed that because C2 left the class, then it followed that this Title IX Policy's section applied. That section provides, "Such conduct has the purpose or affect [sic] of unreasonably interfering with a student's educational right, privilege, advantage or opportunity." (*Id.* at 4 of 274).

172.    However, this provision of the Policy requires that Smiley make a finding of material fact on the threshold legal predicates for sexual harassment.  This provision required a condition precedent, i.e., Plaintiff, Question 5, and his pedagogical queries constituted at the very least unwelcome sexual advances.  They did not.  She did not make any finding of material fact on the legal predicates to sexual harassment.

173.    Related to ¶ 171, Smiley stated, "I contend that the conduct of the question paired with the required discussion unreasonably interfered with the student's education rights, especially since there is no documented relation to this KDO example and the cases listed in the syllabus."⁹ (*Id.* at 5 of 274).

---

⁹      Plaintiff was confused by Smiley's unsupported conclusion.  He was also confused when Smiley conceded that men and women get bikini waxes and full Brazilian, and so depilatory services are not just primary for women.  Yet, in the Rationale where she suggested that for sexual harassment purposes, Question 5 was sexually inappropriate and/or indecent material because waxing as a traditionally female

174.    In response to ¶¶ 171 and 172, C2 stated that she was uncomfortable with the discussion.  C2 did not state what specifically made her uncomfortable about the analyses and feedback on Question 5.  Upon information and belief, C2 did not say that Plaintiff's comments during the feedback caused her discomfort.  Upon information and belief, C2 did not say that her peers' analyses made her feel uncomfortable.  From the interviews, and upon information and belief, after C2 read Plaintiff's articles, and after C2 talked to C1 and a host of students and faculty, and after C2 formed very odious opinions about Plaintiff, C2 did not allege that C2 could not complete the Agency Law class.  C2 likewise did not allege that C2 could not focus in class.  C2 did not allege that she sought out counseling so that she could attend class.  C2 did not allege that she considered dropping the class.  In the interview, C2 made it clear that after she read Plaintiff's articles, C2 believed that Question 5 and Plaintiff's beliefs were connected. C2 took subsequent KDOs.  C2 completed the course.  C2 took the final examination.  C2 passed the final examination (no one failed).  C2 graduated as scheduled.

175.    On September 17, 2015, Plaintiff did not make unwelcome sexual advances to any student.

176.    On September 17, 2015, Plaintiff did not discriminate against any student due to his or her sex.

177.    On September 17, 2015, no student was required to participate in the feedback.  Any student who wished to participate had to volunteer.  Non-participating students did not suffer a final grade penalty.

178.    Question 5, like all KDO questions, is logical black box.  Participating

---

activity draw the students' attention to genitalia, i.e., vagina.  Neither portion of the Rationale makes logical or legal sense.

students must pick only one of four choices, and if they knew the elements of § 261, they could answer the Question 5 without the irrelevancy of personal grooming habits or whether T could in real life sleep lightly.  For purposes of black box logic, the real world outside of the box becomes, for the purposes of disciplining the legal mind and developing technical legal reasoning, irrelevant.

179.    The Report's Rationale presents no facts, either for verbal or conduct, that Plaintiff, Question 5, and his pedagogical queries constituted verbal or physical conduct of a sexual nature.

### v.    Question 5 Was Reasonably Related to the Subject Matter of Agent Law

180.    Smiley argued from ignorance that rape and sexual assault cases in Plaintiff textbook "did not put the students in a position to have to disclose intimate details about their genitalia to the class or to the professor in order to defend an answer choice." (*Id.* at 6 of 274).

181.    Smiley also argued "there is no document that suggest [sic] a relevant nexus to the current KDO and the lesson being taught in Chapter 5." (*Id.*)

182.    First, Plaintiff has not given classroom participation point in doctrinal classes since 1995.  Second, no student is required to participate in classroom discussion, even on KDOs.  Third, all students must volunteer.  After the interview meeting on January 13, 2016, Plaintiff informed Smiley of his classroom pedagogy. (Reggie's Email to Smiley, dated Jan. 19, 2016, Ex. 19).  Upon information and belief, Smiley did not give Plaintiff's objective, exculpatory information any evidentiary weight.  The Rationale does not credit any of Plaintiff's statements and documents.

183.    In discussing rape and sexual assault, Plaintiff has always discouraged

students from sharing personal stories.   During rape and sexual assault discussions, Plaintiff recounts the facts, unless a student volunteers.   As in Question 5, Plaintiff focuses the students' analyses on the applicable rule, its elements, and legally relevant facts.

184.   On September 17, 2015, even if C1 and C2 subjectively and absurdly believed that Plaintiff required them to discuss their personal grooming habits, they did not do so after Plaintiff issued the caveat. C1 and C2, the only students interviewed by Smiley, stated that they felt the need to defend their answer choice by resorting to their personal grooming habits.  However, no student revealed any personal grooming habits after Plaintiff's caveat.

185.   Smiley could only make this argument in ¶ 180 if she had adopted and relied upon the subjective experiences of C1 and C2.  Unfortunately, even if C1 and C2 subjectively experienced the feedback on Question 5 as requiring revelations about their personal grooming habits, C1 and C2 were not harmed because they did not disclose whatever their personal grooming habits were to Plaintiff or the class.  Speculative harm cannot be actionable words or conduct under a Title IX analysis.

186.   Relating to ¶ 181, Plaintiff sent Smiley several emails after the interview of January 13, 2016.  In one such email, Plaintiff explained how § 261 is related to tortious touching based on the fraudulent acts of the agent.  Plaintiff also attached the annotated materials for § 261.  That annotated material clearly link the fraudulent acts of the agent, which was covered in chapter 5, with tortious touching.  Smiley gave Plaintiff's exculpatory and explanatory material no evidentiary weight.  Under § 2.2.4's entitlement, Plaintiff can choose to introduce new, additional materials into the classroom

and to test such materials in a KDO format.

> ### vi. Smiley's Rationale Relies on Inadmissible Character Evidence to Prove that on September 17, 2015, Plaintiff Used Question 5 to Engage in Sexual Harassment

187.    Smiley argued, "While Professor Robinson seems to advocate his innocent [sic] of wrong doing, he is lacking in both evidence and credibility.  He did not tell the truth in regard to previous incidents of changing exam questions due to inappropriate hypotheticals, and he did not disclose any of the information regarding past incidents or allegations of sexual harassment made against him." (*Id.* at 8 of 274).

188.    Smiley also stated that "The level of professionalism in written publications and emails appears to be problematic for some students." (Id.)  Smiley meant C1 and C2, the only students she interviewed. (Smiley appears to pluralize singular events or people, perhaps so that her statements or conclusions have added weight.)

189.    Although Smiley stated that Plaintiff's written publications fall under academic freedom and freedom of speech, "they should be at least noted in this report as they (Professor Robinson's publications) contain very contentious inflammatory views regarding black women and black mothers." (*Id.*)

190.    Smiley stated, "Professor Robinson has also exhibited a past pattern of behavior that makes it more likely than not, that he has created hypotheticals of a sexual nature that made students uncomfortable." (*Id.*)

191.    Smiley stated, "This pattern of behavior is evidenced by both the KDO 5 question regarding a sexual nature, the inappropriate situations he was asked to change on

exams, and previous incidents in which Professor Robinson was inappropriate with faculty members." (*Id.*)

192.   Smiley stated, referring to past events at least 16 years ago and referring to *Martin v. Howard*, of which Plaintiff was not a party, "It stands to reason that if Professor Robinson exhibited behavior that was inappropriate with faculty members, that the same behavior could also be exhibited with his students."

193.   Smiley stated, again referring to past events at least 16 years ago and referring to *Martin v. Howard*, of which Plaintiff was not a party, "This pattern of behavior adds credibility to the allegations that Professor Robinson was inappropriate with his students and also adds to the more likely than not standard required by the OCR for finding of a Title IX violation."

194.   Smiley stated that no record existed in Plaintiff's personnel file to "designate an investigation took place." (*Id.* at 11 of 274).

195.   Smiley then speculated about a note in Plaintiff's personnel file referring to tenure application, in which in June 1996, more than 22 years, a University official expressed concerns about Plaintiff's teaching evaluations.  Given that Smiley took more than 504 impermissible days to investigate the allegations against Plaintiff, she simply speculative in a manner that was highly prejudicial to Plaintiff.  As for the hypo, Plaintiff began using KDO in 2009.

196.   Smiley statements and argument in ¶¶ 189 to 194 are character evidence or traits.

197.   Such evidence or traits are likely to be more prejudicial than probative.

198.   Smiley's Rationale is sprawling, unfocused, and discursive but not

analytical.

199.    Smiley relied on character evidence or traits to assert, as she does, that Plaintiff alleged past events proves that on the particular occasion of September 17, 2015, he used Question 5 to inappropriate test § 261.  Such inappropriateness constituted a violation of the Policy.[14]

### C.    Plaintiff's Interview of January 13, 2016

200.    Smiley never asked Plaintiff if on September 17, 2015 he had engaged generally and/or specifically in words or conduct that could constitute unwelcomed sexual advances, sexual favors, and words or other conduct of a sexual nature.

201.    Based on C2's false statement about a vaguely possible incident of an explicit sexual fact pattern, Smiley had adopted the naked, unsubstantiated allegations by the students, when she asked whether Plaintiff had had such a prior complaint filed against him, to which he answered no.[15]

202.    Based on the allegations by C1 and C2, Smiley had adopted the students' view that Plaintiff used his KDOs to interact with his students inappropriately, even though no objective evidence existed to support their naked, unsubstantiated allegations.

203.    Based on the allegations by C1 and C2, Smiley had adopted students' view that Plaintiff had no (academic freedom or intellectual property right) right to

---

[14]     In the Rationale, Smiley declared that Plaintiff lied when she asked him if he had been asked to change an exam question.  Smiley also declared that Plaintiff lied about a formal complaint of sexual harassment.  However, the Rationale proffered no objective proof of an exam change due to a complaint.  Likewise, the Rationale adduced no documentary proof that Plaintiff had been the subject of a past formal or informal sexual harassment complaint.  Plaintiff answered honestly, and given that Howard took more than an impermissible 504 days to investigate the allegations against Plaintiff under the duty of thoroughness, Smiley should rest her Rationale on more than speculation.  After all, she didn't find any such complaints in Plaintiff's personnel file.  The only thing that sullies Plaintiff's employment file is the erroneous finding of May 4, 2017.

[15]     Although Defendants in their Motion to Dismiss and/or Motion for Summary Judgment stated that Plaintiff had lied about a prior formal complaint about an explicit sexual fact pattern, they did not produce any record evidence of such a complaint.  Moreover, Plaintiff did not test tortious touching in his Agency, Partnerships, and LLC class until September 2015 after he researched the annotated materials related to § 261 of RESTATEMENT (SECOND) AGENCY (1958).

prevent his students from taking KDO questions outside of the classroom.

204.   Based on the allegations by C1 and C2, Smiley adopted the students' position that Question 5 of September 17, 2015 was inappropriate, asking if his KDOs were vetted or reviewed by the academic dean's office.

205.   Based on the allegations by C1 and C2, Smiley adopted the students' view that testing § 261 by using a Brazilian waxing service, interjecting: "a Brazilian wax has to do with body parts, what do you mean there's nothing about body parts?"

206.   Having adopted C1 and C2's misunderstanding of Question 5, and having no working substantive knowledge of Agency Law, Smiley was convinced that Plaintiff's Question 5 was inappropriate, and so she never asked Plaintiff if his students could have analytically discussed Question 5 without having to introduce personal, intimate experiences.

207.   Having adopted C1 and C2's emotional reaction not only to Question 5 but also to Plaintiff's peer-review article, Smiley clearly misunderstood how to apply the reasonable person standard in the context of Title IX, when she stated that a "reasonable person would think genitalia (actually, she said vagina) when you are talking about a Brazilian wax." However, even if a reasonable person thought vagina, it does not follow that Question 5, without more going to the legal and/or factual predicate of sexual harassment, violates the Policy.

208.   Smiley omitted that in the discussion of the reasonable person standard, she stated that she would apply the subjective experience test of the complaining students to determine whether Plaintiff violated the Policy.

209.   Smiley again misunderstood how to apply Title IX and its jurisprudence,

for long before determining how the C1 and C2 were impacted (i.e., purpose or effect of unreasonably interfering or pervasive or severe that it creates an intimidating, hostile, or offensive environment), Smiley had to established by the preponderance of the evidence that Plaintiff made unwelcomed sexual advances, requests for sexual favors, and engaged in words or other physical conduct of a sexual nature. Based on allegations and the events of September 17, 2015, Smiley's Notice of Findings of May 4, 2017 did not make findings of material facts and conclusions on these legal and/or factual predicates of sexual harassment.

210.   Having adopted C1 and C2's view that Question 5 as offensive and inappropriate, Smiley questioned Plaintiff, made general statement about what all of his students felt, and explained how Title IX operates. However, Smiley never critically engaged or questioned C1 and C2. But Smiley said to Plaintiff: (a) "people have been impacted by your behavior";[16] (b) "People have been offended by what's going on";[17] (c) "there doesn't seem to be a reasonable explanation for using this (KDO Brazilian wax example) over any other example that you could have used in a class;"[18] and (d) "She further advised Professor Robinson that people were offended by the fact pattern."[19] (*Id.* at 8)

211.   Having adopted C1 and C2's view of Plaintiff's interactions with the

---

[16]   During the interview of January 13, 2016, Smiley did not use this language. Rather, Smiley stated that if Plaintiff had use a doctor-patient hypothetical, perhaps the students would have not reacted. To see the degree to which Smiley was biased by the students, and to see the degree to which she was determined to "get the bad guy," Plaintiff would have to get an actual transcript of the interviews with the two students and Plaintiff. Accordingly, the narrative of the interviews, which were prepared by Vanessa Love, contains lots of inaccuracies.

[17]   Smiley never used this language.

[18]   Smiley never used the phrase "reasonable explanation" during the interview; but she did suggest that I could have used a doctor-patient hypo, to which Plaintiff responded that there would still have to be tortious touching.

[19]   Smiley never used this language. She limited her language to "the students," referring to the two complaining female law students.

students in the class and students generally, Smiley completely disregards Plaintiff's contractual entitlement of academic freedom, and mischaracterizes a legitimate quizzes on the substantive materials of Agency Law as an unwelcomed sexual advances, when she writes: "Even if Professor Robinson was not aware that this KDO was unwanted, or could cause some students to be uncomfortable, his awareness of whether he conduct complained of was unwelcomed by the students is not required by the Title IX Policy."[20] (*Id.* at 8-9)

212.    Having adopted the subjective experiences of the C1 and C2 as determinative, even though their allegations were specious and emotionally biased, Smiley falsely premised the element of "unwelcomed" not on sexual advances, but on Plaintiff's unspecified conduct, which was non-sexual.  (*Id.* at 9)

### D.    Howard Failed to Follow its Published Rules and Procedures.

#### 1.    Actual Notice of Material Facts.

213.    Given that the *1993 Faculty Handbook* and its implied covenant of good faith and fair dealing, Howard had to give Plaintiff actual notice of the material facts.

214.    Pursuant to its Policy, Howard must provide the accused with the complaint, so that the accused can "submit a written response to the charges." (Complaint, at 3, attached hereto as Ex. 12a.)

215.    Pursuant to its Policy, Howard's notice to the accused must be sufficient enough to permit the accused's written statement to respond "only [to] those relevant statements and materials that you reasonably believe support your view of the important

---

[20]    First, this sentence is narrative and argument, and either Love or Smiley is using the interview transcript (or narrative) to apply the elements of the legal and/or factual predicates of sexual harassment analytically to the "facts".  But the facts as alleged by Complainants 1 and 2 don't sound in sexual harassment.  Second, Smiley never made this statement to me on January 13, 2016.  Considering this statement, I don't trust that Love has faithfully transcribed the interview, which Smiley taped on January 13, 2016.

facts." (*Id.*)

216.   Based on Policy's language, an accused cannot submit a written response that rebuts the allegations unless the accused had received actual notice of the material and important facts and of "relevant statements." (*Id.*)

21.   Pursuant to Policy's language, the accused may "provide a written analysis of whether . . . the facts support a finding that you have violated the standards contained in the Policy." (*Id.*)

218.   The foregoing language permits the valid deduction that Howard must provide the accused with meaningful notice, so that the accused can analyze material and relevant facts before the accused might conclude that the accused has violated the standards in Howard's Policy.

219.   Pursuant to Policy's language, it provides that the accused "will be afforded an opportunity to verbally present [the accused's] position to the Deputy Title IX Coordinator during a personal interview." (*Id.*)

220.   Unfortunately, the accused cannot possibly present an effective, relevant, and material rejoinder to allegations of sexual harassment if the accused cannot possibly present a defense based on exculpatory evidence, witnesses, and documents, when the Investigator, in violation of the Policy, can lie about providing the accused with actual notice of material facts or simply refuse to provide such facts.

221.   Pursuant to its Policy, Howard requires the accused to cooperate with its Investigator and the investigation, perhaps to the prejudice of the accused, where the accused cannot get actual notice of the material facts, where the accused unwittingly might admit to violations of Howard's Policy when the accused writes a response hoping

to hit a moving, elusive bull's eye buried deep within meaningfully undisclosed facts in general allegations, and where the Notice of Complaint stated: "WE EXPECT THAT YOU WILL COOPERATE WITH THIS INVESTIGATION." (*Id.*)

222.   Pursuant to Policy's language, Howard demands that the accused cooperate with the Investigator's investigation due to Howard's concern that it "reach[es] a sound conclusion." (Complaint, at 4, Ex. 12a.)

223.   To ensure that it reaches a sound conclusion, Howard invites the accused to identify "specific individuals who may have relevant information that would tend to establish either the truth or falsity of the allegations." (*Id.*)

224.   In order for him to bring forth such names to Howard, Plaintiff would have had to receive not only actual notice of the material facts, but also the names of the two female complaining students.  However, Plaintiff could not avail himself of such due process principles where Howard either lies about providing such actual notice of material facts or refuses with impunity to provide them.

225.   Given a fair reading of the foregoing language in the *Notice of the Complaint* and its Policy, Plaintiff was entitled to actual notice of the material facts.

**E.   Howard's Had Been Under Public Fire for Its Mishandling of the Jane Doe 5's Sexual Assault Complaints Prior to May 4, 2017, and its Notice Against Plaintiff on May 4, 2017 Created a "Get Tough" Stance for Public and OCR**

226.   Between 2014 and 2016, five female students filed sex assault complaints with Howard, alleging that they had either been raped or suffered sexual misconduct by male students and employees at Howard.  (*Jane Doe 5 v. Howard University*, Case No. 1:17-cv-00870-TSC, filed May 10, 2017.)[21]

---

[21]   This federal complaint has been amended to include Jane Doe 6.

227.    According to *Jane Doe 5 v. Howard University*, as reported by a *BuzzFeed New Article*, entitled *Howard University Refused to Help Suicidal Rape Victims, Explosive Lawsuit Claims*, Jane Doe 1 reported her assault to Smiley on February 28, 2016.   Thereafter, Jane Doe 1 called for an update on her request to have the alleged assailant removed from her space on campus.   Despite Jane Doe 1's calls to Smiley, she did not hear from her until March 2016, when Smiley inquired of her "if she was talking about her rape report in text messages with her friends."   Several days later, according to *Jane Doe 5 v. Howard University*, Howard fired Jane Doe 1 from her Resident Advisor's position.[22]

228.    On or about March 22, 2016, Jane Doe 1, needing to vent about way Howard was treating her and handling her sexual assault complaint, started what *Jane Doe 5 v. Howard University* termed a "Twitter storm."   According to ¶ 3 of Jane Doe 5's federal complaint:

> Plaintiff Doe 1 started a Twitter storm criticizing Howard's mishandling of her complaint of sexual assault. When other students came forward to disclose their similar experiences of indifference at the hands of Howard, Doe 1 learned that Plaintiff Jane Doe 2 reported to Howard in October 2015 that she was also raped by the same male Howard student. Plaintiff Doe 2 left Howard when her case was not investigated because she felt unsafe on campus and was receiving no information or support from Howard. Howard's failure to investigate and effectively resolve Doe 2's complaint meant the assailant remained on campus as an RA and raped Doe 1 over five months later. Only after public criticism brought attention to Howard's deliberate indifference in April 2016 did Howard's Title IX Coordinator reach out to Doe 2 to conduct an investigation into her October 2015 report. Then, in response to Doe 1's Twitter activity, Howard's Dean of Student Affairs told her, "You embarrassed your family by doing that." Doe 1's sexual assault investigation still has not been resolved.

(*Jane Doe 5 v. Howard University*, at 2, ¶ 3.)

---

[22]    Tyler Kingade, *Howard University Refused to Help Suicidal Rape Victims, Explosive Lawsuit Claims:  One Howard University Office Allegedly Told a Student "You Embarrassed Your Family" by Going Public About Being Raped*, at 4*, https://www.buzzfeed.com/tylerkingade/howard-university-sexual-assault-lawsuit?utm_term=.ce6mPdkaAx#.djxxY3QLZj.

229.    On or about March 23, 2016, Jane Doe 1's Twitter storm led to #NoMeansNo protest on Howard's campus.

230.    On or about March 23, 2016, Garrett Haake, WUSA, reported that more than 100 Howard students protested Howard's failure to investigate and respond to two rape complaints that dated back to May 2015.[23]

231.    On March 26, 2016, in response to the allegations of rape by Jane Doe 1 and 2, this Twitter feed went viral, and it called for change at Howard:[24]



232.    According to the BUZZFEED article, Howard has received more $1 million from the U.S. Department of Justice ("DOJ") over the past decade.  With such DOJ funding, Howard must make improvements in how it handles sexual assault complaints, "including training campus official about how best to respond to rape reports."  Although Howard says it has institutional resources for preventing and assisting victims of sexual assaults, according to the Jane Doe 5's attorney, "the university is falling far short when cases crop up in real life."

---

[23]    (*Students Protest Howard University's Handling of Alleged Rapes*, http://www.wusa9.com/news/local/students-protest-howard-universitys-handling-of-rape-investigation/97006950.)

[24]    https://twitter.com/Savage_Glam/status/712319775150624768/photo/1?ref_src= twsrc%5Etfw&ref_url=http%3A%2F%2Fwww.wusa9.com%2Fnews%2Flocal%2Fstudents-protest-howard-universitys-handling-of-rape-investigation%2F97006950

233.    According to *Jane Doe 5*, Howard had been deliberately indifferent to the sexual assault complaints that were filed by the female students by the glacial way Howard investigated their complaints, in which Howard accommodated the needs of these victims, and in which these victims were not afforded a safe educational environment by Howard. (*Jane Doe 5 v. Howard University*, at ¶¶ 132-138.)

234.    According to *Jane Doe 5*, Howard retaliated against Jane Doe 2 when it charged her for relocating to another dormitory, against Jane Doe 1 when it fired her from the RA position after she began texting about how Howard was handling her sexual assault complaint, and against Jane Doe 5 when Howard failed to accommodate her, to investigate in a timely manner, and to notify her that Howard needed more time to investigate her sexual assault complaint. (*Jane Doe 5*, at ¶¶ 56-61, 137, 365, 383-387, and 430-433.)

235.    Upon belief and information, after the March 2016 protest went viral, Howard was concerned about the negative social publicity. Howard was concerned that the Jane Doe 5 would likely sue Howard. Howard was concerned and that the public revelations about its mishandling of sexual assault investigations and report management might trigger an OCR investigation.

236.    At the July 12, 2017 mandatory mediation, Teeling acknowledged that Howard was more concerned about an OCR investigation.

237.    Since October 2015, Howard was on actual notice that Jane Doe 1 had alleged that she had been raped. Protestors accused Howard of sheltering black men, even if they were accused of sexual assault.

238.    According to *Jane Doe 5 v. Howard University*, despite that actual notice,

Howard lied when on March 22, 2016 it said: "The University administration is aware of the allegation and took immediate action as soon as we learned of this matter." In response, the *Jane Doe 5* complaint alleged: "Howard's statement was knowingly false."

239. Upon information and belief, Howard had several institutional concerns. First, Howard had the–actual notice of sexual assault complaint by the Jane Doe 5. Second, Howard had a poor to no response by Smiley and the Title IX Office. Third, some of the Jane Doe 5 were accusing Howard of retaliation and deliberate indifference. Fourth, given the student protests, negative local news coverage, and outrage of the community, Howard needed a respondent on which it could build a different image – of overly aggressive enforcement of Title IX and its regulations. Finally, Howard needed to create a "get-tough" stance.

240. Howard's Findings of May 4, 2017 revealed its belated "get tough" enforcement stance.

241. Upon information and belief, through the Findings of May 4, 2017, Howard deliberately chose the timing that would maliciously harm Plaintiff and that would shore up its flagging institutional standing in the Title IX arena based on what it knew would be the soon-to-be-filed *Jane Doe 5* case.

242. Upon belief and information, knowing that it would soon be sued by the *Jane Doe 5* six days later, Howard announced the Finding against Plaintiff just ahead of May 10, 2017 when the Jane Doe 5 filed their complaint in federal court. Upon information and belief, before a federal jury and/or OCR investigators, Howard's Findings would be proof that it would sanction and discipline an accused male employee of sexual misconduct firmly, even a male law professor.

243.    On May 4, 2017, Howard disciplined and punished Plaintiff. The Reprimand lacked legal sufficiency.  The Reprimand rested on Notice, which lacked the required Findings of Material Facts and Conclusions.  Without such required Findings, Howard has not met its burdens of going forward and ~~burden~~ of persuasion.  At present, especially considering the weak and disorganized Rationale, the Findings are thus unsupported and lack legal sufficiency.  (Provost Wutoh's Letter of Reprimand – Title IX Violation, dated May 4, 2017, at 1-2, attached hereto as Ex. 24)

244.    Howard's Sanctions/Disciplinary Measures under the Reprimand were based on the unsupported Findings of May 4, 2017. (Policy, § V. B. (7) & (9), at 13, 14, Ex. 12b)

245.    Upon information and belief, Howard's Findings of May 4, 2017, on which it would rely to support its likely assertion that it can "get tough" on accused males, meant that Howard would take more than 504 days to investigate the allegations against Plaintiff, even though no objective bases exist to find that Plaintiff's September 17, 2015 quiz and his pedagogical questions constituted unwelcomed *sexual* advances, a request for *sexual* favors, and other verbal, nonverbal, or physical conduct of a *sexual* nature.

246.    Upon information and belief, and based on ¶¶ 226 to 228, Wutoh and Smiley had improper motives, upon which they acted intentionally and purposefully when Wutoh issued the unsupported Findings of May 4, 2017 against Plaintiff.

247.    Upon information and belief, especially given that Wutoh and his Title IX staff are required to have ongoing training, Wutoh and Smiley knew, had reason to know, or should have had reason to know that nothing Plaintiff did on September 17, 2015 in

full view of his students constituted sexual harassment as defined by the *1993 Faculty Handbook*, by the Policy, by OCR guidance, and by federal court jurisprudence.

248.   Upon information and belief, and especially given their familiarity with the Policy and Title IX rules and regulations, Wutoh and Smiley knew, had reason to know, or should have had reason to know that the Findings of May 4, 2017 required findings of material facts and proper conclusions of which material facts violated the elements of the Policy's standards against sexual harassment to satisfy minimally the implied covenant of good faith and fair dealing of the *1993 Faculty Handbook*.

249.   Upon information and belief, especially given their familiarity with the Policy, Title IX rules and regulations, and the implied covenant of good faith and fair dealings of the *1993 Faculty Handbook*, and given that they had to know that the Findings of May 4, 2017 were unsupported by findings of material facts, Wutoh and Smiley were principally and improperly motivated to respond to an institutional conflict of interest.

250.   Upon information and belief, by responding to Howard's institutional conflict of interest through the improper issuing of the unsupported Findings of May 4, 2017, neither Wutoh nor Smiley were impartial, objective investigators who could properly render an impartial, objective and sound conclusion on the subjective allegations of the two female law students, and Wutoh and Smiley conspired to deliberately and maliciously harm Plaintiff.

251.   Upon information and belief, Wutoh and Smiley, now institutionally conflicted, were principally motivated to thwart, if possible, an DOE/OCR investigation based on the *Jane Doe 5* federal complaint, and Plaintiff served as road kill for their

illegal and improper purpose.

252.    Upon information and belief, and to deal with the institutional conflict of interest caused by Howard's mishandling of the *Jane Doe 5* complaints of sexual assault, Howard's leadership, even when Plaintiff and FIRE put such leadership on at the very least inquiry notice, has refused to vacate the erroneous Notice of May 4, 2017 and to rescind the vague, baseless, and unreasonable Sanctions/Disciplinary Measures as set forth in the Notice and Reprimand of May 4, 2017.  (See Exs. 10 and 11; Ex. 16; Ex. 20; Ex. 21;

## COUNT 1
### (Breach of Contract by Howard)

253.    The foregoing allegations are incorporated herein by reference.

254.    Plaintiff's employment relationship with Howard is governed by and understood through the *1993 Faculty Handbook*, of which §§ 2 and 3 are expressly incorporated into Plaintiff's employment contract with Howard.

255.    Plaintiff, was appointed to the faculty in the School of Law in July 1994, and was tenured and promoted under the *1993 Faculty Handbook*, and each of those decisions had to satisfy not only Law School bylaws and Howard's tenure and promotion requirements of Howard, but also the express language and implied duty ~~covenant~~ of good faith and fair dealing of the *1993 Faculty Handbook*.

256.    From 1994 to May 4, 2017, Plaintiff and Howard have been in a twenty-three (23) year employment relationship.

257.    Based on the *1993 Faculty Handbook*, to which Howard's Policy is appended, Plaintiff has reasonable contractual expectations that all decisions by Howard, its agents, and employees that affected his personnel status, and/or his academic freedom

and free speech, and/or terms and conditions of his employment would comply with the express processes and procedures of the Policy as understood through and satisfied by the implied duty ~~covenant~~ of good faith and fair dealing.

258.   Even if Howard posits that the Policy is a stand-alone set of rules and regulations, Howard and its agents and employees cannot in the application of the Policy unilaterally alter the express language and the implied duty of the good faith and fair dealings, under which Plaintiff had the reasonable contractual expectations that he would be free from arbitrary and capricious decisions that affects his personnel status, his academic freedom and free speech, and the terms and conditions of his employment.

259.   Based on the *1993 Faculty Handbook*, to which Howard's Title IX Policy is appended, administrators and faculty who participate in shared governance have a mutual obligation to avoid acting in bad faith, or, stated positively, to make decisions that are unbiased, objective, impartial, and that abide the established and published rules, regulations, and procedures of the Policy and of Title IX.

260.   Based on the aforementioned facts and circumstances, Howard owed duties to Plaintiff when enforcing the Policy and the rules and regulations under Title IX, and given the foregoing facts, pleadings, and circumstances, Howard breached the express and implied duties of good faith and fair dealing ~~with~~ owed to Plaintiff.

261.   Howard committed several breaches duties of the *1993 Faculty Handbook* and rules, processes, and procedures of Title IX and its Policy with Plaintiff, including, without limitation when ~~it~~ Howard:

(a)      refused to give Plaintiff proper, meaningful notice of the fact specific and spurious allegations made by the two complaining female law students from December 17, 2015 to the present day;

(b)      adopted and applied a subjective experience test, which gave undue evidentiary weight and institutional imprimatur to the female victims' ~~victim's~~ narratives, which rejected the reasonable persons standard under Title IX, which a priori made Plaintiff responsible for violating the Policy, which shifted the burden of proof to Plaintiff rebut that implicit finding of responsibility by dislodging the highly subjective experiences of the two complaining females, thus rendering Plaintiff's exculpatory evidence and objective materials moot, and which ~~destroyed~~ permitted Wutoh, Smiley, and/or Love to ignore requirements under Title IX regulations and OCR Guidance that in the investigation of allegations of the accused they would be fair, objective, and impartial;

(c)      became motivated by improper considerations due to the institutional conflict of interest by the Office of the Provost and the Title IX Office to purposefully and intentionally engage in overly aggressive enforcement of its Policy against Plaintiff, so that Howard, anticipating a suit the Jane Doe 5 for its mishandling of their complaints of sexual assault, could have use Plaintiff's finding of responsibility to show that it Howard can and will adopt a "get tough" stance on male employees who found responsible for sexual misconduct like sexual harassment;

(d)      failed to complete the investigation of the spurious and specious allegations against Plaintiff within the required 60-calendar days, and chose to keep the investigation hanging over Plaintiff's professional head and personal life for more than

504 days and then issued the Notice on a timing that conveniently would allow Howard to say to the public, the OCR, and the Jane Doe 5 that it punishes sexual harassers firmly and thoroughly; and

(e)    issued the Notice, even though Smiley's Rationale completely lacked the required findings of material fact on the legal predicate for sexual harassment, even though Smiley's Rationale rested largely on her conclusive presumptions that credited spurious allegations of two female students, and even though Smiley's Rationale gave weight to inadmissible character evidence and character trait that purported to show that due to 20-year old acts, Plaintiff more than likely created a depilatory hypo to test § 261 that was in her ungrounded estimation of a sexual nature.

(f)    Based on the foregoing, Howard's Notice of May 4, 2017 was arbitrary and capricious.

(g)    Based on the foregoing, the Notice was an erroneous outcome, due to the Title IX Office adopting the unknown and unpublished subjective experience test.

(h)    Based on the foregoing, the Notice violated the rules and regulations of Title VII and Title IX, and breached the express and implied duties of the *1993 Faculty Handbook*, against sex discrimination.

262.    Howard's violations and breaches were wrongful, without lawful and contractual justification or excuse.

263.    As a direct and foreseeable consequence of these violations and breaches, Plaintiff has sustained, and will continue to sustain, substantial injury, damages, and loss, including, but not limited to: severe emotional distress; injury to reputation; future

economic loss; past pain and suffering, future pain and suffering, and loss of future legal and legal academic opportunities; suicidal ideation.

264.    As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorney's fees and costs.

### COUNT 2
### (Breach of Implied Duty of Good Faith and Fair Dealing by Howard)

265.    The foregoing allegations are incorporated herein by reference.

266.    Howard violated the implied duty of good faith and fair dealing in its employment contract and under the *1993 Faculty Handbook* with Plaintiff by subjecting him to an unfair, arbitrary, capricious, and malicious investigative procedures, and denying him the fruits of his contract with Howard.

267.    Howard illegally and improperly used an accused male employee like Plaintiff as the patsy in Howard's scheme to remedy the deep, institutional conflict of interest that arose out of and under the Title IX Office's failure to timely and properly investigate complaints of sexual assault by five female students against male students and employees as alleged in the pleadings of the *Jane Doe 5 v. Howard University*.

268.    To respond to the anticipated allegations by *Jane Doe 5 v. Howard University*, Howard needed a clear institutional showing that it would take a "get tough" stance against male employees, especially a law professor, who were accused of sexual misconduct.   Howard needed to find Plaintiff responsible for violating the Policy. Howard then needed strong, near invasive sanctions and disciplinary action against Plaintiff.  On May 4, 2017, days before the Jane Doe 5 sued Howard, Howard unveiled its Notice against Plaintiff, even though Howard knew or in the exercise of due care should have known that Smiley's Rationale was factually and legally flawed, even

though Howard knew or had reason to know that the Rationale failed to make the required findings of material facts, and even though Howard knew and had reason to know that it had not met its burdens of production and persuasion.

269. As a direct, proximate, and foreseeable consequence of these breaches, Plaintiff's academic and career opportunities, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to his physical well-being, emotional and psychological damages, damage to reputation, ~~past and~~ future economic losses, loss of professional opportunities, and other direct and consequential damages.

270. As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, prejudgment interest and attorney's fees and costs.

## COUNT 3
### (Violation of Title IX – Erroneous Outcome Theory by Howard)

271. The foregoing allegations are incorporated herein by reference.

272. Title IX of the Education Amendments of 1972 provides, in relevant part that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

273. Title IX of the Education Amendments of 1972 applies to the entire school or institution if any part of that school receives federal funds; hence, the School of Law is subject to Title IX of the Education Amendments of 1972.

274. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . .

complaints alleging any action which would be prohibited by" Title IX or regulations thereunder, 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (DOJ) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[25]

275.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."[26]

276.    Howard is a private educational institution and is a recipient of federal educational funds. It is not subject to the constitutional due process guarantees in the enforcement of its Policy. However, the due process requirements and basic fairness, to which Plaintiff is entitled, are contractual obligations that arise out of and under Plaintiff's employment contract with Howard, the *1993 Faculty Handbook*, and its implied duty of good faith and fair dealings. One of the fundamental reasonable contractual expectations held by Plaintiff is that in the enforcement of its rules and regulations, Plaintiff must be free from arbitrary and capricious decisions by the University.

277.    The "prompt and equitable" procedures that a school like Howard must implement to "accord due process to both parties involved" or to fulfill its express and implied contractual obligations to Plaintiff, must include, at a minimum: (a) "Notice . . . of the procedures, including where complaints may be filed"; (b) "Application of the procedures to complaint alleging [sexual] harassment"; (c) "Adequate, reliable, and

---

[25]     *See generally* U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX (2001), at 19-20, 21 & nn. 98-101.

[26]     *Id.* at 22.

impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; (d) "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and (e) "Notice to the parties of the outcome of the complaint."[37]

278.   A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

279.   On September 17, 2015, Plaintiff tested his students' knowledge of § 261 through a depilatory service (Brazilian wax) hypo, in which T, the customer, would allege tortious touching. Apart from distributing the KDO, providing feedback during the analyses of the seven questions, and asking relevant pedagogical questions, Plaintiff used no words or engaged in no physical conduct that would independently subject him to an actionable cause under Title IX.   For example, Plaintiff did not invite expressly or otherwise male or female students to reveal personal grooming habits a la Brazilian waxes.  In his issued caveat, he specifically asked students not to use what they know or might know or belief to challenge Question 5.

280.   In law school pedagogy, a logical black-box hypo on tortious touching, which substantively arises in the teaching of first-year courses like Torts and Criminal Law and in upper-level courses like Agency Law, Employment Law, Domestic Violence Law, Child Welfare Law, cannot be in and of themselves actionable examples of verbal or physical conduct of a sexual nature.  Were such hypos to become actionable causes in and of themselves, law professors could not, and would not, teach fundamental legal

---

[37]      *Id.* at 20.

concepts that have helped attorneys represent their clients in matter related to assault, battery, and other sex-related violent acts either by the state or by private individuals.

281.    By issuing the Notice of May 4, 2017, despite the absence of findings of material facts and proper conclusions of which material facts applied to the elements of the Policy's standards against sexual harassment, Howard violated its Policy, Title IX, and/or guidance promulgated by OCR.

282.    By issuing the Reprimand of May 4, 2017, which sanctioned and disciplined Plaintiff, despite the absence of findings of material facts and proper conclusions under the Notice of May 4, 2017, Howard violated its Policy, Title IX, and/or guidance promulgated by OCR.

283.    Based on Wutoh, Love, and/or Smiley adopting and applying the subjective experience of the two complaining female students, which gave undue evidentiary weight to their spurious allegations, and which confessed that Howard would use as an evaluative tool a perspective that had an anti-male bias, Howard's Notice constituted an erroneous outcome.  Upon information and belief, Howard knows that agents and employees in the Title IX Office have an anti-male bias.  However, Howard has not shown that Smiley had an independent, objective (i.e., factual and legal) basis for the unsupported conclusions that she reached in the Rationale of the Report.  Howard knew or in the exercise of due care should have known that Smiley's Rationale stood upon inadmissible character evidence or character traits, so that in lieu of grounded material facts and cogent legal analyses, Howard could yet again attempt to impugn Plaintiff's professional reputation, even to this Honorable Court, by saying that Plaintiff's past screams that he more than likely drafted a depilatory hypo of a sexual nature.

Moreover, Howard knew or in the exercise of due care should have known that Smiley's anti-male bias from the way she littered the Rationale with factual and legal irrelevancies, e.g., Plaintiff's published academic writings.

284.    At the very least, Wutoh, Love, and/or Smiley's anti-male bias, which was clear in Smiley's interview of C1 and C2, the only students that she interviewed of the 34 students in the Agency Law class, in her interview with Plaintiff, and in the unsupported conclusions in the Rationale, informed the Notice of May 4, 2017.

285.    Howard has deprived Plaintiff, based on his sex, of his rights to contractual-based due process, basic fairness, and equal treatment as understood through Title IX regulations and the Policy.

286.    Given the foregoing, Howard unlawfully found that Plaintiff had violated its Policy and wrongfully disciplined Plaintiff because he was an accused male employee.

287.    By erroneously finding and disciplining Plaintiff, Howard violated its Policy, Title IX regulations, and/or guidance promulgated by OCR regarding Title IX.

288.    By erroneously finding and disciplining Plaintiff, Howard breached Plaintiff's reasonable contractual expectations that in enforcing its rules and regulations like the Policy and Title IX regulations, Howard would not engage in arbitrary and capricious conduct and decisions that would violate the express and implied duties of the *1993 Faculty Handbook*.

289.    Howard unlawfully failed to exercise its institutional authority to take corrective measures to remedy:   (a) the Title IX Office's improper assertion of jurisdiction over the spurious allegations against Plaintiff; and/or (b) the Title IX Office's adoption and application of the subjective experience of the female victim, which gave

irrebuttable presumption that their allegations against Plaintiff were true and actionable under Title IX; and/or (c) the Title IX Office's erroneous determination that Plaintiff violated the Policy that Howard adopted pursuant to federal laws and regulations related to Title IX.

290.    Howard, once it had actual or at the very least inquiry notice, was deliberately indifferent by refusing to remedy: (a) the Title IX Office's failure to follow its rules, regulations, and procedures under its Policy, Title IX regulations, and/or guidance issued by OCR; and/or (b) the Title IX Office's adoption and application of the subjective experience test, which grants undue evidentiary weight and/or irrebuttable presumption to spurious allegations against Plaintiff, which prejudices accused males by requiring them to shoulder the burden of proof to discredit highly subjective experiences by two female students, and which leads inexorably to erroneous outcomes; and/or (c) the Title IX Office's erroneous determination that Plaintiff violated the Policy that Howard adopted pursuant to federal laws and regulations related to Title IX.

291.    Upon information and belief, Howard possesses additional communications evidencing Howard's unlawful finding and discipline of Plaintiff based on his sex and gender. Evidence supporting this allegation includes, but is not limited to, Howard's refusal to provide Plaintiff documents and information he requested during the interview, e.g., the complete and unedited transcript of the Smiley's recorded interviews with C1 and C2, Plaintiff, Associate Dean Crooms-Robinson, former acting dean Okianer Christian Dark, and current Dean Danielle Holley-Walker.

292.    As a direct and proximate causes, and foreseeable consequence of these breaches, Howard has cause Plaintiff to suffer now and in the future the loss of academic

and career opportunities, earning potential, and severely harmed reputation.   He has sustained significant damages, including but not limited to, damages to his physical well-being, emotional and psychological damages, mental and emotional anguish, past and future economic losses, past and future pain and suffering, and other direct and consequential damages.   Due to harmful, near unforgiving social climate against males who have been found to be sexual harassers, of which Howard is aware, Plaintiff is reasonably certain to continue to suffer these damages in the future.   Plaintiff is entitled to the rights and remedies at law provided by Title IX and 42 U.S.C. § 1981a, including actual damages, emotional distress, emotional harm, compensatory damages in an amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys' fees, punitive damages, expert witness fees, and attorneys' fees, expenses, costs, and disbursements.

## COUNT 4
### (Violation of Title IX – Deliberate Indifference Claim by Howard)

293.    The foregoing allegations are incorporated herein by reference.

294.    Title IX of the Education Amendments of 1972 provides, in relevant part that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

295.    Title IX of the Education Amendments of 1972 applies to the entire school or institution if any part of that school receives federal funds; hence, the School of Law is subject to Title IX of the Education Amendments of 1972.

296.    Howard, agents, and employees, including but not limited to Wutoh, Smiley, and/or Love, acted with deliberate indifference toward Plaintiff because he is a male.

297.    Howard, agents, and employees, including but not limited to Wutoh, Smiley, and/or Love, due to improper motives arising out of and under the failure to investigate allegations of sexual assault as alleged by the *Jane Doe 5*, were deliberately indifferent to Plaintiff's actual notice to Howard's leadership that he had suffered an erroneous outcome.

298.    Upon information and belief, Howard needed Plaintiff, a male employee, to serve as an example of Howard's recent "get tough" stance against male employees who have been accused of sexual misconduct.

299.    Upon information and belief, Howard, if it properly vacated the finding against Plaintiff, the C1 and C2 might complain that yet again, as in the Jane Doe 5 cases, Howard has refused to punish male employees like Plaintiff who have been accused of sexual misconduct like sexual harassment.

300.    Howard unlawfully failed to exercise its authority to take corrective measures to remedy:  (a) Howard's violation of Plaintiff's rights under the Policy, Title IX regulations, and/or guidance issued by OCR; and/or (b) Howard's erroneous determination that Plaintiff violated its Policy, which Howard adopted pursuant to federal laws and regulations related to Title IX.

301.    Howard was deliberately indifferent by refusing to remedy:  (a) Howard's violation of Plaintiff's rights under the Policy, Title IX regulations, and/or guidance issued by OCR; and/or (b) Howard's erroneous determination that Plaintiff violated its

Policy, which Howard adopted pursuant to federal laws and regulations related to Title IX.

302.    Upon information and belief, Howard possesses communications evidencing its agents and/or employees' sex and gender deliberate indifference towards Plaintiff and/or other similarly situated male students.

303.    Howard, including, but not limited to, the Board of Trustees and the President, who had the institutional authority to take corrective actions and who refused to vacate the erroneous Findings of May 4, 2017 and the baseless Reprimand of May 4, 2017, was the direct and proximate causes of Plaintiff's suffering physical harm, including severe emotional distress, panic attacks, depression, anxiety, loss sleep, and suicidal ideation.

## COUNT 5
### (Violation of Title VII – Sex Discrimination by Howard)

304.    The foregoing allegations are incorporated herein by reference.

305.    Plaintiff is a male employee of Howard, and brings this action under Title VII of the Civil Rights Act of 1964 to redress the wrongs done to him by Howard's decision to find Plaintiff in violation of its Policy after Howard adopted and applied an unknown and unpublished subjective experience test, on which Smiley, the investigator, relied to determine conclusively that (mostly if not exclusively male) accused employees have violated its Policy, based solely on how (mostly if not exclusively female) complainants subjectively experienced, believed, and felt about respondent's words, actions, or conduct. (See EEOC Right to Sue Letter, Nov. 27, 2017, attached hereto as Ex. 30)

306.    By adopting and applying this conclusive presumption in favor of female complainants, Smiley, and thus Howard, gave no evidentiary weight to Plaintiff's objective, exculpatory evidence, documents, and/or statements.

307.    By adopting and applying this conclusive presumption in favor of female complainants, and by thus shifting the burden of proof to the accused male employees like Plaintiff, Smiley, and thus Howard, failed to set forth the required findings of material facts, including but not limited, the presence of absence of independent conduct beyond Plaintiff, and without regard to the absence of threshold legal predicates for sexual harassment, *viz.*, unwelcomed *sexual* advances, request for *sexual* favors, and other verbal, nonverbal, or physical conduct of a *sexual* nature.

308.    Plaintiff has been the victim of unlawful discriminatory conduct in the workplace through Howard's arbitrary, capricious, malicious, and negligent applications of its rules, regulations, processes, and procedures for investigating subjective allegations of sexual harassment to determine whether Plaintiff's actions on September 17, 2015 violated the Policy.   Plaintiff was unlawfully subjected to disparate treatment and suffered adverse employment actions by Howard on the basis of his sex.   These employment actions were unlawful and in violation of Title VII, 42 U.S.C. § 2000e-2(a).

309.    Howard agents and employees, including but not limited to Wutoh, Smiley, and Love, have discriminated against Plaintiff by treating him differently from and less preferably than similarly situated female who might be subjected to highly subjective allegations of sexual harassment.

310.    Howard's processes and procedures have had a disparate treatment on Plaintiff with respects to the terms and conditions of his employment contract and under the implied covenant of good faith and fair dealing of the *1993 Faculty Handbook*.

311.    Howard's agents and its employees', including but not limited to Wutoh, Smiley, and Love, conduct has been intentional, deliberate, willful, malicious, reckless, and/or conduct in callous disregard for Plaintiff's reasonable contractual expectations and entitlement that arise out of and under his employment contract with Howard as understood through and enforced under the implied covenant of good faith and fair dealings of the *1993 Faculty Handbook*.

312.    Plaintiff also suffered disparate treatment in violation of Title VII, where Howard seeking to deal with the deep, institutional conflict of interest arising out of and under Howard's failure to properly investigate the allegations of sexual assaults as set forth in the pleadings of *Jane Doe 5 v. Howard University*, Wutoh and Smiley needed not females who are generally viewed as victims of sexual misconduct, but males who society and they might regard to having a predilection of commit acts of sexual assault as alleged in *Jane Doe 5 v. Howard University*.  Plaintiff is a male faculty member who, based on timing controlled by Howard, was conveniently found to have violated the Policy in the Findings of May 4, 2017 in the immediate days before the Jane Doe 5 filed their federal complaint against Howard on May 10, 2017.

313.    Howard's leadership, including Wutoh, knew, had reason to know, or should have had reason to know that their conduct, actions, omissions, whether willful or otherwise, would cause Plaintiff to suffer disparate treatment, and on July 12, 2017, Wutoh and Teeling acknowledged that Plaintiff had not violated Howard's Policy.

314.    On July 12, 2017, Teeling acknowledged that Howard was less concerned about making the proper finding in its investigation of the allegations against Plaintiff and more concern about a DOE/OCR investigation.

315.    After filing a timely complaint with the EEOC, Plaintiff received on November 27, 2017 a "notice of suit rights" to sue within 90 days from the EEOC. (EEOC, Notice of Suit, dated Nov. 27, 2017, attached hereto as Ex. 31)

316.    As direct and proximate causes, and foreseeable consequences of these breaches, Plaintiff's academic and career opportunities, earning potential, and reputation have been severely harmed.  He has sustained significant damages, including but not limited to, damages to his physical well-being, emotional and psychological damages, mental and emotional anguish, damage to reputation, past and future economic losses, past and future pain and suffering, loss of future professional opportunities, and other direct and consequential damages.  Due to this harm, in near unforgiving social climate against males who have been found to be sexual harassers, Plaintiff is reasonably certain to continue to suffer these damages in the future.  Plaintiff is entitled to the rights and remedies at law provided by Title VII and 42 U.S.C. § 1981a, including actual damages, compensatory damages in an amount to be determined at trial, plus prejudgment and post-judgment interest, attorneys' fees, punitive damages, and attorneys' fees, expenses, costs, and disbursements.

### COUNT 6
### (Title IX Violation – Retaliation by Howard)

317.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides, in relevant part that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance.

318.    Title IX of the Education Amendments of 1972 applies to the entire school or institution if any part of that school receives federal funds; hence, the School of Law is subject to Title IX of the Education Amendments of 1972.

319.    The Department of Education regulations expressly prohibit retaliation.

320.    Howard is a recipient of federal education funding, and it is subject to OCR Guidance and Title IX regulations.

321.    Plaintiff has a private right of action under Title IX when he suffered retaliation for protesting the sex discrimination that he suffered because Smiley and the Title IX Office adopted and relied upon an unknown and unpublished subjective experience test as an evaluative process for determining conclusively when Plaintiff violated the Policy.

322.    Under Title IX, retaliation is sex discrimination because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.

323.    After taking a KDO on September 17, 2015, two third-year female law students waited almost three months to file a complaint against Plaintiff, in which they did not allege that Plaintiff at the very least made unwelcome sexual advances toward them. When asked, they stated that they did not like Plaintiff's professional casualness, his email salutations and signs off, his use of his first name in class or emails, his depilatory hypo that tested § 261, and two of his scholarly articles.

324.    During the three months, the complaining students developed strong odious feelings toward Plaintiff after they read two of his peer-review articles.  After talking to other students, their friends, and law faculty, they concluded that Plaintiff

didn't like black women and that he encouraged or justified misogyny and violence against black women.  They objected to Plaintiff's published ideas and thoughts that black mothers abused their children.

325.    On December 4, 2015, the two female students complained about Plaintiff to Smiley, who believed the complaints as holy writ. She completely accepted their allegations against Plaintiff and their desire to punish him or to have him terminated. After more than 504 days, Howard issued a Notice against Plaintiff that stood upon the Report of Investigation, both of which drew institutional force from Smiley's Rationale.

326.    Smiley's Rationale clearly embraced the subjective experience test to determine conclusively that Plaintiff had violated the Policy. Smiley had adopted the two females point of view.  Smiley questioned, rejected, belittled, and dismiss Plaintiff's exculpatory documents/materials and his explanatory statement.  Most importantly, Smiley's Rationale adduce not sufficiently reliable and probative fact and material findings on the legal predicates of sexual harassment, without which no threshold analyses can take place. Her Rationale was rambling, disorganized, lacking in analyses, and highly speculative as she strained to give institutional force to the two females' highly subjective allegations against Plaintiff.

327.    Far worse, Smiley's Rationale rested impermissibly on inadmissible character evidence and character traits. Offering Plaintiff's past to prejudice him and to bolster her ineffective claims that he violated the Policy, Smiley traveled back in time to 1998, hoping to drudge up "dirt" so that she could convince Wutoh of Plaintiff's propensities where her thinly purported analyses clearly failed her.  Smiley was thus not objective, fair, and impartial.  She stated, "Professor Robinson has also exhibited a past

pattern of behavior that makes it more likely than not, that he has created hypotheticals of a sexual nature that made students uncomfortable." Under Title IX and the Policy, a student's subjective feelings of discomfort born by no behavior that falls under the legal predicates of sexual harassment are not actionable under the Policy.

328. Based on the Rationale, and Smiley and Love's adoption of the subjective experience test to determine conclusively whether an accused male has violated the Policy, Smiley has no independent basis for her unsupported conclusions, which were devoid of any findings of material fact. Without an independent, objective basis for her conclusions, Smiley then must have held an anti-bias or a pro-female bias.

329. On or about May 14, 2017, Plaintiff appealed to Wutoh, the second highest-ranking agent at the University and the Title IX Decisional Authority. After appealing to him, Plaintiff informed Wutoh that he would send his entire record to a disinterested, nonprofit, nonpartisan organization, i.e., FIRE. Plaintiff did send those documents to Ms. Susan Kruth. Plaintiff accepted FIRE's help because he was seeking to reverse the unsupported Notice and to end the sex discrimination he faced from the Title IX Office.

330. After giving Wutoh actual notice that Plaintiff would seek FIRE's help to reserve the erroneous decision against him, Wutoh and Howard had actual or constructive notice that Plaintiff was engaged in protected activities under Title IX.

331. In an email dated May 24, 2017, which Plaintiff received at or around 1:40am on May 25, 2017, Wutoh summarily rejected Plaintiff's appeal. Under the Policy, Wutoh has a due diligence duty, which requires him to read the Report, the Rationale, the findings of material fact, and the Recommendations. After so reading,

Wutoh must use his own independent judgment in deciding whether to accept, reject, or modify Smiley's findings and recommendation. Wutoh, as the Title IX Decisional Authority who has terminal, unappealable authority, cannot delegate such authority to employee or non-agents. First, Wutoh gave Plaintiff's appeal to Smiley who, based on adopting and relying upon the subjective experience test, held an anti-male, should not have received it. Second, in summarily rejecting Plaintiff's appeal, Wutoh stated that not that he revisited Smiley's Report and reconsidered Plaintiff's specific claims, but that he relied on the Title IX Office.

332.    On May 25, 2017, Plaintiff sent by email a copy of his appeal memo to President Frederick and Mr. Stacey Mobley, Chair, Howard Board of Trustees. Plaintiff used email address to which he had sent messages, and from which he had received replies. In Plaintiff's appeal memo, he pointed out that Smiley, the investigator, was biased against him. Neither President Frederick nor Mr. Mobley replied.

333.    Wutoh was the only institutional authority and agent/officer to whom Plaintiff could appeal under the Policy.

334.    Wutoh's summary rejection was an adverse decision that has frustrated Plaintiff's effort to overturn the erroneous outcome and sex discrimination because under the Policy, Plaintiff cannot appeal the Provost's Findings and summary rejection to any other University's official.

335.    Upon information and belief, Wutoh sought to frustrate and/or undermine Plaintiff's protected activities under Title IX, so that Howard could still have an answer to any claim by the *Jane Doe 5 v. Howard* case that Howard does not sanction accused male employees who engage in sexual misconduct.

336.   Upon information and belief, Wutoh's adverse decision, especially if Plaintiff was not prepared to sue and if Howard stonewalled FIRE attempts to help Plaintiff (and Howard did stonewall FIRE), was designed to redress an institutional conflict of interest and to achieve through sex discrimination against Plaintiff an improper purpose.

337.   Howard's violation of Title IX caused Plaintiff to suffer emotionally, physically, and psychologically in an amount to be determined at trial.

**COUNT 7**
**(Intentional Infliction of Emotional Distress Against Howard, Wutoh, Love, and Smiley)**

338.   The foregoing allegations are incorporated herein by reference.

339.   The foregoing allegations are incorporated herein by reference.

340.   Howard's, Wutoh's, Love's, and Smiley's actions and omissions were intentional, extreme, and outrageous during all matters from December 17, 2015 to the present when he: (a) deliberately refused to give Plaintiff proper, meaningful notice; (b) knowingly used the Interview setting to induce prejudicial or injurious statements from Plaintiff; (c) authorized Smiley to announce an unpublished subjective experience test, by which Smiley would give undue evidentiary weight to the two female law students' victim narrative, and on which Howard would rely to determine conclusively that Plaintiff violated its Policy; (d) allowed for an interview that was not a fair, objective, and impartial hearing; (e) authorized and/or permitted the 504-calendar day investigation; (f) agreed with the Report that lacked findings of material facts and proper conclusions on which material facts was related to the elements of the Policy's standards against sexual harassment, despite his duty of due diligence under the Policy; (g) agreed with

Smiley's Recommendations, despite his duty of due diligence under the Policy; (h) authorized the drafting of the unsupported Findings of May 4, 2017; (i) signed the unsupported Findings of May 4, 2017; (j) admitted at the reading of the Findings meeting of May 4, 2017 that under the reasonable persons' objective test Plaintiff had not engaged in sexual harassment; (k) avoided his clear obligations under the *1993 Faculty Handbook*, Howard's Policy, and Title IX's rules and regulations by delegating his nondelegable duty of reviewing Plaintiff's appeal memo and his good faith obligations to Smiley when he had inquiry notice from Plaintiff that Smiley had violated Title IX's rules and regulations and the Policy; (l) authorized the drafting and submission of sanctions and disciplinary actions of the Reprimand of May 4, 2017, even though the Findings of May 4, 2017 were unsupported and demonstrated that Howard had not met its burdens of production and persuasion; and (m) refused to take corrective action to mitigate or end the harm suffered by Plaintiff after Howard labeled him a sexual harasser and after receiving credible inquiry notice from FIRE and Plaintiff. (See Prof. Robinson's Letter to Ms. Smiley, Demanding Actual Notice of the Allegations Against Him, dated Dec. 18, 2016, attached hereto as Ex. 27; Prof. Robinson's Formal Denial of Allegations Against Him, and Demanding Actual Notice of the Allegations Against Him, dated Dec. 21, 2016, attached hereto as Ex. 28)

341.   Howard's, Wutoh's, Love's, and Smiley's actions and omissions were done purposefully and intentionally to injure Plaintiff, who was in fact injured, and to assure a result that found Plaintiff responsible for the alleged sexual harassment of which he was wrongly accused.

342.    Howard's, Wutoh's, Love's, and Smiley's actions and omissions were intentional and was motivated by an improper purpose of ensuring that Plaintiff was found liable for violating the Policy to: (a) protect himself, the Provost's Office, and Howard from the consequences of Smiley failing to timely investigate the Jane Doe 5's sexual assault complaints; (b) quell the student and community unrests related to #NoMeansNo; (c) redress the deep, institutional conflict of interest that arose out of and under the alleged failure by the Title IX Office, *viz.*, Smiley, to investigate the sexual assault complaints against Howard male students and employees from 2014 to 2016 as pled in *Jane Doe 5 v. Howard University*; (d) present an aggressive enforcement and get-tough stance to a potential jury in *Jane Doe 5 v. Howard University*; and (e) stave off a related OCR investigation.

344.    Since December 17, 2015, Howard, Wutoh, Love, and Smiley disregarded Plaintiff's well-being by purposefully ensuring that Plaintiff could not properly defend himself from December 17, 2015 to May 4, 2017 by *inter alia*: (a) not allowing Plaintiff to investigate the case due to the gag order that was enforced by disciplinary action and sanctions, (b) denying Plaintiff access to fact specific allegations, (c) preventing him from calling witnesses who by May 4, 2017 had stale memories or have relocated to different parts of the country, thus imposing additional cost on Plaintiff to depose or garner their testimonies, and (d) allowing the processes and procedures to become tainted by the subjective experiences, beliefs, and feelings of two female law students, which gave them complete access to Smiley, which gave undue evidentiary weight and institutional imprimatur to their subjective allegations, which burdened the processes and

procedures with an anti-male bias, and which caused Plaintiff to suffer sex-based discrimination.

345.   As a result of Wutoh's actions and omissions, Plaintiff has suffered severe emotional distress and physical harm that continue to this day.

346.   This malicious intentional conduct allows for the recovery of compensatory and punitive damages.

## COUNT 8

### (Negligent Infliction of Emotional Distress Against ~~Defendant~~ Howard, Wutoh, Love, and Smiley)

347.   The foregoing allegations are incorporated herein by reference.

348.   Since July 1994, Howard, through its agents and employees, and Plaintiff have been in an employment contractual relationship, the mutual duties and obligations of which are understood through and defined by the implied duty of good faith and fair dealings of the *1993 Faculty Handbook*.

349.   Since 1994, Plaintiff has been tenured and promoted to Professor of Law, and has been granted sabbatical leaves on at least two occasions under Howard's rules and regulations, School bylaws, and the implied duty of good faith and fair dealing under the *1993 Faculty Handbook*.

350.   Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley, must discharge their duties and obligations within bounds of Plaintiff's reasonable contractual expectations as understood through implied duty of good faith and fair dealings in the *1993 Faculty Handbook*.

351.   Under such expectations, any administrator or faculty who participate in shared governance and whose decisions affect Plaintiff's academic freedom, personnel

status, and the terms and conditions of his employment must comply with the implied duty of good faith and fair dealing, so that such decisions do not violate academic freedom, are not arbitrary and capricious, and do not violate established rules and procedures. Howard is the employer, and Wutoh, Smiley, and Love are administrators.

352.   Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley knew, had reason to know, or should have had reason to know that in carrying out the duties and obligations of the Office of the Provost, they ~~he~~ must make all governance and enforcement decisions or adopt the recommendations of deans at the various colleges in a manner or under processes and procedures that per § 2.8.2 comply with the implied duty of good faith and fair dealings.

353.   Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley ~~Wutoh~~ has been in an institutional relationship with Plaintiff since he was appointed Provost and Chief Academic Officer in June 15, 2015.

354.   Since June 15, 2015, Wutoh has evaluated Plaintiff's academic file for Faculty Performance Evaluations, merit increases, and fall 2017 sabbatical leave.

355.   In order to discharge his duties and obligations, Wutoh, as the Title IX Decisional Authority, was required to have proper and ongoing training so that he and others within his office could recognize sexual harassment and would be able to assist employees and students who have been targeted by sex-based discrimination.

356.   Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley ~~Wutoh~~ failed to discharge their varying duties to Plaintiff within the meaning of good faith and fair dealing when he adopted without a proper factual basis Smiley's Report, where she had failed to make findings of material facts and proper conclusions on

which material facts violated the elements of the Policy's standards against sexual harassment.

357.     Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he adopted without a proper factual basis Smiley's Recommendations, where she had failed to make findings of material facts and proper conclusions on which material facts violated the elements of the Policy's standards against sexual harassment.

358.     Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he signed the Findings dated May 4, 2017.

359.     Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he signed the Reprimand dated May 4, 2017.

360.     Wutoh failed to discharge his duty to Plaintiff within the meaning of good faith and fair dealing when he stated at the Notice of Findings' meeting on May 4, 2017: "It's not like you were chasing a student around your office." Wutoh's statement revealed that he knew or had reason to know that under a reasonable person standard, Plaintiff's conduct on September 17, 2015 had not violated Howard's Policy.

361.     On or after December 17, 2015, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley undertook to make decisions through the processes and procedures of Policy that necessarily implicated the Plaintiff's emotional wellbeing, especially by making a proper and correct decision.

362.     On December 17, 2015, when Smiley first told Plaintiff by telephone that the two female students have filed a sexual harassment complaint against him, Plaintiff was emotionally distressed, shocked, and angry.

363.    On and since December 17, 2015, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley knew, had reason to know, or should have had reason to know that a special likelihood existed that if Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley ~~Wutoh~~ negligently failed to abide or ignored the processes and procedures under Howard's Policy, *viz.*, failing to provide Plaintiff with actual notice of the fact specific allegations by the two female complainants, that Plaintiff would suffer emotional distress, as he could not adequate defend himself against such allegations.

364~~279~~.    Prior to May 4, 2017, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley knew, had reason to know, or should have had reason to know that a special likelihood existed that Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley's negligence, which was motivated by the improper purpose, would cause Plaintiff to suffer emotional distress (a) when he failed to investigate properly the five sexual assault complaints filed between 2014 and 2016, (b) when he was subject to negative publicity during the #NoMeansNo protests, (c) when he sought to redress the deep, institutional conflict of interest that arose out of and under the alleged failure by the Title IX Office, *viz.*, Smiley, to investigate the sexual assault complaints against Howard male students and employees from 2014 to 2016 as pled in *Jane Doe 5 v. Howard University*; (d) when he realized that the Jane Doe 5 would sue Howard before the end of May 2017, and (e) when he feared that his mishandling of these complaints could prompt an OCR investigation.[28]

365.    Per ¶ 364, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley, in the absence of a Finding of Material Facts and in the course of

---

[28]    *See Wells v. Xavier Univ.*, 7 F. Supp.3d 746, 751 (S.D. Ohio 2014).

performing their varying ~~his~~ obligations to Plaintiff under the *1993 Faculty Handbook*, adopted an anti-male bias against Plaintiff, an accused male, to show OCR principally that Howard would take action, as it had not done based on the allegations in *Jane Doe 5 v. Howard University*.

366.    Per ¶ 285, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley breached their varying duties and obligations owed to Plaintiff when in the absence of a Finding of Material Facts and in the course of performing their varying ~~his~~ duties obligation under the *1993 Faculty Handbook*, he signed the Findings and Reprimand on May 4, 2017.

367.    On May 15, 2017, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley breached their varying ~~his~~ duties and obligations owed to Plaintiff when in the absence of a Finding of Material Facts and in the course of performing their varying duties and obligations within the meaning of implied duty ~~covenant~~ of good faith and fair dealings of the *1993 Faculty Handbook*, he allowed Smiley to review and to make recommendations on Plaintiff's 32-page appeal memo, even though Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley knew or had reason to know, through the doctrine of imputed knowledge, that Smiley and Love negligently failed to abide the processes and procedures for the equal treatment of the two female complainants and Plaintiff.

368.    On May 25, 2017, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley breached their varying ~~his~~ duties and obligations owed to Plaintiff when in the absence of a Finding of Material Facts and in the course of performing their varying ~~his~~ duties and obligations under the Policy as understood

through and governed by the implied duty of good faith and fair dealing of the *1993 Faculty Handbook*, he failed to read Plaintiff's appeal, and he failed to provide Plaintiff with a full and detailed report for rejecting his appeal, even though per § 2.7.4.6.1 Wutoh's decision to find Plaintiff in violation of Howard's Policy "is of far-reaching importance both to the individual and to the university."[29]  Given the pariah status that society has assigned to men who are found responsible for engaging in sexual harassment, it must be of far-reaching importance to Howard and Plaintiff that Wutoh, the Title IX Decisional Authority, not breach his duties and obligations to Plaintiff in the course of performing this obligation under Howard's Policy, under Title IX rules and regulations, and under the *1993 Faculty Handbook*.

369.    As a result of Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley's failure to abide their varying ~~his~~ duties and obligations to Plaintiff while they were in the course of performing enforcing the Policy as understood through and governed by the *1993 Faculty Handbook*, to which Howard's Policy is appended, they ~~he~~ caused Plaintiff to suffer emotional pain, mental distress, physical harm, and psychological stress.

370.    Since December 17, 2015, Howard, Wutoh (the second highest-ranking agent at Howard), Love, and Smiley's failure to abide their varying ~~his~~ duties to enforce the Policy as understood through and governed by the *1993 Faculty Handbook*, to which Howard's Policy is appended, was the direct and proximate of Plaintiff's emotional pain, mental distress, physical harm, and psychological stress.

---

[29]      *Cf.* 1993 FACULTY HANDBOOK, § 2.7.4.6.1, at 2-50 ("When a review for tenure recommendation is conducted, it is required to be thorough and well documented, since the decision that is made is of far-reaching importance both to the individual and to the university.").

371.    On December 17, 2015 to the present, Plaintiff has not been contributorily negligent, having made every institutional effort to give at the very least inquiry notice to Wutoh that he was breaching his duties and obligations to Plaintiff under the *1993 Faculty Handbook*, to which Howard's Policy is appended, when:

(a)    Plaintiff demanded actual notice of the fact specific allegations against him,

(b)    he delivered email missives to Howard and Wutoh that provided his Office with objective evidence and exculpatory statements, which received no evidentiary weight due to the subjectivity test that gave undue evidentiary weight and institutional imprimatur to the two females' victims' narrative,

(c)    he notified Howard and Wutoh that Smiley had failed to apply the reasonable person standard,

(d)    he filed his 32-page appeal memo with Howard and Wutoh,

(e)    he sought to correct the sex and gender-based discrimination that he had suffered by submitting the relevant documents to FIRE,

(f)    he filed a complaint with the AAUP, which sent a letter to Howard's leadership,

(g)    he gave actual notice to Howard's leadership on May 25, 2017, and

(h)    he filed a timely formal grievance under the *1993 Faculty Handbook* on June 6, 2017.[30]

---

[30]    Per § 2.8.3.2 of the *1993 Faculty Handbook*, and per the statements in ¶ 324, Plaintiff made good faith attempt to mediate any dispute with the Defendant Wutoh, the administrative officer, at the level of his office and the School of Law. Having failed to get Defendant Wutoh to take corrective actions, Plaintiff filed a formal grievance. *See* 1993 FACULTY HANDBOOK, § 2.8.3.2, at 2-62.

372.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, post-judgment interest, attorneys' fees, expert witness fees, expenses, costs, and disbursements.

**COUNT 9**
**(Negligence by Howard)**

373.    The foregoing allegations are incorporated herein by reference.

37.    On May 4, 2017, Plaintiff and Howard had been in an employment relationship for approximately 24 years.

375.    That relationship has been governed by and understood through the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

376.    The *1993 Faculty Handbook* and its implied duty of good faith and fair dealings fully determine the duties, rights, privileges, obligations, and procedures between Howard and faculty like Plaintiff.

377.    Under the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings, Howard owed duties of care, good faith, and fair dealings to Plaintiff. Such duties included, without limitation, a duty of reasonable care in selecting and supervising competent, well-trained, and unbiased agents, administrators, and/or employees to conduct and/or supervise investigations by ~~of~~ the Title IX Office.

378.    Howard breached its duty of care by appointing as a quasi-final decision, Candi N. Smiley, Esq., who was negligently and/or intentionally ~~not~~ unfamiliar with ~~the~~ fair and impartial investigative process and procedures, with known and published Title IX rules and regulations, and with the reasonable contractual expectations of faculty under the *1993 Faculty Handbook*.

379.    Howard breached its duty of care to Plaintiff by permitting Smiley

(investigator), Love (the supervisor), and Wutoh (the Provost and Title IX Decisional Authority), who were so unfamiliar with, or indifferent to, the proper investigative processes and procedures to completely eliminate the basic fairness of Plaintiff's reasonable contractual expectations. Under the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings, Plaintiff was entitled to receive actual notice of the spurious students' allegations against him.

380.   Howard breached its duty of care, good faith, and fair dealings to Plaintiff by permitting Wutoh, Love, and Smiley to adopt an unknown and unpublished evaluative standard called subjective experience of the victims test to determine conclusively whether Plaintiff had violated the Policy.  That irrebuttable presumption eliminated the required preponderance of the evidence standard, which shifted the entire evidentiary burden to Plaintiff to show why he was not responsible for violating the Policy, and replaced it with an unheard of slightest evidence standard under Title IX, which "tilted the playing field against" Plaintiff.

381.   Howard breached its duty of due care, good faith, and fair dealings to Plaintiff when in the worse instance, Wutoh, Smiley, and/or Love willfully, deliberately, and maliciously targeted Plaintiff to conceal their malfeasance or misfeasance in the matters under and leading up to *Jane Doe 5 v. Howard University*.

382.   Howard breached its duty of care, good faith, and fair dealings when Wutoh accepted the Smiley's Report, Rationale, and Recommendations uncritically, as evidenced by him signing the Notice of Findings even though it completely lacked the required Findings of Material Facts and Conclusions.  Howard breached its duty of care, good faith, and fair dealings when Wutoh failed to undertake his burden of due diligence

during his evaluation of Smiley's Report, Rationale, and Recommendations.  Howard breached its duty of care, good faith, and fair dealings when Wutoh permitted Smiley, who had adopted the subjective experience test of (the female) students and who would be sufficiently biased to shield herself from scrutiny, to review Plaintiff's appeal memo.

383.  Howard further breached its duty of care owed to Plaintiff by intentionally, recklessly and/or negligently failing to conduct a proper conflicts check to assure that Plaintiff's appeal was decided by an unbiased investigator other than by Smiley who was biased and conflicted; or, given his duty and obligation as Provost and Title IX Decisional Authority, Wutoh negligently delegated the review of Plaintiff's appeal to Smiley who already had a palpable conflict of interest based on her use of the ~~subjectivity~~ subjective experience test to determine conclusively whether Plaintiff had violated Howard's Policy, and based on ~~her~~ Wutoh, Smiley, and/or Love maliciously targeting Plaintiff to serve as an example of Howard's present-day "get tough" approach to male employees accused of sexual misconduct in the days immediately preceding the filing of the *Jane Doe 5 v. Howard University* on May 10, 2017.

384.  As a direct, proximate, and foreseeable consequence of Howard's conduct, Plaintiff's legal and legal academic career prospects, including decanal appointments or lateraling opportunities, and his reputation, and new earning potential have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

385.  As a result of the foregoing, Plaintiff is entitled to recover damages in an

amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT 10
### (Declaratory Judgment and Permanent Injunctive Relief)

386.    The foregoing allegations are incorporated herein by reference.

387.    Howard has violated contractual obligations, and federal and state law.

388.    Plaintiff's career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to Howard's deeply flawed and institutionally conflicted process will continue to label Plaintiff as a sexual harasser, greatly jeopardizing his prospects for future legal and legal academic employment opportunities, with no end in sight.

389.    As a result of the foregoing, a justiciable controversy exists between the parties with respect to the outcome, permanency, and future handling of Plaintiff's personnel file in the Office of Human Resources and the Office of the Provost, including the Title IX Office.

390.    By reason of the foregoing, pursuant to 28 U.S.C. § 2201, Plaintiff requests a declaration that: (a) the Notice of Findings and Reprimand against Plaintiff made by Howard pursuant to the investigation by the Office of the Provost's Title IX Office be reversed; (b) Plaintiff's disciplinary record pursuant to the investigation by the Title IX Office be expunged and removed from his personnel files in the Office of Human Resources and the Office of the Provost; (c) Howard shall provide Plaintiff with a notarized letter confirming that the Findings and Reprimand have been reversed, vacated, rescinded, and expunged from Plaintiff's personnel files wherever they might be located at Howard or elsewhere; and (d) Howard shall restore Plaintiff's reputation to third parties to whom Howard has leaked, sent, and/or failed to adequately safeguard the

Notice of Findings and Reprimand of the investigation of the Title IX Office.

## PRAYER FOR RELIEF

WHEREFORE, the premises considered, Plaintiff respectfully prays that this Honorable Court:

1.    Order Howard to reverse and expunge its Notice of Findings of responsibility and Reprimand from Plaintiff's employment record and personnel file, and to publicly state that Howard has reversed and expunged the Findings and Reprimand;

2.    Order Howard to verify this reversal and expungement of Plaintiff's employment record and personnel file by providing Plaintiff with a Letter to that effect signed by the Board of Trustees certifying to any third parties that the Notice of Findings and Reprimand have been reversed and expunged from his employment records and personnel file;

3.    Enter judgment in favor of Plaintiff against Howard;

4.    Enter judgment in favor of Plaintiff against Anthony K. Wutoh;

5.    Enter judgment in favor of Plaintiff against Candi N. Smiley, Esq.;

6.    Enter judgment in favor of Plaintiff against Vanessa Love;

7.    Order permanent injunctive relief requiring Howard ~~University~~ to immediately revise and remedy its Title IX Policy ~~policies~~, through its language and application, to eliminate the anti-male bias and improper, unknown and unpublished processes and procedures against Howard employees and students who are subject to allegations of sex-based discrimination;

8.    Award Plaintiff general and compensatory damages against Defendants in an amount not less than Four Million Nine Hundred Ninety Nine Dollars

($4,999,000.00), including, without limitation, damages to his physical well-being, emotional and psychological damage, damages to reputation, past and future economic losses, loss of professional opportunities, and other direct and consequential damages, declaratory relief, injunctive relief, attorney's fees, including expert fees, and any other relief this Court deems appropriate;

9.      Award Plaintiff his court costs and expenses, including reasonable attorneys' fees and expert witnesses' fees under 42 U.S.C. § 1988;

10.      Award Plaintiff prejudgment interest and post-judgment interest;

11.      Declare Howard ~~Defendants~~' conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681;

12.      Award attorney's fees and costs pursuant to statutory or common law doctrines providing for such award; and

13.      Grant such other relief as this Honorable Court deems just and proper.

JURY DEMAND

Respectfully submitted,

Reginald Leamon Robinson, Plaintiff Pro Se
1904 Autumn Ridge Circle
Silver Spring, MD 20906

Dated:  July 18, 2018

100

## CERTIFICATE OF SERVICE

I hereby certify that this document filed with D.C. District Court and paper copies will be

sent via email to those indicated as non-registered participants on July 19, 2018, upon:

Timothy F. McCormack, Partner
Ballard Spahr, LLP
300 East Lombard Street
18th Floor
Baltimore, MD  21202-3268

Michelle McGeogh
Ballard Spahr, LLP
300 East Lombard Street
18th Floor
Baltimore, MD  21202-3268

Maraya Pratt
Ballard Spahr, LLP
300 East Lombard Street
18th Floor
Baltimore, MD  21202-3268

_____

Reginald Leamon Robinson, Plaintiff Pro Se