RECEIVED
U.S. COURT OF APPEALS
FOR

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

……………………………………………x

REGINALD LEAMON ROBINSON, PRO SE

Plaintiff,

-- against ---                                    No. 1:18-cv-00518-TNM

**JURY IS DEMANDED**

HOWARD UNIVERSITY, INC., ET AL.;

Defendants.

……………………………………………x

## PLAINTIFF'S MOTION TO DELAY RESPONSE TO DEFENDANTS' MOTION TO SUMMARY JUDGMENT

Plaintiff Reginald Leamon Robinson (hereinafter "Plaintiff"), by and through himself, hereby respectfully files a motion under Rule 56(d) to delay the Defendants' motion for summary judgment until 30 days after the close of discovery.

Plaintiff's reasons for this motion are as follows:

1.      No depositions have been taken.

2.      No documents have been produced.

3.      Plaintiff is entitled to discovery to support his claims.

Respectfully submitted:

Reginald Leamon Robinson
Plaintiff Pro Se
1904 Autumn Ridge Circle
Silver Spring, MD  20906
Tele:  240-876-7439 (c)
Email:  heru.hermes@gmail.com

RECEIVED
Mail Room

AUG 2   2018

U.S. District Court
District of Columbia

1

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

......................................................x

REGINALD LEAMON ROBINSON, PRO SE

Plaintiff,

-- against ---                                    No. 1:18-cv-00518-TNM

**JURY IS DEMANDED**

HOWARD UNIVERSITY, INC., ET AL.;

Defendants.

......................................................x

## **PROPOSED ORDER**

Upon consideration of Plaintiff's motion to delay a ruling on Defendants' Motion

for Summary Judgment under Rule 56(d) until 30 days after the close of discovery, it is

**HEREBY ORDERED** that Plaintiff's motion is delay response to and ruling on

Defendants' motion for summary judgment is **GRANTED.**

**SO ORDERED.**

Date: ___ day of August 2018          _____

THOMAS N. MCFADDEN
United States District Court

## CERTIFICATE OF SERVICE

I hereby certify that on 25 August 2018, I caused the foregoing document to be served on all counsel via first class mail postage paid.

Reginald Leamon Robinson, Pro Se Plaintiff
1904 Autumn Ridge Circle
Silver Spring, MD  20906-5826
Tel:  240-876-7439
Email:  heru.hermes@gmail.com

3

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

..................................................x

REGINALD LEAMON ROBINSON, PRO SE

Plaintiff,

-- against ---

No. 1:18-cv-00518-TNM

**JURY IS DEMANDED**

HOWARD UNIVERSITY, INC., ET AL.;

Defendants.

..................................................x

## PLAINTIFF'S MOTIONS IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND/OR SUMMARY JUDGMENT TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff Reginald Leamon Robinson (hereinafter "Plaintiff"), by and through himself, hereby respectfully opposes the motion of defendants to dismiss or in the alternative for summary judgment. Plaintiff incorporates the pleadings contained in his First Amended Complaint by reference, as if set forth herein. Docket No. 13.

However, on this day, Plaintiff also files a motion under Rule 56(d) to delay the Defendants' motion for summary judgment until 30 days after the close of discovery.

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     That Defendants' Motion to Dismiss be dismissed with prejudice; or, in the alternative,

B.     That Defendants' Motion for Summary Judgment be denied with prejudice as they are not entitled to judgments as a matter of law; and

C.     That Plaintiff be granted such other and further relief as set forth in his First Amended Complaint and as is just and equitable.

4

Respectfully submitted,


Date:  August 24, 2018

_____

Reginald Leamon Robinson, Pro Se Plaintiff
1904 Autumn Ridge Circle
Silver Spring, MD  20906-5826
Tel:  240-876-7439
Email:  heru.hermes@gmail.com

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

...................................................x

REGINALD LEAMON ROBINSON, PRO SE

Plaintiff,

-- against ---                                    No. 1:18-cv-00518-TNM

**JURY IS DEMANDED**

HOWARD UNIVERSITY, INC., ET AL.;

Defendants.

...................................................x

### PLAINTIFF'S MOTIONS IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND/OR SUMMARY JUDGMENT TO PLAINTIFF'S FIRST AMENDED COMPLAINT

## I.      INTRODUCTION

On May 4, 2017, Howard University breached its employment contract with Plaintiff when in a Notice of Findings ("Notice"), it found that sufficient evidence existed to sustain a finding that Plaintiff had engaged in sexual harassment. Howard's is devoid of any pretense of substantial evidence. Without such evidence, Howard proffers no legal sufficiency that Plaintiff's conduct on September 17, 2015 satisfies the factual or legal predicates of sexual harassment. Instead, the Report of Investigation ("Report") and its Rationale, from which the Notice draws its institutional force and legal authority, made no findings of material facts or conclusions of law. In fact, the Report and its Rationale present no structured, logical, and/or legal analyses to buttress its unsustained and unsupported conclusion. Upon a fair reading of the Report and its Rationale, this Court will find statements, conclusions, and assertions, but no cogent legal analyses on why the Notice declares that such evidence exists to sustain a finding against Plaintiff.

6

On December 4, 2015, after Plaintiff had given his students a quiz, i.e., Knowledge Demonstration Opportunity ("KDO"), two female law students filed a complaint against Plaintiff. They did not allege that Plaintiff had made unwelcomed sexual advances, requested sexual favors, *and* engaged in words or conduct of a sexual nature. Moreover, they did not state that beyond distributing the KDO, beyond seeking volunteers to engage in meaningful participation, beyond giving feedback on each of the seven questions, and beyond reinforcing the substantive legal material of Chapter 5, Plaintiff engaged in specific or non-specific words and/or conduct related to sex, sexuality, and words or conduct of a sexual nature.

Rather, on December 4, 2015, these two female law students primarily went to the Title IX Office because they did not like Plaintiff's academic and scholarly writings. Angered and uncomfortable, they asserted that his writings were against black women and black mothers. They declared that his ideas or beliefs were very disturbing. They disliked what hearsay they heard about him. They refused to attend him office hours as he was no different from a white Klansman who hated blacks. They thought that Plaintiff's writings and beliefs were anathema to Howard's brand and purpose. They rejected Plaintiff's casual professional personality, which was too informal, intimate, and uncomfortable. After reading his two peer-reviewed articles, they projected their odious and unexplained emotional feelings onto Plaintiff's Question 5, which tested § 261 through a depilatory hypothetical. Neither wanted to be in Plaintiff's class, nor believed that he ought to be at Howard. Or at the very least, these two female complainants wanted a negative institutional response from Howard that would say that it was not okay for Plaintiff to believe as he had written, and to act informally and casually as he had.

After Smiley applied the subjective experience test to their complaints that fell outside of the Title IX Policy, that's exactly what they got.

Fortunately, these two female law students never stated or intimated that Plaintiff engaged in any actions or conduct that was legally sufficient to sustain a finding of sexual harassment against him. Smiley's Report and Rationale could make no findings of material fact or conclusions of law. No such facts exist.

On May 4, 2017, the Notice *breached* Plaintiff's employment contract and the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings. That *breach* occurred when Howard's Notice constituted an action that affected Plaintiff's personnel status or the terms and conditions of his employment, which violated his reasonable contractual expectation and/or entitlement of academic freedom, was unsupported by the record (i.e., Report and Rationale) presented to support the action (i.e., arbitrary and capricious), and/or failed to comply with established rules and procedures. To take this action, Howard *violated* its Title IX Policy ("Policy") by engaging in subterfuge, evasion, bad faith, and/or failure to cooperate in Plaintiff's efforts to garner actual notice of the factual allegations against him. In so doing, Howard *violated* the implied duty of good faith and fair dealings.

Since May 4, 2017, Plaintiff has made every reasonable effort to redress Howard's arbitrary and capricious finding. Plaintiff appealed to the Provost, but he summarily dismissed his appeal after the Provost learned from Plaintiff that he would send the Notice and related documents to an outside, disinterested third party, *viz.*, FIRE. Prior to seeking help from FIRE to end the sex discrimination that he faced, Plaintiff filed a complaint with the AAUP. Plaintiff also filed a complaint with the ABA and the

EEOC, and as a result, ABA appeared to have warned the School of Law away from enforcing the disciplinary action against Plaintiff. The EEOC issued Plaintiff a Right to Sue Letter, which was also sent to Howard. On May 25, 2017, Plaintiff notified the Chair of the Board of Trustees and President Frederick, who also serves on the Board, that he had suffered an arbitrary and capricious finding under the Policy. Neither of them responded to Plaintiff, nor took any affirmative steps to investigate or to engage in corrective action, even though they were empowered to do so. Despite responsive letters from AAUP and FIRE to the entire leadership at Howard, none of the University officials, officers, and/or agents took any corrective action. Later, Plaintiff filed a timely grievance with the Faculty Grievance Commission ("FGC"). Despite a preliminary finding by the FGC that Plaintiff's complaint "warranted detail investigation" and that Howard's Notice was at the very least arbitrary and capricious, which was later followed by mandatory mediation under the *1993 Faculty Handbook*, neither the Provost especially nor Smiley took corrective actions. At the mediation, which was not covered by confidentiality or privilege, Provost acknowledged that Plaintiff had not violated the Policy.

Finally, having recourse only to the federal courts, Plaintiff filed this complaint on February 24, 2018. Later, Plaintiff amended the complaint to add counts under Title IX and to drop a defendant and to add Howard University. Since Plaintiff has filed his Amended Complaint, Defendants have again filed a motion to dismiss or in the alternative a motion for summary judgment. In this original complaint and later in the amended complaint, Plaintiff sufficiently alleges a plausible breach of contract and its implied duty of good faith and fair dealings, and violations of Title VII and Title IX. He

sufficiently showed that Defendants' Notice was arbitrary and capricious, and that the Disciplinary Actions were vague and unsupported. These actions by Howard breached Plaintiff's employment contract and the *1993 Faculty Handbook*'s contractual expectations against arbitrary and capricious action. He sufficiently alleges that Defendants' application of its Policy procedures during the investigation violated the implied duty of good faith and fair dealings. Plaintiff has sufficiently alleged that based on Defendant's Report and its Rationale, Defendants applied the subjective experience test (or believe the victim), which is anti-male and which implied on sex-based discrimination in violation of Title VII and Title IX. Plaintiff also sufficiently alleged that common law claims to help this Court and Defendants to determine whether the factual allegations in Plaintiff's complaint set forth cognizable claims for which relief may be granted. Plaintiff has alleged sufficiently that he has suffered emotional, physical, and professional harm. Plaintiff's alleged facts also sufficiently state a claim under the District of Columbia for negligence and related claims.

Today, Plaintiff opposes these motions and files his cross-motion for partial summary judgment.[1]

## FACTUAL BACKGROUND

### A.    KDO5 and Question 5.

In fall 2015, Plaintiff taught an upper-level class entitled "Agency, Partners, and Other Unincorporated Business Associations" ("Agency") (SOF, ¶ 24), and on

---

[1]    Defendants did not notify Plaintiff that they had filed their motions with this Honorable Court on August 3, 2018. Plaintiff pro se did not receive notice by mail from this Honorable Court that Defendants had filed their motions and that Plaintiff pro se needed to file an answer or response by August 24, 2018 or 21 days after Defendants filed their motion to dismiss or in the alternative for summary judgment. As a result, Plaintiff did not retrieve the hard copy from his mailbox until August 9, 2018, which gave Plaintiff pro se only 15 days to draft a response to these motions.

September 17, 2015, he gave his 34 students a quiz, *viz.*, Knowledge Demonstration Opportunity ("KDO"), in which one ("Question 5" or "Q5") of the seven questions dealt with tortious touching and § 261 of RESTATEMENT (SECOND) AGENCY (1958).  Q5 was a depilatory hypothetical, in which a customer (T) alleged that the agent (A) tortiously touched T during the services after awaking from a light sleep.  Eventually, T sued the owner (P) of the spa under § 261, which focuses on whether A who was held out by P had engaged in any fraudulent misrepresentations so that A could induce T who was unaware that A may be acting outside of the scope of A's employment, and so that A could tortiously harm T (SOF, ¶ 29).  Given that Plaintiff was testing § 261, the students had to focus on whether A engaged in fraudulent misrepresentations to induce T to act to T's legal detriment.

Question 5 deviated slightly from the substantive materials that the students had read in Chapter 5, and Plaintiff only drafted Q5 after he read the annotated sections of § 261 and after he researched depilatory services like full or partial Brazilian waxes.  To answer Question 5 properly, the students would have to know the elements of § 261. They need not resort to personal experiences.  During the feedback, which immediately followed the completion of KDO5 (Chapter 5), a female student who volunteered challenged the black box logic of Q5 by asserting that "T would not sleep." (SOF, ¶ 31) Plaintiff halted the feedback, and issued the following caveat:  Don't challenge the hypo based on what you know or believe you know.  After issuing this caveat, no student, female or male, challenged the hypo on this ground; they limited their responses and analyses to choices (A) through (D).

### B.    Non-Sexual Harassment and Gender Discrimination Complaint by Two Female Law Students.

11

### 1.    Complainant 1 ("C1").

On December 4, 2015, two female upper-level students from in the Agency class filed a complaint with Smiley, Deputy Title IX Coordinator. Based on the Interview Report prepared by Love, Title IX Coordinator, Complainant 1 ("C1") and Complainant 2 ("C2") did not allege any sexual harassment claims against Plaintiff.  Nevertheless, Love states that "two students reported an allege case of sexual harassment, and gender discrimination to the Title IX Office."  Defendants' Motion to Dismiss or in the alternative for Summary Judgment, Ex. 1, Love's Interview Report,[2] n.d., at 1.

Complainant 1 made the following statement.  In discussing why she came to the Title Office, C1 stated: "So I am here because of Professor Reginald Robinson.  Um, my issues stem from the way that he interacts with our class and the way that he interacts with students."  *Id.*  That was C1's primary reason.  Then C1 tied that primary reason to Plaintiff's published scholarship.  C1 stated: "I had these issues prior to discovering a number of articles that he had written." *Id.*  C1 did not state what she meant by "interact." C1 acknowledged that Plaintiff had "First Amendment protection." C1 understood that Plaintiff had a "right to think whatever he wants." "But to me," C1 said, "and every female that I sent these articles to" concluded that Plaintiff's "articles advocate misogyny." *Id.* at 1-2.

---

[2]    Love's Interview Report, n.d., is not a true and correct transcript of the interview with C1 and C2.  Rather, Love picks and chooses interview language that she perhaps hoped would support a finding that Plaintiff engaged in sexual harassment.  However, as Plaintiff will argue, Love's Interview Reports failed to establish substantive or sufficient evidence that Plaintiff engaged in sexual harassment, i.e., unwelcomed sexual advances, request for sexual favors, *and* other words or conduct of a sexual nature.  In fact, throughout Smiley's Report of Investigation, she does not define "sexual nature" at all.

Complainant 1 goes further, focusing on two of Plaintiff's articles, both of which focused on why gangsta rap artists impose vilifying lyrics on innocent black females. C1 continued: "To the extent that they don't advocate misogyny they justify misogyny and violence towards women. He uses vulgar and explicit language. Um it's all very, personally offensive to me." *Id.* at 2. C1 who had attended William & Mary goes further: "I, the best way I have felt where, if I had read, if I had found out at William and Mary where I went for undergrad, that I was in class with a Klansmen." *Id.* C1 states further: "I think, that after reading these while they are disturbing, it's disturbing to me that he thinks these things. It's more distributing [sic] that he is trying to work out his problems with our class." *Id.* As a result, C1 continued, "I don't even go to his office hours because I'm uncomfortable being in a room with him." *Id.*

C1 continued, referring to Plaintiff's belief "regarding black mothers as abusers to their children." C1 linked Plaintiff's published beliefs with how he interacts with the Agency class. C1 states, "These beliefs, they matter, and they matter in the way that he's interacting with out [sic] class, and after having read the articles, all the things that he's done and said to the class make a lot more sense." *Id.*

Despite the foregoing statements, Love described Q5 as C1's primary issue for vague complaint about Plaintiff's conduct. C1 informed Q5 with a sex and gender read, and then C1 ascribed that bias to Plaintiff. C1 assigned her subjective feelings to the entire class; however, C1 made no proffer to support that "KDO put the class in an uncomfortable position." C1, after getting lured by a red herring, focused on whether T could sleep through a depilatory waxing service. Urged on by Smiley, C1 explained why she thought Q5 was "inappropriate," stating:

First, of all, I think it's inappropriate to have that sort of hypothetical regarding the Brazilian wax was inappropriate. (Investigator: I was wondering). Yes! I think that's inappropriate on its face, but that apart from that putting your class in a position where like now, a small part of the class: women and an even smaller part of the class, women who have had Brazilian waxes. Now, feel like they have to defend their answer choice based on their more intimate knowledge of Brazilian waxing, very inappropriate."

*Id.* at 2.

C1 disagreed with Plaintiff having any academic freedom and institutional power to protect his intellectual capital, *viz.*, KDO questions. C1 complained that Plaintiff prevent his students from taking KDOs out of the classroom, and from having any access to them outside of the class. *Id.* After the interview of September 12, 2016, Plaintiff sent an explanation to Smiley: (1) he uses KDO questions on the final exam; (2) he announces that some small percentage of KDO questions will be on the final exam; and (3) students have rampantly cheated by copying them during and between classes.

C1 linked Q5 to Plaintiff's published ideas, both of which made her uncomfortable. Both C1 and C2 had highlighted some sections of Plaintiff's two peer-reviewed articles for Smiley, which they gave to her. C1 reported, "So that makes me very uncomfortable." C1 continued, "That in addition to, like ah, I want to read these lyrics so that it will play on the recording but I don't want to read these lyrics because I don't want these words to come out of my mouth, like this. So by all means the introductory paragraph, I have highlighted and [C2] has highlighted some really choice sections so that you can take a look at this." *Id.* at 3.

C1's complaint summed to three main points. First, Plaintiff's email salutations (which Plaintiff sent to his colleagues, too) were "Dear loving

students" and his sign off was "Peace, love and Namaste. Reggie." C1 asserted that, "I think that he is either intentionally or unintentionally establishing an inappropriately intimate relationship with his class." Id. Second, C1 recounted as hearsay a story she had heard about Plaintiff's effort to teach proxy abuse by parents through the retelling of a personal story. C1 was not registered for the class. C1 stated, "However, this level of personal intimate details about this man's life makes me very uncomfortable." Id. C1 did not believe that Howard Law School was an inappropriate place to discuss such details. Id. Smiley then asked[3] her for a "couple of specific examples of conversations or things he has said in class that made her feel uncomfortable to the point where she didn't want to go to his office hours." Id. C1 responded by stating, "That comment (presumably the child welfare example), the way he addresses us in emails: 'Dear loving agency and partnership students,' signed, 'Love and namaste Reggie.'" Id. C1 further stated, "the fact that he uses his first name is overly familiar." Id.

Third, C1 refocused Smiley on her primary reason for filing a complaint with the Title IX Office – Plaintiff's published idea and the article's language. Love linked C1's return to Plaintiff's academic writings to Smiley seeking examples of what Plaintiff said in class that kept C1 from attending his office hours.[4] C1 quoted sentences from the article's first paragraph, and then she stated, "This sets up a dichotomy to me, like, the only justifications he gives are

---

[3]   Smiley's question does not appear logically related to the preceding material, suggesting that Love arranged the narrative of C1 so that it appeared to tell a coherent story that would support C1's view/feeling that "inappropriate" in this pedagogical context meant "sexual harassment."

[4]   Love wrote as a transition phrase to this part of the C1's statement: "In addition to the examples cited above."

either that, it's okay to feel, to have these violent aggressions toward women and that if it's okay, it's a result of black mother's [sic] abusing their children." Id. at 3-4.  After noting that Plaintiff's article first six footnotes described gangsta rap lyrics that demean black women, C1 stated, "This is literature, like I don't understand how in an academic and intellectual environment I'm supposed to look at the things that my professor has published and feel okay, being in his class." Id. at 4.

Finally, C1, having not described anything about Plaintiff that constituted sexual harassment and gender discrimination, returned to main reason why she filed a complaint with the Title IX Office.  "I did this (presumably report to the Title IX office) because I was experiencing, I was having a really negative experience with the professor."[5]  Again, C1 failed to cite specific, actionable behavior that would satisfy the factual or legal predicates for sexual harassment because that's not way she visited the Title IX Office.

### 2.    Complainant 2 ("C2").

C2 focused on Question 5 and Plaintiff's publications, and she too failed to describe any actions, words, or conduct that would make out a prima facie case of sexual harassment.  Apart from telling Smiley how uncomfortable she felt, C2 confessed her central motivation for filing her complaint against Plaintiff.  C2 stated, "You should see the crazy stuff that he has actually published' looking at it, and knowing that there is someone who represents the Howard name at all that

---

[5]    C1 did not say that she had a very difficult time with Plaintiff during KDO5 and Question 5.  C1 provided no time frame.  But from her complaint/narrative, C1 draw heavily on Plaintiff's two peer-reviewed articles to assign meaning not only to Question 5 but also to animus toward Plaintiff's casual professional personality and the notices in his syllabus which was designed to prevent cheating and to create fairness for all students who would sit for his final exam.

has put this kind of black woman hate um out into the public is disturbing for me." *Id.* at 5. Finally, C2 reveals that she seeks institutional retribution: "I really feel like there should be at least some kind of action that students or [sic] able to take to say that is inappropriate. Ah, we're not comfortable with this. I'm not comfortable reading this as a black woman."

## ARGUMENT

A court's goal in reviewing a Rule 12(b)(6) motion is to "test whether the complaint 'state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(b). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that faces a Rule 12(b)(6) motion to dismiss need not allege detail facts. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, the plaintiff is obligated to provide "grounds" of plaintiff's "'entitle[ment] to relief,' which 'requires more than labels and conclusions.'" *Id.* Mere "formulaic recitation of the elements of a cause of action" will not suffice. *Id.*, citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*, citing 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216, pp. 235-236 (3d ed. 2004).

Rather, a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the

misconduct alleged. *JCS Transmashholding v. Miller*, 70 F.Supp.3d 516, 520-21(D.D.C. 2014) (citing *Iqbal*, 556 U.S. at 678, (citing *Twombly* 550 U.S. at 556.)). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in the complaint, conclusory allegations "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

## I.   COUNT I STATES A CLAIM FOR BREACH OF CONTRACT, AND DEFENDANTS ARE NOT ENTITLED TO A JUDGMENT AS A MATTER OF LAW.

To make out a breach of contract claim in the District of Columbia, Plaintiff must allege that (1) a valid contract existed between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty; and (4) damages caused by the breach. *Alemayehu v. Abere*, ___ F.Supp.3d ___, 2018 WL 2336106, at *4 (DDC 2018).

First, since July 1994, Plaintiff and Howard have had a bona fide employment contract. Second, that contract incorporates §§ 2 and 3 of the *1993 Faculty Handbook* and its implied duty of good faith and fair dealing. 1993 Faculty Handbook, § 2.1, at 2-19. It is well established that, under District of Columbia law, "an employee handbook such as the Howard University Faculty Handbook . . . is a contract enforceable by the courts." *McConnell v. Howard Univ.*, 818 F.2d 58, 62-63 (D.C.A. 1987). Courts have found that *1993 Faculty Handbook* defines "the rights and obligations [of the employee and employer]." *Id.* at 62. It serves "in large measure as the contract of employment for Howard faculty." *Allworth v. Howard Univ.*, 890 A.2d at 199.

Third, Plaintiff has a reasonable contractual expectation of academic freedom and the entitlement of free expression. 1993 FACULTY HANDBOOK, § 2.2.4, at 2-22. Under the *1993 Faculty Handbook*, Howard by implication cannot take personnel action that is

arbitrary and capricious (i.e., an act that is unsupported by record presented to support the action taken), and/or that violates established rules and regulations, and/or that involves the faculty member's personnel status and alters the terms and conditions of employment. *Id.*, § 2.8.2. On May 4, 2017, Howard's Notice of Finding and its Disciplinary Action affected not only Plaintiff's contract right to academic freedom and entitlement to free expression, but also his personnel status, the terms and conditions of employment. That Howard's Notice was flawed, lacking the Policy's required findings of material facts and OCR's required conclusions of law. Policy, V. C. (10), at 14; OCR, Q&A, Sept. 2017 (citing significant OCR Guidance of 2001 and 2014).

Howard's Policy is subject to the strictures and reasonable contractual expectation of the 1993 Faculty Handbook and its implied duty of good faith and fair dealing. For example, the Trustees expressly excluded §§1, 4 through 7 from the Faculty Handbook grievance procedures. 1993 FACULTY HANDBOOK, § 2.1, at 2-19. Then, the Trustees stated, "the informal or formal procedures described in Sexual Harassment Policy and Procedures adopted by the Board of Trustees and incorporated here by reference." *Id.*, § 2.2.1.2, at 2-20. Under the Handbook, §§ 2 and 3 are incorporated; those sections are subject to grievance procedures. *See id.*, § 2.8.2. Accordingly, the Policy must be subject to strictures that protect Plaintiff from at the very least arbitrary and capricious actions, which support the valid conclusion that even if Defendants argue that the Policy is a state-alone regulations, Howard's application and enforcement of the Policy, especially against covered under the *1993 Faculty Handbook* are subject of contractual grounds for grieving at the very least arbitrary and capricious personnel actions by Howard.

On May 4, 2017, Howard issued an arbitrary and capricious finding against Plaintiff, one that also failed to comply with OCR guidance. That findings flowed inexorably out of the Report and Rationale was written by Smiley. That underlying document was principally flawed because it did not contain a statement of the material and relevant facts as presented by the two female complaining students. Most critically, the Report lacked any deep, structured, and analytical approach to testing the legal sufficiency of the students' highly subjective complaint by applying them through an objective, impartial, and fair to the factual and/or legal predicates of sexual harassment.

In drafting the Report, Smiley relied on the subjective experience of the complaining female students to determine conclusively whether Plaintiff had violated the Policy. That errant reliance turned Smiley not into an objective investigator, but into a biased investigator with an anti-male axe to grind. Accordingly, Smiley believed what the female students told her, used their words and language, criticized what they found disturbing, granted no creditability to Plaintiff, considered Plaintiff's scholarship as adjunct support for her conclusion, peered into his personnel file (but was surprised to find it empty), speculated unwarrantedly and prejudicially on a past university official concern about Plaintiff's teaching evaluations (did she actually read them?), ventured into Plaintiff past of 16 to 22 years seeking inculpating evidence, accused groundlessly Plaintiff of lying about past complaints of sexual harassment (however, she failed to adduce university records of such complaints), and ultimately concluded relying solely on character traits and evidence that if Plaintiff passed around dirty jokes to his colleagues 22 years, then it must follow that more than likely he drafted Question 5 of a sexual nature.

None of the foregoing items is legally sufficient to meet the factual and/or legal predicates of sexual harassment. Then on what objective basis or substantial evidence that was material and relevant facts, which made them specifically reliable and of probative value to support the conclusion in her Report? Based on her Report and her Declaration, Smiley never revealed the substantive basis and factual and material evidence that properly and credibly explains how she reached her decision, not as an advocate for the two female students, but as an institutional investigator who charged by the Policy and federal court jurisdiction to be an impartial, objective investigator.

Fourth, as a result, Plaintiff suffered physical, emotional, and psychological damages, including suicidal ideations, panic attacks, difficulty sleeping. Moreover, Plaintiff will suffer lost present and future opportunities in academic to improve his prestige by enjoying visiting opportunities, lateral appointments, decanal appointments whether at Howard or elsewhere, for which Plaintiff had already interviewed. *See* Affidavit of Peter Alexander, dated Aug. 22, 2018, attached hereto as Ex. 1.

## II.   COUNT II STATES A CLAIM FOR BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.

In the District of Columbia, every contract includes an implied duty of good faith and faith dealing. *Allworth v. Howard University*, 890 A.2d 194, 202 (D.C. 2006). Under this implied duty, neither party to the contract "shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.*, citing *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000). As the D.C. Court stated, "If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing." *Id.; see*

RESTATEMENT (SECOND) OF CONTRACT § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

In *Allworth*, the Court, looking to the RESTATEMENT, sought to shed light on the meaning of good faith, which varies with differing context. Good faith thus "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Allworth*, 890 A.2d at 201. By definition, good faith excludes "bad faith," which violates "standards of decency, fairness or reasonableness." *Id.* at 202. In part, bad faith involves "abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Id.*

Plaintiff's employment contract with Howard contains the 1993 Faculty Handbook and its implied duty of good faith and fair dealing. And when considering the 1993 Faculty Handbook, the parties now have fully informed rights and duties of the contract. *See McConnell v. Howard*, 818 F.2d 58, 62 (DCA 1987) (viewing the Faculty Handbook as constituting the contract defining the parties' rights and obligations). Read in good faith, and with the reasonable expectations of fair dealings, Howard had a duty to grant Plaintiff full access to the actual factual allegations of sexual harassment and gender discrimination against him. Under the Policy, Howard would abide the implied covenant of good faith and fair dealing by permitting Plaintiff to write a response to the material and relevant facts, which were alleged by the two complaining students. Instead, in violation of the implied duty of good faith and fair dealing, Howard, through its Policy, imposed a gag order on Plaintiff that prevent him from interviewing students, garnering affidavits, marshaling exculpatory documents or statements. Moreover, Howard, for inexplicable reasons, violated the implied covenant of good faith and fair dealings when

Smiley converted the complaint of the two female students' statements into allegations of sexual harassment and gender discrimination.

In the drafting of the Report of Investigation, Smiley made every effort to make the two females' subjective feelings about Plaintiff's professional personality, his salutations and sign off in his emails, his beliefs as published in his peer-review articles, their misreading of Question 5, and their desire to punish Plaintiff for his beliefs into substantial evidence that would satisfy the legal sufficiency requirement for the legal predicates for sexual harassment. To do so, Smiley engaged in bad faith, or a violation of the implied duty of good faith and fair dealings because she willfully rendered imperfect performance, not only so that she could validate the subjective feelings of the two female students, but also so that she could personally, professionally, and institutionally injure Plaintiff. In addition, before to contorting the two females' complaint into a sustained finding against Plaintiff, Smiley deliberately lied to Plaintiff about getting access to the factual allegations against him, and based on the revelations supplied by Report of Investigation, which is logically and legally incoherent, Smiley needed to engage in subterfuge and evasions because she had no legal or institutional basis for asserting Title IX jurisdiction over the complaints filed by the two female students on December 4, 2015.

Lastly, Provost Wutoh had a due diligence requirement under the Policy, and given that he is the Title IX Decisional Authority, and given that the Provost thus must receive ongoing and periodic training so that he too can effectively determine whether sexual harassment and gender discrimination has taken place, it was bad faith and thus a violation of the implied duty of good faith and fair dealing because as the second highest

ranking agent at Howard University, the Provost must have a greater sensitivity to the 1993 Faculty Handbook and its implied duty of good faith and fair dealing. As such, the Provost must appreciate that Plaintiff had a reasonable contractual expectation to be free from arbitrary and capricious personnel actions that would alter the terms and conditions of employment, violate academic freedom, alter his personnel status, or violate established rules and regulations. *See* 1993 FACULTY HANDBOOK, § 2.8.2, at 2-61. Moreover, upon his appeal to Provost, Howard was placed at the very least was placed on inquiry notice, and Plaintiff's appeal should have triggered the Provost to exercise a heightened level of due diligence. However, in an effort to retaliate and thus to frustrate Plaintiff's effort to seek appropriate redress, after all he could not appeal to any other University official, Provost acted in bad faith, thus violating the implied duty of good faith and fair dealing.

## III.   COUNTS 3, 4, and 6 STATE A CLAIM UNDER TITLE IX, AND DEFENDANTS ARE NOT ENTITLED A JUDGMENT AS A MATTER OF LAW.

In Counts 3, 4, and 6, Plaintiff asserts claims that Howard violated Title IX of the Education Amendments of 1972 (20 U.S.C. §§ 1681-1688) [commonly known as "Title IX"). Amended Compl., ¶¶ 272-292, at 69-75; ¶¶ 294-303, at 75-77. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Howard is a private institution of higher education and a recipient of federal funding, and thus it is subject of the rules and regulations of Title IX. Plaintiff has a private right of action for violation of Title IX and its regulations against recipients of

federal financial assistance. *See Cannon v. University of Chicago*, 441 U.S. 677 (1979). Although Defendants argue that he invites this Court to second-guess university disciplinary decisions, Plaintiff simply ask this Court whether an unsupported Notice of Finding by an investigator who applied the subjective experience constituted a breach of his employment contract and the 1993 Faculty Handbook and its implied duty of good faith and fair dealing. In the District of Columbia, federal and state courts have refused to defer to Howard University when it and an employee disputed when either of them had breached the employment agreement and the Faculty Handbook. *See McConnell v. Howard Univ.*, 818 F.2d 58, 68 (D.C.A. 1987) ("On remand, the trial court must consider de novo the appellant's breach of contract claims; no special deference is due the Board of Trustees once the case is properly before the court for resolution of the contract dispute.").

1.    Count 3 States an "Erroneous Outcome" Claim Under Title IX and Defendants Are Not Entitled to a Judgment as a Matter of Law.

On May 4, 2017, Howard made no objective findings of material fact or conclusions of law to support its finding, recommendations, and disciplinary action. See supra Count 1, at 17-21. Without that finding, Howard's Notice not only was arbitrary and capricious, but also had violated established rules and procedures. Under the Policy, one of those rules was that the Report had to make findings of material facts. It did not. Under the Policy, one of the procedures was that, given that Plaintiff was strongly encouraged to cooperate with the investigation, he needed to write a response to the important facts in the allegations against him. In his December 21, 2015 denial of violating the Policy, Plaintiff plainly and cogently explained a fair reading of the Notice of Complaint and the Policy required a degree basic fairness that would have been

25

consistent with the *1993 Faculty Handbook*. Smiley thereafter lied, deceived, evaded, and engaged in subterfuge, so that Plaintiff could not prepare himself for the Interview of January 13, 2016, where Smiley played the role not of investigator but prosecutor.

On January 13, 2016, Smiley told Plaintiff that Howard applied the subjective experience test to determine conclusively whether Plaintiff violated the Policy. On May 10, 2017, when Plaintiff attended the Mandatory Sensitivity Training for Sexual Harassment, Love showed him slides and told Plaintiff during the presentation on the 2017 Policy that Howard applied the subjective experience test.[6] And after January 13, 2016, Plaintiff wrote to Smiley saying that she was biased, and relied on the wrong test for evaluating objectively whether Plaintiff had violated Howard's Policy. Since that Interview and in his appeal to Wutoh, Plaintiff again stated that Howard (and Smiley) had failed to apply the objective test. *See Oncale v. Sundowner Offshore*, 523 U.S. 75 (1998).

According to others, the subjective experience test, or believe the victim, denies the accused like Plaintiff of his right to be investigated fairly. As at Howard, some local police units rely on this approach. According to Amy Swearer, "the basis premise of the ["Start by Believing"] campaign is . . . to focus on how the complainant could be telling the truth despite evidence to the contrary." Amy Swearer, *This Junk-Science Approach to Sexual Assault Cases Would Trample on Rights of the Accused*, LAW COMMENTARY, Jan. 24, 2018, at 2, attached hereto as Ex. 2. Swearer also states, "Under this approach, investigators should no longer be neutral, third-party fact-gatherers, but agents of the person alleging sexual assault [or sexual harassment]. They should assume all

---

[6]     Throughout these pre-trial filings and motions, Howard has never denied that it has relied on the subjective experience test to determine conclusively whether more than likely an accused male student and/or employee has violated the Policy. During discovery, Plaintiff will have apt opportunity to find other accused males and depose them or get their affidavits whether they too were told by either Love and/or Smiley that Howard applies the subjective experience test.

complainants are genuine victims and must find ways of making even inconsistent, inaccurate, and exculpatory evidence support the complainant's allegations." *Id.*

However, this Court ought not to abide the subjective experience test, which is unpublished and unknown at Howard, and on which Howard unofficially relies and uses institutionally against (more than likely) accused male students and employees to determine whether they engaged in sexual misconduct against the University community.

Defendants assert that this Court cannot review whether Smiley's Report satisfies the sufficiency of the evidence test, and whether Howard's adoption of her unsustained findings breached its contract with Plaintiff. Defs' Mem in Support of Motion to Dismiss or in the alternative Sum Judg, at 21. They say that Howard's Notice, which essentially sanctions Plaintiff for breaching his contract with the University not to engage in such sexual misconduct, lies beyond the reviewing ken of this Court, calling it a "super review" because, as Defendants' argue, "Robinson's misleading and conclusory allegations are insufficient to state a valid claim pursuant to an "erroneous outcome" theory." *Id.*

Yet, with no objective evidence and with thus a subjective one, Howard has punished Plaintiff. On paper, and in fact, Howard has taken away Plaintiff's reasonable contractual expectations of academic freedom and free expression. In effect, Howard's unsustained finding and disciplinary action told him that he can be terminated from his faculty position for the following reasons: (1) students feel strongly that he has asked the wrong factual or substantive question; (2) students have hearsay information about him and act on this unreliable information; (3) students who lack Plaintiff's substantive knowledge of Agency Law can object to his teaching tools; (4) they emotionally and

strongly object to his published ideas and beliefs; and/or (5) they object to his casual, professional personality.  Now, having supplemented how it defines sexual harassment, Howard can terminate Plaintiff's tenured faculty position with little regard for whether it has also breached his reasonable contractual expectations and entitlements under his employment contract and the *1993 Faculty Handbook* and its implied duty of good faith and fair dealing.

According to the D.C. Court of Appeals, this Court can review whether Howard properly investigated and applied its procedures under the Policy when viewed through Plaintiff's employment contract, and the 1993 Faculty Handbook and its implied duty of good faith and fair dealings.  In *McConnell v. Howard University*, Howard's Board of Trustees, ignoring the full report of a Faculty Grievance Committee, voted to terminate Professor McConnell, a tenured faculty member, when he refused to teach one of his courses after he was insulted by a student who later refused to apologize.  The District Court asserted in its ruling against Professor McConnell that the reviewing court ought to defer to Howard's termination decision. 818 F.2d 58, 67 (D.C.A. 1987).  The Court of Appeals rejected that argument as meritless.  *Id.*

In *McConnell*, the Court of Appeals noted that the lower court seized on Faculty Handbook's language that Trustees' decisions were final.  As Professor McConnell had agreed to those terms, then "judicial scrutiny [was] limited to a modest inquiry as to whether the Trustees' decision was 'arbitrary,' 'irrational,' or infected by improper motivation.'" *Id.*  However, Howard's employment contract, which includes the *1993 Faculty Handbook* and its implied duty of good faith and fair dealing, "is not intended to shield decisions of the Board of Trustees from judicial scrutiny, but is designed to

indicate the endpoint of the internal grievance procedures." *Id.* at 68. If the Court of Appeals were to adopt the lower court's limited judicial review over the Board of Trustees' substantive decisions, "we would be allowing one of the parties to the contract to determine whether the contract has been breached. This would make a sham of the parties' contractual tenure arrangement." *Id.*

Moreover, the *McConnell* Court ruled that the District Court must consider de novo Plaintiff's claim that Howard's Notice and Disciplinary breached its employment contract with Plaintiff and his reasonable contractual expectations and entitlements of the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings. *Id.* The Court of Appeals also held that "no special deference is due to the Board of Trustees once the case is properly before the court for resolution of the contract dispute." *Id.* In this Court's search for the reasonableness of Howard's actions, the question must be whether Howard's Notice and Disciplinary Actions were consistent with the parties' contract. *Id.* at 69. As the Court of Appeals stated, "It would make no sense for a court blindly to defer to a university's interpretation of a tenure contract to which it is an interested party." *Id.*

Plaintiff has placed his contract dispute with Howard properly before this Court. In its original complaint and first amended complaint, Plaintiff has stated a claim for which relief can be granted by alleging that Howard breached its employment contract and the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings, when, without objective findings of material facts and conclusions of law, the Provost who has terminal, nonreviewable authority adopted Smiley's Report that falsely sustained allegations of sexual harassment. After placing the Board of Trustees, the President, and

the General Counsel on at the very least inquiry notice, the Provost's decision has been ratified by the Board of Trustees. Under the *McConnell* principle, the Provost's decision, as well as the Trustees, the Court must *de novo* Plaintiff's breach of contract claim, and it must grant no special deference to the Provost's decision, which has impliedly been ratified by the Board of Trustees.

In his First Amended Complaint, Plaintiff has taken greater steps to plead that the Report evidences that Howard's procedures, which are informed by the subjective experience test to determine conclusively whether an accused (male) have violated the Policy, was infused impermissibly with an anti-male bias. Consider the following: (1) on September 17, 2015, Plaintiff does not engage in sexual harassment; (2) on December 4, 2015, two female students, who were highly emotional and angry, filed complaints against Plaintiff, neither of which alleged sexual harassment, and Smiley is deferential and highly supportive; (3) on December 17, 2015, Smiley improperly notifies Plaintiff of the actual facts of the allegations against him, evidencing a degree of evasion, subterfuge, and bad faith; (4) on December 21, 2015, Plaintiff denies violating the Policy, and clearly pointed out that the Policy's language mandated that Smiley's notice satisfy a basic fairness standard; (5) on January 13, 2016, Smiley, while standing a prosecutorial stance and revealing a gender bias, told Plaintiff that she would apply a subjective experience of the complaining students test to determine conclusively whether he violated the Policy; (6) after the January 13, 2016 meeting, Plaintiff proffered pedagogical contexts and exculpatory documents through emails that were rational, analytical, cogent, and documented; (7) on May 4, 2017, after more than 504 days of investigating the allegations against Plaintiff, Smiley submitted a Report that was irrational, illogical, and

unfocused but purposeful in her effort to find any basis to conclude that the allegations against Plaintiff were sustained; (8) Smiley's report adopted the emotional language of the two female students, rejected what Plaintiff said or submitted to her as completely lacking in credibility; (9) Smiley's Report, having made no findings of material facts and having tied no material facts to the factual and/or legal predicate of sexual harassment, researched Plaintiff's employment history based 16 to 22 years, and relied completely on prejudicial character traits and/or evidence to conclude:  If Plaintiff shared dirty jokes, which he did not draft, with colleagues 22 years ago, then he more than likely drafted Question 5 of a sexual nature; and (10) although Smiley completed the Report in March 2017, the Provost rolled out the Notice of Finding on May 4, 2017 at an institutionally convenient time that preceded the filing of the Jane Doe 5 case on May 10, 2017.

Given the foregoing, Plaintiff has stated a claim under Title IX.  To sufficiently establish a claim of "erroneous outcome," Plaintiff must claim sufficiently, but not prove factually and definitively, at this pre-trial stage, that:  (1) "a procedurally or otherwise flawed proceeding"; (2) "that has led to an adverse and erroneous outcome;" and (3) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous findings." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994); *see also Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) ((recognizing Title IX defenses of "(1) erroneous outcome, (2) selective enforcement, (3) deliberate indifference, and (4) archaic assumptions") (internal punctuation and citations omitted); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016). To succeed, the plaintiff must show "particular facts sufficient to cast some articulable doubt on the outcome of the disciplinary

proceeding" and circumstances showing "that gender bias was a motivating *factor* behind the erroneous finding." *Yusuf*, 35 F.3d at 715.

Given the foregoing, Plaintiff has stated a claim for which relief can be granted, and thus Defendants are not entitled to dismiss this count. Plaintiff asserts that the central dispute of material fact is: (1) whether on September 17, 2015, he engaged in conduct of sexual harassment, and (2) whether Howard breached Plaintiff's employment contract and the *1993 Faculty Handbook* and its implied covenants of good faith and fair dealing by finding that sufficient evidence existed to sustain allegations of sexual harassment against him. Given the centrality of this dispute, and given that has been properly apprised of Plaintiff's claim, Defendants have no basis to have this claim dismissed or to get a judgment as a matter of law.

2.   Count 4 Stated a Claim of Deliberate Indifference in Violation of Title IX, and Defendants Are Not Entitled to a Judgment as a Matter of Law.

Plaintiff has properly stated a claim under Title IX for deliberate indifference, where the sex discrimination is not student to student but administrator/investigator to faculty. In order to establish a Title IX deliberate indifference claims, Plaintiff must establish that "an official of the institution [who] had authority to institute corrective measures had actual notice of and was deliberately indifferent to the misconduct," (2) the university's conduct caused the student "to undergo harassment or to make [him/her] liable or vulnerable to it", (3) and the university's response to the harassment . . . is clearly unreasonable in light of the known circumstances." *See Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6t Cir. 2003).

In make out such a claim, Plaintiff need not be forced to make a sexual harassment allegation against Smiley and/or the Provost. *Doe v. Univ. of the South*, 687

F. Supp. 2d 744, 758 (E.D. Tenn. 2009) (dismissing a plaintiff's Title IX deliberate-indifference claim because he "fail[ed] to allege any facts to support a finding that the University's actions were at all motivated by [his] gender or sex or constituted gender harassment or sexual harassment"). Rather, Plaintiff can assert that the investigative and disciplinary process were deeply infected by an anti-male bias, viz., the subjective experience of the complaining female students. *See Plummer v. Univ. of Houston*, 860 F.3d 767, 778 (5th Cir. 2017) (dismissing plaintiffs' deliberate-indifference claim, but implying that the misconduct need not be sexual harassment, but rather could be constitutional deficiencies in the disciplinary process).

Prior to May 4, 2017, Plaintiff knew that Smiley was biased against him and/or accused males. In his many email missives to Smiley, he made rational, logical, and substantive effort to move her toward adopting a rational, objective investigator posture. It was not until May 4, 2017 that he realized that the every investigative process was infected by the subjective experience, which gave undue evidentiary weight to the two complaining female students, even though they never made a prima facie case of sexual harassment. Moreover, until Defendants' filed their first motion to dismiss or in the alternative summary judgment, and included the Report and Rationale, Plaintiff had no idea the depth to which Smiley would plum to ensure that she validated every statement made by C1 and C2. To say the least, Smiley's (and Love's) committed to the investigative process revealed itself in the Report, on which the Notice was premised.

Moreover, on May 4, 2017, when Plaintiff with the Provost and Love for the reading of the Notice of Findings, he again learned that the Title IX Office had relied not an objective but subjective evaluation test. For example, Love stated, "Plaintiff should

understand that if the students had to answer the question, they were already harmed," or words to that effect.

On May 14, 2017, Plaintiff appealed the Notice of Finding to the Provost. On May 25, 2017, he spent that appeal to Mr. Stacey Mobley, Chair, Board of Trustees and to President Wayne Frederick. At the very least, they had inquiry notice. At best, they had actual notice. In May 2017, Plaintiff sent the Notice the FIRE, and in June 2017, FIRE sent their letter to Howard's entire leadership, putting them against on actual notice. Lastly, Plaintiff filed grievance complaint with the Faculty Grievance Commission ("FGC"), and by June 14, 2017, the FGC had reached a preliminary finding that Plaintiff's grievance "merited detailed investigation." The FGC sent preliminary finding to Wutoh and Smiley, and for these purposes, Wutoh, the second highest-ranking University officer, who was empowered to take corrective action, especially because he had terminal authority that was not appealable, and he did nothing. Lastly, at mandatory mediation in July 2017, which was not covered by confidentiality and privilege, the Provost admitted that Plaintiff had not violated the Policy. As such, the Provost had wanton disregard for the unsupported Notice, and he still continues not to take corrective action.

Given the importance of the 1993 Faculty Handbook and its implied duty of good faith and fair dealing, which imposes duties and obligations on administrators and faculty, Howard's leadership response has been clearly unreasonable. Likewise, it was clearly unreasonable for Wotuh, Smiley, Love, and the Title IX Office to use the unsupported Notice to address a deep institutional conflict of interest that arouse out of and under the *Jane Doe 5 v. Howard University* case. Such deliberate conduct more than

suggests that Wutoh, Smiley, and Howard were far more concern about an OCR investigation than whether their calculated use of the timing of the Notice harmed Plaintiff.

>        3.        Count 4 Stated a Claim of Retaliation in Violation of Title IX, and Defendants Are Not Entitled to a Judgment as a Matter of Law.

For purposes of Title IX, sex discrimination encompasses retaliation against a person because that person has complained of sexual harassment. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005). By definition, retaliation within Title IX is an intentional act of sex discrimination. *Wells v. Hense*, 235 F.Supp.3d 1, 7 (DDC 2017), citing *Jackson*, 544 U.S. at 173-174.

Prior to sending the Notice and related documents to FIRE, Plaintiff and the Wutoh had communicated privately by email. On May 14, 2015, before graduation, Plaintiff had filed his appeal with the Provost. At the graduation, he had planned to talk with Plaintiff. Unfortunately, Plaintiff could not attend. Having missed me at graduation, Wutoh sent Plaintiff an email, indicating that he had wished to talk with him at graduation. Later, discovering that Wutoh had written to him in a tone that would invite a conversation, Plaintiff wrote an apologetic note to him.

However, after he filed his appeal, which had intended to be private, it was Smiley either had been directed by Wutoh to read the appeal, or had insinuated herself into Plaintiff's private effort to redress this erroneous finding institutionally. At or around May 20, 2017, Susan Kruth of FIRE contacted Plaintiff, and they talked. As a mere courtesy to Wutoh, Plaintiff notified him that he would send the Notice and related documents to a disinterested third party. However, once Wutoh permitted Smiley to review his appeal, Plaintiff realized that she would infect his appeal with her anti-male

bias. On the morning of May 25, 1017, at approximately 1:40am, Plaintiff received an email from Wutoh with an attached letter, which was dated May 24, 2017, or approximately 2 or 3 days after he had told Wutoh about FIRE's interest.

In that May 24, 2017 letter, the Provost did not say that he was returning my appeal because under the Policy, his decisions as the Title IX Decisional Authority are final and unappealable. Prior to sending the appeal to Wutoh, Plaintiff was aware that under § V. C. (10), at 14 of the Policy, Wutoh had a due diligence obligation. Plaintiff had hoped that even if he had relied solely on Smiley and at that earlier time had not properly exercise his due diligence, he would do so in the face of Plaintiff's appeal. Rather than say that he had reviewed my appeal and then had revisited the Report and its Rationale and that he stands by his decision, Wutoh stated that he relied on the Title IX Office and that I had found in violation of the Policy. At that juncture, Wutoh could have reversed himself, unless he required a finding against Plaintiff due to the institutional conflict arising out of the federal court filing of *Jane Doe 5 v. Howard University.*

Due to the complete institutional authority invested in Wutoh as the Title IX Decisional Authority, once he failed to undertake due diligence and once he summarily rejected his appeal, Plaintiff had very few options. He had none institutionally other than filing a grievance complaint with the FGC. However, after the FGC issued its preliminary finding, Wutoh and Smiley never forwarded their investigative file to the FGC. Although he filed a complaint with the FGC, the Board of Trustees and the President are not institutionally required to accept his recommendations, and in the preliminary findings, the FGC found that Wutoh and Smiley at the very least had acted

arbitrarily and capriciously. That finding did not move Wutoh and/or Smiley to undertake corrective measures, even though Wutoh was clearly empowered to do so.[7]

Lastly, Plaintiff states that Wutoh was angry that an outside, third party would in effect discover that Howard had issued a Notice of Finding that had nothing to do with sexual harassment by Plaintiff. Even at the mandatory mediation, after Wutoh admitted that Plaintiff had not violated the Policy, he asked Plaintiff: "Now what about Howard? What about our needs?," or words to that effect. He and Teeling wanted Plaintiff to agree that as a consequence of Plaintiff's Question 5, the Title IX Office investigated. Yet, the Provost and Teeling continued the subterfuge, causing Plaintiff to believe that the two complaining female students had actually filed allegations of sexual harassment.

## IV. COUNT 5 STATES A CLAIM UNDER TITLE VII.

After filing his complaint with the EEOC, Plaintiff received a Right to Sue Letter that was sent on November 27, 2017. Accordingly, to the Letter, Plaintiff was required to file his case in federal court not later than 90 days from the date he received the Right to Sue Letter. Conservatively, Plaintiff received the EEOC Letter on November 28, 2017, allowing one day's delivery by USPS. Although Plaintiff filed his original complaint on February 24, 2018, the clerk's office did not docket it until February 26, 2018. Accordingly, Plaintiff's EEOC or Title VII claim is not time barred.

Plaintiff, in original complaint and first amended complaint, stated a claim for sex discrimination under Title VII. First, he pled sufficiently factual allegation. He stated that Howard had adopted a subjective experience test, or believe the victim, that had an anti-male bias. However, it was Plaintiff's reading of the Report and its Rationale that

---

[7]     Defendants' motion referred the adverse action of the Letter of Reprimand. However, Plaintiff did not receive that Letter of Reprimand until May 30, 2017, at which time she informed me that the Letter of Reprimand would be permanently placed in Plaintiff's personnel file.

allowed him to fully see that extend to which Smiley went to credit C1 and C2's very emotional statements and substantive misunderstandings will absolute truthfulness.

Second, Howard has the burden of production and persuasion to show that despite Smiley's anti-male bias, it had an objective, non-pretextual, and non-discriminatory reason for issuing the Notice and the Letter of Reprimand. Based on the Report and its Rationale, Howard failed to show that the C1 and C2 made out a prima facie case of sexual harassment, and that after a thorough investigation, the findings of material facts and conclusions of law more than likely show that Plaintiff's conduct meets that legal sufficiency for sexual harassment.

Third, Plaintiff has been harm, i.e., emotionally, physically, and psychologically. Howard's disciplinary action did not give Plaintiff the choice to "allow" class observations, to "allow" review of his quizzes, and "allow" students to keep his intellectual capital, i.e., quizzes. Plaintiff had to attend the training, or Howard would fire him. Howard further threatened Plaintiff with additional disciplinary action if he violated the Policy again, even though Howard failed to show that he had engaged in sexual harassment.

Fourth, the Court should apply the relations back doctrine. In his Original Complaint, Howard University and its Trustees were aware that Plaintiff had filed a Title VII Claim. After he filed his complaint, Plaintiff communicated with the General Counsel who had apparently seen Plaintiff's Original Complaint. In this way, Howard has not been prejudiced by any significant delay.

## VI.   COUNT 7 STATES A CLAIM UNDER INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

In the First Amended Complaint, Plaintiff stated a claim for which relief could be granted, and so that Defendants understood what claim he was asserting. Mindfully, Plaintiff is not required to adduce trial-admissible evidence, or allege detailed facts. To made out a prima facie case of intentional infliction of emotional distress, Plaintiff must show: (1) extreme and outrageous conduct on the part of Defendants which (2) either intentionally or recklessly (3) causes Plaintiff severe emotional distress. *See Morton v. District of Columbia Housing Authority*, 720 F.Supp.2d 1, 8-9 (DDC 2010) (holding that plaintiffs made out a claim of intentional infliction of emotional distress in the face of a motion to dismiss, where reasonable people might disagree, it becomes a jury matter). To survive a 12(b)(6) motion, Plaintiff's "allegations . . . must afford a basis for concluding that [the plaintiff] may be able to prove conduct of the required enormity." *Carey v. Edgewood Mgmt Corp.*, 754 A.2d 951, 956 (D.C. 2000).

In today's social climate, Defendants who must make the weighty decision to find against an accused, especially a male, must appreciate that a sexual harasser has a doomed social life and marginal career opportunities. In this, Plaintiff has claimed that Defendants knew or in the exercise of due care should have known that by applying the subjective experience test, they ran a high risk of condemning Plaintiff not only at Howard but also within his profession. By closely examining the Report and its Rationale, or just by giving it a fair read, Smiley knew, especially due to her required training, or in the exercise of due care should have known that C1 and C2 had failed to make a prima facie claim that they had suffered sexual harassment. Moreover, Plaintiff has claimed, and he ought to have a chance through discovery and a jury to make this claim, Wutoh, Smiley, and Love used Plaintiff and the finding against him to deal with a

deep institutional conflict of interest arose out of the protest by students (i.e., #NoMeansNo) to stave off a hostile jury if and when the Jane Doe 5 sued Howard in federal court and if and when the OCR investigated the University.

But to effectively deal with this conflict of interest, Plaintiff has claimed that Wutoh, Smiley, and Love decided to control the timing of the Notice of Finding, picking May 4, 2017, which was six days before the Jane Doe 5 sued Howard in federal court. Today, it is extreme and outrageous for Howard, Wutoh, Smiley, and Love to target Plaintiff so that they could say to a jury or to OCR that they will punished accused males of sexual misconduct because they just did so to a law professor. By implication, Plaintiff claims that the Defendants acted intentionally and recklessly.

Second, Plaintiff suffered severe emotional distress. Once Plaintiff read the Notice, he became depressed, especially when despite his best effort and his desire to pursue a remedy quietly and institutionally, it became clear that he would have to risk exposing himself to public scrutiny. He had to face his 12-year-old son, telling him that his father had been effectively accused of touching females without their permission. He had to overcome deep bout of depression, and to seeking counseling so that he could cope not only with daily parenting demands but also professional obligations. Eventually, Plaintiff felt so boxed and could see no way out of this inexplicable finding that he contemplated suicide. Through discovery and depositions, Plaintiff may be able to prove the "conduct of required enormity."

## VII.   COUNT 7(b) STATES A CLAIM UNDER NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.

In the First Amended Complaint, Plaintiff stated a claim for negligent infliction of emotional distress, which is a common law species of negligence theory. Since 1994,

Plaintiff has been in an employment relationship. However, the special relationship that Plaintiff asserts here flows from the undertaking of the Title IX Office to continue a tortious relationship with Plaintiff, where on its face, C1 and C2 had failed to make a prima facie case of sexual harassment against Plaintiff.

To make out a claim of negligent infliction of emotional distress, Plaintiff may recover if he can show (1) "the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being," (2) an especially likely risk exists that "the defendant's negligence would cause serious emotional distress to the plaintiff," and (3) the negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Doe v. Barnabei & Wachtell*, PLLC, 116 A.2d 1262, 1268-1269 (D.C. 2015), citing *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 810-11 (D.C. 2001) (en banc).

In this case, Plaintiff claims that ordinarily Wutoh, Love, and Smiley would be in a purely employer-employee relationship that would bar a claim of a special relationship within the meaning of *Hedgepeth*'s reasoning. However, when Smiley and Love undertook to cause Plaintiff to suffer tortiously, and when Wutoh, Love, and Smiley associated to decide to use Plaintiff and an unsupported Notice against him, they altered the institutional relationship because such conduct would fall outside of the scope of their employment and it constitutes an intentional act of sex-based discrimination in violation of Title VII and Title IX. Under Agency Law, without direct commands and/or authorization by their superiors, Wutoh, Smiley, and Love's tortious, discriminatory

conduct cannot create vicariously liability for Howard, even if they were to argue that their illegal conduct was solely intended to benefit their employer.

Moreover, Wutoh, Smiley, and Love had to know or in the exercise of due care should have known that their undertaking would necessarily implicate Plaintiff's emotional well-being, and they would case Plaintiff to suffer emotional harm. Lastly, Plaintiff did suffer emotional harm, including but not limited to an inability to sleep, panic attacks, depression, suicidal thoughts, etc.

## VIII. COUNT 9 STATES A CLAIM UNDER NEGLIGENCE, AND DEFENDANTS ARE NOT ENTITLED TO A JUDGMENT AS A MATTER OF LAW.

Plaintiff states a claim for negligence against Defendant Howard. In the District of Columbia, "[t]o invoke this theory of liability it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." Giles v. Shell Oil Corp., 487 A.2d 610, 613 (D.C. 1985), citing Brown v. Argenbright Sec., Inc., 782 A.2d 752, 760 (D.C. 2001).

Yet, even if the Howard asserts that it cannot be held liable for the negligence of its employees, including the second highest-ranking agent at the University, it can still be liable under the "sole actor doctrine." Grassmueck v. Americn Shorthorn Ass'n, 402 F.3d 833, 837-838 (8th Cir. 2005) ("There is, in turn, a caveat to that 'adverse interest' exception to imputation rules, known as the 'sole actor doctrine.'"). Under this doctrine, third parties can impute an agent's knowledge to the principal, i.e., Howard,

notwithstanding the agent's adverse interests, where "the principal and agent are one and the same." *Id.* at 838 (quoting *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997).

For institutional reasons, Howard set up the Title IX Office, so that its personnel could meet the charge imposed on Howard University by local and federal authorities, rules, and regulations.   What follows is purely speculative in the absence of discovery.

Nevertheless, the Board of Trustees has oversight responsibility, basically so that they can ensure compliance.   To ensure compliance, the Provost would report directly to the Trustees and/or he would ensure that periodic compliance or risk management reports were placed before the Trustees. Through such contact with the Trustees, who must undertake due diligence, especially if Wutoh, a fiduciary, were fully disclosing, Howard could learn whether its employees were proficient, dangerous or otherwise incompetent. If the Trustees failed to exercise their due diligence and fiduciary duty, they might refuse to open a proverbial "can of worms," especially if the Provost assured them that lurking issues would not place Howard at risk of exposure to liability.   Regardless, the Trustees would be on constructive notice and would have knowledge imputed to them in the event that a Howard employee like Plaintiff were injured by Smiley's crusade to save female complainants at the expense of accused males.   Such notice and knowledge would make Trustees either liable individually and/or as a body.

However, if Howard set up the Title IX Office to work as a silo, attempting to hermetically shelter it from political pressure and personal influence, and if as a result, that institutional arrangement permitted the Title IX Decisional Authority to operate virtually without oversight, then the "sole actor doctrine" would like apply.   Under this agency concept, Howard cannot escape liability for the actions of Wutoh, Smiley, and

Love by declaring that they were simply adverse agents and/or employees, and are thus personally liable for their own tortious conduct, destructive actions, and incompetence.

Under either common law theory of negligence and agency law, Howard has negligently supervised Wutoh, Smiley, and Love either by failing to undertake due diligence, thus making Howard and perhaps the Trustees liable under constructive knowledge theory and breach of their fiduciary duties, or by construction through the "sole actor doctrine," which permitted an adverse agent and/or employees to engage in destructive, tortious, and injurious conduct as a result of isolating the Title IX Office from stringent oversight.

## IX. COUNT 10 STATES A CLAIM FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF, AND DEFENDANTS ARE NOT ENTITLE TO A JUDGMENT AS A MATTER OF LAW.

Plaintiff has stated claim that would likely entitle him to relief, and so Defendants' premise fails – Plaintiff has stated causes of actions for which relief can be grant. Thus, it does not follow logically that Plaintiff's demands for declaratory and injunctive relief must fail.

As for the injunctive relief, Plaintiff would prevail on the merit. At present, Howard cannot argue successfully that Smiley's Report and its Rationale tie material and relevant facts to elements of the legal predicates of sexual harassment. Without this link, Howard has failed to meet its burden of proof. Moreover, Plaintiff has stated a claim sufficiently that Howard breached its employment contract with Plaintiff, including the *1993 Faculty Handbook* and its implied duty of good faith and fair dealings.

Assuming arguendo that has met the legal sufficiency tests for counts 1 though 6, then Plaintiff claims that he has suffered irreparable. Even given what Defendants' legal

counsels know about this case, they stated perhaps inadvertently in their motion to dismiss that "Plaintiff is a sexual harasser." That label has harmed Plaintiff, especially within legal academe. He simply will be unable to enjoy the well-earned fruits of his intellectual labors. Moreover, wherever he travels professionally, he cannot know whether one of his colleagues, not perhaps a close, has read of Plaintiff's legal struggle with Howard, and he or she can concluded that "Reggie is damaged goods." While this Court cannot remove the tortious stain from Plaintiff's once immaculate professional reputation, it can lessen the injury in a #MeToo social climate, in which an accusation against a male is tantamount to public domain conviction.

As for the balancing of the hardships between the parties, Plaintiff has suffered lost that Howard will never feel. Eventually, the agents and/or employees who harmed Plaintiff will retire or venture elsewhere. However, Plaintiff will likely never have an opportunity to lateral. At the very least, this Court have begin the process by which Plaintiff lives and works without the Damocles sword of "sexual harasser" hanging above his neck.

Lastly, the public interest would support granting Plaintiff's request for injunctive relief. No one wishes another to suffer without cause. In today's social climate, no one throws "sexual harasser" around liberally and recklessly. Without cause, "sexual harasser" is damning to the lips that recklessly speak it, and a blow to innocent face that tortiously receives it.

Throughout this memorandum in opposition, Plaintiff has stated claims for which can be granted. One such request is for injunctive relief. His claims done fail, and so argued above, Plaintiff respectfully ask this Honorable Court for injunctive relief.

**CONCLUSION**

For the foregoing reasons, Plaintiff is entitled to his day in court, and Defendants are not entitled to a dismissal or a judgment as a matter of law.

Date: August 24, 2018

Reginald Leamon Robinson
Plaintiff Pro Se
1904 Autumn Ridge Circle
Silver Spring, MD  20906
Tel:  240-876-7439
Email:  heru.hermes@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on *25* August 2018, I caused the foregoing document to be served on all counsel via first class mail postage paid.

Reginald Leamon Robinson, Pro Se Plaintiff
1904 Autumn Ridge Circle
Silver Spring, MD  20906-5826
Tel:  240-876-7439
Email:  heru.hermes@gmail.com

# Exhibit 1

IN THE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGINALD LEAMON ROBINSON,              )
                                       )
          Pro Se Plaintiff,            )
                                       )
vs.                                    )          Case No. 18-cv-00518-TNM
                                       )
HOWARD UNIVERSITY, et al.,             )
                                       )
          Defendants.                  )

### AFFIDAVIT OF PETER C. ALEXANDER

The undersigned, PETER C. ALEXANDER, being duly sworn, hereby deposes and states:

1. I am currently a Visiting Professor and Interim Associate Dean for Academic Affairs at the University of North Texas at Dallas College of Law.

2. I am in my twenty-seventh year in legal education and, in addition to my current position, I have served as a professor, an Associate Dean for Research and Faculty Development, and as Dean at two law schools.

3. During my twenty-seven years in legal education, I have served on or have chaired faculty hiring committees for at least twelve of those years.

4. I have read the pleadings in the above-captioned action and have discussed the underlying facts of this case with the Plaintiff and it is my opinion that the allegations that were made against Professor Robinson would be disqualifying to a faculty hiring committee, even if all the allegations were resolved in Professor Robinson's favor.

5. From my experience in law school faculty hiring, I can confidently state that hiring committees are risk-averse, and it is unlikely that a hiring committee would want to use its limited resources to invite to campus for a full interview someone who has had allegations levied against them as Professor Robinson has.

6. Moreover, I do not believe that a hiring committee would treat an application from a candidate like Professor Robinson differently, even if the candidate was ultimately

vindicated, because there are so many law teaching applicants each year with no blemishes on their records.

7. It is also my opinion that the chances of Professor Robinson being able to obtain a lateral appointment at another law school are slim to none.

FURTHER AFFIANT SAYETH NAUGHT.

I declare that, to the best of my knowledge and belief, the information herein is true, correct, and complete.

Executed this 22nd day of August, 2018.

_Peter C. Alexander_
PETER C. ALEXANDER, Affiant


TEXAS NOTARY ACKNOWLEDGEMENT

State of Texas
County of Dallas

Before me, Affiant Peter C. Alexander, on this day personally appeared before me and, having presented a valid form of identification, proved to me that he is the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 22 day of August, 2018.


Notary Public


[seal]

# Exhibit 2

LAW COMMENTARY

# This Junk-Science Approach to Sexual Assault Cases Would Trample on Rights of the Accused

Amy Swearer / @AmySwearer / January 24, 2018

COMMENTARY BY



Amy Swearer @AmySwearer

Amy Swearer is a visiting legal fellow at the Meese Center for Legal and Judicial Studies at The Heritage Foundation.

A group of bipartisan congressmen have introduced a bill in the House of Representatives that would award monetary grants to law enforcement and related agencies that use so-called "trauma-informed investigation" for handling cases of sexual violence and stalking.

The money distributed under H.R. 4720 would directly fund training programs that instruct relevant personnel on a "trauma-informed" approach to crimes of sexual violence, informed by "the fundamentals of the neurobiology of trauma [and the] impact of trauma on victims."

H.R. 4720 pursues the admirable goal of promoting justice in the interests of victims. However, despite these good intentions, it fails to achieve that goal and instead promotes a scientifically unsound pseudo-science and a criminal justice theory completely at odds with well-established concepts of procedural due process.

Congress should reject this effort to fundamentally alter the role of the impartial police investigator.

Americans need an alternative to the mainstream media. But this can't be done alone. Find out more >>

## What is a 'trauma-informed' investigation?

Trauma-informed investigative practices are an offspring of the "Start by Believing" campaign, launched in 2011 by End Violence Against Women International as part of its goal to "transform the way we respond to sexual assault."

As the name suggests, the basic premise of the campaign is to dramatically reconstruct the role of law enforcement officers, detectives, and other investigators of sexual assault by training them to focus on how the complainant could be telling the truth despite evidence to the contrary.

Under this approach, investigators should no longer be neutral, third-party fact-gatherers, but agents of the person alleging sexual assault. They should assume all complainants are genuine victims and must find ways of making even inconsistent, inaccurate, and exculpatory evidence support the complainant's allegations.

"Trauma-informed investigation" theory attempts to cloak "Start by Believing" with an air of scientific credibility, instructing investigators and adjudicators of assault claims to consider the "neurobiology of trauma" and how it affects an alleged victim's behaviors and ability to recall information.

Proponents of this theory claim that trauma—such as being sexually assaulted—often causes a disabling physiological response that severely inhibits victims' memories of an event, limits their cognizance of time frames, and results in actions otherwise considered abnormal by a passive observer.

In layman's terms, "trauma-informed" investigators are told to ignore standard red flags, such as inconsistent accounts, counterintuitive behavioral responses, and even factually wrong statements, because these things are normal from trauma victims.

In fact, because these are the exact type of responses expected of "real victims," their presence should be interpreted as evidence that the complainant experienced psychological trauma and must be telling the truth.

# 'Trauma-informed investigation': Scientifically and legally problematic

There are two substantial problems with the use of a "trauma-informed" approach to criminal investigations.

First, it is based on "junk science" with no grounding in reality. Second, its use necessarily destroys very important due process safeguards, effectively stacking the deck against any person accused of sexual assault and increasing the risk of erroneous convictions.

It is absolutely true that victims of trauma will respond to the experience in a variety of ways, some of which may be out of step with how even the victim thought he or she would react.

It is also true that people who experience the most severe cases of trauma—such as those who spend time in war zones—may have gaps in their memory of the events. Such gaps can also exist due to the presence of drugs or alcohol, which limit the brain's ability to form and retain memories.

However, there is no scientific support for claims that victims of trauma store infallible, but "fragmented," memories, as proponents of the neurobiology of trauma contend.

In fact, many studies seem to indicate an opposite conclusion. As Richard McNally, a Harvard psychology professor and expert on trauma and memory, notes in his book "Remembering Trauma," extreme stress is known to often enhance the subsequent recall of life-threatening incidents.

This is not to say that this enhanced recall will always be present, but it is certainly not evidence tending to support a theory that victims of trauma suffer from memory-recall problems as a general rule.

Equally disturbing is the apparent lack of concern from proponents about the well-documented malleability of memory, or the very real likelihood that complainants can be vulnerable to post-event suggestions that lead them to label consensual acts as rape.

As one writer from The Atlantic has noted, the neurobiology of trauma theory is eerily reminiscent of the "repressed memory" scare of the 1980s and 1990s, which is now widely regarded as "psychiatric folklore devoid of convincing empirical support."

The use of "trauma-informed investigation" in criminal cases also poses significant,

perhaps even irreconcilable, constitutional problems. Under the Fifth and 14th Amendments, no person may be deprived of life, liberty, or property without due process of law.

Procedural due process ensures that a defendant facing criminal charges receives adequate and fair proceedings for the determination of his guilt or innocence. Although what constitutes "fairness" is relative and may depend on the circumstances of the particular defendant (Snyder v. Massachusetts), there are certain safeguards that the Supreme Court has determined are absolutely necessary to the provision of procedural due process.

The presence of an impartial investigator concerned with separating fact from fiction—one who does not take sides, but who gathers and analyzes evidence in a neutral light—is a principle vitally important to the concept of fundamental fairness.

Like the presumption of innocence and the use of a reasonable-doubt standard, the use of neutral investigators is a prime instrument in reducing the risk of convictions based on factual errors.

But this is, in fact, the very purpose of "trauma-informed" investigation. In the words of Janet Halley, a professor at Harvard Law School, the intended effect of "trauma-informed" investigation training is "100 percent aimed to convince [training recipients] to believe complainants, precisely when they seem unreliable and incoherent."

One poignant illustration of just how devastating "trauma-informed" investigations can be to due process is the case of a male former student at the University of Oregon who is now suing the school and several school officials after finally having his suspension for sexual assault overturned by a judge.

The student, known only as John Doe, was accused of rape by a female student, whose inconsistent—and sometimes blatantly false—testimony was either ignored or, worse, weaponized under the "neurobiology of trauma" theory as proof that she was raped.

The stunning ways school investigators managed to ignore the overwhelming weight of the evidence is detailed in John Doe's complaint, which was filed in federal district court.

If Congress is truly worried about helping victims of sexual assault, it will not fund training programs designed to obfuscate the due process rights of every person accused of this

Due process safeguards are not obstacles to be overcome or avoided. They are, on the contrary, precious protections of liberty to be cherished in a free society that values justice and equality before the law.

Depriving defendants of due process rights does not make justice easier to obtain, but harder to obtain, because it taints convictions with the most conscience-damning burden known to a just society; namely, doubt.

When the even-handed and fair nature of a society's justice system sits in doubt, its legitimacy as an institution sits equally in doubt.

*This article has been corrected to reflect the political parties of the lawmakers introducing the bill.*

## A Note for our Readers:

**Trust in the mainstream media is at a historic low—and rightfully so given the behavior of many journalists in Washington, D.C.**

Ever since Donald Trump was elected president, it is painfully clear that the mainstream media covers liberals glowingly and conservatives critically.

Now journalists spread false, negative rumors about President Trump before any evidence is even produced.

**Americans need an alternative to the mainstream media. That's why The Daily Signal exists.**

The Daily Signal's mission is to give Americans the real, unvarnished truth about what is happening in Washington and what must be done to save our country.

Our dedicated team of more than 100 journalists and policy experts rely on the financial support of patriots like you.

Your donation helps us fight for access to our nation's leaders and report the facts.

You deserve the truth about what's going on in Washington.

Please make a gift to support The Daily Signal.

**SUPPORT THE DAILY SIGNAL**

# Exhibit 3



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**September 2017**

**Q&A on Campus Sexual Misconduct**

Under Title IX of the Education Amendments of 1972 and its implementing regulations, an institution that receives federal funds must ensure that no student suffers a deprivation of her or his access to educational opportunities on the basis of sex. The Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence. The Department will solicit input from stakeholders and the public during that rulemaking process. In the interim, these questions and answers—along with the *Revised Sexual Harassment Guidance* previously issued by the Office for Civil Rights[1]—provide information about how OCR will assess a school's compliance with Title IX.

### SCHOOLS' RESPONSIBILITY TO ADDRESS SEXUAL MISCONDUCT

Question 1:

What is the nature of a school's responsibility to address sexual misconduct?

Answer:

Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[2] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.[3]

---

[1] Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance]; *see also* Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.
[2] 2001 Guidance at (VII).
[3] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1). Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Accordingly, OCR has informed institutions that "[a] university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." Oklahoma State University Determination Letter at 2, OCR Complaint No. 06-03-2054 (June 10, 2004); *see also* University of Wisconsin-Madison Determination Letter, OCR Complaint No. 05-07-2074 (Aug. 6, 2009) ("OCR determined that the alleged assault did not occur in the context of an educational program or activity operated by the University."). Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities. Under the Clery Act, postsecondary institutions are obliged to collect and report statistics on crimes that occur on campus, on noncampus properties controlled by the institution or an affiliated student organization and used for educational purposes, on public property within or immediately adjacent to campus, and in areas within the patrol jurisdiction of the campus police or the campus security department. 34 C.F.R. § 668.46(a); 34 C.F.R. § 668.46(c).

Each recipient must designate at least one employee to act as a Title IX Coordinator to coordinate its responsibilities in this area.[4] Other employees may be considered "responsible employees" and will help the student to connect to the Title IX Coordinator.[5]

In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech.[6]

## THE CLERY ACT AND TITLE IX

Question 2:

What is the Clery Act and how does it relate to a school's obligations under Title IX?

Answer:

Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX.[7] Each year, institutions must disclose campus crime statistics and information about campus security policies as a condition of participating in the federal student aid programs. The Violence Against Women Reauthorization Act of 2013 amended the Clery Act to require institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking, and to include certain policies, procedures, and programs pertaining to these incidents in the annual security reports. In October 2014, following a negotiated rulemaking process, the Department issued amended regulations to implement these statutory changes.[8] Accordingly, when addressing allegations of dating violence, domestic violence, sexual assault, or stalking, institutions are subject to the Clery Act regulations as well as Title IX.

## INTERIM MEASURES

Question 3:

What are interim measures and is a school required to provide such measures?

Answer:

Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending.[9] Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations.

---

[4] 34 C.F.R. § 106.8(a).
[5] 2001 Guidance at (V)(C).
[6] Office for Civil Rights, Dear Colleague Letter on the First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html; 2001 Guidance at (XI).
[7] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, Pub. L. No. 101-542, 20 U.S.C. § 1092(f).
[8] *See* 34 C.F.R. § 668.46.
[9] *See* 2001 Guidance at (VII)(A).

It may be appropriate for a school to take interim measures during the investigation of a complaint.[10] In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

## GRIEVANCE PROCEDURES AND INVESTIGATIONS

Question 4:

What are the school's obligations with regard to complaints of sexual misconduct?

Answer:

A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.[11] OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.[12]

Question 5:

What time frame constitutes a "prompt" investigation?

Answer:

There is no fixed time frame under which a school must complete a Title IX investigation.[13] OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

Question 6:

What constitutes an "equitable" investigation?

---

[10] 2001 Guidance at (VII)(A). In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v).
[11] 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); see also 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result").
[12] 2001 Guidance at (IX); see also 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking, 34 C.F.R. § 668.46 (k)(1)(i), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A).
[13] 2001 Guidance at (IX); see also 34 C.F.R. § 668.46(k)(3)(i)(A).

3

Answer:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.[14]

Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.[15] Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.[16]

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.[17] Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.[18]

## INFORMAL RESOLUTIONS OF COMPLAINTS

Question 7:

After a Title IX complaint has been opened for investigation, may a school facilitate an informal resolution of the complaint?

Answer:

If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate for such a process, the school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution.

---

[14] 2001 Guidance at (V)(A)(1)-(2); see also 34 C.F.R. § 668.46(k)(2)(ii).
[15] 2001 Guidance at (X).
[16] 34 C.F.R. § 106.31(a).
[17] 2001 Guidance at (VII)(B).
[18] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

## DECISION-MAKING AS TO RESPONSIBILITY

Question 8:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

Answer:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.[19]

The decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report.[20] The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility.

Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).[21] When resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must "[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[22] In such disciplinary proceedings and any related meetings, the institution may "[n]ot limit the choice of advisor or presence for either the accuser or the accused" but "may establish restrictions regarding the extent to which the advisor may participate in the proceedings."[23]

Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

---

[19] The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).

[20] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

[21] A school has discretion to reserve a right of appeal for the responding party based on its evaluation of due process concerns, as noted in Question 11.

[22] 34 C.F.R. § 668.46(k)(2)(iii).

[23] 34 C.F.R. § 668.46(k)(2)(iv).

Question 11:

How may a school offer the right to appeal the decision on responsibility and/or any disciplinary decision?

Answer:

If a school chooses to allow appeals from its decisions regarding responsibility and/or disciplinary sanctions, the school may choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case any appeal procedures must be equally available to both parties.[30]

## EXISTING RESOLUTION AGREEMENTS

Question 12:

In light of the rescission of OCR's 2011 Dear Colleague Letter and 2014 Questions & Answers guidance, are existing resolution agreements between OCR and schools still binding?

Answer:

Yes. Schools enter into voluntary resolution agreements with OCR to address the deficiencies and violations identified during an OCR investigation based on Title IX and its implementing regulations. Existing resolution agreements remain binding upon the schools that voluntarily entered into them. Such agreements are fact-specific and do not bind other schools. If a school has questions about an existing resolution agreement, the school may contact the appropriate OCR regional office responsible for the monitoring of its agreement.

*Note:* The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This document does not add requirements to applicable law. If you have questions or are interested in commenting on this document, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

---

[30] 2001 Guidance at (IX). Under the Clery Act, a postsecondary institution must provide simultaneous notification of the appellate procedure, if one is available, to both parties. 34 C.F.R. § 668.46(k)(2)(v)(B). OCR has previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation." Skidmore College Determination Letter at 5, OCR Complaint No. 02-95-2136 (Feb. 12, 1996); *see also* Suffolk University Law School Determination Letter at 11, OCR Complaint No. 01-05-2074 (Sept. 30, 2008) ("[A]ppeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University."); University of Cincinnati Determination Letter at 6, OCR Complaint No. 15-05-2041 (Apr. 13, 2006) ("[T]here is no requirement under Title IX that a recipient provide a victim's right of appeal.").

# Exhibit 4

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: **Reginald L. Robinson**<br>**1904 Autumn Ridge Circle**<br>**Silver Spring, MD 20906** | From: **Washington Field Office**<br>**131 M Street, N.E.**<br>**Suite 4NW02F**<br>**Washington, DC 20507** |

[ ] On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **570-2018-00222** | **Monica R. Colunga,**<br>**Enforcement Supervisor** | **(202) 419-0711** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

**NOV 27 2017**

~Mindy E. Weinstein~
**Mindy E. Weinstein,**
**Acting Director**

*(Date Mailed)*

Enclosures(s)

cc:
**Adonna Bannister**
**Manager Of Litigation**
**HOWARD UNIVERSITY**
**2400 6th St, N.W.**
**Suite 321**
**Washington, DC 20059**

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*