**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **REGINALD LEAMON ROBINSON**, <br><br> Plaintiff, <br><br> v. <br><br> **HOWARD UNIVERSITY, INC. *et al*.**, <br><br> Defendants. | Case No. 1:18-cv-00518 (TNM) |

<u>**MEMORANDUM OPINION**</u>

This is a case about a professor's poor choices and the disciplinary actions that followed. Reginald Robinson is a tenured law professor at Howard University.  During a lecture on agency law, he distributed a quiz to his class.  One of the quiz questions described in graphic detail types of body waxes and the way aestheticians perform them.  Mr. Robinson called on two female students to discuss their answers to the question.  They later reported that the exchange made them feel uncomfortable and that at least one other student had left the classroom.  After investigating, University officials determined that the question was indeed inappropriate and issued Mr. Robinson a confidential letter of reprimand.  He was also required to participate in sensitivity training, to submit future quiz and exam questions to the Dean's Office for approval, and to have a few of his future lectures monitored.

Impenitent, Mr. Robinson sued the University and various University officials.  He alleges breach of contract, bad faith, violations Title IX of the Education Amendments Act of 1972 ("Title IX"), sex discrimination, intentional infliction of emotional distress, and other claims.  The Court will dismiss some of these allegations for failure to state a claim.  Because the Defendants are entitled to judgment as a matter of law, and because they have shown that there is

no genuine dispute as to any material fact, the Court will grant the Defendants summary

judgment on the remainder of Mr. Robinson's claims.

## I.

In the fall of 2015, Mr. Robinson taught a course called "Agency, Partnerships, and Other

Unincorporated Business Associations." Am. Compl. 13, ECF No. 19.  To test students'

understanding of the concepts covered, he often used in-class quizzes.  *Id*.  "Meaningful

participation" in these evaluations "require[d] students to reveal their choices and to defend those

choices based on the legal principles and relevant/material facts."  *Id*. at 13-14.  The relevant part

of the quiz question at issue said:

> Among other services, P offered Brazilian and bikini waxes – sometimes called
> "Sphynx," bare waxing, or Hollywood waxing. . . .  T looked confused, and so A
> explained that a Full Brazilian ("FB") would render T hairless from belly button to
> buttocks, and a FB required [that] T would be naked from the waist down.  A FB
> required A to touch T's body and to adjust T's body so that A could access every
> follicle of pubic hair.  Next, A explained a Modified Brazilians [sic] ("MB").  A
> MB left a thin strip of hair at the top of T's genitalia, *viz*., a "landing strip."  T opted
> for FB.  A again told T that A would have to touch T's genitals to complete the
> waxing.  T agreed, and T signed the service contract and initialed the space for
> acknowledging A's information.  T got undressed in a private salon, where T also
> drank hot herbal tea.  At A's behest, T, w [sic] who was waist down naked, got on
> the waxing table.  Once on the table, with instrumental tones wafting, T drifted into
> light sleep; A completed the FB.  Upon awaking, T felt physically uncomfortable,
> asking A if A had touched T improperly. . . .  [W]ill the court find in favor of T?

Am. Compl. Ex. 9, ECF No. 13 at 162-163.[1]

Mr. Robinson called on a female student who suggested that "T would not sleep" during

the sort of procedure described.  Am. Compl. Ex. 25, ECF No. 13 at 208.  The professor pressed

---

[1] Mr. Robinson submitted an original Complaint and two versions of the First Amended Complaint.  *See*
ECF Nos. 1, 13, and 19.  Some exhibits referenced in the operative complaint were only included in one
of the document's prior versions.  Citations to these exhibits include a docket number identifying the
location of the exhibit where appropriate.

her to answer the question, as he "still wanted to know what choice she had made." *Id*. He also sought an answer to the hypothetical from a second female student, before moving on to the remainder of his lecture. *Id*. at 208-209.

The two students filed complaints against him with the University. Am. Compl. 3. Based on their allegations, Candi Smiley, the University's Deputy Title IX Coordinator, issued Mr. Robinson a Notice of Complaint. Compl. Ex. 10a, ECF No. 1 at 188. It said that the University's Title IX Office would investigate his conduct as required by federal law. *Id*. It specified that Mr. Robinson was alleged to have engaged in "acts of sexual harassment" and "acts of gender-based discrimination" in violation of the University's Title IX Policy. *Id*. And it explained that the "charges will be 'sustained' if it is found that the important facts contained in an allegation are more likely true than not <u>and</u> that those facts violate one or more of" the University's Title IX Policy standards. *Id*. at 189 (emphasis in original).

The Notice also described Mr. Robinson's rights and the decision-making process. He had the right to submit a written response to the charges against him, to verbally present his position to the Deputy Title IX Coordinator, and to retain counsel for any interviews with the University. *Id*. at 190. The letter warned Mr. Robinson that the "decision of the Title IX Decisional Authority is the final administrative action of the University and is not subject to appeal." *Id*. at 189-90. The "Decisional Authority" is "the person or persons who will review the final Report of Investigation" prepared by the Deputy Title IX Coordinator. *Id*. at 189.

After completing her investigation, Ms. Smiley issued a Report of Investigation and Findings. *See* Defs.' Mot. to Dismiss or in the Alternative, Mot. for Summ. J. Ex. 1, ECF No. 20 ("Defs.' Mot.").[2] The Report concluded that "there is sufficient evidence to determine Professor

---

[2] Though he did not include it as an exhibit, Mr. Robinson refers to Ms. Smiley's Report in his Amended Complaint. *See, e.g.*, Am. Compl. 28 ("See Smiley's Report of Investigation and Findings of Complaint

Reginald Robinson committed acts of Sexual Harassment in violation of the Title IX Policy." *Id.*
at 3.  Ms. Smiley found insufficient evidence to sustain the charge of gender discrimination. *Id.*

The Report identified the University's Provost, Anthony Wutoh, as the Title IX
Decisional Authority. *Id.* at 12.  Upon completing his review, Mr. Wutoh issued a Notice of
Findings.  It informed Mr. Robinson that the University agreed with the Report's conclusions,
and that he would therefore be subject to disciplinary action.  Compl. Ex. 24, ECF No. 1-1 at 47-
48.  A confidential letter detailing his conduct, the actions taken, and the possible punishments
for future violations of the Title IX Policy was "placed in his file." *Id.*

Mr. Robinson appealed this decision in a letter to Mr. Wutoh.  Am. Compl. 24.  In
response, the Provost explained that, "[i]n accordance with the Howard University Title IX
Policy, I serve as the . . . Title IX Decisional Authority.  As with all cases, I carefully reviewed
the recommendation from the Title IX Office before rendering a decision in this matter.  The
decision reached . . . is final, and is not subject to reconsideration or appeal."  Am. Compl. Ex.
13, ECF No. 13 at 196.

Dissatisfied, Mr. Robinson pursued several strategies to force a reversal of the decision.
He sent "his documents to a [sic] FIRE," a nonprofit organization he believed could help him
"end the sex discrimination he faced."  Am. Compl. 25.  He appealed the Provost's decision to
the University's Faculty Grievance Commission. *Id.*  And when these efforts failed, Mr.
Robinson filed a gender discrimination claim against the University with the U.S. Equal
Employment Opportunity Commission (the "EEOC"). *See* Dismissal and Notice of Rights,

---

Against Professor Reginald L. Robinson . . . .").  The Court considered the Report's full contents for two
reasons.  First, Mr. Robinson partially incorporated it into the Amended Complaint by reference.  Second,
for the reasons discussed in Section III, the Court treated the Defendants' Motion to Dismiss as one for
summary judgment under Federal Rule of Civil Procedure 12(d).

Compl. Ex. 31, ECF No. 1-1 at 65.  The EEOC dismissed his complaint, as it was "unable to conclude that the information obtained establishes violations of the [applicable] statutes." *Id*.

Mr. Robinson then filed this case.  He accuses the University, Mr. Wutoh, Ms. Smiley, and Title IX Coordinator Vanessa Love of "knowingly fraudulent," "deliberately deceptive," and "arbitrary and capricious" conduct.  Am. Compl. 1, 3.  The operative complaint features several claims, including:

- Breach of contract and the implied duty of good faith and fair dealing;

- Erroneous outcome, deliberate indifference, and unlawful retaliation in violation of Title IX;

- Sex discrimination in violation of Title VII of the Civil Rights Act of 1964;

- Intentional and negligent infliction of emotional distress;

- Negligence; and

- A request for declaratory and injunctive relief styled as a claim.

The Defendants maintain that the actions taken by the University complied with its Title IX Policy and all relevant laws.  Thus, they moved to dismiss or, based on the extra-pleadings evidence before the Court, for summary judgment.  *See* Defs.' Mot. at 9 n.3.

## II.

Defendants may move to dismiss a complaint when it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A valid complaint must contain factual allegations that, if true, "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Mere "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" are insufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quotations omitted).  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

 In evaluating a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-pleaded allegations.  *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).  The Court need not, however, accept legal conclusions or mere conclusory statements as true.  *Iqbal*, 556 U.S. at 678.  Evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  It "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

 If "matters outside the pleadings are presented to and not excluded by the court," a motion to dismiss "must be treated as one for summary judgment," and the "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  The decision to covert a motion to dismiss into a motion for summary judgment is "committed to the sound discretion of the trial court." *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006).

 To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A factual dispute is material if it could alter the outcome of the suit under the substantive

governing law. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant makes this showing, the non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

## III.

Before addressing the substance of Mr. Robinson's claims, two preliminary matters warrant brief discussion. *First*, the parties disagree on whether to treat Mr. Robinson as a pro se litigant. He has described himself as a lawyer, a law professor, and "an adept legal academic" who "knows the legal system." Pl.'s Rule 6(b) Mot., ECF No. 26 at 12-13. Pointing to these statements, the Defendants argue that he is "not entitled to the leeway sometimes granted to pro se litigants." Defs.' Mem. in Opp. to Pl.'s Mot. to Delay Resp., ECF No. 31 at 1 n.1. Mr. Robinson disagrees, citing a definition of "pro se" from Black's Law Dictionary ("one proceeding for himself and on their own behalf, in person") and cases in which the pleadings of attorneys appearing pro se were granted liberal construction. *See* Pl.'s Rep. in Supp. of His Rule 56(d) Mot., ECF No. 33 at 1 n.1 ("Pl.'s Rule 56(d) Reply").

Self-represented lawyers are "not automatically subject to the very liberal standards afforded to a non-attorney pro se plaintiff because an attorney is presumed to have a knowledge of the legal system and needs less protections from the court." *Richards v. Duke University*, 480

F. Supp. 2d 222, 234 (D.D.C. 2007).  Indeed, some circuits and courts of this District have held

that lawyers are not entitled to any special protection when they appear pro se.  *See, e.g.*,

*Harbulak v. Suffolk County*, 654 F.2d 194, 198 (2d Cir. 1981) (noting that the plaintiff "is a

lawyer and, therefore, he cannot claim the special consideration which the courts customarily

grant to pro se parties"); *Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 317 (D.D.C. 2012)

(denying an attorney appearing pro se special consideration).

But the D.C. Circuit has not conclusively resolved the issue.  *See Klayman v. Zuckerberg*,

753 F.3d 1354, 1357 (D.C. Cir. 2014) ("This Court has not yet decided, however, whether that

rule applies when the pro se plaintiff is a practicing lawyer . . . [and we] need not resolve that

question here").  And though Mr. Robinson's use of Black's Law perhaps exemplifies his legal

sophistication, the Court has reviewed his pleadings under "less stringent standards than formal

pleadings drafted by lawyers."  *Prunte v. Universal Music Group, Inc.*, 499 F. Supp. 2d 15, 21

(D.D.C. 2010).  After all, it does not appear Mr. Robinson is barred in the District, and the gap

between the theoretical world of legal academia and the actual practice of law raises questions

about the equity of treating Mr. Robinson as a true practitioner.

*Second*, Mr. Robinson contends that consideration of the Defendants' request for

summary judgment is premature.  *See* Pl.'s Rule 56(d) Reply at 2.  He seeks "the opportunity for

discovery [that] would be essential to every claims [sic] against defendants."  *Id*. at 8.  He also

suggests that Ms. Smiley's Report of Investigation and Findings is "not materially relevant" to

his claims.  *Id*.  The Court disagrees on both counts.

A reviewing court should treat a motion to dismiss as one for summary judgment "if

extra-pleading evidence is comprehensive and will enable a rational determination of a summary

judgment motion."  *Alston v. Johnson*, 208 F. Supp. 3d 293, 298 (D.D.C. 2016) (cleaned up).

There is "no bright-line threshold for conversion under Rule 12(d)." *Ryan-White v. Blank*, 922 F. Supp. 2d 19, 23 (D.D.C. 2013). The "touchstone is fairness and whether consideration of summary judgment is appropriate, in light of the nature of the extra-pleading material submitted, the parties' access to sources of proof, and the parties' concomitant opportunity to present evidence in support or opposition to summary judgment." *Id*.

Here, treating the Defendants' motion as one for summary judgment is appropriate for two reasons. First, as discussed below, many of his claims fail under both the Rule 12(b)(6) dismissal standard and the Rule 56 summary judgment standard. Second, both parties have submitted and responded to ample documentary evidence allowing the Court to carefully evaluate Mr. Robinson's claims.

His initial Complaint featured 34 exhibits and was 276 pages long. *See* Compl, ECF No. 1. Most of these exhibits are incorporated into his First Amended Complaint. They include dozens of pages of his correspondence with the relevant University officials, his various appeals and legal arguments, the relevant excerpts from the University's Faculty Handbook and Title IX Policy, and affidavits in support of his character and claims. *See id*. Though his pleadings did not include Ms. Smiley's Report, the Amended Complaint and his many later filings show that Mr. Robinson has received, considered, and made arguments about the weight the Court should accord it. *See, e.g.*, Am. Compl. 28 (noting that the complaints against him as summarized in the Report "never alleged that Plaintiff had made unwelcomed sexual advances, requested sexual favors, and engaged in words or other physical conduct of a sexual nature"); Pl.'s Rule 56(d) Reply at 8 (suggesting reasons why the Report is immaterial to his claims).

Both parties also have "submitted exhibits in support and opposition to the alternative motion for summary judgment." *Ramsey v. Moniz*, 75 F. Supp. 3d 29, 40 (D.D.C. 2014). While

Mr. Robinson requested additional discovery, he failed to explain how the new facts sought "are necessary to the litigation." *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). Under Federal Rule of Civil Procedure 56(d), a party seeking more discovery before summary judgment must show that "it cannot present facts essential to justify its opposition" to the movant's motion. Fed. R. Civ. P. 56(d). The party "may not rely on speculation that discovery will produce material evidence." *Harrison v. Office of the Architect of the Capitol*, 281 F.R.D. 49, 52 (D.D.C. 2012). Rather, he must "adduce 'support for the proposition that discovery would have produced the evidence [he] anticipated.'" *Id*. (quoting *Messina v. Krakower*, 439 F.3d 755, 763 n.6 (D.C. Cir. 2006)).

Mr. Robinson failed to meet these requirements. He seeks documents about the "unpublished, unknown, and unofficial evaluative tools" that the Title IX Office allegedly used to investigate the claims against him. Rule 56(d) Declaration, ECF No. 29-2 at 4-5. He also requests all documents relating to the employment history of and training received by the University's Title IX Office personnel. *Id*. at 3-4. And he demands that the Defendants produce every investigative report about "each complaint" Ms. Smiley received about potential Title IX violations at the University. *Id*. at 6.

But he offers only "conclusory assertion[s] without any supporting facts to justify the proposition that the discovery sought will produce" evidence of improper motives or malicious conduct by the people who investigated him. *Messina*, 439 F.3d at 762. In short, the extensive briefing and exhibits here have established a robust evidentiary record, and the Court can fairly consider the Defendants' motion as one for summary judgment.[3] It will therefore deny Mr. Robinson's request for additional discovery.

---

[3] The Court also notes that Mr. Robinson filed two motions to "Delay Response to [the Defendants'] Motion to Dismiss or in the Alternative Motion for Summary Judgment. *See* ECF Nos. 22, 29. The

## IV.

Central to each of Mr. Robinson's claims is his belief that the University mishandled the

investigation into the offending Fall 2015 quiz and that University officials punished him based

on impermissible motivations.  But because he offers no more than mere speculation in support

of these beliefs, his claims must be denied.

### A.

Mr. Robinson alleges that the University breached both its employment contract with him

and the implied duty of good faith and fair dealing.[4]  Am. Compl. 65.  He contends that the

University's Title IX Policy is incorporated into the contract and that the Defendants' alleged

violations of the Policy therefore breached that agreement.  *Id*. at 64-67.  The Defendants believe

that the Policy is a standalone document and that they did not violate any of its relevant terms.

Defs.' Mot. at 14-20.  Relying on the contents of the Title IX Report prepared by Ms. Smiley, the

Court finds that the University did not breach the contract or its implied duty of good faith and

Court denied Mr. Robinson's first motion, as it failed to comply with the Rule 56(d) requirements
articulated by *Convertino*, 684 F.3d at 99-100.  *See* September 24, 2018 Minute Order.  The Court
explained that Mr. Robinson did not state with "sufficient particularity why additional discovery is
necessary and why the nonmovant cannot produce the facts essential to its opposition to the motion for
summary judgment."  *Id*.

By filing his second motion, Mr. Robinson asked the Court to reconsider its prior denial.  According to its
Standing Order, the Court typically "will not entertain" motions for reconsideration that feature
"arguments which should have been previously raised, but are being raised for the first time."  ECF No. 2
at 7 (citing *Nat'l Trust v. Dep't of State*, 834 F. Supp. 453, 455 (D.D.C. 1995)).  Mr. Robinson was
directed to read and comply with the Standing Order many times.  *See, e.g.*, ECF No. 2; Court's June 7,
2018 Minute Order; Court's September 24, 2018 Minute Order.  While his noncompliance with the
Standing Order presents alternative grounds for denying his second Rule 56(d) Motion, the Court
considered the merits of his arguments given his status as a pro se litigant.

[4]  The Court has federal question jurisdiction over Mr. Robinson's claims brought under Title IX and
under Title VII of the Civil Rights Act.  28 U.S.C. § 1331.  It has supplemental jurisdiction over his
contract and tort claims.  28 U.S.C. § 1367.

fair dealing.  It will thus grant summary judgment for the Defendants on this count.

A successful breach of contract claim requires that Mr. Robinson "establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015).  In the District of Columbia, "all contracts contain an implied duty of good faith and fair dealing." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 321 (D.C. 2008).  This duty "means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id*. (cleaned up).  The duty is breached if a party "evades the spirit of the contract" or "willfully renders imperfect performance." *Id*.

To begin with, the Policy's relationship to the University's employment contracts is unclear.  Mr. Robinson began working for the University in 1994, and he relies on the 1993 Faculty Handbook in support of his argument.  *See* Am. Compl. 10.  It notes that "Sections 2 and 3 of this handbook . . . are incorporated into the individual contract of employment of each faculty member, and they are subject to change by the Board of Trustees as conditions require." Compl. Ex. 18, ECF No. 1-1 at 24.  Section 2.2.1.2 of the Handbook discusses sexual harassment.  *Id*. at 23.  It states that:

> It is the policy of Howard University to maintain the university community as a place of work and study for staff, faculty, and students free of sexual harassment and all forms of sexual intimidation and exploitation.  *The entire text of the policy and procedures is set forth in Appendix B.*  All faculty members as well as staff and students are subject to this policy.

*Id*. (emphasis added).  Appendix B describes the University's "Sexual Harassment Policy and Procedures" approved by the Board of Trustees in 1989.  *See* Defs.' Mot. Ex. 3, ECF No. 20-3 at 106.

The Defendants correctly assert that the University publishes a separate policy called the "Title IX (Student) Policy on Prohibited Sexual Harassment and Gender-Based Discrimination in Education Programs and Activities."  Defs.' Mot. at 15; Ex. 4, ECF No. 20-4 at 2.  This document's original "Effective Date" is listed as June 5, 1999, suggesting that it is distinct from the 1989 statement on sexual harassment.  *Id*.

But evaluating the allegations in the light most favorable to Mr. Robinson, the Court assumes that the University intended the operative version of its Title IX Policy to be incorporated into faculty's employment contracts.  The language of the two policies is substantially similar in many important respects.  For instance, both define and provide examples of sexual harassment.  *See* Defs.' Mot. Ex. 3 at 107; Defs.' Mot. Ex. 4 at 8.  Thus, the University could have breached its contract with Mr. Robinson if it violated its Title IX Policy.

No such violation occurred.  Mr. Robinson claims that the University "refused to give Plaintiff proper, meaningful notice of the fact specific and spurious allegations made by the two complaining female law students."  Am. Compl. 66.  The Policy includes a section titled "Notice to the Respondent."  Compl. Ex. 10b, ECF No. 1-1 at 5.  It requires that, when the Title IX Office receives a complaint, the "Respondent shall be informed in writing of the complaint and the allegations made against them . . . [and] will then have an opportunity to submit a written response to the allegations in the complaint."  *Id*.

The four-page Notice of Complaint Ms. Smiley issued Mr. Robinson satisfied this requirement.  It listed the allegations against him, the applicable Policy standards and investigative procedures, Mr. Robinson's rights including his right to respond, and the complainants' rights to confidentiality.  *See* Compl. Ex. 10a, ECF No. 1 at 188-191.

Mr. Robinson acknowledged receipt of this Notice, argued that it was deficient, denied the allegations against him, and asked for more details about the complaints.  *See* Compl. Ex. 16, ECF. No. 1-1 at 15-18.  Consistent with the Title IX Policy and the Notice of Complaint, Ms. Smiley scheduled an oral interview with Mr. Robinson.  *See* Compl. Ex. 20, ECF No. 1-1 at 39.

After that interview, Mr. Robinson wrote that he was "finally glad to know the underlying circumstances behind these allegations."  *Id*.  In an email to Ms. Smiley, he defended his quiz question by asking her to visit a website depicting men's underwear and told her "[y]ou'll see that men wear bikini underwear, too."  *Id*.  He also suggested that he would "send [her] additional information, so that [she] can appreciate the context from which [he] was working" when he wrote the question.  *Id*.  Over the next few days, he sent Ms. Smiley several emails.  *See* Compl. Ex. 21-23, ECF No. 1-1 at 40-46.  These multi-page documents cited legal provisions, relevant cases, and the University's Title IX Policy to argue that Mr. Robinson had done nothing wrong.  *Id*.

Ms. Smiley's Report noted that she reviewed the electronic communications sent by Mr. Robinson.  Defs.' Mot. Ex. 1 at 2.  The Report included as exhibits the emails and supporting documents that Mr. Robinson sent her.  *See id*. at 192-201.  So, based on the Notice of Complaint, his correspondence with Ms. Smiley, and the many arguments he raised in his defense, Mr. Robinson had ample notice of and opportunity to respond to the claims made against him.

Next, Mr. Robinson argues that the findings in Ms. Smiley's Report were based on the application of a "subjective experience test, which gave undue evidentiary weight and institutional imprimatur to the female victims' narratives . . . ." Am. Compl. 66.  He also contends that the Report "completely lacked the required findings of material fact on the legal

predicate for sexual harassment." *Id*. at 67.  These assertions fall flat.  The Report employed a preponderance of the evidence standard and is replete with supporting factual findings.  *See* Defs.' Mot. Ex. 1 at 3-10.

Ms. Smiley concluded, for example, that Professor Robinson "exhibited a past pattern of behavior that makes it more likely than not[] that he has created hypotheticals of a sexual nature that made students uncomfortable." *Id*. at 8.  From 1998 – 2002, Mr. Robinson sent several "emails of explicit sexual jokes" to University faculty members.  Later, "a faculty member alleged Professor Robinson made inappropriate comments to her about socializing with him." *Id*. at 9.  And the Associate Provost for Faculty Development reported that "Professor Robinson's exams were always among the most challenging to review . . . we sent them back to him to change hypotheticals that we thought were too . . . I don't want to say sexual [sic] explicit but they're just insensitive . . . to women." *Id*. at 22.  Thus, far from relying solely on the subjective testimony of the complainants, Ms. Smiley considered objective contextual evidence in determining that Mr. Robinson's question constituted unwelcome conduct of a sexual nature. *Id*. at 3.

Mr. Robinson also believes that the Policy mandated that the University complete its investigation within "60 calendar days" of receiving the complaint.  Am. Compl. 66.  Not so. True, the Policy states that the Title IX Officer "will have 60 calendar days to conduct an impartial, thorough and timely investigation of all complaints alleging harassment or discrimination under this policy."  Compl. Ex. 10b, ECF No. 1-1 at 6.  But it also allows the Officer to take additional time, requiring only that the she "notify the *Complainant*, in writing, that additional time is needed for completion of the investigation." *Id.* (emphasis added).  There is no evidence, and Mr. Robinson does not allege, that such written notice was not provided to

the students who lodged the complaint.  In any event, any breach of this requirement would implicate the complainants' rights, not his.

In sum, the University did not breach Mr. Robinson's contract or the implied duty of good faith and fair dealing.  The Defendants' investigation of his conduct complied with the University's Title IX Policy.  By all available indicia, the fact-finding process appears to have been impartial, thorough, and reasonable.  So the Court will grant summary judgment for the Defendants on Mr. Robinson's contract claims.

## B.

In an audacious move, Mr. Robinson next argues that he, rather than his students, is the victim of a Title IX violation.  *See* Am. Compl. 69-76.  He suggests that, by "erroneously finding [against] and disciplining Plaintiff" the University violated Title IX because its actions were motivated by the "anti-male bias" of Ms. Smiley, the Title IX Coordinator, and Mr. Wutoh.  *Id.* at 73.  This claim fails under the Rule 12(b)(6) dismissal standard.  In the alternative, relying on Ms. Smiley's Title IX Report, the Court finds that, even if Mr. Robinson has sufficiently alleged a Title IX claim, the Defendants are entitled to judgment as a matter of law.

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Because the University receives federal funding, it is subject to Title IX.  Am. Compl. 8.

Some courts have recognized an "erroneous outcome" theory of Title IX liability.  *See, e.g. Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d Cir. 1994) ("[W]e may safely say that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to

discipline"). To succeed under this theory, Mr. Robinson must show that "he was innocent and wrongfully found responsible of an offense due to gender bias." *Doe v. George Washington Univ.*, 305 F. Supp. 3d 126, 133 (D.D.C. 2018) (citing *Yusuf*, 35 F.3d at 715). He must allege "particular facts sufficient to cast some articulable doubt on the outcome of the proceeding" and establish that "gender bias was a motivating factor behind the erroneous finding." *Id.* "[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Yusuf*, 35 F.3d at 715.

Mr. Robinson alleges that the University "gave undue evidentiary weight" to the "spurious allegations" of the complaining female students. Am. Compl. 72. He claims that the University "knows that agents and employees in the Title IX Office have an anti-male bias" and that this bias "informed" the decision to reprimand him. *Id.* at 72-73. And he believes that "[d]ue to [the] harmful, near unforgiving social climate against males who have been found to be sexual harassers, of which Howard is aware, Plaintiff is reasonably certain to continue to suffer" harm because of the Defendants' wrongful decision. *Id.* at 75.

But he offers little beyond these conclusory statements. He does not allege "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making" that might "show the influence of gender" or "reflect[] bias by members of the tribunal." *Yusuf*, 35 F.3d at 715. In fact, the available evidence shows that the University applied its facially gender-neutral Title IX policy in a reasonable manner. Ms. Smiley's Report, for instance, noted that Mr. Robinson's quiz question "creates an uncomfortable situation for any male or female student," as it may require students "to disclose intimate details" about their personal grooming habits. Defs.' Mot. Ex. 1 at 6. Neither the Report nor the University's later

correspondence with Mr. Robinson show that the University's Title IX staff harbored anti-male biases.  Mr. Robinson's claim therefore fails.

Similarly, his contention that the University acted with "deliberate indifference" in violation of Title IX fails to state a claim.  To establish liability under this theory, Mr. Robinson must show that a "school administrator with authority to take corrective action responded to harassment with deliberate indifference." *Fitzgerald v. Barnstable School Comm.*, 555 U.S. 246, 257 (2009).  The administrator's response must be "clearly unreasonable in light of the known circumstances," and must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Wells v. Hense*, 235 F. Supp. 3d 1, 7 (D.D.C. 2017) (cleaned up).  Deliberate indifference claims "are typically brought in cases where a school has ignored a victim's complaint of sexual harassment or assault." *Doe v. Brown University*, 166 F. Supp. 3d 177, 191 (D.R.I. 2016).

Mr. Robinson alleges that the University was deliberately indifferent when it "refus[ed] to remedy" its decision to reprimand him.  Am. Compl. 76-77.  He believes that the University has shown "sex and gender deliberate indifference towards Plaintiff and/or other similarly situated male students."  Am. Compl. 77.  But again, Mr. Robinson offers little more than mere speculation.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  In declining to change his decision, for example, Mr. Wutoh noted he had "carefully reviewed the recommendation from the Title IX Office," and that per the University's Title IX Policy, his decision was "final" and "not subject to reconsideration or appeal."  Am. Compl. Ex. 13, ECF No. 13 at 196.  His response cannot reasonably be described as "objectively offensive."

Mr. Robinson makes a third Title IX claim.  It fares no better.  He alleges that he "suffered retaliation for protesting the sex discrimination that he suffered" at the hands of Ms. Smiley and the Title IX Office.  Am. Compl. 81.  He believes that Mr. Wutoh "summarily rejected Plaintiff's appeal" to retaliate against him for sending the "entire record to a disinterested, nonprofit, nonpartisan organization, i.e., FIRE."  *Id.* at 83.

To state a claim for retaliation, Mr. Robinson must establish that he "made a charge or opposed a practice made unlawful" by Title IX, that the University "took a materially adverse action" against him, and that the University "took the action because of [his] protected conduct." *Cavalier v. Catholic Univ. of America*, 306 F. Supp. 3d 9, 36 (D.D.C. 2018).

If the materially adverse action alleged is the reprimand Mr. Robinson received, he has failed to state a claim, as the action was taken ten days before his decision to send his documents to the nonprofit organization.  *See* Am. Compl. 86, 83.  And if the adverse action is Mr. Wutoh's rejection of Mr. Robinson's "appeal," the University's Title IX Policy makes clear that "[o]nce the Provost has rendered his or her decision, that decision is final and may not be appealed to any other authority."  Compl. Ex. 10b, ECF No. 1-1 at 7.  Thus, Mr. Robinson's retaliation claim must be dismissed, as he fails to sufficiently allege a materially adverse action taken because of his protected conduct.

## C.

Next, Mr. Robinson alleges that the University violated his civil rights.  He contends that he "has been the victim of unlawful discriminatory conduct in the work place through Howard's arbitrary, capricious, malicious, and negligent applications of its rules."  Am. Compl. 78.  He was, he claims, "subjected to disparate treatment and suffered adverse employment actions by Howard on the basis of his sex" in violation of Title VII of the Civil Rights Act.  *Id.*  This claim

fails under the Rule 12(b)(6) dismissal standard.

The "two essential elements of a [Title VII] discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). The D.C. Circuit has held that "formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions." *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002).

Because he received only a letter of reprimand without a demotion, reduction in salary, or reduced benefits, Mr. Robinson has failed to sufficiently allege that he suffered an adverse employment action. He suggests that, because of the University's conduct, his "academic and career opportunities, earning potential, and reputation have been severely harmed." Am. Compl. 80.

But both the Notice of Findings and the Letter of Reprimand Mr. Robinson received were marked "Confidential," and Mr. Robinson does not allege that the University made its findings, decision, or disciplinary measures public. *See* Compl. Ex. 24, 25, ECF No. 1-1 at 47-50. In short, there are no colorable allegations of reputational harm. At least before he filed suit. If anything, it is Mr. Robinson's decision to make a federal case out of the confidential letter that may harm his future career prospects. Put simply, a reprimand "that amounts to a mere scolding" of the kind that Mr. Robinson received "does not rise to the level of adverse action." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 94 (D.D.C. 2005). And he cannot manufacture reputational harm by publicizing otherwise private matters. Thus, his Title VII claim fails.[5]

---

[5] The Defendants suggest that Mr. Robinson's Title VII claim is also barred by the statute of limitations. *See* Defs.' Mot. at 39. Title VII "requires that a person complaining of a violation file an administrative charge with the EEOC and allow the agency time to act on the charge." *Park v. Howard Univ.*, 71 F.3d

**D.**

Next, Mr. Robinson raises three tort claims, including intentional infliction of emotional distress (IIED), negligent infliction of emotional distress (NIED), and ordinary negligence.  *See* Am. Compl. 85-97.  These allegations fail under both the Rule 12(b)(6) and Rule 56 standards.

Turning first to his IIED claim, Mr. Robinson alleges that the Defendants' "actions were intentional, extreme, and outrageous during all matters. . . ."  Am. Compl. 85.  The University's Title IX investigation and findings were "done purposefully and intentionally to injure Plaintiff, who was in fact injured, and to assure a result that found Plaintiff responsible for the alleged sexual harassment of which he was wrongly accused."  *Id*. at 86.  In short, Mr. Robinson believes that the University knowingly made an example out of him to "quell the student and community unrests related" to instances of campus sexual assault.  *Id*. at 87.

A *prima facie* showing of IIED requires "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional

---

904, 907 (D.C. Cir. 1995).  Plaintiffs then have 90 days upon receiving the EEOC's decision to file a suit in federal court.  *Id*.

Mr. Robinson filed a claim with EEOC that was dismissed on November 27, 2017.  Compl. Ex. 31, ECF No. 1-1 at 65.  The notice of this dismissal stated that his lawsuit "must be filed within 90 days of [his] receipt of this notice; or [his] right to sue based on this charge will be lost."  *Id*.  He filed his first Complaint before the Court on February 26, 2018.  *See* ECF No. 1.  Assuming he received the EEOC notice shortly after November 27, the Complaint was timely filed against Mr. Wutoh, Ms. Smiley, and Ms. Love.  But his original Complaint named the "Trustees of Howard University, Inc." rather than "Howard University, Inc" as a Defendant.  *Id*.  And his First Amended Complaint was filed several months later.  *See* ECF No. 13.  The Defendants contend that the 90-day deadline must be strictly enforced, and that his claim was thus barred as applied to the University.  Defs.' Mot. at 39 (citing, among other cases, *Smith v. Dalton*, 971 F. Supp. 1, 2 (D.D.C. 1997)).

Typically, where "the complainant is at fault," he is "not entitled to equitable tolling" of the EEOC deadline.  *Maggio v. Wisconsin Ave. Psychiatric Ctr., Inc.*, 795 F.3d 57, 60 (D.C. Cir. 2015).  But because it finds that Mr. Robinson's Title VII arguments fail as applied to all named defendants, the Court need not decide whether the "Trustees of Howard University" were a sufficient alter ego of the University itself.

distress." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (cleaned up).  To

meet the first prong, the conduct must be "so outrageous in character, and so extreme in degree,

as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community."  *Id*.  This is a high bar.  The District of Columbia Court of

Appeals has found an IIED claim insufficient even though an employer allegedly "targeted [an

employee] for a sexual harassment investigation, manufactured evidence against him in order to

establish a false claim of sexual harassment, leaked information from the investigation to other

employees, and unjustifiably demoted him."  *Kerrigan v. Britches of Georgetowne, Inc.*, 705

A.2d 624, 628 (D.C. 1997).

"[D]rawing all reasonable inferences in Mr. [Robinson's] favor," the facts are "less

egregious than those in *Kerrigan*."  *North v. Catholic Univ. of America*, 310 F. Supp. 3d 89, 95

(D.D.C. 2018).  *North* is particularly instructive.  In that case, a student alleged that university

personnel investigating allegations of sexual harassment against him were "not adequately

trained to conduct their fact-finding role."  *Id*.  He also claimed that because of "the University's

flawed process and failure to have or follow its own procedures, he was erroneously held

responsible for the offense."  *Id*.  He argued that university administrators showed a "clear bias"

against him and were "openly hostile" to him.  Still, this Court found that this was like the "type

of employer-employee conflict that does not, as a matter of law, rise to the level of outrageous

conduct."  *Id*.

The same conclusion applies here.  Even if Mr. Robinson's investigation were handled

poorly, Ms. Smiley improperly weighed the evidence against him, and he was denied a complete

opportunity to contest the allegations against him, he has still failed to sufficiently allege conduct

so outrageous and extreme as to go beyond all possible bounds of decency.  And despite his

repeated claims of a pernicious, anti-male bias, Mr. Robinson offers no facts or allegations from which the Court can reasonably infer such a motive.  His IIED claim fails to clear the bar.

His NIED claim falls short, too.  Under the District of Columbia's laws, a plaintiff may recover for NIED under either of two theories.  First, the "well-established 'zone of danger' test allows a plaintiff to recover 'for mental distress if the defendant's actions caused the plaintiff to be in danger of physical injury and if, as a result, the plaintiff feared for his own safety.'"  *Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp. 3d 261, 268 (D.D.C. 2016) (quoting *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 796 (D.C. 2011) (en banc)).  Second, a plaintiff can recover if there is a "special relationship" between the parties that "necessarily implicates the plaintiff's emotional well-being."  *Id*.

Mr. Robinson does not allege the existence of a zone of danger or any risk of physical injury.  And he has not alleged anything besides an "arm's length, supervisor-employee relationship" with Mr. Wutoh, the Title IX personnel, or other University officials.  *Id*.  Merely alleging an employer-employee relationship "foreclose[es] any 'special relationship' liability."  *Id*.  Mr. Robinson therefore cannot recover on an NIED theory.

Mr. Robinson also believes that the University "breached its duty of care, good faith, and fair dealings."  Am. Compl. 96.  He suggests that the University negligently hired and supervised Ms. Smiley.  *Id*. at 95-96.  He rehashes his arguments that the investigative process and resulting decision were impermissibly based on the "subjective experience of the victims."  *Id*. at 96.  And he suggests that the University "intentionally, recklessly and/or negligently fail[ed] to conduct a proper conflicts check to assure that Plaintiff's appeal was decided by an unbiased investigator other than by Smiley who was biased and conflicted."  *Id*. at 97.

His negligence claim suffers from the same fatal defect as the rest of his allegations.  It is

based on unfounded speculation and conclusory statements.  Negligent hiring or supervision, for instance, requires a showing that "an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee."  *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (citation omitted).

Far from acting in a dangerous or incompetent manner, Ms. Smiley and Mr. Wutoh appear to have followed the University's Title IX Policy, relied on objective evidence in making their decision, and afforded Mr. Robinson many opportunities to raise arguments in his favor. Thus, Mr. Robinson has failed to sufficiently allege a negligence claim.  And, even if Mr. Robinson he has adequately stated claims for IIED, NIED, and negligence, Ms. Smiley's Title IX Report and the University's actions discussed above show that neither she, Mr. Wutoh, nor other University officials intentionally, recklessly, or negligently caused Mr. Robinson the emotional distress he felt.

## E.

Finally, Count 10 of the First Amended Complaint seeks declaratory and injunctive relief. Am. Compl. 98.  Mr. Robinson contends that his "career opportunities have been severely damaged," and he seeks a permanent injunction requiring the University "to eliminate the anti-male bias and improper, unknown and unpublished processes and procedures" used by the Title IX Office.  "A request for declaratory judgment constitutes a form of relief, not a cause of action."  *Fitts v. Fed. Nat'l Mortg. Ass'n*, 44 F. Supp. 2d 317, 330 (D.D.C. 1999).  Because the Court will dismiss or grant summary judgment to the Defendants on his preceding claims, Mr. Robinson has stated no cause of action for which equitable relief may be granted.

**V.**

Professor Robinson used an inappropriate and sexually suggestive question during one of his lectures.  After some of his students reported the question, the University investigated and reasonably decided to reprimand him, monitor some of his future lectures and test questions, and require him to take sensitivity training.  His disagreement with this decision does not provide sufficient legal grounds for the many claims and allegations he has raised.  The Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment will be granted.  The Plaintiff's Motion to Delay Response to the Defendants' motion will be denied.  A separate order will issue.


Dated: November 20, 2018        _____
                                            TREVOR N. MCFADDEN, U.S.D.J.